**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CV-460-RP |
| | ) | |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KINDER MORGAN TEXAS PIPELINE | ) | |
| LLC AND PERMIAN HIGHWAY | ) | |
| PIPELINE LLC, | ) | |
| | ) | |
| Intervenor Defendants. | ) | |

**FEDERAL DEFENDANTS' OPPOSITION TO SIERRA CLUB'S MOTION FOR
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.      INTRODUCTION............................................................................................... 1

II.     STATUTORY AND REGULATORY FRAMEWORK................................... 3

        A.      Clean Water Act Permitting Program.................................................. 3

        B.      Nationwide Permit 12........................................................................ 4

        C.      National Environmental Policy Act.................................................... 6

        D.      NWP 12 NEPA Process ..................................................................... 7

                1.      NWP 12 Environmental Assessment ....................................... 8

                2.      Corps' Supplemental Decision Document for Texas............... 9

                3.      Case-Specific Impacts Analysis ...........................................10

III.    FACTUAL BACKGROUND .......................................................................10

IV.     STANDARD OF REVIEW ..........................................................................14

V.      ARGUMENT ................................................................................................15

        A.      Sierra Club Has Not Shown a Substantial Likelihood of Success on the
                Merits. ...............................................................................................15

                1.      The Corps' Adoption and Incorporation of Mandatory Incidental
                        Take Provisions Into its NWP 12 Verifications Did Not Constitute a
                        Major Federal Action. .............................................................15

                2.      The Service Required the Corps to Include the ESA-related Terms
                        and Conditions to Comply With the ESA; Therefore, the Corps'
                        Actions Were Nondiscretionary and Did Not Trigger a NEPA
                        analysis. ...................................................................................17

                3.      NEPA is Not Required Because the Corps Lacks the Authority to
                        Consider an Alternative to Incorporating the Service's Required
                        Terms and Conditions. ............................................................20

                4.      Sierra Club v. U.S. Army Corps of Engineers is Not Controlling
                        Precedent..................................................................................23

        B.      Sierra Club Has Not Shown Irreparable Harm is Likely to Occur without an
                Injunction. ........................................................................................25

1.      Sierra Club's Delay in Requesting Preliminary Injunctive Relief
        Weighs Against a Finding of Irreparable Harm. .....................................25

2.      Sierra Club Has Not Shown Irreparable Harm. .......................................27

C.      The Public Interest Would Not Be Served by a Preliminary Injunction
        Order, and the Balance of Equities Weighs Against Issuing an Injunction. .........34

VI.   CONCLUSION..........................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*,
  280 F. Supp. 3d 118 (D.D.C. 2017) ...................................................................29

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
  480 U.S. 531 (1987).............................................................................34, 35

*Bluefield Water Ass'n v. City of Starkville*,
  577 F.3d 250 (5th Cir. 2009) ...........................................................................14

*Boire v. Pilot Freight Carriers, Inc.*,
  515 F.2d 1185 (5th Cir. 1975) .........................................................................25

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009) .....................................................................27

*Calhoun v. Lillenas Publg.*,
  298 F.3d 1228 (11th Cir. 2002) .......................................................................26

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971)...................................................................................7, 15

*City of Austin v. Kinder Morgan Tex. Pipeline, LLC*,
  No. 1:20-CV-138-RP, 2020 WL 1324071 (W.D. Tex. Mar. 19, 2020) ...........32, 33

*Daily Instruments Corp. v. Heidt*,
  998 F. Supp. 2d 553 (S.D. Tex. 2014)...............................................................26

*DOT v. Public Citizen*,
  541 U.S. 752 (2004)..........................................................6, 7, 17, 18, 19, 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)....................................................................................29, 33

*Gen. Land Office v. U.S. Dep't of the Interior*,
  947 F.3d 309 (5th Cir. 2020) ...................................................................6, 15, 20

*Guy Carpenter & Co. v. Provenzale*,
  334 F.3d 459 (5th Cir. 2003) ......................................................................29, 33

*Handley v. Chapman*,
  587 F.3d 273 (5th Cir. 2009) ...........................................................................15

*Hirschfeld v. Bd. of Elections*,
  984 F.2d 35 (2d Cir. 1993) ..............................................................................26

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ...........................................................................25

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
  156 F. Supp. 3d 1252 (W.D. Wash. 2015)....................................................32, 33

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014) ................................................................................14

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976).............................................................................................7

*La. Crawfish Producers Ass'n W. v. Mallard Basin, Inc.*,
   Nos. 6:10-cv-1085, 6:11-cv-0461, 2019 WL 171693 n.13 (W.D. La. Jan. 10, 2019) ..............4

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
   No. 3:17-CV-3200-N, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ............................26, 32

*Lichterman v. Pickwick Pines Marina Inc.*,
   308 F. App'x 828 (5th Cir. 2009) ........................................................................25

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983)..............................................................................................6

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)............................................................................................27

*Nat'l Wildlife Fed'n v. U.S. Dep't of Transp.*,
   960 F.3d 872 (6th Cir. 2020) ...............................................................................19

*Nken v. Holder*,
   556 U.S. 418 (2009)......................................................................................14, 34

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
   817 F. Supp. 2d 1290 (D. Or. 2011) .....................................................................32

*Orleans Audubon Soc'y v. Lee*,
   742 F.2d 901 (5th Cir. 1984) ...............................................................................27

*Pac. Legal Found. v. Andrus*,
   657 F.2d 829 (6th Cir. 1981) ...............................................................................20

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,
   418 F.3d 535 (5th Cir. 2005) ...............................................................................14

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)..............................................................................................6

*San Luis & Delta-Mendota Water Authority v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ...............................................................................24

*Sepulvado v. Jindal*,
   729 F.3d 413 (5th Cir. 2013) ...............................................................................14

*Sierra Club v. Bostick*,
   787 F.3d 1043 (10th Cir. 2015) ........................................................................7, 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   803 F.3d 31 (D.C. Cir. 2015)..................................................................4, 7, 21, 23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................. 35

*Snoqualmie Valley Pres All. v. U.S. Army Corps of Eng'rs*,
  683 F.3d 1155 (9th Cir. 2012) ............................................................ 7, 16

*Strycker's Bay Neighborhood Council v. Karlen*,
  444 U.S. 223 (1980) ............................................................................... 6

*United States v. Emerson*,
  270 F.3d 203 (5th Cir. 2001) ................................................................. 31

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) .............................................................................. 35

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ............................................................... 25

*Whole Woman's Health v. Paxton*,
  264 F. Supp. 3d 813 (W.D. Tex. 2017) ................................................... 14

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................................ 25, 34

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .......................................................... 25, 29

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ............................................................. 25

*Yakus v. United States*,
  321 U.S. 414 (1944) .............................................................................. 35

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................. 15

16 U.S.C. § 1532(19) .................................................................................. 11

16 U.S.C. § 1536(a)(2) ................................................................................ 18

16 U.S.C. § 1536(b)(4)(C)(iv) ................................................... 11, 13, 18, 19, 21

16 U.S.C. § 1536(o)(2) .............................................................. 12, 13, 19, 21

16 U.S.C. § 1538(a)(1) ................................................................................ 11

33 U.S.C. § 1251(a) ..................................................................................... 3

33 U.S.C. § 1311(a) ..................................................................................... 3

33 U.S.C. § 1344 ......................................................................................... 3

33 U.S.C. § 1344(a) ..................................................................................... 3

33 U.S.C. § 1344(b)(1) ................................................................................. 7

33 U.S.C. § 1344(e)(1) .................................................................................. 4

33 U.S.C. § 1362(7) ...................................................................................... 3

33 U.S.C. §1344(e) ..................................................................................... 16

42 U.S.C. § 4332(2)(C) ..................................................................7, 15, 20, 23

42 U.S.C. § 4332(C) ...................................................................................... 6

**Regulations**

33 C.F.R. § 320.1(c) ..................................................................................... 7

33 C.F.R. § 320.4(a)(1) ................................................................................. 7

33 C.F.R. § 328.3(a) ..................................................................................... 3

33 C.F.R. § 330.1(b) ..................................................................................... 4

33 C.F.R. § 330.1(e) ................................................................................... 10

33 C.F.R. § 330.1(e)(3) ............................................................................... 17

33 C.F.R. § 330.4(f) ............................................................................... 19, 21

33 C.F.R. pt. 320 .......................................................................................... 3

33 C.F.R. pt. 323 .......................................................................................... 3

33 C.F.R. pt. 325 ....................................................................................... 3, 4

40 C.F.R. § 1500.1(b) ................................................................................... 6

40 C.F.R. § 1501.4(b) ................................................................................... 6

40 C.F.R. § 1502.14 ................................................................................... 20

40 C.F.R. § 1502.14(a) ............................................................................... 20

40 C.F.R. § 1502.14(d) ............................................................................... 20

40 C.F.R. § 1508.10 ..................................................................................... 7

40 C.F.R. § 1508.9 .................................................................................. 6, 20

40 C.F.R. Pt. 230 .......................................................................................... 7

50 C.F.R. § 402.14(i)(1)(ii) ..................................................................... 11, 19

53 Fed. Reg. 3120 (Feb. 3, 1988) ................................................................. 8

82 Fed. Reg. 1860 (Jan. 6, 2017) ...................................4, 5, 7, 8, 9, 10, 11, 16, 28

82 Fed. Reg. 1985 (Jan. 6, 2017) .....................................................4, 5, 8, 18

**Other Authorities**

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL
  PRACTICE & PROCEDURE § 2948.1 (3d ed., April 2020 update) ....................................26

9 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D §
  2948.1 ..........................................................................................................................31

H.R. Rep. No. 95-830, 1977 U.S.C.C.A.N. 4424....................................................................... 4

## I.  INTRODUCTION

On February 13, 2020, the United States Army Corps of Engineers ("Corps") verified that activities related to the construction of portions of the Permian Highway Pipeline ("Pipeline") qualified for use of Nationwide Permit 12 ("NWP 12").  NWP 12 covers utility line activities and can only be utilized if the proposed activities have minimal impacts and comply with the Endangered Species Act ("ESA"), among other general and specific conditions.  After consultation under the ESA, the United States Fish and Wildlife Service ("Service") issued a biological opinion ("BiOP") and "incidental take statement," attached as Ex. C to PI Mot., that requires the Corps to include certain terms and conditions in the verifications in order to meet its ESA obligations and to be insulated from liability under Section 9 of the ESA for any "take" of ESA-listed species that may occur.  These requirements were mandatory, and the Corps adopted them in its verifications in order to maintain take coverage.  The Permian Highway Pipeline Company has been proceeding with construction in areas within the Corps' jurisdiction since the verifications were issued.

On April 30, 2020, Sierra Club filed its complaint to challenge, *inter alia*, the two verifications because it alleges the Corps was required to perform an analysis under the National Environmental Policy Act ("NEPA") before the Corps incorporated the Service's required ESA terms and conditions into the verifications.  On June 19, 2020, over four months after the Corps issued its verifications, and nearly two months after the complaint was filed, Sierra Club moved for a preliminary injunction ("Motion") seeking to stay the NWP 12 verifications and enjoin any further dredge and fill activities or ground disturbance within the Corps' jurisdiction.  Sierra Club cannot satisfy its high burden to show that a preliminary injunction is warranted.

First, Sierra Club does not have a substantial likelihood of success on the merits.  The Corps satisfied its NEPA obligations before it re-issued NWP 12 when it determined, through a

robust NEPA process, that the use of NWP 12 will have no more than minimal adverse environmental effects. The Corps is not required to complete another NEPA analysis when it adopts and incorporates incidental take terms and conditions into its NWP 12 verifications because this action did not constitute a "major Federal action[] significantly affecting the quality of the human environment" subject to NEPA. Further, to avoid liability for any take of ESA-listed species that may occur incidental to the NWP 12 activities, the Corps was required to adopt and incorporate these specific terms and conditions from the Service's incidental take statement issued with the BiOP. To ensure compliance with the ESA's substantive obligations and take provisions, the Corps had no discretion to act otherwise, so under NEPA's "rule of reason," NEPA was not required. An additional NEPA analysis of the terms and conditions would serve no purpose because the Corps could not select another alternative other than complying with the Service's required terms and conditions.

Next, Sierra Club has not shown that irreparable harm will occur in the absence of an injunction. Sierra Club waited over four months after the Corps issued its verifications with the knowledge that construction was proceeding before bringing this request for injunctive relief. Its delay indicates that there is no urgency here and the Court should find that Sierra Club has not met its burden. In addition, the Corps' verifications found that the project would have very little impact on waters of the United States, and no permanent loss as all disturbed waters of the United States would be restored to pre-construction contours and re-vegetated. Nor has Sierra Club shown that incorporation of the terms and conditions of the BiOp will cause immediate and irreparable harm. Sierra Club offers only speculation about injuries that might occur, which is insufficient to carry its burden. Sierra Club also has not shown that ESA-listed species are likely

to be harmed, much less at a species-level as required.  This Court should therefore find that Sierra Club has not carried its burden to demonstrate irreparable harm.

Finally, the balance of harms and the public interest weigh against issuing an injunction. In Kinder Morgan's response to the Motion, it discusses the potential harm it will suffer if the Court grants an injunction.  With regard to the public interest, the United States has a strong interest in the orderly administration of the Corps' nationwide permitting process and the Service's ESA consultation process. The agencies' interests would be harmed due to Sierra Club's requested relief.  This Court should deny Sierra Club's Motion.

## II. STATUTORY AND REGULATORY FRAMEWORK

### A.    Clean Water Act Permitting Program

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. *See* 33 U.S.C. § 1311(a). The Act defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include certain wetlands. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a), (b).

Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into waters of the United States through the issuance of permits. 33 U.S.C. § 1344.  The Corps may issue individual permits or general permits. *See* 33 U.S.C. § 1344(a), (e). Individual permits are issued on a case-by-case basis after a process that involves site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. *See generally,* 33 C.F.R. pts. 320, 323, 325.  Unless a categorical exclusion

applies, individual permits require an analysis under the National Environmental Policy Act ("NEPA"). *See id.* at pt. 325.

However, Congress concluded that requiring individual Section 404 permits for routine activities imposes unnecessary delay and administrative burdens on the public and the Corps. *See* 33 U.S.C. § 1344(e)(1); *see also* H.R. Rep. No. 95-830, at 38, 98, 100 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424. "The [Corps] may issue general permits (including nationwide permits), rather than individual permits, for 'any category of activities' that has 'only minimal adverse environmental effects when performed separately, and will only have minimal cumulative adverse effect on the environment.'" *La. Crawfish Producers Ass'n W. v. Mallard Basin, Inc.*, Nos. 6:10-cv-1085, 6:11-cv-0461, 2019 WL 171693, at *8 n.13 (W.D. La. Jan. 10, 2019) (quoting 33 C.F.R. § 330.1(b); 33 U.S.C § 1344(e)(1)). Nationwide permits are aimed at advancing Congress's goal "to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b). "After the Corps has promulgated a general permit, with public notice and an opportunity for a hearing, regional staff members consider requests for 'verifications' of projects thereunder." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39 (D.C. Cir. 2015).

## B.    Nationwide Permit 12

NWP 12 is aimed at reducing what could otherwise be individual permit-based administrative burdens and delays associated with "the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States." Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860, 1868, 1985-86 (Jan. 6, 2017). "Utility line" is defined to include electric, telephone, internet, radio, and television cables, lines, and wires, as well as oil or gas pipelines. 82 Fed. Reg. at 1985.

NWP 12 only applies if "the activity does [1] not result in the loss of greater than ½-acre of waters of the United States for [2] each single and complete project." 82 Fed. Reg. at 1985. There also "must be no change in pre-construction contours of waters of the United States." *Id*. NWP 12 requires a pre-construction notice to the Corps District Engineer "prior to commencing the activity" if, among other reasons, the "discharges [will] result in the loss of greater than 1/10-acre of waters of the United States[.]" *Id*. at 1,986.  District Engineers may add special conditions to NWP 12 to require a remediation plan for addressing inadvertent returns of drilling fluids to waters of the United States during horizontal directional drilling activities conducted for the purpose of installing any utility line, including portions of natural gas pipelines. *Id*. at 1986.

NWP 12 is also subject to 32 general conditions.  *Id*. at 1862, 1998–2005.  Relevant here is general condition 18, which provides, *inter alia*, that no activity under a NWP may jeopardize an ESA-listed species or adversely modify critical habitat of such species. *Id*. at 1999.  The condition requires non-federal permittees to notify the Corps, before construction occurs, if any listed species or designated critical habitat "might be affected or is in the vicinity of the activity, or if the activity is located in designated critical habitat, and shall not begin work on the activity until notified by the District Engineer that the requirements of the ESA have been satisfied and that the activity is authorized." *Id*.  Likewise, the Corps may not authorize an activity under NWP 12 that "may affect a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." *Id*.  If the Corps determines that the proposed activity "may affect" a listed species or critical habitat, it consults with the appropriate agency under Section 7 of the ESA, then issues a verification of the NWP 12, which confirms that the proposed activity complies with general condition 18 and the ESA. 82 Fed. Reg. at 1873-74, 1878, 1999-2000.

C.      **National Environmental Policy Act**

"Congress passed NEPA 'to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment.'" *Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 314–15 (5th Cir. 2020) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983)). NEPA requires that environmental information be available and subject to comment, review, and analysis by officials and citizens prior to making decisions. 40 C.F.R. § 1500.1(b). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Thus, a court may not require agencies "to elevate environmental concerns over other, admittedly legitimate, considerations." *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228 n.2 (1980) (*per curiam*).

NEPA requires agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "An environmental impact statement is 'a detailed statement by the responsible official' regarding, among other things, the 'environmental impact of the proposed action' and 'any adverse environmental effects which cannot be avoided should the proposal be implemented.'" *Gen. Land Office*, 947 F.3d at 314 (quoting 42 U.S.C. § 4332(C). To determine if an action requires an EIS, the agency may do an Environmental Assessment ("EA"), which is a document that briefly describes the proposal, examines alternatives, and considers environmental impacts. 40 C.F.R. §§ 1501.4(b), 1508.9.

Not every "major Federal action" requires NEPA documentation. Rather, NEPA is limited by a "rule of reason," which "ensures that agencies determine whether and to what extent to prepare an [Environmental Impact Statement] based on the usefulness of any new potential information to the decisionmaking process." *DOT v. Public Citizen*, 541 U.S. 752, 767 (2004)

(citation omitted).  Where an agency has no discretion to refuse to perform a certain act, NEPA is not required. *Id*. at 769.  Accordingly, where an agency has no ability to choose among alternatives or to "prevent a certain effect due to its limited statutory authority over the relevant actions," NEPA analysis is not required. *Id* at 769-770.

The agency is entitled to considerable deference in the Court's consideration of whether it complied with NEPA. *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). When the resolution of the issues involves primarily issues of fact and "requires a high level of technical expertise [it] is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

**D.     NWP 12 NEPA Process**

"The Corps' practice is to perform a NEPA analysis for general permits in advance of their promulgation, and not to conduct additional NEPA analysis when it verifies specific activities under the general permits." *Sierra Club*, 803 F.3d at 39–40 (citing *Sierra Club v. Bostick*, 787 F.3d 1043, 1054 (10th Cir. 2015); *Snoqualmie Valley Pres All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1158 (9th Cir. 2012) (per curiam). The Corps prepares appropriate NEPA documentation, 42 U.S.C. § 4332(2)(C), and analyzes the relevant factors under the Environmental Protection Agency's Clean Water Act Section 404(b)(1) Guidelines (which EPA prepared in conjunction with the Corps). 40 C.F.R. § 1508.10; 33 U.S.C. § 1344(b)(1); 40 C.F.R. Pt. 230 Subparts C-F. The Corps also conducts a "public interest review" of approximately twenty factors, such as how Nationwide Permit issuance might affect conservation, wetlands, and energy needs. 33 C.F.R. §§ 320.1(c), 320.4(a)(1).

When a District Engineer issues an NWP verification, the District Engineer is "merely verifying that the activity is authorized by an NWP issued by Corps Headquarters." 82 Fed. Reg. at 1861. Thus, a NWP 12 verification "does not require separate NEPA documentation," *id*.

(citing Environmental Quality: Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120, 3126) (Feb. 3, 1988), but is subject to the 32 general conditions, any regional conditions, and any activity-specific conditions added to the NWP by the District Engineer, such as mitigation requirements, to ensure that the adverse environmental effects caused by the proposed activity will only be minimal. 82 Fed. Reg. at 1861, 1866, 1998. If the District Engineer determines that the proposed NWP activity will result in *more* than minimal individual and cumulative adverse environmental effects, the District Engineer will notify the applicant that the activity is not authorized by a NWP permit and will require an individual permit, which triggers a NEPA analysis. NWP 12 Decision Doc., 22, attached as Ex. 1.

### 1.  NWP 12 Environmental Assessment

After a three-year review, the latest issuance of NWP 12 was issued in January 6, 2017 in the final weeks of the prior Administration. Before issuance, the Corps completed an environmental assessment ("EA") for NWP 12 on December 21, 2016. NWP 12 Decision Doc., 80. The Corps reviewed the public comments and used the substantive comments "to improve the NWP by changing NWP terms and limits, pre-construction notification requirements, and/or NWP general conditions, as necessary." NWP 12 Decision Doc., 6. Based on the analysis in the EA, the Corps issued a Finding of No Significant Impact ("FONSI") for NWP 12. NWP 12 Decision Doc., 79.

With regard to impacts, the EA discussed the affected environment, which "consists of terrestrial and aquatic ecosystems in the United States, as they have been directly and indirectly affected by past and present federal, non-federal, and private activities." *Id*. at 28. The Corps then examined the potential cumulative impacts from issuing NWP 12s across the nation on the affected environment. *Id*. at 42-56. The Corps also considered certain substantive public

comments concerning NWP 12 to assess the expected impacts. *Id*. at 26.  The EA determined that during the five-year period this NWP 12 is in effect, the activities it authorizes will result in no more than minimal cumulative effects to wetlands, streams, other aquatic ecosystems, coastal areas, and endangered and threatened species and their habitats. *Id*. at 52-55.  All NWPs are also subject to general condition 18, which prohibits the use of NWPs for activities that are likely to jeopardize ESA-listed species or adversely modify critical habitat. *Id*. at 66.  In addition, the Corps determined that, as part of its public interest review, the adverse effects of NWP 12 activities on conservation and the general environmental will be minor. *Id*. at 56-57.

### 2.      Corps' Supplemental Decision Document for Texas

The structure of the NWP program relies on the expectation that Corps Divisions and Districts will "add regional conditions to the NWPs to enhance protection of the aquatic environment and address local concerns." NWP 12 Decision Doc., 27.  District Engineers issue supplemental decision documents to ensure compliance with the "no more than minimal individual and cumulative adverse environmental effects" requirements for general permits. 82 Fed. Reg. 1867.

The Corps Southwestern Division issued a Supplemental Decision Document ("SDD") for the use of NWP 12 in the state of Texas following two public comment periods. Attached as Ex. 2.  The SDD applies to all Pipeline activities in waters of the United States.  The SDD examined potential individual and cumulative impacts that could result from use of NWP 12 in areas under the Corps' regulatory authority within Texas. SDD 1-56.  This analysis included the potential need for additional modifications to NWP 12 to ensure that those individual and cumulative adverse environmental effects are no more than minimal.  *Id*. at 1.  The Corps estimates that NWP 12 will be used approximately 3,000 times per year in Texas, in

circumstances where a pre-construction notice is required. *Id*. at 54-55. Thus, it is estimated that the Corps will need to perform over 3,000 verifications of NWP 12 activities every year.

### 3. Case-Specific Impacts Analysis

A third level of impacts analysis occurs on the activity-specific level. Before verifying that the proposed activity qualifies for use of an NWP 12, the District Engineer may impose case-specific special conditions, in addition to the general conditions and any regional conditions, to ensure that the authorized activities will have no more than minimal individual and cumulative adverse environmental effects. 82 Fed. Reg. at 1866.

## III. FACTUAL BACKGROUND

The proposed 42-inch outer diameter Pipeline will be approximately 428.54 miles long and will extend from the Waha Interconnect in Reeves County, Texas, to the delivery point in Colorado County, Texas. BiOp 7-8. The vast majority of the Pipeline will be constructed on private land, and as of June 20, 2020, 62 percent of the Pipeline has been completed. Decl. of Sital K. Mody ¶ 12, ECF No. 16-1. For the places where the Pipeline will cross waters of the United States under the jurisdiction of the Corps, and where activities "might affect" ESA-listed species (approximately 129 single and complete crossings), Intervenor Defendants Permian Highway Pipeline, LLC and Kinder Morgan Texas Pipeline, LLC (together, "Kinder Morgan") provided pre-construction notice to the Corps under general condition 18 and requested verification from the Corps that its proposed activities qualify for NWP 12. *See* Biological Assessment ("BA") at PDF 7, attached as Ex. A to PI Mot. For the other crossings (approximately 320), Kinder Morgan could proceed with those activities without notifying the Corps. 33 C.F.R. § 330.1(e). Pursuant to general condition 18, the Corps also prepared a BA where it analyzed the direct, indirect, and cumulative effects of the proposed activities and

determined that they "may affect" ESA-listed species. *See* BA at PDF 79. The Corps therefore consulted with the U.S. Fish and Wildlife Service under Section 7 of the ESA. BiOp 2.

Each year, the Corps conducts thousands of the required ESA section 7 consultations with the appropriate sister agency for activities authorized by NWPs. During the period of March 19, 2012, to September 30, 2016, the Corps conducted 1,402 formal consultations and 9,302 informal consultations for NWP activities under ESA section 7. 82 Fed. Reg. at 1873-74. During that time period, the Corps also used regional programmatic consultations for 9,829 NWP verifications to comply with ESA section 7. Therefore, each year, NWP activities are covered by an average of more than 4,500 formal, informal, and programmatic section 7 consultations. 82 Fed. Reg. at 1873-1874.

Before the Corps can verify an activity-specific NWP, it must ensure that the terms and conditions from these ESA consultations are incorporated into the NWP. Specifically, if the Service determines that an agency action is not likely to jeopardize the existence of an ESA-listed species, but anticipates that it may result in the "take" of individual members of the species,[1] the Service must issue an incidental take statement that, among other things, "sets forth the terms and conditions (including, but not limited to, reporting requirements) that *must be complied with* by the Federal agency or applicant (if any), or both, to implement" measures necessary to minimize such impact. 16 U.S.C. § 1536(b)(4)(C)(iv) (emphasis added); *see also* 50 C.F.R. § 402.14(i)(1)(ii) (ITS "[s]pecifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact") and 50 C.F.R. § 402.14(i)(1)(ii) (ITS "[s]ets forth the terms and conditions (including, but not limited to,

---

[1] The term take "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct". 16 U.S.C. § 1532(19). ESA section 9 prohibits the take of listed species unless excepted. 16 U.S.C. § 1538(a)(1).

reporting requirements) that must be complied with by the Federal agency or any applicant to implement the [incidental take] measures. . . .”). Any taking that is in compliance with the terms and conditions is not prohibited under the Act. 16 U.S.C. § 1536(o)(2).

Here, after approximately 18 months of communication regarding the project, consultation was completed when the Service issued its BiOp on February 3, 2020. *See* BiOp at 1, 5. The BiOp found that Kinder Morgan's construction and operation of the Pipeline is not likely to jeopardize the continued existence of ESA-listed species. *Id*. at 47. The BiOp also concluded that because no designated critical habitat is located within these areas, none will be affected. *Id*. The Service's expert conclusion was based on the best available scientific information, its extensive experience with the species involved, the relatively small amount of habitat impacted, the temporary nature of many of the impacts, and the protections and conservation measures for listed species and their habitat that Kinder Morgan is providing. *See* BiOp.

The BiOp also included an incidental take statement that required certain terms and conditions to be incorporated into the Corps' verifications of NWP 12: "The measures described below [related to incidental take] are *nondiscretionary* and must be implemented" by the Corps and Kinder Morgan. BiOp at 52 (emphasis added); *see also id*. at 54-55. The Corps complied with this requirement by adopting and incorporating the required terms and conditions for areas within the Corps jurisdiction into the NWP 12 verifications.

*Galveston Verification*: Approved on February 13, 2020, this NWP 12 verification approves the temporary discharge of fill material into a total of 0.462 acres of wetlands and ponds, and a total of 5,377 linear feet of waters of the United States, during the open cut and horizontal directional drill installation of portions of a 42-inch diameter natural gas pipeline and

auxiliary facilities. Galveston Permit at 1, attached as Ex. E to PI Mot.; Galveston Memorandum for Record ("MFR") at ¶ 1.3, attached as Ex. 3. The permit authorizes activities in forty-three single and complete crossings of jurisdictional wetlands and waters within Gonzales, Lavaca, and Colorado Counties, within the boundaries of the Galveston District. *Id*.

The Corps was required to incorporate the incidental take terms and conditions into its verifications to ensure compliance with the ESA. 16 U.S.C. § 1536(b)(4)(C)(iv), (o)(2). The Service stated that the BiOp "contains mandatory terms and conditions to implement the reasonable and prudent measures that are associated with 'incidental take' that is also specified in the [BiOp]." *See* Galveston MFR at ¶ 4.2(1); Galveston Permit at 2. The verification included other special conditions, such as fencing and a buffered area, to ensure the proposed actions had minimal effects on certain specific crossings that are within the Corps' jurisdiction. Galveston Permit at 2; Galveston MFR at ¶¶ 4.2(2), (3).

*Fort Worth Verification*: Also approved on February 13, 2020, the verification approves activities in Reagan, Crockett, Schleicher, Menard, Kimble, Gillespie, Blanco, Hays, and Caldwell Counties within the Fort Worth District. Fort Worth MFR at ¶ 1.2, attached as Ex. 4; Fort Worth Permit at 1, attached as Ex. D to PI Mot. The permit approves the temporary discharge of dredge and fill materials into the waters of the United States. Impacts will be to 268 streams, 48 open waters (ponds), and 20 wetlands, totaling 3.96 acres of wetland impacts, 15.51 acres of open water impacts, and 42,925 linear feet of stream impact. Fort Worth MFR, ¶ 1.3. No permanent loss of waters of the United States is expected.

Like the Galveston verification, the Corps was required to incorporate terms and conditions from the BiOp into this verification. Fort Worth MFR, ¶ 4.2(1); Fort Worth Permit at 2. The BiOp, attached to the verification, "contains mandatory terms and conditions to

implement the reasonable and prudent measures that are associated with 'incidental take'" within the Fort Worth District. *Id.*

## IV.  STANDARD OF REVIEW

The party moving for a preliminary injunction, must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable harm if the temporary restraining order is denied; (3) that the threatened injury outweighs any damage that the temporary restraining order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest." *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017) (citing *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014), *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)).  The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (citation omitted).

When one party is a United States agency, the public interest element "merge[s]" with the United States' interest, and the public interest weighs in favor of the agency's decision. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  If the plaintiff cannot demonstrate a likelihood of success on the merits, a preliminary injunction and/or temporary restraining order should be denied. *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("Because we have determined that [Sepulvado] cannot show a substantial likelihood of success . . . , we need not address [the state]'s additional arguments regarding the other necessary elements for preliminary injunctive relief. Our ruling on the initial element is sufficient for reversal. The holding on the initial element is sufficient to vacate the injunction.") (citations and internal quotation marks omitted).

On the merits, the Corps' decisions are subject to the judicial review standards of the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The APA standard affords great deference to agency decision-making and the agency's action is presumed valid. *See Overton Park*, 401 U.S. at 415–16; *Gen. Land Office*, 947 F.3d at 320. The standard of review is narrow, meaning that the Court's review is limited to a determination as to whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The agency must provide a 'satisfactory explanation' for its action, and 'a court is not to substitute its judgment for that of the agency'" but "a decision of less than ideal clarity" may be upheld "if the agency's path may be reasonably discerned." *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) (citations omitted).

## V. ARGUMENT

### A.   Sierra Club Has Not Shown a Substantial Likelihood of Success on the Merits.

Sierra Club argues that the Corps was required to perform a NEPA analysis before it adopted and incorporated the required terms and conditions from the Service's BiOp into its NWP 12 verifications. PI Mot. 8, 11-13. However, this action was not a "major Federal action" subject to NEPA. But even assuming it was, the Corps could not refuse to incorporate the Service's incidental take terms and conditions into its verifications of the Galveston and Fort Worth NWP 12 permits. Therefore, these actions did not require a NEPA analysis because the Corps lacked the discretion to choose an alternative to this action.

### 1.   The Corps' Adoption and Incorporation of Mandatory Incidental Take Provisions Into its NWP 12 Verifications Did Not Constitute a Major Federal Action.

As an initial matter, the adoption and incorporation of the mandatory incidental take provisions into a NWP 12 verification is not a "major Federal action[]" that "significantly affect[s] the quality of the human environment," that requires a NEPA analysis. 42 U.S.C. § 4332(2)(C).

15

Under the general permit program authorized by 33 U.S.C. §1344(e), the Corps takes an "action" for purposes of NEPA when it adopts or re-issues a general permit. It is the general permit that authorizes discharges that meet the specific conditions of that general permit. The Corps conducts a NEPA analysis of activities authorized by a NWP "at the time the permit is promulgated, rather than at the time an applicant seeks to discharge fill material under such a permit." *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs,* 683 F.3d 1155, 1158 (9th Cir. 2012) (citing 33 C.F.R. § 330.5(b)(3)); *see Bostick*, 787 F.3d at 1053 ("Corps complied with NEPA when it issued Nationwide Permit 12 for the construction, maintenance, and repair of a wide variety of utility lines."). The appropriate NEPA analysis therefore occurs before the Corps adopts any incidental take provisions or verifies that the activity is authorized by a NWP issued by Corps Headquarters. *See* 82 Fed. Reg. at 1861. The Corps' adoption and incorporation of mandatory incidental take provisions into a NWP 12 verification also does not fall into one of the four categories in 40 C.F.R. § 1508.18(b), which defines "major federal actions." *See Bostick*, 787 F.3d at 1052 (The Corps' "issuance of a verification letter would create a 'major Federal action' only if it resulted in significant impact, and the verification letters would not result in significant impact[].").

By their own terms, activities carried out under NWPs can only have minimal adverse impacts. *See* 82 Fed. Reg. at 1867 ("Because the NWPs only authorize activities that have no more than minimal adverse environmental effects, individually and cumulatively, the issuance or reissuance of an NWP does not result in significant impacts to quality of the human environment and does not trigger the requirement to prepare an environmental impact statement"). The Corps' adoption and incorporation of the incidental take provisions into its verifications ensure the proposed activities comply with general condition 18 and have minimal effects. Therefore,

the action of adopting terms and conditions that ensure no more than minimal impacts cannot, at the same time, "significantly affect the quality of the human environment." If a District Engineer determines that an applicant's activities *do not* meet the terms and conditions of NWP 12, the Corps would require the applicant to seek an individual permit, and the Corps would conduct a sites-specific NEPA evaluation of that activity. 33 C.F.R. § 330.1(e)(3).

**2.      The Service Required the Corps to Include the ESA-related Terms and Conditions to Comply With the ESA; Therefore, the Corps' Actions Were Nondiscretionary and Did Not Trigger a NEPA analysis.**

Assuming, *arguendo*, that the Corps' adoption and incorporation of the Service's incidental take provisions into its verifications constituted a separate major "Federal action[]," that does not mean a NEPA analysis was automatically required. If, like here, the agency's actions are nondiscretionary, a NEPA analysis is not required.

The Supreme Court explained in *Public Citizen* that "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an [Environmental Impact Statement] based on the usefulness of any new potential information to the decisionmaking process." 541 U.S. at 767. The Court further determined that it "would not . . . satisfy NEPA's 'rule of reason' to require an agency to prepare a full [Environmental Impact Statement] due to the environmental impact of an action it could not refuse to perform." *Id.* at 769. That situation occurs, the Court explained, when a federal agency "simply lacks the power to act on whatever information might be contained in the [Environmental Impact Statement]" and "simply could not act on whatever input" the public could provide based on the information in the NEPA document. *Id.* at 768-69. The Court therefore held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant

'cause' of the effect," and "the agency need not consider these effects . . . when determining whether its action is a 'major Federal action' " to which NEPA would apply. *Id*. at 770.

That holding applies here because in order to have take coverage under ESA Section 9, the Corps could not refuse to adopt and incorporate the Service's required terms and conditions from the BiOp. Because the Corps determined that the proposed activities "may affect" ESA-listed species or critical habitat, general condition 18 of NWP 12 required it to consult with the Service under section 7 of the ESA to address the potential effects of the proposed activities. 82 Fed. Reg. at 1999; *see* 16 U.S.C. § 1536(a)(2). After approximately 18 months of communication regarding the project, the Service issued its BiOp. The BiOp found that the Corps' verification of NWP authorizations for the Pipeline, and Kinder Morgan's resulting construction and operation of the Pipeline, was not likely to jeopardize the continued existence of ESA-listed species. *See* BiOp at 47. However, to ensure compliance with the BiOp's ITS, pursuant to 16 U.S.C. § 1536(b)(4)(C)(iv) the Service mandated that certain incidental take provisions be incorporated into the Corps' verifications of the NWP 12 permits: "The measures described below [related to incidental take] are *nondiscretionary* and must be implemented" by the Corps and Kinder Morgan, in areas within the Corps' jurisdiction. BiOp at 52 (emphasis added); *see also id*. at 54-55. The Service clarified that these were "binding conditions of any authorization issued by the Corps to implement the project covered by this biological opinion." *Id*. at 52. Because the Corps "could not refuse to" verify the permits without these terms and conditions, it "simply lacks the power to act on whatever information might be contained in" a NEPA document and "simply could not act on whatever input" the public could provide based on the information in that document. *Pub. Citizen*, 541 U.S. at 768-69. Thus, under NEPA's "rule of reason," the Corps need not conduct another NEPA analysis of the potential

environmental effects of adopting and implementing the required incidental take terms and conditions as part of its NWP 12 verifications.

A recent Sixth Circuit decision is instructive here. Consistent with NEPA's rule of reason, and relying on the principles from *Public Citizen*, the court recently held in *National Wildlife Federation v. U.S. Department of Transportation*, 960 F.3d 872, 879-80 (6th Cir. 2020), that when the administering agency (there, the Pipeline and Hazardous Materials Safety Administration) approved a response plan under the CWA, it did not need to perform a NEPA analysis because the action approving the plan was nondiscretionary. The court reasoned that it "makes little sense to compel the agency to prepare an impact statement for 'an action it [cannot] refuse to perform.'" *Id.* at 879 (alteration in original) (quoting *Pub. Citizen*, 541 U.S. at 769). "And, like in *Public Citizen*, 'the legally relevant cause' of any environmental impact isn't the agency's approval of the response plan but rather Congress's decision to limit the agency's discretion in the first place." *Id.* at 879-80 (internal quotation omitted). Here, Congress established the CWA's nationwide permitting scheme, and part of that scheme requires the Corps to comply with the ESA. *See, e.g.*, 16 U.S.C. § 1536(b)(4)(C)(iv), (o)(2); 33 C.F.R. § 330.4(f). If the resulting biological opinion contains an ITS, the Service "sets forth the terms and conditions (including, but not limited to, reporting requirements) that *must be complied with* by the Federal agency or applicant (if any), or both, to implement the [incidental take] measures. . . ." 16 U.S.C. § 1536(b)(4)(C)(iv) (emphasis added); *see also* 50 C.F.R. § 402.14(i)(1)(ii). Because the Corps cannot dictate the BiOp's terms and conditions, it makes little sense for it to perform a NEPA analysis related to impacts from terms and conditions that the Service already analyzed and which it could not refuse to include in its verifications. The Corps had no discretion to "act otherwise." *Nat'l Wildlife Fed'n,* 960 F.3d at 879 (citing *Pub. Citizen*, 541 U.S. at 770). Indeed,

Sierra Club admits that the Corps was required to include these conditions in its verifications. PI Mot. at 13-14.

Likewise, in *General Land Office v. U.S. Department of Interior*, the 5th Circuit, relying on *Public Citizen*, held that it was unnecessary for the Service to produce an EA or EIS before it decided whether to list or delist a species as endangered or threatened. 947 F.3d at 319-20. The Court reasoned:

> [T]he statutory mandate of ESA prevents the [Service] from considering the environmental impact when listing a species as endangered or threatened . . . . The impact statement cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors. As far as the determination to list a species is concerned, preparing an impact statement is a waste of time.

*Id*. at 320 (alterations in original) (quoting *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981)). The same is true here: the Corps was required (by the Service and by statute) to adopt and incorporate the specific incidental take terms and conditions to comply with the ESA, and therefore lacked discretion to consider information that might be contained in a NEPA analysis related to the impacts of the Service's terms and conditions.

### 3.    NEPA is Not Required Because the Corps Lacks the Authority to Consider an Alternative to Incorporating the Service's Required Terms and Conditions.

The statutory and regulatory requirements of NEPA further demonstrate its inapplicability to the verifications at issue here. For either an EA or EIS, an analysis of the alternatives is required. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. The analysis of alternatives "is the heart of the environmental impact statement" and serves to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. The analysis must include "the alternative of no action," *id*. § 1502.14(d), but the agency must only examine "reasonable alternatives." *Id*. § 1502.14(a).

Here, the Corps lacks discretion to make a "choice among options" of terms and conditions contained in an ITS, or an alternative of "no action." Rather, the Service determined that the incidental take measures are "nondiscretionary and must be implemented" by the Corps and Kinder Morgan. BiOp at 52. When verifying whether the activities qualified for NWP 12, and after its required consultation with the Service pursuant to general condition 18, the Corps has no option but to adopt the Service's terms and conditions related to incidental take because they are necessary to comply with the ESA. 16 U.S.C. § 1536(b)(4)(C)(iv), (o)(2) . It would be unreasonable for the Corps to examine an option where it foregoes ITS take coverage by adopting its own incidental take provisions that are inconsistent with the Service's incidental take provisions.

Sierra Club defines the federal agency action that triggers NEPA as the Corps' adoption and incorporation of the Service's mandatory incidental take terms and conditions. PI Mot. at 14-15. Under that unsupportable scenario, the no-action alternative would be the Corps not adopting and incorporating these mandatory terms and conditions in its verifications. But this would be unlawful. *See* 16 U.S.C. § 1536(b)(4)(C)(iv), (o)(2) ; 33 C.F.R. § 330.4(f). It would, of course, be unreasonable for the Corps to examine an alternative that would entail ignoring a mandate from a sister agency that is carrying out its statutory functions. *See Sierra Club*, 803 F.3d at 41 ("[T]he action agency and private party (unless it has obtained a Section 10 permit) must comply with the Service's ITS if they wish to be insulated from ESA liability for taking species incidental to the project."). Since the Corps could not refuse to adopt these terms, the Corps "could not act on whatever input [a] 'larger audience' could provide" during a NEPA process. *Pub. Citizen*, 541 U.S. at 769.

The inapplicability of a NEPA analysis to the adoption of mandatory incidental take provisions into the Corps' NWP 12 verifications does not mean that potential environmental impacts of these conditions, or the activities authorized under NWP 12, were not given robust consideration or that the public did not have a chance to voice concerns related to the impacts. As discussed above, the Corps completes an EA every five years before it re-issues NWP 12. The Corps completed the most recent EA for NWP 12 on December 21, 2016. NWP 12 Decision Doc., 80. Based on public input and its own analysis, the Corps determined that the activities authorized under NWP 12 would have minimal adverse impacts across the nation, and it issued a FONSI for NWP 12. NWP 12 Decision Doc., 79.

Because the EA examined cumulative impacts on a national scale, the NWP program also relies on the Corps to add regional conditions to the NWPs to enhance protection of the aquatic environment and address local concerns. That happened here. The Corps solicited public comments on the proposed regional conditions for NWP 12 activities in Texas through two public notices. *See* SDD at 1-2. The Corps received a number of comments from interested parties, including from Sierra Club. *Id*. The SDD applies to all the Corps-regulated Pipeline activities and it examined potential individual and cumulative impacts that could result from use of NWP 12 in areas under the Corps' regulatory authority within Texas. SDD at 1-56. The Southwestern Division Commander added thirty regional conditions to the use of NWP 12 in Texas to ensure the individual and cumulative adverse environmental effects remained no more than minimal.

Moreover, the Corps analyzed the impacts of the proposed activities in its BA. And after the Corps determined that the proposed activities "may affect" ESA-listed species in areas under its jurisdiction, it consulted with the Service under general condition 18. The Service, relying on

its scientific expertise, closely examined the potential impacts from the Pipeline activities and determined that the activities are not likely to jeopardize any ESA-listed species, nor likely to affect any critical habitat, for no critical habitat is located within the Corps' jurisdiction where the activities would occur. BiOp at 47.

Thus, when the District Engineers adopted and incorporated the incidental take provisions, the Corps determined that activities authorized under NWP 12 for the Pipeline will have no more than minimal adverse environmental effects. The Service also determined the specific activities authorized under the Fort Worth and Galveston verifications would not jeopardize any ESA-listed species under the ESA.

### 4.      Sierra Club v. U.S. Army Corps of Engineers is Not Controlling Precedent.

Sierra Club relies heavily on *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 45 (D.C. Cir. 2015), for the following argument: the Corps' adoption and incorporation of the Service's mandatory incidental take terms and conditions into its NWP 12 verifications was the "functional equivalent of a permit" and constituted a federal action that triggered a NEPA analysis. PI Mot. at 12-13 (internal quotation omitted). Beyond the fact that this decision is from another circuit and not binding on this Court, the Court should not consider *Sierra Club* persuasive authority on this point for a number of reasons.

First, as discussed above, the adoption and incorporation of mandatory incidental take provisions was not a "major Federal action[]" that "significantly affect[s] the quality of the human environment," which requires a NEPA analysis." 42 U.S.C. § 4332(2)(C). Second, the *Sierra Club* court did not discuss at all whether the Corps' incorporation of the incidental take provisions into its verifications may have constituted a nondiscretionary action that was not subject to NEPA. Finally, the court's discussion of the Corps' incorporation of incidental take provisions in its NWP 12 verifications is the functional equivalent of a permit was dicta, and the

Court was not undertaking an analysis of the situation presented here. The only claim the plaintiff there properly preserved was whether the government had to analyze the entire pipeline route under NEPA, so any statements about whether the Corps took major federal action by incorporating the terms and conditions of the ITS were not germane to the issues the court was adjudicating, nor were they fully developed or considered in the court's opinion.

Likewise, Sierra Club's reliance on *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 642 (9th Cir. 2014) is also misplaced. PI Mot. at 12. That case did not concern nationwide permits, or the Corps' incorporation of incidental take provisions into its verification of a NWP. There, the court held that the Bureau of Reclamation's provisional adoption and implementation of a biological opinion triggered a NEPA analysis. *Id*. In that case, the Bureau of Reclamation was the operator of the project that was the subject of the ESA consultation and the ITS provided take coverage for the agency's own activity, as opposed to here, where the Corps' jurisdiction is limited and a private company is constructing and operating the project largely on private land. In addition, the BiOp in *San Luis* resulted in a jeopardy determination, unlike the no-jeopardy determination here, and the Service was therefore required to develop a reasonable and prudent alternative to avoid jeopardy. The alternative consisted of modifications to the existing projects, including extensive changes to water delivery operations. The court found it was unlawful for the Bureau to implement these substantive changes to the proposed action without engaging in additional NEPA analysis. *Id*. at 647. In contrast, here, the terms and conditions of the ITS do not themselves cause significant environmental harm, as they largely involve protective measures, such as seasonal clearing and vegetation management restrictions, and oak wilt mitigation measures and do not involve extensive changes to the proposed action itself. *See* BiOp at 43. The case is therefore not relevant here.

Because NEPA was not required, Sierra Club has not shown a substantial likelihood of success on the merits.

**B.      Sierra Club Has Not Shown Irreparable Harm is Likely to Occur without an Injunction.**

Sierra Club has not shown a likelihood of success on merits, and the Court may deny the Motion on that basis alone. *See Lichterman v. Pickwick Pines Marina Inc.*, 308 F. App'x 828, 835 n.5 (5th Cir. 2009) (per curiam) (noting denial of injunctive relief based solely on failure to demonstrate likelihood of success on the merits). Nonetheless, Sierra Club also fails to meet its high burden of demonstrating that irreparable harm is likely to occur in the absence of an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 21–22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *White v. Carlucci*, 862 F.2d 1209, 1212 (5th Cir. 1989) (holding that irreparable harm must be proven even if likelihood of success on the merits is shown). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985). "Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

**1.      Sierra Club's Delay in Requesting Preliminary Injunctive Relief Weighs Against a Finding of Irreparable Harm.**

"A delay in seeking a preliminary injunction of even only a few months — though not necessarily fatal — militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (finding a five month delay without explanation indicative of lack of irreparable harm); *see Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185,

1193 (5th Cir. 1975) (finding three months delay in seeking preliminary relief indicative of lack of urgency). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014) (internal quotation omitted); *see also Calhoun v. Lillenas Publg.*, 298 F.3d 1228, 1235 n.1 (11th Cir. 2002) (per curiam) (Birch, J. concurring) (noting that "delay is suggestive of a lack of irreparable harm."); *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993) (holding that a party's delay in seeking an injunctive relief "severely undermines [its] argument that absent a stay irreparable harm w[ill] result"); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed., April 2020 update). Courts in this circuit "generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200-N, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (citing cases).

Here, Sierra Club's delay in bringing this case and in moving for preliminary injunctive relief shows that there is no urgency to its request. Sierra Club challenges the Corps' verifications, which were signed in February 2020. The BiOp and ITS were likewise issued in February, and Sierra Club acknowledges that construction of the pipeline, including in waters covered by the verifications, has been ongoing since February 2020. PI Mot. at 15. Sierra Club does not contend, nor could it, that it was unaware of the ongoing construction. This Court held proceedings on motions for a temporary restraining order and preliminary injunction in the *City of Austin* case in February and March, 2020, and the pipeline construction was well-publicized. Yet, Sierra Club waited until June 19, four months after construction began and seven weeks

after it filed its complaint in this Court, to bring its Motion.  In addition, Sierra Club filed its

Complaint in this Court on April 30, 2020, but did not perfect service on the Federal Defendants

until June 29, 2020.  Certificate of Service 20, ECF No. 23; Corrected Certificate of Service,

ECF No. 24.  Sierra Club's assertions, therefore, that "[t]he impacts of this clearing and

construction constitute irreparable harm," PI Mot. at 15, should be rejected, as Sierra Club did

not act to prevent this clearing and construction for over four months.  Much of the alleged harm

that Sierra Club asserts has already occurred.  Sierra Club has offered no reason for its delay,

and, as such, the Court should find that it has not shown that irreparable harm is imminent absent

an injunction.

> **2.     Sierra Club Has Not Shown Irreparable Harm.**

Setting aside Sierra Club's delay, Sierra Club cannot demonstrate irreparable harm based

on the purported NEPA violation.  "[A] procedural violation of NEPA is not itself sufficient to

establish irreparable injury."  *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp.

2d 1, 24 (D.D.C. 2009).  Indeed, the Supreme Court has explained that injunctive relief cannot be

automatically presumed to be appropriate in cases raising claims under environmental statutes.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) ("No such thumb on the scales

is warranted.").  "It is not enough for a court considering a request for injunctive relief to ask

whether there is a good reason why an injunction should *not* issue; rather, a court must determine

that an injunction *should* issue under the traditional four-factor test set out above."  *Id*. at 158.

Further, as discussed above, the Corps complied with NEPA.  Congress established the

nationwide permit system to allow projects with minimal potential impacts to avoid further

NEPA documentation.  Requiring an elaborate NEPA analysis would defeat this purpose.  *See*

*Orleans Audubon Soc'y v. Lee*, 742 F.2d 901, 909–10 (5th Cir. 1984).  The Corps considered the

direct, indirect, and cumulative impacts of activities nationwide that would be authorized by

NWP 12 before it reissued that permit.  The Nationwide Permit process does not provide for additional public participation when verifications are issued, and the Corps' compliance with this process is not a NEPA violation.

Sierra Club also cannot meet its burden of demonstrating irreparable harm because the Corps determined that the activities covered by the verifications would have little or no environmental impact.  Galveston Verification; Fort Worth Verification.  The Corps found that the activities met the standards for NWP 12, including that they were less than half an acre in total impacts and "have no more than minimal individual and cumulative adverse environmental effects."  82 Fed. Reg. 1,860.  Specifically, the Galveston District's verification found that the project would result in the temporary discharge of fill material within forty-three single and complete crossings of a total of 0.462 acres of wetlands and ponds and 5,377 linear feet of water.  It found that the impacts were no more than minimal and were spread through the entire project within the boundaries of the Galveston District.  The Corps also found that the impacts were minimized to the least amount necessary to safely construct the pipeline project.  Galveston MFR at 3.  Specifically, PHP minimized impacts by routing design to avoid waterbodies and wetlands through alignment changes.  *Id.* at 3.  Similarly, the Fort Worth District found that "the proposed impacts to waters are considered by USACE to have such a minimal effect that the proposed impacts to waters of the U.S. do not require any additional avoidance or compensatory mitigation."  Fort Worth MFR at 1.  In fact, the Fort Worth District determined that impacts to wetlands in the district did not trigger the compensatory mitigation requirement because less than 0.10 acres of wetlands would be impacted.  *Id.*

Notably, the Corps also found that any impacts to waters of the United States would be temporary and, therefore, by definition, not irreparable.  For example, the Galveston District

found that all impacts to wetlands and waterbodies are temporary and waters would be restored to pre-disturbance conditions following completion of the activity. Galveston MFR at 3. Similarly, the Fort Worth district found that there would be no permanent loss of waters of the United States. Fort Worth MFR at 1. All crossings of waters of the United States would be restored to their pre-construction contours and revegetated. *Id.* at 2. The pipeline project thus will not result in any long-term or permanent adverse effects to waters of the United States. Temporary impacts do not meet the "irreversible" requirement for a preliminary injunction.

Sierra Club complains that construction impacts through the pipeline right-of-way will result in irreparable harm to the environment, but does not tie these alleged impacts to their members' interest. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003) (citation omitted) (requiring that [*the movant*] must show it will suffer irreparable harm if the injunction is not granted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000) (relevant showing "is not injury to the environment but injury to the plaintiff"). In addition, the vast majority of the pipeline is outside the Corps' jurisdiction. Sierra Club's Motion requests that the Court "enjoin the Corps' verifications and all actions taken pursuant to them, including any dredge and fill or other ground disturbing activities in the 129 water crossings that comprise the Corps' Action Areas." PI Mot. at 36. To show irreparable harm, Sierra Club "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 280 F. Supp. 3d 118, 122 (D.D.C. 2017) (quoting *Wis. Gas Co.*, 758 F.2d at 674). The pipeline is a largely private undertaking on private land and much of it can proceed without federal authorization. As Sierra Club itself states, its "requested injunctive relief would *not* actually require Permian Highway Pipeline to cease all construction activities." PI Mot. at 31. Thus,

even if the Court were to enjoin the verifications, PHP could continue with pipeline construction in areas that do not involve waters of the United States and an injunction would not remedy Sierra Club's alleged injury.

As an example, Sierra Club asserts that the Trinity and Edwards aquifers may be harmed. PI Mot. at 20. Those aquifers are not waters of the United States and the Corps therefore does not have authority to regulate activity in those areas. Sierra Club also asserts that horizontal directional drilling can result in an inadvertent return of drilling fluid to the overlying water. PI Mot. at 19. But Sierra Club has not alleged harm from the permittee's proposed plan to utilize horizontal directional drilling in a water of the United States.

Sierra Club's allegations that implementation of the ITS will involve additional impacts in the Corps' Action Areas do not withstand scrutiny. *See id.* at 20–21. First, the Corps analyzed many of the impacts in its NEPA analysis for NWP 12. NWP 12 Decision Doc., 57–58, 61, 77. The Corps in issuing NWP 12 addressed the impacts of vegetation clearing, including right-of-way maintenance. It also considered the impacts of trenching. *Id.* at 1. In the decision document, the Corps found that activities authorized by NWP 12 "will affect general environmental concerns, such as water, air, noise, and land pollution," and "will also affect the physical, chemical, and biological characteristics of the environment." *Id.* at 57. The Corps concluded that "[t]he adverse effects of the activities authorized by this NWP on general environmental concerns will be minor." *Id.* In issuing the NWP, the Corps found it would not have a significant impact on the quality of the human environment and that its issuance is not contrary to the public interest. *Id.* at 79. And in issuing the verifications, the Corps confirmed that the project will not have more than minimal impacts, and no permanent impacts, to waters of the United States. Galveston MFR, ¶ 5.2.; Fort Worth MFR, ¶ 5.2. Thus, Sierra Club's

argument that these activities will themselves cause irreparable harm that has not been analyzed is not supported.

Second, Sierra Club also fails to show that the terms and conditions Sierra Club identifies from the ITS — such as "seasonal restrictions on construction activities, the purchase and transfer of conservation credits and mitigation lands, wilt oak fungus prevention measures, additional vegetation clearing and revegetation measures, and construction of fencing, drive-over gates, and sediment barriers" — are likely to cause any harm to Sierra Club's members, much less imminent irreparable harm. *See* PI Mot. at 22-23. The terms and conditions are intended to be protective of the environment and minimize take of endangered species and thus are unlikely to cause irreparable injury. Because Sierra Club offers no evidence beyond its conclusory allegations that the impacts from implementing the ITS will be irreparable, this Court should reject Sierra Club's argument.

In addition, Sierra Club's allegations of irreparable harm to its members are too speculative and remote to support a finding of irreparable harm. "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (quoting 9 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2948.1 at 153–56). Sierra Club speculates, for example, about the possibility of damage to aquifers, gas spills, or that an explosion or leak could occur during pipeline operation and impair Sierra Club's interests. But Sierra Club has not shown that such potential injuries are likely to occur from the regulated activities, or that they would be irreparable. Here, Sierra Club's alleged injuries are based on mere speculation and do not meet its burden of showing that irreparable injury is likely in the absence of an injunction.

Sierra Club also has failed to show irreparable harm based on alleged impacts to ESA-listed species. As this Court found in *City of Austin*, while an "extinction-level harm" to listed species is not required for a preliminary injunction, Sierra Club must show a "definitive threat of future harm to protected *species*, not mere speculation." *City of Austin v. Kinder Morgan Tex. Pipeline, LLC,* No. 1:20-CV-138-RP, 2020 WL 1324071, at *7 (W.D. Tex. Mar. 19, 2020) (emphasis added) (internal quotation omitted). Thus, as many courts have found, Sierra Club must show more than just impacts to individual members of ESA-listed species. And as this Court explained in *City of Austin*, the Service found after an extensive analysis in its BiOp that "the potential injury to protected species [from the PHP] does not rise to the level of irreparable harm." *Id.* at *8; BiOp, at 2-4, 41-46, 47-51. Thus, as in *City of Austin*, Sierra Club has failed to overcome the Service's expert findings and shown a likelihood of irreparable harm to ESA-listed species.

Sierra Club appears to assert that the outcome should be different here because purportedly in NEPA cases, "harm to the 'species as a whole' is not required to demonstrate irreparable harm." PI Mot. at 26 n.14. Contrary to Sierra Club's one cited 2003 Tenth Circuit case that is not binding on this Court, a number of courts have more recently found that irreparable harm at the species level is required for injunctive relief in cases brought under NEPA and other statutes. *See Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1261-65 (W.D. Wash. 2015) (finding that harm to individual members of the species of concern to plaintiff was not sufficient to show irreparable harm under NEPA or CWA); *see Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (involving both NEPA and ESA claims and finding that "[i]rreparable harm to ESA listed species must be measured at the species level").

In any event, as discussed above, Sierra Club must demonstrate that its members — not the environment — are likely to suffer irreparable harm in the absence of an injunction. *Guy Carpenter*, 334 F.3d at 464 (citation omitted); *Friends of the Earth*, 528 U.S. at 180-81. Thus, Sierra Club must show irreparable harm to itself (or its members) from impacts on listed species, not harm to the species themselves. To "irreparably" injure Sierra Club members' claimed interests in ESA-listed species, there necessarily must be a substantial, non-speculative impact on these *species* — not just impacts on individual animals or limited habitat. *See Idaho Rivers United*, 156 F. Supp. 3d at 1262-64. Here, Sierra Club has not identified members with an affinity or interest in particular, identifiable warblers or toads, and thus species-level impacts are required to establish irreparable injury.

In addition, past harm is insufficient to support an injunction, and Kinder Morgan has already completed much of the construction for the pipeline. It has cleared nearly all warbler habitat in the right-of-way with the exception of certain limited areas subject to re-routing. Sierra Club's members have not alleged an interest in viewing warblers in particular areas that remain to be cleared, or that there is no habitat nearby suitable for viewing the warbler. As the Court recognized in denying injunctive relief in *City of Austin*, while some lower quality warbler and Houston toad habitat will be impacted by the PHP, the amount is very small and the warbler impacts are being offset through a preserve of high quality habitat purchased by Kinder Morgan. *City of Austin*, 2020 WL 1324071 at *8; TRO Order at 7; BiOp at 32, 38, 48-51. For both the warbler and the Houston toad, the Service also relied on the fact that many of the impacts would be minor and/or of limited duration. BiOp at 47-50. Thus, Sierra Club has not shown that its declarants' ability to continue to view and enjoy the warbler and Houston toad as a species will be irreparably harmed in the absence of an injunction.

As to the Tobush fishhook cactus, Sierra Club has not provided any member declarations alleging specific, concrete interests in this species. But in any event, the PHP is expected to impact only forty-two Tobush fishhook cacti out of a total of over 5,000 documented individuals of this species in the affected counties. *Id.* at 50-51. And only six Tobush cacti occur within the Corps' jurisdiction. *Id.* at 40. Sierra Club has not shown that any irreparable harm is certainly impending for these species.

In conclusion, Sierra Club has not shown that irreparable harm is likely to occur absent an injunction. The Court should therefore deny Sierra Club's Motion.

**C.    The Public Interest Would Not Be Served by a Preliminary Injunction Order, and the Balance of Equities Weighs Against Issuing an Injunction.**

In seeking a preliminary injunction, Sierra Club "must establish . . . that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 7, 20. Where the federal government is a party, the equities and public interest inquiries tend to merge. *Nken*, 556 U.S. at 435. With regard to balancing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

Environmental injuries may sometimes be outweighed by other considerations, including risks to other resources and economic harms that would be caused by the injunction. *See id.* at 23-24. Here, Kinder Morgan is best suited to address the harm it would suffer if a preliminary injunction were to be entered at this time, and to explain more specifically how a delay in construction during the window in which the work has been authorized to take place could result in significant added cost and lengthy delays in completing the project.

However, the public interest would be harmed by an injunction. The public interest standard is a separate consideration in determining whether to grant equitable relief. *Amoco Prod. Co.*, 480 U.S. at 545-46. If injunctive relief would harm the public interest, the Court may withhold the relief, even if doing so would burden or cause irreparable injury to the movant. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982); *Yakus v. United States*, 321 U.S. 414, 440 (1944). The United States has a strong interest in the orderly administration of the Corps' environmental permitting process and the Service's ESA consultation process, and that interest would be harmed if the injunctive relief Sierra Club seeks is awarded. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 42–43 (D.D.C. 2013).

## VI. CONCLUSION

For the reasons stated above, Sierra Club has not satisfied the four elements necessary for a preliminary injunction. Therefore, the Court should deny the Motion.

Respectfully submitted this 10th day of July.

JEAN E. WILLIAMS
DEPUTY ASSISTANT ATTORNEY GENERAL

*/s/Jeffrey N. Candrian*
JEFFREY NEEL CANDRIAN
Colorado Bar No. 43839
PAUL E. SALAMANCA
DEVON LEHMAN McCUNE
Colorado Bar No. 33223
United States Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1487 (McCune)
(303) 844-1382 (Candrian)
(303) 844-1350-Fax
Email: Devon.McCune@usdoj.gov
Email: Jeffrey.Candrian@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of Court will transmit a notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service.

*s/ Jeffrey N. Candrian*
Jeffrey Neel Candrian
Trial Attorney