# DECISION DOCUMENT
# NATIONWIDE PERMIT 12

This document discusses the factors considered by the Corps of Engineers (Corps) during the issuance process for this Nationwide Permit (NWP).  This document contains: (1) the public interest review required by Corps regulations at 33 CFR 320.4(a)(1) and (2); (2) a discussion of the environmental considerations necessary to comply with the National Environmental Policy Act; and (3) the impact analysis specified in Subparts C through F of the 404(b)(1) Guidelines (40 CFR Part 230).  This evaluation of the NWP includes a discussion of compliance with applicable laws, consideration of public comments, an alternatives analysis, and a general assessment of individual and cumulative effects, including the general potential effects on each of the public interest factors specified at 33 CFR 320.4(a).

## 1.0 Text of the Nationwide Permit

<u>Utility Line Activities</u>. Activities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project.

<u>Utility lines</u>: This NWP authorizes discharges of dredged or fill material into waters of the United States and structures or work in navigable waters for crossings of those waters associated with the construction, maintenance, or repair of utility lines, including outfall and intake structures. There must be no change in pre-construction contours of waters of the United States. A "utility line" is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and internet, radio, and television communication. The term "utility line" does not include activities that drain a water of the United States, such as drainage tile or french drains, but it does apply to pipes conveying drainage from another area.

Material resulting from trench excavation may be temporarily sidecast into waters of the United States for no more than three months, provided the material is not placed in such a manner that it is dispersed by currents or other forces. The district engineer may extend the period of temporary side casting for no more than a total of 180 days, where appropriate. In wetlands, the top 6 to 12 inches of the trench should normally be backfilled with topsoil from the trench. The trench cannot be constructed or backfilled in such a manner as to drain waters of the United States (e.g., backfilling with extensive gravel layers, creating a french drain effect). Any exposed slopes and stream banks must be stabilized immediately upon completion of the utility line crossing of each waterbody.

<u>Utility line substations</u>: This NWP authorizes the construction, maintenance, or expansion of substation facilities associated with a power line or utility line in non-tidal waters of the United States, provided the activity, in combination with all other activities included in one

NWP005262

single and complete project, does not result in the loss of greater than 1/2-acre of waters of the United States. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters of the United States to construct, maintain, or expand substation facilities.

Foundations for overhead utility line towers, poles, and anchors: This NWP authorizes the construction or maintenance of foundations for overhead utility line towers, poles, and anchors in all waters of the United States, provided the foundations are the minimum size necessary and separate footings for each tower leg (rather than a larger single pad) are used where feasible.

Access roads: This NWP authorizes the construction of access roads for the construction and maintenance of utility lines, including overhead power lines and utility line substations, in non-tidal waters of the United States, provided the activity, in combination with all other activities included in one single and complete project, does not cause the loss of greater than 1/2-acre of non-tidal waters of the United States. This NWP does not authorize discharges into non-tidal wetlands adjacent to tidal waters for access roads. Access roads must be the minimum width necessary (see Note 2, below). Access roads must be constructed so that the length of the road minimizes any adverse effects on waters of the United States and must be as near as possible to pre-construction contours and elevations (e.g., at grade corduroy roads or geotextile/gravel roads). Access roads constructed above pre-construction contours and elevations in waters of the United States must be properly bridged or culverted to maintain surface flows.

This NWP may authorize utility lines in or affecting navigable waters of the United States even if there is no associated discharge of dredged or fill material (See 33 CFR part 322). Overhead utility lines constructed over section 10 waters and utility lines that are routed in or under section 10 waters without a discharge of dredged or fill material require a section 10 permit.

This NWP authorizes, to the extent that Department of the Army authorization is required, temporary structures, fills, and work necessary for the remediation of inadvertent returns of drilling fluids to waters of the United States through sub-soil fissures or fractures that might occur during horizontal directional drilling activities conducted for the purpose of installing or replacing utility lines. These remediation activities must be done as soon as practicable, to restore the affected waterbody. District engineers may add special conditions to this NWP to require a remediation plan for addressing inadvertent returns of drilling fluids to waters of the United States during horizontal directional drilling activities conducted for the purpose of installing or replacing utility lines.

This NWP also authorizes temporary structures, fills, and work, including the use of temporary mats, necessary to conduct the utility line activity. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and discharges, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. After construction, temporary fills must be removed in their entirety

2

Exhibit 1

NWP005263

and the affected areas returned to pre-construction elevations. The areas affected by temporary fills must be revegetated, as appropriate.

Notification: The permittee must submit a pre-construction notification to the district engineer prior to commencing the activity if any of the following criteria are met: (1) the activity involves mechanized land clearing in a forested wetland for the utility line right-of-way; (2) a section 10 permit is required; (3) the utility line in waters of the United States, excluding overhead lines, exceeds 500 feet; (4) the utility line is placed within a jurisdictional area (i.e., water of the United States), and it runs parallel to or along a stream bed that is within that jurisdictional area; (5) discharges that result in the loss of greater than 1/10-acre of waters of the United States; (6) permanent access roads are constructed above grade in waters of the United States for a distance of more than 500 feet; or (7) permanent access roads are constructed in waters of the United States with impervious materials. (See general condition 32.) (Authorities: Sections 10 and 404)

Note 1: Where the utility line is constructed or installed in navigable waters of the United States (i.e., section 10 waters) within the coastal United States, the Great Lakes, and United States territories, a copy of the NWP verification will be sent by the Corps to the National Oceanic and Atmospheric Administration (NOAA), National Ocean Service (NOS), for charting the utility line to protect navigation.

Note 2: For utility line activities crossing a single waterbody more than one time at separate and distant locations, or multiple waterbodies at separate and distant locations, each crossing is considered a single and complete project for purposes of NWP authorization. Utility line activities must comply with 33 CFR 330.6(d).

Note 3:  Utility lines consisting of aerial electric power transmission lines crossing navigable waters of the United States (which are defined at 33 CFR part 329) must comply with the applicable minimum clearances specified in 33 CFR 322.5(i).

Note 4: Access roads used for both construction and maintenance may be authorized, provided they meet the terms and conditions of this NWP. Access roads used solely for construction of the utility line must be removed upon completion of the work, in accordance with the requirements for temporary fills.

Note 5: Pipes or pipelines used to transport gaseous, liquid, liquescent, or slurry substances over navigable waters of the United States are considered to be bridges, not utility lines, and may require a permit from the U.S. Coast Guard pursuant to section 9 of the Rivers and Harbors Act of 1899. However, any discharges of dredged or fill material into waters of the United States associated with such pipelines will require a section 404 permit (see NWP 15).

Note 6: This NWP authorizes utility line maintenance and repair activities that do not qualify for the Clean Water Act section 404(f) exemption for maintenance of currently serviceable fills or fill structures.

Exhibit 1

NWP005264

Note 7: For overhead utility lines authorized by this NWP, a copy of the PCN and NWP verification will be provided to the Department of Defense Siting Clearinghouse, which will evaluate potential effects on military activities.

Note 8: For NWP 12 activities that require pre-construction notification, the PCN must include any other NWP(s), regional general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity, including other separate and distant crossings that require Department of the Army authorization but do not require pre-construction notification (see paragraph (b) of general condition 32). The district engineer will evaluate the PCN in accordance with Section D, "District Engineer's Decision." The district engineer may require mitigation to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects (see general condition 23).

## *1.1 Requirements*

General conditions of the NWPs are in the <u>Federal Register</u> notice announcing the issuance of this NWP.  Pre-construction notification requirements, additional conditions, limitations, and restrictions are in 33 CFR part 330.

## *1.2 Statutory Authorities*

- Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403)
- Section 404 of the Clean Water Act (33 U.S.C. 1344)

## *1.3 Compliance with Related Laws (33 CFR 320.3)*

1.3.1 General

NWPs are a type of general permit designed to authorize certain activities that have no more than minimal individual and cumulative adverse environmental effects and generally comply with the related laws cited in 33 CFR 320.3.  Activities that result in more than minimal individual and cumulative adverse environmental effects cannot be authorized by NWPs.  Individual review of each activity authorized by an NWP will not normally be performed, except when pre-construction notification to the Corps is required or when an applicant requests verification that an activity complies with an NWP.  Potential adverse impacts and compliance with the laws cited in 33 CFR 320.3 are controlled by the terms and conditions of each NWP, regional and case-specific conditions, and the review process that is undertaken prior to the issuance of NWPs.

The evaluation of this NWP, and related documentation, considers compliance with each of the following laws, where applicable:  Sections 401, 402, and 404 of the Clean Water Act; Section 307(c) of the Coastal Zone Management Act of 1972, as amended; Section 302 of

NWP005265

the Marine Protection, Research and Sanctuaries Act of 1972, as amended; the National Environmental Policy Act of 1969; the Fish and Wildlife Act of 1956; the Migratory Marine Game-Fish Act; the Fish and Wildlife Coordination Act, the Federal Power Act of 1920, as amended; the National Historic Preservation Act of 1966; the Interstate Land Sales Full Disclosure Act; the Endangered Species Act; the Deepwater Port Act of 1974; the Marine Mammal Protection Act of 1972; Section 7(a) of the Wild and Scenic Rivers Act; the Ocean Thermal Energy Act of 1980; the National Fishing Enhancement Act of 1984; the Magnuson-Stevens Fishery and Conservation and Management Act, the Bald and Golden Eagle Protection Act; and the Migratory Bird Treaty Act.  In addition, compliance of the NWP with other Federal requirements, such as Executive Orders and Federal regulations addressing issues such as floodplains, essential fish habitat, and critical resource waters is considered.

### 1.3.2 Terms and Conditions

Many NWPs have pre-construction notification requirements that trigger case-by-case review of certain activities.  Two NWP general conditions require case-by-case review of all activities that may adversely affect Federally-listed endangered or threatened species or historic properties (i.e., general conditions 18 and 20, respectively).  General condition 16 restricts the use of NWPs for activities that are located in Federally-designated wild and scenic rivers.  None of the NWPs authorize the construction of artificial reefs.  General condition 28 prohibits the use of an NWP with other NWPs, except when the acreage loss of waters of the United States does not exceed the highest specified acreage limit of the NWPs used to authorize the single and complete project.

In some cases, activities authorized by an NWP may require other federal, state, or local authorizations.  Examples of such cases include, but are not limited to: activities that are in marine sanctuaries or affect marine sanctuaries or marine mammals; the ownership, construction, location, and operation of ocean thermal conversion facilities or deep water ports beyond the territorial seas; activities that result in discharges of dredged or fill material into waters of the United States and require Clean Water Act Section 401 water quality certification; or activities in a state operating under a coastal zone management program approved by the Secretary of Commerce under the Coastal Zone Management Act.  In such cases, a provision of the NWPs states that an NWP does not obviate the need to obtain other authorizations required by law.  [33 CFR 330.4(b)(2)]

Additional safeguards include provisions that allow the Chief of Engineers, division engineers, and/or district engineers to: assert discretionary authority and require an individual permit for a specific activity; modify NWPs for specific activities by adding special conditions on a case-by-case basis; add conditions on a regional or nationwide basis to certain NWPs; or take action to suspend or revoke an NWP or NWP authorization for activities within a region or state.  Regional conditions are imposed to protect important regional concerns and resources.  [33 CFR 330.4(e) and 330.5]

### 1.3.3 Review Process

Exhibit 1

NWP005266

The analyses in this document and the coordination that was undertaken prior to the issuance of the NWP fulfill the requirements of the National Environmental Policy Act (NEPA), the Fish and Wildlife Coordination Act, and other acts promulgated to protect the quality of the environment.

All NWPs that authorize activities that may result in discharges into waters of the United States require water quality certification.  NWPs that authorize activities within, or affecting land or water uses within a state that has a Federally-approved coastal zone management program, must also be certified as consistent with the state's program.  The procedures to ensure that the NWPs comply with these laws are described in 33 CFR 330.4(c) and (d), respectively.

### 1.4 Public Comment and Response

For a summary of the public comments received in response to the June 1, 2016, <u>Federal Register</u> notice, refer to the preamble in the <u>Federal Register</u> notice announcing the reissuance of this NWP.  The substantive comments received in response to the June 1, 2016, <u>Federal Register</u> notice were used to improve the NWP by changing NWP terms and limits, pre-construction notification requirements, and/or NWP general conditions, as necessary.

We proposed to clarify that this NWP authorizes discharges of dredged or fill material into waters of the United States and structures or work in navigable waters of the United States for crossings of those waters associated with the construction, maintenance, repair, and removal of utility lines.  In addition, we proposed to modify the definition of "utility line" to make it clear that utility lines can also include optic cables and other lines that communicate through the internet.  We also proposed to add a paragraph to this NWP to authorize, to the extent that DA authorization is required, discharges of dredged or fill material into waters subject to section 404 of the Clean Water Act and structures and work in waters subject to section 10 of the Rivers and Harbors Act of 1899, necessary to remediate inadvertent returns of drilling fluids that can occur during horizontal directional drilling operations to install utility lines under jurisdictional waters and wetlands.  Other proposed changes to NWP 12 are discussed in more detail in the preamble to the June 1, 2016, proposal (see 81 FR 35198 – 35199).

Several commenters expressed their support for the proposed modifications to NWP 12. Some of these commenters agreed with the clarification that, for utility lines authorized by NWP 12, the Corps is only authorizing regulated activities to cross waters of the United States, including navigable waters.  Several commenters said that utility lines crossing multiple waterbodies should require individual permits, instead of authorizing each separate and distant crossing by NWP.  In contrast, several commenters said they support the use of NWP 12 to authorize separate and distant crossings of waters of the United States.  One commenter suggested clarifying that "crossing" only refers to regulated activities, and to not activities such as horizontal directional drilling and aerial crossings of jurisdictional waters. Several commenters said this NWP does not authorize activities that are similar in nature.  A

Exhibit 1

NWP005267

couple of these commenters asserted that this NWP does not authorize activities that are similar in nature because pipelines can carry a variety of types of fluids, some of which are harmful and some of which are benign.  Other commenters made the "not similar in nature" objection, stating that pipelines that carry fluids such as oil are different than pipelines that carry water or sewage, which are different than utility lines that carry electricity.

We are retaining the long-standing practice articulated in the NWP regulations at 33 CFR 330.2(i), in which each separate and distant crossings of waters of the United States is authorized by NWP.  The utility line activities authorized by NWP 12 are similar in nature because they involve linear pipes, cables, or wires to transport physical substances or electromagnetic energy from a point of origin to a terminal point.  For the purposes of this NWP, the term "crossing" refers to regulated activities.  However, it should be noted that installing utility lines under a navigable water of the United States subject to section 10 of the Rivers and Harbors Act of 1899 via horizontal directional drilling, as well as aerial crossings of those navigable waters, require authorization under section 10 of the Rivers and Harbors Act of 1899.  The substations, tower foundations, roads, and temporary fills that are also authorized by NWP 12 (when those activities require Department of the Army (DA) authorization) are integral to the fulfilling the purpose of utility lines, and thus fall within the "categories of activities that are similar in nature" requirement for general permits stated in section 404(e) of the Clean Water Act.

Many commenters objected to the reissuance of NWP 12, stating that it authorizes oil and gas pipelines that should be subject to the individual permit process instead.  Many commenters said that these activities should be subject to a public review process.  Many of these commenters cited the risk of oil spills as a reason why oil pipelines should be evaluated under the Corps' individual permit process.  Many commenters based their concerns on their views that the Corps is the only federal agency that regulates oil pipelines.

The Corps does not regulate oil and gas pipelines, or other types of pipelines, per se.  For utility lines, including oil and gas pipelines, our legal authority is limited to regulating discharges of dredged or fill material into waters of the United States and structures or work in navigable waters of the United States, under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act of 1899, respectively.  We do not have the authority to regulate the operation of oil and gas pipelines, and we do not have the authority to address spills or leaks from oil and gas pipelines.  General condition 14, proper maintenance, requires that NWP activities, including NWP 12 activities, be properly maintained to ensure public safety.  The proper maintenance required by general condition 14 also ensures compliance with the other NWP general conditions, many of which are designed to protect the environment, as well as any regional conditions imposed by the division engineer and activity-specific conditions imposed by the district engineer.  In addition, we do not have the legal authority to regulate the construction, maintenance, or repair of upland segments of pipelines or other types of utility lines.  For example, for a recent oil pipeline (e.g., the Flanagan South pipeline), the segments of the oil pipeline that were subject to the Corps' jurisdiction (i.e., the crossings of waters of the United States, including navigable waters of the United States, that were authorized by the 2012 NWP 12) was only 2.3% of the total length of the pipeline; the remaining 97.7% of the oil pipeline was constructed in upland areas outside of the Corps' jurisdiction.  Interstate natural gas

7

Exhibit 1

NWP005268

pipelines are regulated by the Federal Energy Regulatory Commission. The Federal Energy Regulatory Commission also regulates some electric transmission projects.

There are other federal laws that address the operation of pipelines and spills and leaks of substances from pipelines. Those laws are administered by other federal agencies. Under the Natural Gas Pipeline Safety Act of 1968, the Department of Transportation (DOT) regulates pipeline transportation of natural gas and other gases. The DOT also regulates the transportation and storage of liquefied natural gas. Under the Hazardous Liquid Pipeline Safety Act, the DOT regulates pipeline transportation of hazardous liquids including crude oil, petroleum products, anhydrous ammonia, and carbon dioxide. The DOT administers its pipeline regulations through the Office of Pipeline Safety (OPS), which is in its Pipelines and Hazardous Materials Safety Administration (PHMSA). Specific to oil pipelines, the PHMSA is responsible for reviewing oil spill response plans for onshore oil pipelines.

Oil spills are also addressed through the Oil Pollution Act of 1990, which is administered by the U.S. Environmental Protection Agency and the U.S. Coast Guard. Under the Oil Pollution Act of 1990, EPA is responsible for addressing oil spills occurring in inland waters and the U.S. Coast Guard is responsible for addressing oil spills in coastal waters and deepwater ports. The U.S. EPA has issued regulations governing its oil spill prevention program, and requires oil spill prevention, control, and countermeasures, and facility response plans (see 40 CFR part 300 and 40 CFR part 112). Oil spill prevention, control, and countermeasures are intended to ensure that oil facilities prevent discharges of oil into navigable waters or adjoining shorelines. Their facility response plan regulations require certain facilities to submit response plans to address worst case oil discharges or threats of a discharge. The U.S. Coast Guard has the authority to ensure the effective cleanup of oil spills in coastal waters and require actions that prevent further discharges of oil from the source of the oil spill. Activities regulated under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act that are determined by the U.S. EPA or U.S. Coast Guard to be necessary to respond to discharges or releases of oil or hazardous substances may be authorized by NWP 20.

Many commenters based their objections to the reissuance of NWP 12 on the inability for public involvement to occur during the Corps' NWP verification process for specific pipelines. Many commenters said the Corps' authorization process should be modified to prevent the segmentation of pipelines and that the Corps should fully evaluate the environmental impacts of individual fossil fuel pipelines, including the burning of those fossil fuels. Many commenters cited climate change as a reason why oil and gas pipelines should be evaluated under the individual permit process instead of the Corps using NWP to authorize crossings of waters of the United States.

The purpose of the NWPs, as well as regional general permits, is to provide a streamlined authorization process for activities that result in no more than minimal individual and cumulative adverse environmental effects. When section 404(e) of the Clean Water Act became law in 1977, lawmakers endorsed the general permit concept that was developed by the Corps in its 1975 and 1977 regulations (see 40 FR 31335 and 42 FR 37140, 37145 respectively). For the issuance or reissuance of NWPs and other general permits, the public involvement process occurs during the development of the general permit. If public notices

Exhibit 1

NWP005269

were required to authorize specific activities after the NWP or other general permit was issued, it would not provide the streamlined process intended by Congress. Individual pipelines may be able to operate independently to transport substances from a point of origin to a terminal point, even though they may be part of a larger network of pipelines. The Corps may authorize these independent pipelines, if all crossings of waters of the United States involving regulated activities qualify for NWP authorization.

The Corps does not have the legal authority to regulate the burning of fossil fuels that are transported by pipelines where the Corps authorized crossings of waters of the United States by NWP 12, other general permits, or individual permits. Therefore, in its environmental documentation the Corps is not required to fully evaluate the burning of fossil fuels, except to respond to specific comments submitted in response to a proposed rule (in the case of these NWPs) or comments submitted in response to a public notice for an individual permit application.

Activities authorized by NWP 12 are currently playing, and will continue to play, and important role in helping the nation achieve goals regarding the increased reliance on clean energy projects to meet the energy needs of its populace, to help reduce emissions of greenhouse gases that contribute to climate change. Clean energy projects include the construction, operation, and maintenance of more efficient and cleaner fossil-fuel energy generation facilities, nuclear power plants, and renewable energy generation projects that use solar and wind energy. Natural gas and electricity transmission and distribution systems will also need to be constructed or upgraded to bring clean energy to consumers.

The utility line activities authorized by NWP 12 will continue to be needed by society, including the goods and services transported by those utility lines. In areas of increasing temperatures, there will be increased demand for air conditioning and the energy needed to run air conditioners. Some areas of the country will receive less precipitation, and their water needs may need to be fulfilled through the construction and operation of utility lines that carry water to those areas that need additional water.

One commenter said that for any oil pipeline that affects aboriginal, historic treaty or reservation lands of an Indian tribe, the terms of NWP 12 should require consultation with all affected tribes and that any permit decision protect the full range of tribal rights under federal law. Two commenters stated that all NWP 12 activities should require pre-construction notification to ensure that consultation occurs with tribes on any utility line that may affect protected tribal resources, tribal rights, or Indian lands. One of these commenters said that general condition 17 in effect delegates the Corps' tribal trust responsibility to project proponents, and that the vast majority of impacts to waters of the United States can occur without notification to the Corps.

Activities authorized by NWP 12 must comply with general condition 17, tribal rights, and general condition 20, historic properties. We have modified general condition 17 to more effectively address the Corps' responsibilities regarding tribal rights (including treaty rights), protected tribal resources, and tribal lands. For the 2017 NWPs, district engineers have been consulting with tribes to identify regional conditions that will facilitate compliance with general conditions 17 and 20. As a result of this consultation, district

Exhibit 1

NWP005270

engineers can establish coordination procedures to identify utility line activities that require government-to-government consultation to protect tribal trust resources and tribal treaty rights. These consultations will be done in accordance with the Corps' tribal policy principles. Further information on the Corps' tribal policy principles is available at: http://www.usace.army.mil/Missions/Civil-Works/Tribal-Nations/ . In fulfilling its trust responsibilities to tribes, the Corps follows the Department of Defense American Indian and Alaska Native Policy. The Corps' tribal trust responsibilities apply to the activities regulated by the Corps, and do not extend to associated activities that the Corps does not have the authority to regulate, such as activities in upland areas outside of the Corps' legal control and responsibility.

The consultation between Corps districts and tribes that has been conducted for these NWPs can result in additional procedures or regional conditions to protect tribal trust resources. District engineers will work to establish procedures with interested tribes to coordinate on specific NWP 12 activities to assist the Corps in executing its tribal trust responsibilities, or add mitigation requirements that the district engineer determines are necessary to ensure that the verified NWP activity results in no more than minimal individual and cumulative adverse environmental effects. Division engineers will, as necessary, impose regional conditions on this NWP, including requiring more activities to require pre-construction notification, to ensure that these activities do not cause more than minimal adverse effects on tribal rights, protected tribal resources, or tribal lands. When a Corps district receives a pre-construction notification that triggers a need to consult with one or more tribes, that consultation will be completed before the district engineer makes his or her decision on whether to issue the NWP verification. Regional conditions and coordination procedures can help ensure compliance with general condition 17. The Corps does not, and cannot, delegate its tribal trust responsibilities to permit applicants.

One commenter said that NWP 12 should prohibit construction in waters of the United States until all other federal and state permits are issued for pipelines. One commenter suggested adding language that allows temporary impacts for repair of a utility line parallel a bank, which is not a "crossing." Several commenters stated that this NWP should not authorize activities in regions in Appalachia because it is not possible to mitigate impacts in those mountainous areas. Two commenters said this NWP should require the use of best management practices to control release of sediments during construction.

Paragraph 2 of Section E, "Further Information," states that the NWPs do not remove the need to obtain other required federal, state, or local authorizations as required by law. The NWPs have a 45-day review period (with some exceptions), so district engineers cannot wait for all other federal, state, or local authorizations to be issued. Otherwise, the proposed NWP activity would be authorized after the 45-day period passed with no response from the Corps. The default NWP authorization would not have any activity-specific conditions, such as mitigation requirements, to ensure that the adverse environmental effects are no more than minimal. This NWP authorizes temporary fills to construct a utility line. Concerns about the use of this NWP in Appalachia are more appropriately addressed by the appropriate division engineer, who has the authority to modify, suspend, or revoke the NWP in a specific region. General condition 12 requires the use of soil and erosion controls to ensure that sediments associated with an NWP activity are not released downstream.

Exhibit 1

NWP005271

Several commenters suggested changing the acreage limit from 1/2-acre to 1 acre.  Some commenters said the 1/2-acre limit is too high, and some commenters stated that the 1/2-acre limit is appropriate.  A number of commenters recommended imposing an acreage limit that would place a cap on losses of waters of the United States for the entire utility line.  A few commenters recommended reducing the 1/2-acre limit to 1/4-acre.  One commenter said the 1/2-acre limit should apply to the entire utility line, not to each separate and distant crossing.  One commenter recommended establishing an acreage limit based on a county or state.  Another commenter suggested applying the acreage limit to a waterbody.  One commenter stated that this NWP should not authorize waivers of the 1/2-acre limit.  Two commenters said that stream impacts should be limited to 300 linear feet, especially in headwater streams.

We are retaining the 1/2-acre limit for this NWP because we believe it is an appropriate limit for authorizing most utility line activities that have no more than minimal individual and cumulative adverse environmental effects.  Division engineers can modify this NWP on a regional level to reduce the acreage limit if necessary to ensure that no more than minimal adverse environmental effects occur in that region.  We do not agree that the acreage limit should apply to the entire utility line because the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds especially for utility lines that run through multiple counties, states, or Corps districts.  For utility lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.  If the district engineer determines after reviewing the PCN that the cumulative adverse environmental effects are more than minimal, after considering a mitigation proposal provided by the project proponent, he or she will exercise discretionary authority and require an individual permit.

The 1/2-acre limit cannot be waived.  We do not believe it is necessary to impose a 300 linear foot limit for the loss of stream bed because most utility line crossings are constructed perpendicular, or nearly perpendicular, to the stream.  In addition, most utility line crossings consist of temporary impacts.  This NWP requires PCNs for proposed utility lines constructed parallel to, or along, a stream bed, and the district engineer will evaluate the adverse environmental effects and determine whether NWP authorization is appropriate.

Several commenters said this NWP does not authorize oil pipelines.  One commenter said that the requirement that utility lines result in "no change in pre-construction contours" will not prevent changes in habitats or physical features in some streams, and utility lines may become exposed over time.  One commenter objected to the requirement that there must be no change in pre-construction contours, because it is a new requirement and would require the permittee to complete a pre- and post- construction survey.  One commenter said this NWP should not authorize mechanized landclearing in forested wetlands or scrub-shrub wetlands.  Two commenters supported the addition of "internet" to the list of examples of utility lines.  One commenter recommended removal of the reference to "telegraph lines" from the list of types of utility lines covered by this NWP.

Exhibit 1

This NWP authorizes crossings of waters of the United States that are part of utility lines used to transport any "gaseous, liquid, liquescent, or slurry substance" which includes oil. We acknowledge that the construction and maintenance of utility lines in jurisdictional waters and wetlands will result in some changes to the structure of waters and wetlands and to the ecological functions and services provided by those waters and wetlands.  There is often conversion of wetland types within utility line rights-of-way and those conversions often need to be permanently maintained while the utility line is operational.  Periodic maintenance may be necessary to respond to erosion exposing utility lines that were buried when they were constructed.  The requirement to ensure that there are no changes in pre-construction contours of waters of the United States does not mandate pre- and post-construction surveys.  Compliance with this requirement can usually be accomplished by examining the nearby landscape to determine if there has been a change in pre-construction contours.  The NWP requires PCNs for mechanized landclearing in the utility line right-of-way so that district engineers can evaluate those proposed activities and determine whether they qualify for NWP authorization and whether compensatory mitigation is necessary to ensure no more than minimal adverse environmental effects in accordance with general condition 23, mitigation.  We have retained the internet as a form of communication that may be transmitted by utility lines. We do not see the need to remove "telegraph messages" from the type of communications that may be conveyed by utility lines because there may be some use of telegraph messages by historic societies or other entities.  Some of the existing utility lines that previously conveyed telegraph messages may now carry other forms of communication.

One commenter recommended modifying NWP 12 to authorize activities associated with wireless communication facilities, because these facilities could be considered substations. Two commenters said that NWP 12 should not authorize the construction or expansion of utility line substations because these facilities should not be located in waters of the United States. Several commenters said that utility line substations and access roads should not be limited to non-tidal waters of the United States to allow them to be constructed in all waters of the United States.

The substations authorized by this NWP must be associated with utility lines. With wireless telecommunication facilities, there are no utility lines connecting the various facilities because they transmit their information via electromagnetic waves traveling through the atmosphere.  The construction of wireless communication facilities that involves discharges of dredged or fill material into waters of the United States may be authorized by NWP 39 or other NWPs.  For some utility lines, it may not be practicable or feasible to locate a substation outside of waters of the United States.  As long as the construction or expansion of the proposed utility line substation results in no more than minimal adverse environmental effects, it can be authorized by this NWP.  We believe that it is necessary to limit the construction of utility line substations and access roads to non-tidal wetlands (except for non-tidal wetlands adjacent to tidal waters) to ensure that NWP 12 only authorizes activities that result in no more than minimal adverse environmental effects. Conducting those activities in tidal waters and wetlands, and in non-tidal wetlands adjacent to tidal waters is more likely to result in more than minimal adverse environmental effects.

One commenter expressed opposition to moving the provisions authorizing access roads to

Exhibit 1

NWP005273

NWPs 14 and 33.  One commenter said that this NWP should not authorize access roads, because those roads can cause fragmentation of the landscape.

We did not propose to move the provisions authorizing the construction of utility line access roads to NWPs 14 and 33.  We have retained the access road provision in this NWP.  The Corps only regulates those portions of access roads that require DA authorization because they involve regulated activities in jurisdictional waters and wetlands.  The Corps does not regulate access roads constructed in upland areas that, in many areas of the country, are more likely to result in substantial habitat fragmentation.  In those areas of the country where much of the landscape is comprised of wetlands, utility line access roads are more likely to exceed the 1/2-acre limit and thus require individual permits.  District engineers will review PCNs with proposed access roads and determine whether the proposed activities will have more than minimal adverse environmental effects on wetland functions, including habitat connectivity.

In the June 1, 2016, proposed rule, we proposed to add a paragraph to NWP 12 to authorize, to the extent that DA authorization is required, discharges of dredged or fill material into waters of the United States, and structures and work in navigable waters, necessary to remediate inadvertent returns of drilling fluids that can occur during horizontal directional drilling operations to install utility lines below jurisdictional waters and wetlands. An inadvertent return occurs when drilling fluids are released through fractures in the bedrock and flow to the surface, and possibly into a river, stream, wetland, or other type of waterbody.  For NWP 12 activities where there is the possibility of such inadvertent returns, district engineers may add conditions to the NWP 12 verification requiring activity-specific remediation plans to address these situations, should they occur during the installation or maintenance of the utility line.

The fluids used for directional drilling operations consist of a water-bentonite slurry and is not a material that can be considered "fill material" under 33 CFR 323.2(e). This water-bentonite mixture is not a toxic or hazardous substance, but it can adversely affect aquatic organisms if released into bodies of water. Because these drilling fluids are not fill material, inadvertent returns of these drilling fluids are not regulated under section 404 of the Clean Water Act. However, activities necessary to contain and clean up these drilling fluids may require DA authorization (e.g., temporary fills in waters of the United States, or fills to repair a fracture in a stream bed).

Several commenters expressed support for adding the paragraph on remediation of inadvertent returns of drilling fluids from directional drilling activities.  A few commenters said that the term "frac-out" should not be used when referring to inadvertent returns of drilling fluids during horizontal directional drilling operations.  A commenter recommended replacing the term "sub-soil" with "subsurface."  One commenter objected to the proposed addition, stating that these inadvertent returns of drilling fluids occur too frequently.  One commenter asked for a definition of "inadvertent return" and said the NWP should explain that inadvertent returns of drilling fluids during horizontal directional drilling activities may require a Clean Water Act section 402 permit.  One commenter requested clarification that activities which remediate inadvertent returns of drilling fluids minimize environmental impacts.  One commenter agreed that inadvertent returns of drilling fluids that occur during

13

Exhibit 1

horizontal directional drilling activities are not discharges of dredged or fill material into waters of the United States. One commenter said that for horizontal directional drilling activities, the NWP should require entry and exit 50 feet from the stream bank, and sufficient depths prevent inadvertent returns of drilling fluids. One commenter said that the NWP should require upland containment of drilling fluids. One commenter requested that this paragraph distinguish between horizontal directional drilling for the purposes of utility line installation or replacement, and directional drilling for oil and gas extraction.

Horizontal directional drilling for utility line installation and replacement is an important technique for avoiding and minimizing adverse effects to jurisdictional waters and wetlands during the construction of utility lines. We believe that modifying NWP 12 to authorize remediation activities that involve discharges of dredged or fill material into waters of the United States and/or structures or work in navigable waters of the United States and are necessary to address these inadvertent returns to protect the aquatic environment is a prudent course of action. We have removed the term "frac-out" from the text of this NWP, and replaced the term "mud" with "fluid." We have also replaced the term "sub-soil" with "subsurface" because horizontal directional drilling activities usually occur well below the soil. District engineers may add conditions to NWP verifications to require activity-specific remediation plans to address potential inadvertent returns that might occur during the construction of the utility line.

If the horizontal directional drilling activities require DA authorization, the district engineer may add conditions to the NWP authorization to specify entry and exit points for the drilling equipment. If the drilling fluids return to the surface and are not considered to be discharges of dredged or fill material regulated under section 404 of the Clean Water Act, then the Corps cannot require those drilling fluids to be contained in an upland area. The text of this paragraph of NWP 12 specifically refers to horizontal directional drilling for utility line installation or replacement, but we have revised the text of this paragraph to specify that these activities are being "conducted for the purpose of installing or replacing utility lines."

Several commenters said that for utility lines involving horizontal directional drilling, the PCN should require drilling plans and site-specific spill detection and remediation measures. One commenter stated that mitigation should be required for the remediation of inadvertent returns of drilling fluids. Two commenters recommended adding a requirement that remediation of inadvertent returns of drilling fluids must be based on contingency plans submitted in advance of conducting horizontal directional drilling. One commenter said that PCNs should be required for these remediation activities and agency coordination should be conducted. Another commenter said that water quality certification agencies should be involved in the review and approval of these remediation plans.

If the horizontal directional drilling involves activities that require authorization under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act, the PCN should describe those activities and their environmental effects. The PCN should also describe mitigation measures that will be used to ensure compliance with the terms and conditions of the NWP. We believe that remediating the inadvertent returns of drilling fluids and restoring, to the maximum extent practicable, the affected jurisdictional waters and wetlands is sufficient mitigation. District engineers can add conditions to the NWP

14

Exhibit 1

NWP005275

authorization to require contingency plans for utility line activities that require DA authorization. We do not agree that it is necessary to require PCNs for inadvertent returns of drilling fluids or to conduct agency coordination. Through this provision of NWP 12, we are trying to encourage timely remediation of these inadvertent returns of drilling fluids to protect the aquatic environment. States can determine whether water quality certification is required for activities conducted to remediate inadvertent returns of drilling fluids. States can require water quality certification for any discharge into jurisdictional waters and wetlands, not just discharges of dredged or fill material.

Several commenters said they support the addition of temporary mats to minimize impacts of utility line activities. Two commenters requested clarification that not all uses of temporary mats in jurisdictional waters and wetlands results in a regulated activity. One commenter recommended adding language to this paragraph to include other measures that distribute the weight of construction equipment to minimize soil disturbance. Another commenter stated that this paragraph should require best management practices, such as low pressure equipment, wide tires, and varying travel paths, to minimize the adverse environmental effects of NWP 12 activities. One commenter suggested inserting the word "promptly" between the words "be removed" to require the prompt removal of all temporary fills.

District engineers will determine on a case-by-case basis whether the use of timber mats in jurisdictional waters and wetlands requires DA authorization. We believe that the proposed language in this paragraph allows for a variety of temporary structures, fills, and work necessary to construct, maintain, or repair a utility line, substation, foundation for overhead utility lines, or access road. We do not believe it is necessary to provide, for NWP 12 activities, a comprehensive list of techniques to minimize soil disturbance and minimize the impacts of construction equipment. We also do not agree with the proposed addition of "promptly" because it may be more protective of the environment to keep temporary fills in place until post-construction restoration activities or permanent fills have had time to stabilize.

One commenter stated that the PCN thresholds for NWP 12 should not be changed. One commenter said that PCNs should be required for all NWP 12 activities. Several commenters suggested increasing the 1/10-acre PCN threshold (item 5 in the "Notification" paragraph) to 1/2-acre. One commenter asked the Corps to remove the PCN requirement for the maintenance of aerial crossings of section 10 waters that do not include installation of new structures. One commenter opposed replacing the current PCN thresholds with a single 1/10-acre PCN threshold. One commenter requested clarification of the PCN threshold for proposed NWP 12 activities that run parallel to a stream bed (item 4 in the "Notification" paragraph). One commenter said that PCNs should be required for utility line crossings of streams inhabited by species listed under the Endangered Species Act.

We have not made any changes to the PCN thresholds for this NWP. We do not agree that PCNs should be required for all activities authorized by this NWP because the current PCN thresholds have been effective in identifying proposed NWP 12 activities that should be reviewed by district engineers on a case-by-case basis to ensure that they result in only minimal individual and cumulative adverse environmental effects. In addition, paragraph

15

Exhibit 1                                                                 NWP005276

(b)(4) of general condition 32 requires that NWP 12 PCNs (and PCNs for other NWPs) also include information on other crossings of waters of the United States for the linear project that will use NWP 12 authorizations but do not require PCNs. This requirement is also explained in Note 8 of NWP 12.

All NWP 12 activities that require authorization under section 10 of the Rivers and Harbors Act of 1899 require PCNs to ensure that these utility lines will have no more than minimal adverse effects on navigation. This includes the maintenance of aerial crossings of navigable waters. We agree that the current PCN thresholds should be maintained instead of simplifying the PCN thresholds to a single PCN threshold for the loss of greater than 1/10-acre of waters of the United States. Item 4 of the "Notification" paragraph requires pre-construction notification for utility lines placed in jurisdictional waters and wetlands if the proposed utility line runs parallel to, or along, a stream bed. These activities require PCNs to allow district engineers to evaluate potential impacts to the stream. General condition 18, endangered species, requires PCNs for all NWP activities to be conducted by non-federal permittees that might affect listed species or critical habitat (see paragraph (c) of general condition 18).

Several commenters expressed agreement with adding the proposed Note 2, and some of those commenters requested clarification of the use of the term "independent utility" in the proposed note. Several commenters objected to the proposed Note 2, stating that only the crossings of waters of the United States that do not qualify for NWP authorization should be evaluated through the individual permit process, allowing the remaining crossings to be authorized by NWP 12. Several commenters said that the second sentence of Note 2 should be removed. Several commenters requested clarification that the phrase "independent utility" in 33 CFR 330.6(d) does not affect the current practice for linear projects found in 33 CFR 330.2(i) and in the NWP definition of "single and complete linear project" in which separate and distant crossings of waters of the United States can qualify for separate NWP authorization. Several commenters asked for thresholds for determining when utility line crossings are "separate and distant."

Note 2 is based on the NWP regulations that were published in the Federal Register on November 22, 1991 (56 FR 59110), and represent long-standing practices in the NWP program. Those regulations include the definition of "single and complete project" at 33 CFR 330.2(i) and the provision for combining NWPs with individual permits at 33 CFR 330.6(d). We have removed the phrase "with independent utility" from the second sentence of Note 2. We believe that the second sentence, with this modification, needs to be retained to remind users of NWP 12 of the requirements in the regulations at 33 CFR 330.6(d). This will help ensure that the project proponent submits the appropriate request for authorization, specifically an individual permit application or NWP PCN.

If one or more crossings of waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 CFR 330.6(d). An exception would be if a regional general permit is available to authorize the crossing or crossings that do not qualify for NWP authorization. In these circumstances, the project proponent also has the option of relocating or redesigning the crossings of waters of the United States that does not qualify for NWP authorization so

16

Exhibit 1

NWP005277

that all of the utility line crossings could qualify for NWP authorization.

There is no conflict between 33 CFR 330.6(d) and 33 CFR 330.2(i). In addition, these regulations do not conflict with the NWP definition of "single and complete linear project" in Section F of these NWPs. It should be noted that both 33 CFR 330.2(i) and the NWP definition of "single and complete linear project" do not discuss the concept of "independent utility." We cannot establish national thresholds for determining when crossings of waters of the United States are "separate and distant" because a variety of factors should be considered by district engineers when making those decisions, such as topography, geology, hydrology, soils, and the characteristics of wetlands, streams, and other aquatic resources. Corps districts may establish local guidelines for identifying "separate and distant" crossings.

One commenter said that Note 2 uses the phrase "utility lines with independent utility" and observes that the definition of "independent utility" in the "Definitions" section of the NWPs states that independent utility is a test for "a single and complete non-linear project." This commenter said that this inconsistent wording causes confusion. One commenter stated that the difference between "stand-alone" activities and "segments" is unclear. One commenter recommended removing the second sentence of Note 2. One commenter requested a definition of "stand-alone linear project."

As stated above, we have removed the phrase "with independent utility" from the second sentence of Note 2. District engineers will apply the concept of independent utility in 33 CFR 330.6(d) to determine when NWP authorizations can be combined with individual permit authorizations, or whether an individual permit is required for the regulated activities. Therefore, there is no need to further explain the concept of "stand-alone" activities or "stand-alone linear project." Note 2 covers linear projects, not single and complete non-linear projects, so Note 2 should not be applied to non-linear projects. There are separate definitions of "single and complete linear project" and "single and complete non-linear project" in the Definitions section of these NWPs because these are different concepts for the NWP program.

Several commenters opposed Note 2, stating that it would allow utility line proponents to break up large utility lines into separate projects and prevent them from being evaluated under the individual permit process. One commenter requested clarification whether the permittee can identify to the district engineer the origin and terminal point for each utility line that has independent utility (i.e., each stand-alone utility line).

The purpose of Note 2 is to prevent the situations the commenters opposing the proposed note are concerned about, to ensure that utility lines with one or more crossings that do not qualify for NWP authorization are evaluated under the individual permit process. To assist district engineers in applying 33 CFR 330.6(d), in an individual permit application or a PCN, the project proponent can identify the point of origin and terminal point of the utility line that could function independently of a larger overall utility line project.

The objective of Note 2 is to improve consistency in implementation of the NWP program, especially the application of 33 CFR 330.6(d). Project proponents usually design their

utility lines to reduce their impacts to waters of the United States to qualify for NWP authorization.  That avoidance and minimization is a benefit of the NWP program. In addition, most of the crossings of waters of the United States for utility lines result in temporary impacts to those jurisdictional waters and wetlands.  The use of the term "separate and distant" in Note 2 is the same as its use in 33 CFR 330.2(i) and the definition of "single and complete linear project" in the "Definitions" section of the NWPs (Section F).

A few commenters asserted that proposed Note 2 does not comply with NEPA or the National Historic Preservation Act (NHPA) because the Corps should view an entire oil pipeline as a single and complete project.  These commenters objected to the Corps' practice of authorizing each separate and distant crossing by NWP.

The Advisory Council on Historic Preservation's regulations for implementing NHPA section 106 define the term "undertaking" as: "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." (See 36 CFR 800.16(y).)  It should be noted that the Advisory Council's definition of "undertaking" refers not only to projects, but also to activities.  Their definition of "undertaking" recognizes that federal agencies may not regulate or permit entire projects, and that a federal agency might only have the authority to authorize an activity or a number of activities that is a component or are components of a larger overall project.

For oil pipelines and other utility lines, the activities that are subject to the Corps' regulatory authorities and require DA authorization are crossings of jurisdictional waters and wetlands, as well as utility line substations, foundations for overhead utility lines, and access roads, that involve discharges of dredged or fill material into waters of the United States or structures or work in navigable waters of the United States.  Segments of an oil pipeline or other utility line in upland areas outside of the Corps' jurisdiction, or attendant features constructed in upland areas, do not require DA authorization and therefore are not, for the purposes of the Corps' compliance with section 106 of the NHPA, "undertakings."  The Corps does not have direct or indirect jurisdiction over pipeline segments in upland areas. The Corps does not regulate oil pipelines, or other utility lines per se; we only regulate those components of oil pipelines or other utility lines, that involve activities regulated under our authorities (i.e., section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act of 1899).

The activities regulated by the Corps, as well as the Corps' analysis of direct and indirect effects caused by those regulated activities, are the same regardless of whether the Corps processes an individual permit application or uses NWPs or other general permits to authorize the regulated activities.  Likewise, for the consideration of cumulative effects, the incremental contribution of regulated activities to cumulative effects is the same regardless of the type of DA authorization.  That incremental contribution consists of the direct and indirect effects of the activities that require DA authorization.

One commenter supported the addition of Note 3.  One commenter requested that this Note clarify that the term "navigable waters of the United States" refers to the waters defined at

18

Exhibit 1                                                                  NWP005279

33 CFR part 329.  We have added a reference to 33 CFR part 329 to Note 3.

One commenter agreed with the proposed addition of Note 6.  Several commenters said the word "that" should be added before the phrase "do not qualify."  One commenter stated that the phrase "or another applicable 404(f) exemption" should be added to Note 6 because a project proponent may use other Clean Water Act section 404(f) exemptions, such as the exemptions for ditch maintenance and the construction of temporary sedimentation basins. One commenter requested confirmation that the Clean Water Act section 404(f) exemptions that are applicable to currently serviceable structures used for transportation have not been changed.  Another commenter requested examples of activities that do not qualify for the Clean Water Act section 404(f) exemptions, such as mechanized landclearing outside previously authorized right-of-ways.

We have added the word "that" after "activities" to correct the error in the proposed Note 6. Note 6 does not preclude project proponents from utilizing other Clean Water Act section 404(f) exemptions that are applicable to activities that may be related to utility lines.  Note 6 refers to the maintenance exemption because NWP 12 explicitly refers to maintenance activities, which may require Clean Water Act section 404 authorization if the maintenance activity does not qualify for the section 404(f) maintenance exemption.  Note 6 does not affect the application of the maintenance exemption to fill structures used for transportation. It is beyond the scope of Note 6 to discuss activities related to utility lines that do not qualify for any of the Clean Water Act section 404(f) exemptions.

One commenter pointed out that Note 8 was not discussed in the preamble of the June 1, 2016, proposed rule.  One commenter asked the Corps to explain why it proposed to add Note 8.  Another commenter requested clarification of whether Note 8 would affect utility lines that have stormwater outfalls.

The lack of discussion of Note 8 in the preamble to the proposed rule was an error.  As stated on page 35197 of the proposed rule, we solicited comments on all of the NWPs, general conditions, definitions, and all NWP application procedures presented in the proposed rule.  The purpose of Note 8 is to remind users of the NWPs that if a utility line includes crossings of waters of the United States that are authorized by NWP but do not require PCNs, and one or more crossings of waters of the United States requires pre-construction notification, then the PCN must include those non-PCN crossings, in accordance with the requirements of paragraph (b)(4) of general condition 32 . The requirements in Note 8 may apply to outfalls for utility lines and outfalls for stormwater management facilities, depending on the case-specific characteristics of the utility line, outfall, and stormwater management facility.

Several commenters said that Corps districts should be prohibited from suspending or revoking NWP 12 and using RGPs for utility lines that cross state or district boundaries. One commenter recommended that NWP 12 include prescriptive national standard best management practices (BMPs) and provide notifications to stakeholders when pipelines, cables, and utility lines are proposed to be constructed in marine transportation routes. These notifications would also be provided to the U.S. Coast Guard and the National Marine Fisheries Service.  A few commenters said that the mitigation process for NWP 12 is not in

Exhibit 1                                                                                    NWP005280

compliance with the National Environmental Policy Act (NEPA) because the public is not provided with an opportunity to comment on requests for NWP verifications. A few commenters also stated that reliance on a district engineer's compensatory mitigation requirement for an NWP 12 verification is inadequate to support a finding of no significant impact under an environmental assessment prepared to satisfy NEPA requirements.

For utility lines that cross Corps district boundaries, each Corps district may process the NWP 12 PCNs for crossings located in its district, or the Corps districts may designate a lead district to provide a single response to the NWP 12 PCNs. If a Corps district has had NWP 12 suspended or revoked by the division engineer to use a regional general permit or state programmatic general permit instead of NWP 12, it can use that regional or programmatic general permit to authorize utility line activities. We believe that it would be more appropriate to have district engineers determine which BMPs should be applied to the construction, maintenance, or repair of utility lines in their geographic areas of responsibility, as those BMPs may vary by region and utility sector. If the U.S. Coast Guard has a role in regulating utility lines in marine transportation routes, the U.S. Coast Guard can take its own actions under its authorities to ensure compliance with its requirements. We will continue to provide NWP verifications to the National Ocean Service for the charting of utility lines in navigable waters of the United States.

The decision document for this NWP includes an environmental assessment with a mitigated finding of no significant impact. Mitigation measures are discussed throughout the combined decision document, which includes the environmental assessment, public interest review, and 404(b)(1) Guidelines analysis. Other mitigation measures may be required by district engineers through conditions added to activity-specific NWP verifications. The mitigation measures discussed in the national decision documents include the NWP general conditions, which help ensure that NWP activities result in no more than minimal adverse environmental effects.

The draft decision document for NWP 12 was made available for public review and comment concurrent with the proposed rule that was published in the Federal Register on June 1, 2016. The decision document describes, in general terms, mitigation that helps ensure that NWP 12 activities result in no more than minimal adverse environmental effects. Mitigation requirements, including compensatory mitigation requirements, will be determined by district engineers for activity-specific NWP verifications. Compliance with NEPA is accomplished when the NWP is issued by Corps Headquarters, with its decision document. Individual NWP 12 verifications do not require NEPA documentation, nor do they require an opportunity for public comment. The public comment process occurs during the rulemaking procedures to issue or reissue an NWP. A public notice and comment process for NWP verifications would not be consistent with the Congressional intent of section 404(e) of the Clean Water Act, which envisions a streamlined authorization process for activities that result in no more than minimal individual and cumulative adverse environmental effects.

One commenter said that utility lines constructed parallel to the stream gradient should have the minimum number of crossings, and those crossings should intersect the stream as close to 90 degrees to the stream centerline as possible. That commenter also stated that trench

plugs should be no more than 200 feet apart, and plugs must be used on either side of the stream crossing.  One commenter recommended adding a permit condition to prevent utility lines from creating new drainage paths away from a waterbody.

Paragraph (a) of general condition 23, mitigation, requires permittees to avoid and minimize adverse effects to waters of the United States to the maximum extent practicable on the project site.  For the purposes of NWP 12, this means that the project proponent should design the utility line to minimize the number of crossings of waters of the United States. The use of trench plugs will be determined on a case-by-case basis by district engineers when processing NWP 12 PCNs or voluntary requests for NWP verification.  District engineers may also impose activity-specific conditions on NWP 12 authorizations to minimize draining of waters of the United States.

One commenter said that compensatory mitigation should be required for the permanent conversion of forested wetlands to scrub-shrub wetlands for utility line rights-of-way.  Two commenters stated that this NWP should not authorize sidecasting of excavated material into waters of the United States because the sidecast material will be dispersed by currents or rainfall.  One commenter requested clarification of a statement made in the preamble to the proposed rule that some excavation activities do not require Clean Water Act section 404 authorization.  Two commenters said that if Corps districts consider separate and distant crossings of waters of the United States to qualify for separate NWP authorization, how are cumulative impacts considered in accordance with Section D, District Engineer's Decision?

District engineers have the discretion to require compensatory mitigation for the permanent conversion of forested wetlands to scrub-shrub wetlands, if that permanent conversion is conducted as a result of activities that require DA authorization (see paragraph (i) of general condition 23, mitigation).  General condition 12, soil erosion and sediment controls, requires permittees to stabilize exposed soils and fills at the earliest practicable date, to minimize dispersion by currents, rainfall, or other erosive forces.  Excavation activities require Clean Water Act section 404 authorization if they result in regulated discharges of dredged or fill material into waters of the United States (see the definitions at 33 CFR 323.2).

Paragraph 1 of Section D, District Engineer's Decision, requires district engineers to consider the cumulative effects of all crossings of waters of the United States for a single and complete linear project that is authorized by NWP, including those crossings that require DA authorization but do not otherwise require pre-construction notification.  A complete PCN requires the project proponent to identify, in addition to the NWP 12 activities that require PCNs, the NWP 12 activities that do not require PCNs (see paragraph (b)(4) of general condition 32 and Note 8).  The information regarding the cumulative effects of all of the utility line activities authorized by NWP 12 will be considered by the district engineer in his or her decision-making process for an NWP 12 verification.

A number of commenters asserted that the issuance of NWP 12 requires an environmental impact statement.  A few commenters stated that the cumulative effects analysis for NWP 12 in the draft decision document was insufficient.  A few commenters said that the cumulative effects analysis for NWP 12 in the draft decision document was properly done.  One

commenter indicated that the Corps improperly deferred the requirement to do a NEPA cumulative effects analysis to the district engineer's NWP verification decision.  One commenter opined that the Corps defers its NEPA review for later stages in the permitting process and that NWP 12 provides no guarantee that the Corps district will conduct a NEPA analysis for the NWP verification.  One commenter said that Corps districts should prepare supplemental environmental impact statements for NWP 12 verifications.  One commenter stated that the decision document should discuss NWP 12 activities and their effects on climate change.  Many commenters remarked that the Corps should not issue permits for pipelines because the burning of fossil fuels contributes greenhouse gases that cause climate change.

For the issuance or reissuance of an NWP, including NWP 12, the Corps complies with NEPA when Corps Headquarters issues or reissues the NWP with its decision document.  The decision document issued by Corps Headquarters includes an environmental assessment and a finding of no significant impact, which concludes the NEPA process.  The finding of no significant impact is reached because of the terms and conditions of the NWP and the mitigation measures (e.g., general conditions and other mitigation measures) for NWP 12 activities that are discussed throughout the decision document.  Therefore, an environmental impact statement is not required for the issuance or reissuance of NWP 12.  When a district engineer issues an NWP 12 verification, he or she is confirming that the proposed NWP 12 activity complies with the terms and conditions of the NWP, including any regional and activity-specific conditions, and will result in no more than minimal individual and cumulative adverse environmental effects.  If the district engineer requires activity-specific mitigation measures, he or she will require those mitigation measures through conditions added to the NWP authorization.

To issue an NWP verification the district engineer does not need to prepare a NEPA document because the requirements for NEPA were fulfilled when Corps Headquarters issued the national decision document for the NWP.  Since NEPA compliance is achieved by Corps Headquarters through the preparation of a combined decision document that includes an environmental assessment and finding of no significant impact, Corps districts do not need to prepare supplemental environmental impact statements for NWP verifications.  If a proposed NWP activity will result in more than minimal individual and cumulative adverse environmental effects after considering the mitigation proposal submitted by the prospective permittee, the district engineer will assert discretionary authority and require an individual permit if the adverse environmental effects will be more than minimal.  During the individual permit process, the district engineer will prepare the appropriate NEPA documentation.

The NEPA cumulative effects analysis in the NWP 12 decision document was prepared in accordance with the Council of Environmental Quality's definition of "cumulative impact" at 40 CFR 1508.7, and utilizes concepts presented in CEQ's 1997 and 2005 guidance on conducting cumulative impact analyses.  The NEPA cumulative effects analysis examines cumulative effects on various resources of concern, including wetlands, rivers and streams, coastal areas, and endangered and threatened species.  Our NEPA cumulative effects analysis examines past, present, and reasonably foreseeable future actions that affect those

resources of concern, including federal, non-federal, and private actions. Because the decision document is national in scope it is a general cumulative effects analysis.

We also conducted a cumulative effects analysis in accordance with the 404(b)(1) Guidelines because this NWP authorizes discharges of dredged or fill material into waters of the United States. The Corps does not defer the NEPA cumulative effects analysis to the NWP verification stage of the authorization process. Corps Headquarters conducts the required NEPA analyses when it issues or reissues the NWP. The final national decision document includes a discussion of NWP 12 activities and climate change. Activities authorized by NWP will result in small incremental contributions to greenhouse gas emissions during construction periods, if the equipment used to construct the crossings of waters of the United States, utility line substations, footings for overhead utility lines, or access roads in waters of the United States consumes fossil fuels. The Corps does not have the authority to regulate the burning of fossil fuels that may be transported by utility lines. The Corps does not have the legal authority to regulate emissions of greenhouse gases during the operation and maintenance of the utility line activities, if those operations and maintenance activities do not involve activities that require DA authorization.

A number of commenters said the draft decision document for NWP 12 is inadequate, especially in its evaluation of the risks and impacts of oil spills, gas pipeline leaks, and inadvertent returns of drilling fluids from horizontal directional drilling activities. One commenter stated that with respect to the discussion of Subpart G (Evaluation and Testing) in the draft decision document, that voluntary compliance is rarely as effective as monitored compliance. Another commenter objected to the statement that "this NWP will encourage applicants to design their projects within the scope of the NWP" because the commenter believes that the NWP encourages massive cross-country pipeline projects. One commenter said the decision document must address impacts to forested wetlands caused by NWP 12 activities.

The decision document for NWP 12 treats oil spills and gas pipeline leaks as reasonably foreseeable future actions in the NEPA cumulative impact analysis section. The decision document also discusses the potential for inadvertent returns of drilling fluids to occur during horizontal directional drilling activities used to install or replace utility lines. As discussed above, the Corps does not regulate the operation of oil or gas pipelines, or leaks that might occur. In addition, the Corps does not regulate inadvertent returns of drilling fluids that might occur as a result of subsurface fractures during horizontal directional drilling activities. Oil spills and gas leaks are addressed by other federal agencies under other federal laws.

As discussed in the proposed rule, it is our position that inadvertent returns of drilling fluids from horizontal directional drilling are not discharges regulated under section 404 of the Clean Water Act, under the current definitions of "discharge of dredged material" and "discharge of fill material" at 33 CFR 323.2. We have added provisions to NWP 12 to authorize discharges of dredged or fill material into waters of the United States and/or structure or work in navigable waters of the United States to remediate inadvertent returns of

drilling fluids if they occur, to minimize the adverse environmental effects of those inadvertent returns of drilling fluids.

For those NWP 12 activities that do not require PCNs, voluntary compliance is an appropriate means of compliance.  District engineers will take appropriate action if they discover cases of non-compliance with the terms and conditions of NWP 12.  For utility lines, this NWP only authorizes crossings of waters of the United States that involve activities regulated under the Corps' authorities.  It does not authorize segments of utility lines constructed in uplands because those segments do not require DA authorization.  It does not authorize the entire utility line unless the entire utility line is constructed in jurisdictional waters and wetlands and involves activities that require DA authorization. For the crossings of waters of the United States authorized by NWP 12, the terms and conditions of this NWP encourage the project proponent to minimize adverse effects to jurisdictional waters and wetlands to qualify for NWP authorization, instead of having to apply for an individual permit.

For utility lines that cross state and/or Corps district boundaries, district engineers will consider the cumulative impacts of those NWP 12 activities when determining whether to issue NWP 12 verifications.  The national decision document for NWP 12 discusses, in general terms, the impacts that NWP 12 activities have on wetlands of all types, including forested wetlands.  For some utility lines, forested wetlands may be permanently converted to scrub-shrub or emergent wetlands to construct a right-of-way.

A few commenters said this NWP should not authorize utility lines in drinking water source areas.  One commenter stated that this NWP should not authorize pipelines under rivers or near the ocean because those pipelines could leak and threaten water supplies.  Many commenters said that the Corps should consider the environmental effects of the entire pipeline, including potential impacts to water supplies, to not just the specific activities authorized by NWP 12 or other DA permits.

General condition 7, water supply intakes, prohibits NWP activities in proximity of public water supply intakes except under specific circumstances.  General condition 14, proper maintenance, requires NWP activities to be maintained to ensure public safety. For NWP 12 activities, this includes maintaining the utility line so that it does not leak.  The Corps does not regulate the operation and maintenance of pipelines, if those activities do not include activities that require DA authorization.  As discussed above, there are other federal agencies that have legal responsibility for addressing the operation of pipelines and responding to leaks or spills that may occur.  Concerns regarding pipeline leaks or spills should be brought to the attention of those federal agencies.

One commenter expressed concern regarding the effects of dispersants on public health and the environment.  One commenter said that in the draft decision document the projected amount of compensatory mitigation required for NWP 12 activities is far less than the projected authorized impacts, and that difference results in inadequate mitigation.  One commenter said that the draft NWP 12 decision document fails to acknowledge that water quality standards will be violated in some cases.

Exhibit 1                                                                 NWP005285

The Corps does not have the legal authority to regulate the use of dispersants.  Other federal or state agencies may have that responsibility.  Many of the activities authorized by NWP 12 result in temporary impacts to jurisdictional waters and wetlands, and often district engineers do not require compensatory mitigation to offset those temporary impacts because those waters and wetlands continue to provide ecological functions and services.  The estimated impacts in the draft decision document include both permanent and temporary impacts to jurisdictional waters and wetlands.  For discharges into waters of the United States, general condition 25 requires certification that an NWP activity complies with applicable water quality standards unless a waiver of the Clean Water Act section 401 water quality certification requirement occurs.  The district engineer has discretion to take action to ensure compliance with the water quality certification issued by the state, tribe, or U.S. EPA.  The section 401 certifying authority also has the authority to enforce the terms and conditions of its water quality certification.

## 2.0 Alternatives

This evaluation includes an analysis of alternatives based on the requirements of NEPA, which requires a more expansive review than the Clean Water Act Section 404(b)(1) Guidelines.  The alternatives discussed below are based on an analysis of the potential environmental impacts and impacts to the Corps, Federal, Tribal, and state resource agencies, general public, and prospective permittees.  Since the consideration of off-site alternatives under the 404(b)(1) Guidelines does not apply to specific projects authorized by general permits, the alternatives analysis discussed below consists of a general NEPA alternatives analysis for the NWP.

### 2.1 No Action Alternative (No Nationwide Permit)

The no action alternative would not achieve one of the goals of the Corps Nationwide Permit Program, which is to reduce the regulatory burden on applicants for activities that result in no more than minimal individual and cumulative adverse environmental effects.  The no action alternative would also reduce the Corps ability to pursue the current level of review for other activities that have greater adverse environmental effects, including activities that require individual permits as a result of the Corps exercising its discretionary authority under the NWP program.  The no action alternative would also reduce the Corps ability to conduct compliance actions.

If this NWP is not available, substantial additional resources would be required for the Corps to evaluate these minor activities through the individual permit process, and for the public and Federal, Tribal, and state resource agencies to review and comment on the large number of public notices for these activities.  In a considerable majority of cases, when the Corps publishes public notices for proposed activities that result in only minimal individual and cumulative adverse environmental effects, the Corps typically does not receive responses to these public notices from either the public or Federal, Tribal, and state resource

NWP005286

agencies.  Another important benefit of the NWP program that would not be achieved through the no action alternative is the incentive for project proponents to design their projects so that those activities meet the terms and conditions of an NWP.  The Corps believes the NWPs have significantly reduced adverse effects to the aquatic environment because most applicants modify their projects to comply with the NWPs and avoid the delays and costs typically associated with the individual permit process.

In the absence of this NWP, Department of the Army (DA) authorization in the form of another general permit (i.e., regional or programmatic general permits, where available) or individual permits would be required.  Corps district offices may develop regional general permits if an NWP is not available, but this is an impractical and inefficient method for activities with no more than minimal individual and cumulative adverse environmental effects that are conducted across the Nation.  Not all districts would develop these regional general permits for a variety of reasons.  The regulated public, especially those companies that conduct activities in more than one Corps district, would be adversely affected by the widespread use of regional general permits because of the greater potential for lack of consistency and predictability in the authorization of similar activities with no more than minimal individual and cumulative adverse environmental effects.  These companies would incur greater costs in their efforts to comply with different regional general permit requirements between Corps districts.  Nevertheless, in some states Corps districts have issued programmatic general permits to take the place of this and other NWPs.  However, this approach only works in states with regulatory programs comparable to the Corps Regulatory Program.

## 2.2 National Modification Alternatives

Since the Corps Nationwide Permit program began in 1977, the Corps has continuously strived to develop NWPs that only authorize activities that result in no more than minimal individual and cumulative adverse environmental effects.  Every five years the Corps reevaluates the NWPs during the reissuance process, and may modify an NWP to address concerns for the aquatic environment.  Utilizing collected data and institutional knowledge concerning activities authorized by the Corps regulatory program, the Corps reevaluates the potential impacts of activities authorized by NWPs.  The Corps also uses substantive public comments on proposed NWPs to assess the expected impacts.  This NWP was developed to authorize the construction, maintenance, repair, and removal of utility lines and associated facilities, provided those activities and facilities have no more than minimal individual and cumulative adverse environmental effects.  The Corps has considered suggested changes to the terms and conditions of this NWP, as well as modifying or adding NWP general conditions, as discussed in the preamble of the Federal Register notice announcing the reissuance of this NWP.

In the June 1, 2016, Federal Register notice, the Corps requested comments on the proposed reissuance of this NWP.  As discussed above, The Corps proposed to modify this NWP to clarify that the NWP authorizes regulated activities for utility line crossings of waters of the United States, and that the Corps does not regulate entire utility lines. The Corps also

Exhibit 1

NWP005287

proposed to modify the definition of "utility line" to make it clear that it includes optic cables. In addition, the Corps proposed to add a paragraph authorizing regulated activities necessary to remediate inadvertent returns of drilling muds that can occur during directional drilling operations to install utility lines below jurisdictional waters and wetlands. The Corps also proposed to add three new notes to this NWP to clarify the use of this NWP.

### 2.3 Regional Modification Alternatives

An important aspect for the NWPs is the emphasis on regional conditions to address differences in aquatic resource functions, services, and values across the nation. All Corps divisions and districts are expected to add regional conditions to the NWPs to enhance protection of the aquatic environment and address local concerns. Division engineers can also revoke an NWP if the use of that NWP results in more than minimal individual and cumulative adverse environmental effects, especially in high value or rare wetlands and other waters. When an NWP is issued or reissued by the Corps, division engineers issue supplemental decision documents that evaluate potential impacts of the NWP at a regional level, and include regional cumulative effects assessments.

Corps divisions and districts also monitor and analyze the cumulative adverse effects of the NWPs, and if warranted, further restrict or prohibit the use of the NWPs to ensure that the NWPs do not authorize activities that result in more than minimal individual and cumulative adverse environmental effects. To the extent practicable, division and district engineers will use regulatory automated information systems and institutional knowledge about the typical adverse effects of activities authorized by NWPs, as well as substantive public comments, to assess the individual and cumulative adverse environmental effects resulting from regulated activities.

### 2.4 Case-specific On-site Alternatives

Although the terms and conditions for this NWP have been established at the national level to authorize most activities that have no more than minimal individual and cumulative adverse environmental effects, division and district engineers have the authority to impose case-specific special conditions on an NWP authorization to ensure that the authorized activities will result in only minimal individual and cumulative adverse environmental effects.

General condition 23 requires the permittee to minimize and avoid impacts to waters of the United States to the maximum extent practicable on the project site. Off-site alternatives cannot be considered for activities authorized by NWPs. During the evaluation of a pre-construction notification, the district engineer may determine that additional avoidance and minimization is practicable. The district engineer may also condition the NWP authorization to require compensatory mitigation to offset losses of waters of the United States and ensure that the net adverse effects on the aquatic environment are no more than minimal. As another example, the NWP authorization can be conditioned to prohibit the

NWP005288

permittee from conducting the activity during specific times of the year to protect spawning fish and shellfish.  If the proposed activity will result in more than minimal adverse environmental effects, then the district engineer will exercise discretionary authority and require an individual permit.  Discretionary authority can be asserted where there are concerns for the aquatic environment, including high value aquatic habitats.  The individual permit review process requires a project-specific alternatives analysis, including the consideration of off-site alternatives, and a public interest review.

## 3.0 Affected Environment

This environmental assessment is national in scope because the NWP may be used across the country, unless the NWP is revoked or suspended by a division or district engineer under the procedures in 33 CFR 330.5(c) and (d), respectively.  The affected environment consists of terrestrial and aquatic ecosystems in the United States, as they have been directly and indirectly affected by past and present federal, non-federal, and private activities.  The past and present activities include activities authorized by the various NWPs issued from 1977 to 2012, activities authorized by other types of Department of the Army (DA) permits, as well as other federal, tribal, state, and private activities that are not regulated by the Corps. Aquatic ecosystems are also influenced by past and present activities in uplands, because those land use/land cover changes in uplands and other activities in uplands have indirect effects on aquatic ecosystems (e.g., MEA 2005b, Reid 1993). Due to the large geographic scale of the affected environment (i.e., the entire United States), as well as the many past and present human activities that have shaped the affected environment, it is only practical to describe the affected environment in general terms. In addition, it is not possible to describe the environmental conditions for specific sites where the NWPs may be used to authorize eligible activities.

The total land area in the United States is approximately 2,264,000,000 acres, and the total land area in the contiguous United States is approximately 1,894,000,000 acres (Nickerson et al. 2011).  Land uses in 48 states of the contiguous United States as of 2007 is provided in Table 3.1 (Nickerson et al. 2011). Of the land area in the entire United States, approximately 60 percent (1,350,000,000 acres) is privately owned (Nickerson et al. 2011).  In the contiguous United States, approximately 67 percent of the land is privately owned, 31 percent is held by the United States government, and two percent is owned by state or local governments (Dale et al. 2000).  Developed non-federal lands comprise 4.4 percent of the total land area of the contiguous United States (Dale et al. 2000).

Exhibit 1

NWP005289

**Table 3.1. Major land uses in the United States (Nickerson et al. 2011).**

| Land Use | Acres | Percent of Total |
|---|---|---|
| Agriculture | 1,161,000,000 | 51.3 |
| Forest land | 544,000,000 | 24.0 |
| Transportation use | 27,000,000 | 1.2 |
| Recreation and wildlife areas | 252,000,000 | 11.1 |
| National defense areas | 23,000,000 | 1.0 |
| Urban land | 61,000,000 | 2.7 |
| Miscellaneous use | 197,000,000 | 8.7 |
| **Total land area** | 2,264,000,000 | 100.0 |

*3.1 Quantity of Aquatic Ecosystems in the United States*

There are approximately 283.1 million acres of wetlands in the United States; 107.7 million acres are in the conterminous United States and the remaining 175.4 million acres are in Alaska (Mitsch and Hernandez 2013). Wetlands occupy less than 9 percent of the global land area (Zedler and Kercher 2005). According to Dahl (2011), wetlands and deepwater habitats cover approximately 8 percent of the land area in the conterminous United States. Rivers and streams comprise approximately 0.52 percent of the total land area of the continental United States (Butman and Raymond 2011). Therefore, the wetlands, streams, rivers, and other aquatic habitats that are potentially waters of the United States and subject to regulation by the Corps under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899 comprise a minor proportion of the land area of the United States. The remaining land area of the United States (more than 92 percent, depending on the proportion of wetlands, streams, rivers, and other aquatic habitats that are subject to regulation under those two statutes) is outside the Corps regulatory authority.

Dahl (1990) estimated that approximately 53 percent of the wetlands in the conterminous United States were lost in the 200-year period from the 1780s to 1980s, while Alaska lost less than one percent of its wetlands and Hawaii lost approximately 12 percent of its original wetland acreage. In the 1780s, there were approximately 221 million acres of wetlands in the conterminous United States (Dahl 1990). California lost the largest percentage of its wetlands (91 percent), whereas Florida lost the largest acreage (9.3 million acres) (Dahl 1990). During that 200-year period, 22 states lost more than 50 percent of their wetland acreage, and 10 states have lost more than 70 percent of their original wetland acreage (Dahl 1990).

Frayer et al. (1983) evaluated wetland status and trends in the United States during the period of the mid-1950s to the mid-1970s. During that 20-year period, approximately 7.9 million acres of wetlands (4.2 percent) were lost in the conterminous United States. Much of the loss of estuarine emergent wetlands was due to changes to estuarine subtidal deepwater habitat, and some loss of estuarine emergent wetlands was due to urban development. For palustrine vegetated wetlands, nearly all of the losses of those wetlands were due to

NWP005290

agricultural activities (e.g., conversion to agricultural production).

The U.S. Fish and Wildlife Service also examined the status and trends of wetlands in the United States during the period of the mid-1970s to the 1980s, and found that there was a net loss of more than 2.6 million acres of wetlands (2.5 percent) during that time period (Dahl and Johnson 1991). Freshwater wetlands comprised 98 percent of those wetland losses (Dahl and Johnson 1991). During that time period, losses of estuarine wetlands were estimated to be 71,000 acres, with most of that loss due to changes of emergent estuarine wetlands to open waters caused by shifting sediments (Dahl and Johnson 1991). Conversions of wetlands to agricultural use were responsible for 54 percent of the wetland losses, and conversion to other land uses resulted in the loss of 41 percent of wetlands (Dahl and Johnson 1991). Urban development was responsible for five percent of the wetland loss (Dahl and Johnson 1991). The annual rate of wetland loss has decreased substantially since the 1970s (Dahl 2011), when wetland regulation became more prevalent (Brinson and Malvárez 2002).

Between 2004 and 2009, there was no statistically significant difference in wetland acreage in the conterminous United States (Dahl 2011). According to the 2011 wetland status and trends report, during the period of 2004 to 2009 urban development accounted for 11 percent of wetland losses (61,630 acres), rural development resulted in 12 percent of wetland losses (66,940 acres), silviculture accounted for 56 percent of wetland losses (307,340 acres), and wetland conversion to deepwater habitats caused 21 percent of the loss in wetland area (115,960 acres) (Dahl 2011). Some of the losses occurred to wetlands that are not subject to Clean Water Act jurisdiction and some losses are due to activities not regulated under Section 404 of the Clean Water Act, such as unregulated drainage activities, exempt forestry activities, or water withdrawals. From 2004 to 2009, approximately 100,020 acres of wetlands were gained as a result of wetland restoration and conservation programs on agricultural land (Dahl 2011). Another source of wetland gain is conversion of other uplands to wetlands, resulting in a gain of 389,600 acres during the period of 2004 to 2009 (Dahl 2011). Inventories of wetlands, streams, and other aquatic resources are incomplete because the techniques used for those studies cannot identify some of those resources (e.g., Dahl (2011) for wetlands; Meyer and Wallace (2001) for streams).

Losses of vegetated estuarine wetlands due to the direct effects of human activities have decreased significantly due to the requirements of Section 404 of the Clean Water Act and other laws and regulations (Dahl 2011). During the period of 2004 to 2009, less than one percent of estuarine emergent wetlands were lost as a direct result of human activities, while other factors such as sea level rise, land subsidence, storm events, erosion, and other ocean processes caused substantial losses of estuarine wetlands (Dahl 2011). The indirect effects of other human activities, such as oil and gas development, water extraction, development of the upper portions of watersheds, and levees, have also resulted in coastal wetland losses (Dahl 2011). Eutrophication of coastal waters can also cause losses of emergent estuarine wetlands, through changes in growth patterns of marsh plants and decreases in the stability of the wetland substrate, which changes those marshes to mud flats (Deegan et al. 2012).

The Emergency Wetlands Resources Act of 1986 (Public Law 99-645) requires the USFWS

to submit wetland status and trends reports to Congress (Dahl 2011).  The latest status and trends report, which covers the period of 2004 to 2009, is summarized in Table 3.2.  The USFWS status and trends report only provides information on acreage of the various aquatic habitat categories and does not assess the quality or condition of those aquatic habitats (Dahl 2011).

**Table 3.2.  Estimated aquatic resource acreages in the conterminous United States in 2009 (Dahl 2011).**

| Aquatic Habitat Category | Estimated Area in 2009 (acres) |
|---|---:|
| Marine intertidal | 227,800 |
| Estuarine intertidal non-vegetated | 1,017,700 |
| Estuarine intertidal vegetated | 4,539,700 |
| **All intertidal waters and wetlands** | 5,785,200 |
| Freshwater ponds | 6,709,300 |
| Freshwater vegetated | 97,565,300 |
| •   Freshwater emergent wetlands | 27,430,500 |
| •   Freshwater shrub wetlands | 18,511,500 |
| •   Freshwater forested wetlands | 51,623,300 |
| **All freshwater wetlands** | 104,274,600 |
| Lacustrine deepwater habitats | 16,859,600 |
| Riverine deepwater habitats | 7,510,500 |
| Estuarine subtidal habitats | 18,776,500 |
| **All wetlands and deepwater habitats** | 153,206,400 |

The acreage of lacustrine deepwater habitats does not include the open waters of Great Lakes (Dahl 2011).

The Federal Geographic Data Committee has established the Cowardin system developed by the U.S. Fish and Wildlife Service (USFWS) (Cowardin et al. 1979) as the national standard for wetland mapping, monitoring, and data reporting (Dahl 2011) (see Federal Geographic Data Committee (2013)).  The Cowardin system is a hierarchical system which describes various wetland and deepwater habitats, using structural characteristics such as vegetation, substrate, and water regime as defining characteristics.  Wetlands are defined by plant communities, soils, or inundation or flooding frequency.  Deepwater habitats are permanently flooded areas located below the wetland boundary.  In rivers and lakes, deepwater habitats are usually more than two meters deep. The Cowardin et al. (1979) definition of "wetland" differs from the definition used by the Corps and U.S. EPA for the purposes of implementing Section 404 of the Clean Water Act.  The Corps-U.S. EPA regulations defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated

soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." [33 CFR 328.3(c)(4); 40 CFR 230.3(o)(3)(iv)]  The Cowardin et al. (1979) requires only one factor (i.e., wetland vegetation, soils, hydrology) to be present for an area to be a wetland, while the Corps-U.S. EPA wetland definition requires all three factors to be present under normal circumstances (Tiner 1997b, Mitsch and Gosselink 2015). The NWI produced by applying the Cowardin et al. (1979) definition is the only national scale wetland inventory available. There is no national inventory of wetland acreage based on the Corps-U.S. EPA wetland definition at 33 CFR 328.3(c)(4).

There are five major systems in the Cowardin classification scheme: marine, estuarine, riverine, lacustrine, and palustrine (Cowardin et al. 1979).  The marine system consists of open ocean on the continental shelf and its high energy coastlines.  The estuarine system consists of tidal deepwater habitats and adjacent tidal wetlands that are usually partially enclosed by land, but may have open connections to open ocean waters.  The riverine system generally consists of all wetland and deepwater habitats located within a river channel.  The lacustrine system generally consists of wetland and deepwater habitats located within a topographic depression or dammed river channel, with a total area greater than 20 acres. The palustrine system generally includes all non-tidal wetlands and wetlands located in tidal areas with salinities less than 0.5 parts per thousand; it also includes ponds less than 20 acres in size.  Approximately 95 percent of wetlands in the conterminous United States are freshwater wetlands, and the remaining 5 percent are estuarine or marine wetlands (Dahl 2011).

According to Hall et al. (1994), there are more than 204 million acres of wetlands and deepwater habitats in the State of Alaska, including approximately 174.7 million acres of wetlands. Wetlands and deepwater habitats comprise approximately 50.7 percent of the surface area in Alaska (Hall et al. 1994).

The National Resources Inventory (NRI) is a statistical survey conducted by the Natural Resources Conservation Service (NRCS) (USDA 2015) of natural resources on non-federal land in the United States.  The NRCS defines non-federal land as privately owned lands, tribal and trust lands, and lands under the control of local and state governments.  Acreages of palustrine and estuarine wetlands and the land uses those wetlands are subjected to are summarized in Table 3.3.  The 2012 NRI estimates that there are 111,220,800 acres of palustrine and estuarine wetlands on non-Federal land and water areas in the United States (USDA 2015). The 2012 NRI estimates that there are 49,518,700 acres of open waters on non-Federal land in the United States, including lacustrine, riverine, and marine habitats, as well as estuarine deepwater habitats.

Exhibit 1                    NWP005293

**Table 3.3. The 2012 National Resources Inventory acreages for palustrine and estuarine wetlands on non-federal land, by land cover/use category (USDA 2015).**

| National Resources Inventory Land Cover/Use Category | Area of Palustrine and Estuarine Wetlands (acres) |
|---|---|
| cropland, pastureland, and Conservation Reserve Program land | 17,800,000 |
| forest land | 65,800,000 |
| rangeland | 8,000,000 |
| other rural land | 14,700,000 |
| developed land | 1,400,000 |
| water area | 3,600,000 |
| **Total** | 111,300,000 |

The land cover/use categories used by the 2012 NRI are defined below (USDA 2015). Croplands are areas used to produce crops grown for harvest. Pastureland is land managed for livestock grazing, through the production of introduced forage plants. Conservation Reserve Program land is under a Conservation Reserve Program contract. Forest land is comprised of at least 10 percent single stem woody plant species that will be at least 13 feet tall at maturity. Rangeland is land on which plant cover consists mostly of native grasses, herbaceous plants, or shrubs suitable for grazing or browsing, and introduced forage plant species. Other rural land consists of farmsteads and other farm structures, field windbreaks, marshland, and barren land. Developed land is comprised of large urban and built-up areas (i.e., urban and built-up areas 10 acres or more in size), small built-up areas (i.e., developed lands 0.25 to 10 acres in size), and rural transportation land (e.g., roads, railroads, and associated rights-of-way outside urban and built-up areas). Water areas are comprised of waterbodies and streams that are permanent open waters.

The wetlands data from the Fish and Wildlife Service's Status and Trends study and the Natural Resources Conservation Service's National Resources Inventory should not be compared, because they use different methods and analyses to produce their results (Dahl 2011).

Leopold, Wolman, and Miller (1964) estimated that there are approximately 3,250,000 miles of river and stream channels in the United States. This estimate is based on an analysis of 1:24,000 scale topographic maps. Their estimate does not include many small streams. Many small streams, especially headwater streams, are not mapped on 1:24,000 scale U.S. Geological Survey (USGS) topographic maps (Leopold 1994) or included in other inventories (Meyer and Wallace 2001), including the National Hydrography Dataset (Elmore et al. 2013). Many small streams and rivers are not identified through maps produced by aerial photography or satellite imagery because of inadequate image resolution or trees or other vegetation obscuring the visibility of those streams from above (Benstead

NWP005294

and Leigh 2012).  In a study of stream mapping in the southeastern United States, only 20 percent of the stream network was mapped on 1:24,000 scale topographic maps, and nearly none of the observed intermittent or ephemeral streams were indicated on those maps (Hansen 2001.  Another study in Massachusetts showed that those types of topographic maps exclude over 27 percent of stream miles in a watershed (Brooks and Colburn 2011). For a 1:24,000 scale topographic map, the smallest tributary found by using 10-foot contour interval has a drainage area of 0.7 square mile and length of 1,500 feet, and smaller stream channels are common throughout the United States (Leopold 1994). Benstead and Leigh (2012) found that the density of stream channels (length of stream channels per unit area) identified by digital elevation models was three times greater than the drainage density calculated by using USGS maps.  Elmore et al. (2013) made similar findings in watersheds in the mid-Atlantic, where they determined that the stream density was 2.5 times greater than the stream density calculated with the National Hydrography Dataset.  Due to the difficulty in mapping small streams, there are no accurate estimates of the total number of river or stream miles in the conterminous United States that might be considered as "waters of the United States."

The quantity of the Nation's aquatic resources presented by studies that estimate the length or number of stream channels (see above) or the acreage of wetlands (USFWS status and trends studies, National Wetland Inventory (NWI), and Natural Resources Inventory (NRI) are underestimates, because those inventories do not include many small wetlands and streams.  The USFWS status and trends study does not include Alaska, Hawaii, or the territories. The underestimate of national wetland acreage by the USFWS status and trends study and the NWI is primarily the result of the minimum size of wetlands detected through remote sensing techniques and the difficulty of identifying certain wetland types through those remote sensing techniques.  The remote sensing approaches used by the USFWS for its NWI maps and its status and trends reports result in errors of omission that exclude wetlands that are difficult to identify through photointerpretation (Tiner 1997a). These errors of omission are due to wetland type and the size of target mapping units (Tiner 1997a). Therefore, it is important to understand the limitations of the source data when describing the environmental baseline for wetlands using maps and studies produced by remote sensing, especially in terms of wetland quantity.

Factors affecting the accuracy of wetland maps made by remote sensing include: the degree of difficulty in identifying a wetland, map scale, the quality and scale of the source information (e.g., aerial or satellite photos), the environmental conditions when the source information was obtained, the time of year source information was obtained, the mapping equipment, and the skills of the people producing the maps (Tiner 1999).  The map scale usually affects the target mapping unit, which is the minimum wetland size that can be consistently mapped (Tiner 1997b).  In general, wetland types that are difficult to identify through field investigations are likely to be underrepresented in maps made by remote sensing (Tiner 1999).  Wetlands difficult to identify through remote sensing include forested wetlands, small wetlands, narrow wetlands, mowed wetlands, farmed wetlands, wetlands with hydrology at the drier end of the wetland hydrology continuum, and significantly drained wetlands (Tiner 1999).  In the most recent wetland status and trends report published by the U.S. Fish and Wildlife Service, the target minimum wetland mapping unit was 1 acre,

NWP005295

although some easily identified wetlands as small as 0.1 acre were identified in that effort (Dahl 2011). The National Wetland Inventory identifies wetlands regardless of their jurisdictional status under the Clean Water Act (Tiner 1997b).

Activities authorized by NWPs will adversely affect a smaller proportion of the Nation's wetland base than indicated by the wetlands acreage estimates provided in the most recent status and trends report, or the NWI maps for a particular region.

Not all wetlands, streams, and other types of aquatic resources are subject to federal jurisdiction under the Clean Water Act (Mitsch and Gosselink 2015). Two U.S. Supreme Court decisions have identified limits to Clean Water Act jurisdiction. In 2001, in *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers* (531 U.S. 159) the U.S. Supreme Court held that the use of isolated, non-navigable, intrastate waters by migratory birds is not, by itself a sufficient basis for exercising federal regulatory authority under the Clean Water Act (see 80 FR 37056). In the Supreme Court's 2006 decision in *Rapanos* v. *United States,* (547 U.S. 715), one justice stated that waters and wetlands regulated under the Clean Water Act must have a "significant nexus" to downstream traditional navigable waters. Four justices (the plurality) concluded that Clean Water Act jurisdiction applies only to relatively permanent waters connected to traditional navigable waters and to wetlands that have a continuous surface connection to those relatively permanent waters.  The remaining justices in *Rapanos* stated that Clean Water Act jurisdiction applies to waters and wetlands that meet either the significant nexus test or the Plurality's test.

There are 94,133 miles of shoreline in the United States (NOAA 1975).  Of that shoreline, 88,633 miles are tidal shoreline and 5,500 miles are shoreline along the Great Lakes and rivers that connect those lakes to the Atlantic Ocean. More recently, Gittman et al. (2015) estimated that there are 99,524 miles of tidal shoreline in the conterminous United States.


### 3.2 Quality of Aquatic Ecosystems in the United States

The USFWS status and trends study does not assess the condition or quality of wetlands and deepwater habitats (Dahl 2011).  Information on water quality in waters and wetlands, as well as the causes of water quality impairment, is collected by the U.S. EPA under sections 305(b) and 303(d) of the Clean Water Act. Table 3.4 provides U.S. EPA's most recent national summary of water quality in the Nation's waters and wetlands.

Exhibit 1

NWP005296

**Table 3.4.  National summary of water quality data (U.S. EPA 2015).**

| Category of water | Total waters | Total waters assessed | Percent of waters assessed | Good waters | Threatened waters | Impaired waters |
|---|---|---|---|---|---|---|
| Rivers and streams | 3,533,205 miles | 1,046,621 miles | 29.6 | 476,765 miles | 7,657 miles | 562,198 miles |
| Lakes, reservoirs and ponds | 41,666,049 acres | 17,904,395 acres | 43.0 | 5,658,789 acres | 145,572 acres | 12,100,034 acres |
| Bays and estuaries | 87,791 square miles | 33,402 square miles | 38.0 | 7,291 square miles | 0 square miles | 26,111 square miles |
| Coastal shoreline | 58,618 miles | 8,162 miles | 13.9 | 900 miles | 0 miles | 7,262 miles |
| Ocean and near coastal waters | 54,120 square miles | 1,674 square miles | 3.1 | 616 square miles | 0 square miles | 1,058 square miles |
| Wetlands | 107,700,000 acres | 1,112,438 acres | 1.0 | 573,947 acres | 0 acres | 538,492 acres |
| Great Lakes shoreline | 5,202 miles | 4,431 miles | 85.2 | 78 miles | 0 miles | 4,353 miles |
| Great Lakes open waters | 60,546 square miles | 53,332 square miles | 88.1 | 62 square miles | 0 square miles | 53,270 square miles |

Waters and wetlands classified by states as "good" meets all their designated uses. Waters classified as "threatened" currently support all of their designated uses, but if pollution control measures are not taken one or more of those uses may become impaired in the future.  A water or wetland is classified by the state as "impaired" if any one of its designated uses is not met. The definitions of good, threatened, and impaired are applied by states to describe the quality of their waters (the above definitions were found in the metadata in U.S. EPA (2015)).  Designated uses include the "protection and propagation of fish, shellfish and wildlife," "recreation in and on the water," the use of waters for "public water supplies, propagation of fish, shellfish, wildlife, recreation in and on the water," and "agricultural, industrial and other purposes including navigation." (40 CFR 130.3). These designated uses are assessed by states in a variety of ways, by examining various physical, chemical and biological characteristics, so it is not possible to use the categories of "good," "threatened," and "impaired" to infer the level of ecological functions and services these waters perform.

According to the latest U.S. EPA national summary (U.S. EPA 2015), 54 percent of assessed rivers and streams, 68 percent of assessed lakes, reservoirs, and ponds, 78 percent of assessed bays and estuaries, 89 percent of assessed coastal shoreline, 63 percent of assessed ocean and near coastal waters, and 48 percent of assessed wetlands are impaired.

For rivers and streams, 34 causes of impairment were identified, and the top 10 causes were pathogens, sediment, nutrients, mercury, organic enrichment/oxygen depletion, polychlorinated biphenyls, metals (other than mercury), temperature, habitat alterations, and

Exhibit 1                                                                                  NWP005297

flow alteration(s). The primary sources of impairment for the assessed rivers and streams were agriculture, unknown sources, atmospheric deposition, urban-related runoff/stormwater, hydromodification, municipal discharges/sewage, natural/wildlife, unspecified point source, habitat alterations not directly related to hydromodification, and resource extraction.

Thirty-one causes of impairment were identified for bays and estuaries. The top 10 causes of impairment for these waters is: mercury, polychlorinated biphenyls, pathogens, organic enrichment/oxygen depletion, dioxins, other causes, fish consumption advisories, metals (other than mercury), noxious aquatic plants, and pesticides. For bays and estuaries, the top 10 sources of impairment were atmospheric deposition, unknown sources, municipal discharges/sewage, other sources, industrial, natural/wildlife, urban-related runoff/stormwater, spills/dumping, unspecified non-point sources, and agriculture.

Coastal shorelines were impaired by 15 identified causes, the top 10 of which were: mercury, pathogens, organic enrichment/oxygen depletion, turbidity, pH/acidity/caustic conditions, nutrients, temperature, oil and grease, algal growth, and causes unknown/impaired biota. The top 10 sources of impairment of coastal shorelines are "unknown," atmospheric deposition, municipal discharges/sewage, urban-related runoff/stormwater, hydromodification, unspecified non-point sources, agriculture, recreational boating and marinas, industrial, and spills/dumping.

For wetlands, 26 causes of impairment were identified, and the top 10 causes were organic enrichment/oxygen depletion, mercury, pathogens, metals (excluding mercury), toxic inorganics, temperature, sediment, algal growth, flow alterations, and turbidity. The primary sources for wetland impairment were "unknown," agriculture, atmospheric deposition, industrial, municipal discharges/sewage, recreational boating and marinas, resource extraction, natural/wildlife, hydromodification, and unspecified point sources.

Water quality standards are established by states, with review and approval by the U.S. EPA (see Section 303(c) of the Clean Water Act and the implementing regulations at 40 CFR part 131). Under Section 401 of the Clean Water Act States review proposed discharges to determine compliance with applicable water quality standards.

Most causes and sources of impairment are not due to activities regulated under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act of 1899. Inputs of sediments into aquatic ecosystems can result from erosion occurring within a watershed (Beechie et al. 2013, Gosselink and Lee 1989). As water moves through a watershed it carries sediments and pollutants to streams (e.g., Allan 2004, Dudgeon et al. 2005, Paul and Meyer 2001) and wetlands (e.g., Zedler and Kercher 2005, Wright et al. 2006). Non-point sources of pollution (i.e., pollutants carried in runoff from farms, roads, and urban areas) are largely uncontrolled (Brown and Froemke 2012) because the Clean Water Act only requires permits for point sources discharges of pollutants (i.e., discharges of dredged or fill material regulated under section 404 and point source discharges of other pollutants regulated under section 402).

NWP005298

The indirect effects of changes in upland land use (which are highly likely not to be subject to federal control and responsibility, at least in terms of the Corps Regulatory Program), including the construction and expansion of upland developments, have substantial adverse effects on the quality (i.e. the ability to perform hydrologic, biogeochemical, and habitat functions) of jurisdictional waters and wetlands because those upland activities alter watershed-scale processes. Those watershed-scale processes include water movement and storage, erosion and sediment transport, and the transport of nutrients and other pollutants.

Habitat alterations as a cause or source of impairment may be the result of activities regulated under section 404 and section 10 because they involve discharges of dredged or fill material into jurisdictional waters or structures or work in navigable waters, but habitat alterations may also occur as a result of activities not regulated under those two statutes, such as the removal of vegetation from upland riparian areas. Hydrologic modifications may or may not be regulated under section 404 or section 10, depending on whether those hydrologic modifications are the result of discharges of dredged or fill material into waters of the United States regulated under Section 404 of the Clean Water Act or structures or work in navigable waters of the United States regulated under Section 10 of the Rivers and Harbors Act of 1899. When states, tribes, or the U.S. EPA establish total daily maximum loads (TMDLs) for pollutants and other impairments for specific waters, there may be variations in how these TMDLs are defined (see 40 CFR part 130).

As discussed below, many anthropogenic activities and natural processes affect the ability of jurisdictional waters and wetlands to perform ecological functions. Stream and river functions are affected by activities occurring in their watersheds, including the indirect effects of land uses changes (Beechie et al. 2013, Allan 2004, Paul and Meyer 2001). Booth at al. (2004) found riparian land use in residential areas also strongly affects stream condition because many landowners clear vegetation up to the edge of the stream bank. The removal of vegetation from upland riparian areas and other activities in those non-jurisdictional areas do not require DA authorization. Wetland functions are also affected by indirect effects of land use activities in the land area that drains to the wetland (Zedler and Kercher 2005, Wright et al. 2006). Human activities within a watershed or catchment that have direct or indirect adverse effects on rivers, streams, wetlands, and other aquatic ecosystems are not limited to discharges of dredged or fill material into waters of the United States or structures or work in a navigable waters. Human activities in uplands have substantial indirect effects on the structure and function of aquatic ecosystems, including streams and wetlands, and their ability to sustain populations of listed species. It is extremely difficult to distinguish between degradation of water quality caused by upland activities and degradation of water quality caused by the filling or alteration of wetlands (Gosselink and Lee 1989).

Most causes and sources of impairment are not due to activities regulated under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act of 1899. Habitat alterations as a cause or source of impairment may be the result of activities regulated under section 404 and section 10 because they involve discharges of dredged or fill material or structures or work in navigable waters, but habitat alterations may also occur as a result of activities not regulated under those two statutes, such as the removal of vegetation from

Exhibit 1

NWP005299

upland riparian areas. Hydrologic modifications may or may not be regulated under section 404 or section 10.

The U.S. Environmental Protection Agency (U.S. EPA) has undertaken the National Wetland Condition Assessment (NWCA), which is a statistical survey of wetland condition in the United States (U.S. EPA 2016). The NWCA assesses the ambient conditions of wetlands at the national and regional scales. The national scale encompasses the conterminous United States. The regional scale consists of four aggregated ecoregions: Coastal Plains, Eastern Mountains and Upper Midwest, Interior Plains, and West.  In May 2016, U.S. EPA issued a final report on the results of its 2011 NWCA (U.S. EPA 2016).

The 2011 NWCA determined that, across the conterminous United States, 48 percent of wetland area (39.8 million acres) is in good condition, 20 percent of the wetland area (12.4 million acres) is in fair condition, and 32 percent (19.9 million acres) is in poor condition (U.S. EPA 2016). The 2011 NWCA also examined indicators of stress for the wetlands that were evaluated.  The most prevalent physical stressors were vegetation removal, surface hardening via conversion to pavement or soil compaction, and ditching (U.S. EPA 2016).  In terms of chemical stressors, most wetlands were subject to low exposure to heavy metals and soil phosphorous, but substantial percentages of wetland area in the West and Eastern Mountains and Upper Midwest ecoregions were found to have moderate stressor levels for heavy metals (U.S. EPA 2016).  For soil phosphorous concentrations, stressor levels were high for 13 percent of the wetland area in the Eastern Mountains and Upper Midwest ecoregion (U.S. EPA 2016).  Across the conterminous United States, for biological stressors indicated by non-native plants, 61 percent of the wetland area exhibited low stressor levels (U.S. EPA 2016).  When examined on an ecoregion basis, the Eastern Mountains and Upper Midwest and Coastal Plains ecoregions had high percentages of wetland area with low non-native plant stressor levels, but the West and Interior Plains ecoregions had small percentages of areas with low non-native plant stressor levels (U.S. EPA 2016).

### 3.3 Aquatic resource functions and services

Functions are the physical, chemical, and biological processes that occur in ecosystems (33 CFR 332.2).  Wetland functions occur through interactions of their physical, chemical, and biological features (Smith et al. 1995).  Wetland functions depend on a number of factors, such as the movement of water through the wetland, landscape position, surrounding land uses, vegetation density within the wetland, geology, soils, water source, and wetland size (NRC 1995).  In its evaluation of wetland compensatory mitigation in the Clean Water Act Section 404 permit program, the National Research Council (2001) recognized five general categories of wetland functions:

- Hydrologic functions
- Water quality improvement
- Vegetation support
- Habitat support for animals
- Soil functions

Exhibit 1                                                                NWP005300

Hydrologic functions include short- and long-term water storage and the maintenance of wetland hydrology (NRC 1995). Water quality improvement functions encompass the transformation or cycling of nutrients, the retention, transformation, or removal of pollutants, and the retention of sediments (NRC 1995). Vegetation support functions include the maintenance of plant communities, which support various species of animals as well as economically important plants. Wetland soils support diverse communities of bacteria and fungi which are critical for biogeochemical processes, including nutrient cycling and pollutant removal and transformation (NRC 2001). Wetland soils also provide rooting media for plants, as well as nutrients and water for those plants. These various functions generally interact with each other, to influence overall wetland functioning, or ecological integrity (Smith et al. 1995; Fennessy et al. 2007). As discussed earlier in this report, the Corps regulations at 33 CFR 320.4(b) list wetland functions that are important for the public interest review during evaluations of applications for DA permits, and for the issuance of general permits.

Not all wetlands perform the same functions, nor do they provide functions to the same degree (Smith et al. 1995). Therefore, it is necessary to account for individual and regional variation when evaluating wetlands and the functions and services they provide. The types and levels of functions performed by a wetland are dependent on its hydrologic regime, the plant species inhabiting the wetland, soil type, and the surrounding landscape, including the degree of human disturbance of the landscape (Smith et al. 1995).

Streams also provide a variety of functions, which differ from wetland functions. Streams also provide hydrologic functions, nutrient cycling functions, food web support, and corridors for movement of aquatic organisms (Allan and Castillo 2007). When considering stream functions, the stream channel should not be examined in isolation. The riparian corridor next to the stream channel is an integral part of the stream ecosystem and has critical roles in stream functions (NRC 2002). Riparian areas provide many of the same general functions as wetlands (NRC 1995, 2002). Fischenich (2006) conducted a review of stream and riparian corridor functions, and through a committee, identified five broad categories of stream functions:
- Stream system dynamics
- Hydrologic balance
- Sediment processes and character
- Biological support
- Chemical processes and landscape pathways

Stream system dynamics refers to the processes that affect the development and maintenance of the stream channel and riparian area over time, as well as energy management by the stream and riparian area. Hydrologic balance includes surface water storage processes, the exchange of surface and subsurface water, and the movement of water through the stream corridor. Sediment processes and character functions relate to processes for establishing and maintaining stream substrate and structure. Biological support functions include the biological communities inhabiting streams and their riparian areas. Chemical processes and pathway functions influence water and soil quality, as well as the chemical processes and nutrient cycles that occur in streams and their riparian areas. Rivers

NWP005301

and streams function perform functions to different degrees, depending on watershed condition, the severity of direct and indirect impacts to streams caused by human activities, and their interactions with other environmental components, such as their riparian areas (Allan 2004, Gergel et al. 2002).

Ecosystem services are the benefits that humans derive from ecosystem functions (33 CFR 332.2). The Millennium Ecosystem Assessment (2005b) describes four categories of ecosystem services: provisioning services, regulating services, cultural services, and supporting services. For wetlands and open waters, provisioning services include the production of food (e.g., fish, fruits, game), fresh water storage, food and fiber production, production of chemicals that can be used for medicine and other purposes, and supporting genetic diversity for resistance to disease. Regulating services relating to open waters and wetlands consist of climate regulation, control of hydrologic flows, water quality through the removal, retention, and recovery of nutrients and pollutants, erosion control, mitigating natural hazards such as floods, and providing habitat for pollinators. Cultural services that come from wetlands and open waters include spiritual and religious values, recreational opportunities, aesthetics, and education. Wetlands and open waters contribute supporting services such as soil formation, sediment retention, and nutrient cycling.

Examples of services provided by wetland functions include flood damage reduction, maintenance of populations of economically important fish and wildlife species, maintenance of water quality (NRC 1995, MEA 2005b) and the production of populations of wetland plant species that are economically important commodities, such as timber, fiber, and fuel (MEA 2005b). Wetlands can also provide important climate regulation and storm protection services (MEA 2005b).

Stream functions also result in ecosystem services that benefit society. Streams and their riparian areas store water, which can reduce downstream flooding and subsequent flood damage (NRC 2002, MEA 2005b). These ecosystems also maintain populations of economically important fish, wildlife, and plant species, including valuable fisheries (MEA 2005b, NRC 2002). The nutrient cycling and pollutant removal functions help maintain or improve water quality for surface waters (NRC 2002, MEA 2005b). Streams and riparian areas also provide important recreational opportunities. Rivers and streams also provide water for agricultural, industrial, and residential use (MEA 2005b).

Freshwater ecosystems provide services such as water for drinking, household uses, manufacturing, thermoelectric power generation, irrigation, and aquaculture; production of finfish, waterfowl, and shellfish; and non-extractive services, such as flood control, transportation, recreation (e.g., swimming and boating), pollution dilution, hydroelectric generation, wildlife habitat, soil fertilization, and enhancement of property values (Postel and Carpenter 1997).

Marine ecosystems provide a number of ecosystem services, including fish production; materials cycling (e.g., nitrogen, carbon, oxygen, phosphorous, and sulfur); transformation, detoxification, and sequestration of pollutants and wastes produced by humans; support of ocean-based recreation, tourism, and retirement industries; and coastal land development

Exhibit 1

NWP005302

and valuation, including aesthetics related to living near the ocean (Peterson and Lubchenco 1997).

Activities authorized by this NWP will provide a wide variety of goods and services that are valued by society.  For example, utility lines are important components of urban and rural infrastructure. They convey a variety of substances or products to people, such as water, fuel, and electricity.  Utility lines are also essential for communication, including telephone lines, internet connections, and cable television. Utility lines are also important for the removal of wastes from residences, as well as commercial and institutional facilities.

## 4.0 Environmental Consequences

### 4.1 General Evaluation Criteria

This document contains a general assessment of the foreseeable effects of the individual activities authorized by this NWP and the anticipated cumulative effects of those activities. In the assessment of these individual and cumulative effects, the terms and limits of the NWP, pre-construction notification requirements, and the standard NWP general conditions are considered.  The supplemental documentation provided by division engineers will address how regional conditions affect the individual and cumulative effects of the NWP.

The following evaluation comprises the NEPA analysis, the public interest review specified in 33 CFR 320.4(a)(1) and (2), and the impact analysis specified in Subparts C through F of the 404(b)(1) Guidelines (40 CFR Part 230).

The issuance of an NWP is based on a general assessment of the effects on public interest and environmental factors that are likely to occur as a result of using this NWP to authorize activities in waters of the United States.  As such, this assessment must be speculative or predictive in general terms.  Since NWPs authorize activities across the nation, projects eligible for NWP authorization may be constructed in a wide variety of environmental settings.  Therefore, it is difficult to predict all of the indirect impacts that may be associated with each activity authorized by an NWP.  For example, the NWP that authorizes 25 cubic yard discharges of dredged or fill material into waters of the United States may be used to fulfill a variety of project purposes, and the indirect effects will vary depending on the specific activity and the environmental characteristics of the site in which the activity takes place.  Indication that a factor is not relevant to a particular NWP does not necessarily mean that the NWP would never have an effect on that factor, but that it is a factor not readily identified with the authorized activity.  Factors may be relevant, but the adverse effects on the aquatic environment are negligible, such as the impacts of a boat ramp on water level fluctuations or flood hazards.  Only the reasonably foreseeable direct, indirect, and cumulative effects are included in the environmental assessment for this NWP.  Division and district engineers will impose, as necessary, additional conditions on the NWP authorization or exercise discretionary authority to address locally important factors or to ensure that the authorized activity results in no more than minimal individual and

Exhibit 1

NWP005303

cumulative adverse environmental effects.  In any case, adverse effects will be controlled by the terms, conditions, and additional provisions of the NWP.  For example, Section 7 Endangered Species Act consultation will be required for all activities that may affect endangered or threatened species or critical habitat (see 33 CFR 330.4(f) and NWP general condition 18).

### 4.2  Impact Analysis

This NWP authorizes the construction, maintenance, repair, or removal of utility lines and associated facilities in waters of the United States.  The acreage limit for this NWP is 1/2 acre.

Pre-construction notification is required if: (1) the activity involves mechanized land clearing in a forested wetland for the utility line right-of-way; (2) a section 10 permit is required; (3) the utility line in waters of the United States, excluding overhead lines, exceeds 500 feet; (4) the utility line is placed within a jurisdictional area (i.e., water of the United States), and it runs parallel to or along a stream bed that is within that jurisdictional area; (5) discharges that result in the loss of greater than 1/10-acre of waters of the United States; (6) permanent access roads are constructed above grade in waters of the United States for a distance of more than 500 feet; or (7) permanent access roads are constructed in waters of the United States with impervious materials. The pre-construction notification requirement allows district engineers to review proposed activities on a case-by-case basis to ensure that the individual and cumulative adverse environmental effects of those activities are no more than minimal.  If the district engineer determines that the adverse environmental effects of a particular project are more than minimal after considering mitigation, then discretionary authority will be asserted and the applicant will be notified that another form of DA authorization, such as a regional general permit or individual permit, is required (see 33 CFR 330.4(e) and 330.5).

When making minimal effects determinations the district engineer will consider the direct and indirect effects caused by the NWP activity. The district engineer will also consider site specific factors, such as the environmental setting in the vicinity of the NWP activity, the type(s) of resource(s) that will be affected by the NWP activity, the functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be lost as a result of the NWP activity (e.g., partial or complete loss), the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (e.g., watershed or ecoregion), and mitigation required by the district engineer. These criteria are listed in the NWPs in Section D, "District Engineer's Decision." If an appropriate functional or condition assessment method is available and practicable to use, that assessment method may be used by the district engineer to assist in the minimal adverse effects determination. The district engineer may add case-specific special conditions to the NWP authorization to address site-specific environmental concerns.

Additional conditions can be placed on proposed activities on a regional or case-by-case

Exhibit 1                                    NWP005304

basis to ensure that the activities have no more than minimal individual and cumulative adverse environmental effects. Regional conditioning of this NWP will be used to account for differences in aquatic resource functions, services, and values across the country, ensure that the NWP authorizes only those activities with no more than minimal individual and cumulative adverse environmental effects, and allow each Corps district to prioritize its workload based on where its efforts will best serve to protect the aquatic environment and other appropriate resources. Regional conditions can prohibit the use of an NWP in certain waters (e.g., high value waters or specific types of wetlands or waters), lower pre-construction notification thresholds, or require pre-construction notification for some or all NWP activities in certain watersheds or types of waters. Specific NWPs can also be revoked on a geographic or watershed basis where the individual and cumulative adverse environmental effects resulting from the use of those NWPs are more than minimal.

In high value waters, division and district engineers can: 1) prohibit the use of the NWP in those waters and require an individual permit or regional general permit; 2) decrease the acreage limit for the NWP; 3) lower the pre-construction notification threshold of the NWP to require pre-construction notification for NWP activities with smaller impacts in those waters; 4) require pre-construction notification for some or all NWP activities in those waters; 5) add regional conditions to the NWP to ensure that the individual and cumulative adverse environmental effects are no more than minimal; or 6) for those NWP activities that require pre-construction notification, add special conditions to NWP authorizations, such as compensatory mitigation requirements, to ensure that the adverse environmental effects are no more than minimal. NWPs can authorize activities in high value waters as long as the individual and cumulative adverse environmental effects are no more than minimal.

The construction and use of fills for temporary access for construction may be authorized by NWP 33 or regional general permits issued by division or district engineers. The related activity must meet the terms and conditions of the specified permit(s). If the discharge is dependent on portions of a larger project that require an individual permit, this NWP will not apply. [See 33 CFR 330.6(c) and (d)]

### *4.3  Cumulative Effects*

#### 4.3.1 General Analysis

The Council on Environmental Quality's (CEQ's) NEPA regulations define cumulative effects as: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." [40 CFR 1508.7.] Therefore, the NEPA cumulative effects analysis for an NWP is not limited to activities authorized by the NWP, other NWPs, or other DA permits (individual permits and regional general permits). The NEPA cumulative effects analysis must also include other Federal and non-Federal activities that affect the Nation's wetlands, streams, and other aquatic resources, as well as other resources

(e.g., terrestrial ecosystems, air) that may be directly or indirectly affected by the proposed action and other actions. According to guidance issued by CEQ (1997), a NEPA cumulative effects analysis should focus on specific categories of resources (i.e., resources of concern) identified during the review process as having significant cumulative effects concerns. These cumulative effects analyses also require identification of the disturbances and stressors that cause degradation of those resources, including those caused by actions unrelated to the proposed action.  A NEPA cumulative effects analysis does not need to analyze issues that have little relevance to the proposed action or the decision the agency will have to make (CEQ 1997).

The geographic scope of this cumulative effects analysis is the United States and its territories, where the NWP may be used to authorize specific activities that require DA authorization. The temporal scope of the cumulative effects analysis includes past federal, non-federal, and private actions that continue to affect the Nation's wetlands, streams, and other aquatic resources (including activities authorized by previously issued NWPs, regional general permits, and DA individual permits) as well as present and reasonably foreseeable future federal, non-federal, and private actions that are affecting, or will affect, wetlands, streams, and other aquatic resources.  The present effects of past federal, non-federal, and private actions on wetlands, streams, and other aquatic resources are included in the affected environment, which is described in section 3.0. The affected environment described in section 3.0 also includes present effects of past actions, including activities authorized by NWPs issued from 1977 to 2012 and constructed by permittees, which are captured in national information on the quantity and quality of wetlands, streams, and other aquatic resources.

In addition to the activities authorized by this NWP, there are many categories of activities that contribute to cumulative effects on wetlands, streams, and other aquatic resources in the United States, and alter the quantity of those resources, the functions they perform, and the ecosystem services they provide. Activities authorized by past versions of NWP 12, as well as other NWPs, individual permits, letters of permission, and regional general permits have resulted in direct and indirect impacts to wetlands, streams, and other aquatic resources. Those activities may have legacy effects that have added to the cumulative effects and affected the quantity of those resources and the functions they provide. Discharges of dredged or fill material that do not require DA permits because they are exempt from section 404 permit requirements can also adversely affect the quantity of the Nation's wetlands, streams, and other aquatic resources and the functions and services they provide. Discharges of dredged or fill material that convert wetlands, streams, and other aquatic resources to upland areas result in permanent losses of aquatic resource functions and services. Temporary fills and fills that do not convert waters or wetlands to dry land may cause short-term or partial losses of aquatic resource functions and services.  During construction of utility lines, where horizontal directional drilling is used to install or replace the utility line, there is a possibility of inadvertent returns of drilling fluids that could adversely affect wetlands, streams, and other aquatic resources. Those inadvertent returns of drilling fluids are not considered discharges of dredged or fill material that require Clean Water Act section 404 authorization.  Activities necessary to remediate these inadvertent returns of drilling fluids may involve activities that require Department of the Army authorization, and

45

Exhibit 1

NWP005306

those activities may be authorized by NWP 12.

Humans have long had substantial impacts on ecosystems and the ecological functions and services they provide (Ellis et al. 2010). Around the beginning of the 19th century, the degree of impacts of human activities on the Earth's ecosystems began to exceed the degree of impacts to ecosystems caused by natural disturbances and variability (Steffen et al. 2007). All of the Earth's ecosystems have been affected either directly or indirectly by human activities (Vitousek et al. 1997). Over 75 percent of the ice-free land on Earth has been altered by human occupation and use (Ellis and Ramankutty 2008). Approximately 33 percent of the Earth's ice-free land consists of lands heavily used by people: urban areas, villages, lands used to produce crops, and occupied rangelands (Ellis and Ramankutty 2008). For marine ecosystems, Halpern et al. (2008) determined that there are no marine waters that are unaffected by human activities, and that 41 percent of the area of ocean waters are affected by multiple anthropogenic stressors (e.g., land use activities that generate pollution that go to coastal waters, marine habitat destruction or modification, and the extraction of resources). The marine waters most highly impacted by human activities are continental shelf and slope areas, which are affected by both land-based and ocean-based activities (Halpern et al. 2008). Human population density is a good indicator of the relative effect that people have had on local ecosystems, with lower population densities causing smaller impacts to ecosystems and higher population densities having larger impacts on ecosystems (Ellis and Ramankutty 2008). Human activities such as urbanization, agriculture, and forestry alter ecosystem structure and function by changing their interactions with other ecosystems, their biogeochemical cycles, and their species composition (Vitousek et al. 1997). Changes in land use reduce the ability of ecosystems to produce ecosystem services, such as food production, reducing infectious diseases, and regulating climate and air quality (Foley et al. 2005).

Recent changes in climate have had substantial impacts on natural ecosystems and human communities (IPCC 2014). Climate change, both natural and anthropogenic, is a major driving force for changes in ecosystem structure, function, and dynamics (Millar and Brubaker 2006). However, there are other significant drivers of change to aquatic and terrestrial ecosystems. In addition to climate change, aquatic and terrestrial ecosystems are also adversely affected by land use and land cover changes, natural resource extraction (including water withdrawals), pollution, species introductions, and removals of species (Staudt et al. 2013, Bodkin 2012, MEA 2005d) and changes in nutrient cycling (Julius et al. 2013).

Cumulative effects to wetlands, streams, and other aquatic resources in the United States are not limited to the effects caused by activities regulated and authorized by the Corps under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899. Other federal, non-federal, and private activities also contribute to the cumulative effects to wetlands, streams, and other aquatic resources, by changing the quantity of those resources and the functions they provide. Wetlands, streams, and other aquatic resources and the functions and services they provide are directly and indirectly affected by changes in land use and land cover, alien species introductions, overexploitation of species, pollution, eutrophication due to excess nutrients, resource extraction including water withdrawals,

NWP005307

climate change, and various natural disturbances (MEA 2005b). Freshwater ecosystems such as lakes, rivers, and streams are altered by changes to water flow, climate change, land use changes, additions of chemicals, resource extraction, and aquatic invasive species (Carpenter et al. 2011). Cumulative effects to wetlands, streams, and other aquatic resources are the result of landscape-level processes (Gosselink and Lee 1989). As discussed in more detail below, cumulative effects to aquatic resources are caused by a variety of activities (including activities that occur entirely in uplands) that take place within a landscape unit, such as the watershed for a river or stream (e.g., Allan 2004, Paul and Meyer 2001, Leopold 1968) or the contributing drainage area for a wetland (e.g., Wright et al. 2006, Brinson and Malvárez 2002, Zedler and Kercher 2005).

Cumulative effects also include environmental effects caused by reasonably foreseeable future actions that may take place after the permitted activity is completed. Such effects may include direct and indirect environmental effects caused by the operation and maintenance of the facility constructed on the discharge of dredged or fill material into waters of the United States or the structures or work in navigable waters of the United States. For NWP 12, this includes activities associated with the operation and maintenance of the utility lines, substations, and access roads constructed or expanded as a result of activities authorized by this NWP. Utility line activities and associated will also contribute to other cumulative effects to aquatic and terrestrial environments and to the atmosphere, during their construction, maintenance, and operation. During the operation of utility lines, substances carried by those utility lines may leak into surrounding areas. For oil pipelines, operators are required to comply with the Pipeline and Hazardous Materials Safety Administration's safety requirements, and have plans for addressing the risk of oil spills. Oil spills are also addressed through the Oil Pollution Act of 1990, which is administered by the U.S. Environmental Protection Agency and the U.S. Coast Guard. The U.S. EPA is responsible for oil spills in inland waters and the U.S. Coast Guard is responsible for oil spills in coastal waters and deepwater ports. For natural gas pipelines, there may be gas leaks during the operation of those pipelines. Sewer lines may develop breaks or leaks that discharge sewage into nearby waters and wetlands. Pipelines carrying other types of substances must comply with other applicable federal and state laws and regulations during their operations. For example, the Federal Energy Regulatory Commission regulates the interstate transmission of electricity, natural gas, and oil, and issues licenses for interstate natural gas pipelines. For utility lines that carry oil or natural gas, reasonably foreseeable future actions also include the burning of the fossil fuels, which produce carbon dioxide that contribute to greenhouse gas emissions. The Corps does not have the authority to control the burning of fossil fuels or the adverse environmental effects that are caused by burning those fossil fuels to produce energy.

The construction of utility lines and their rights-of-way will fragment terrestrial and aquatic ecosystems. Utility line substations may leak transformer fluids, or the liquids or gases carried by the utility lines those substations support. A variety of pollutants might be released into the environment during the operation and maintenance of these facilities. Those pollutants may be discharged through either point sources or non-point sources and reach jurisdictional waters and wetlands. Point-source discharges would likely require National Pollutant Discharge Elimination System Permits under Section 402 of the Clean

NWP005308

Water Act, which is administered by U.S. EPA or by states with approved programs. Pollutants may also be discharged through spills and other accidents. Operations and maintenance activities may also other direct and indirect effects on wetlands, streams, and other aquatic resources. The Corps does not have the authority to regulate operations and maintenance activities that: (1) do not involved discharges of dredged or fill material into waters of the United States; (2) involve activities exempt from Clean Water Act Section 404 permit requirements under section 404(f); and (3) do not involve structures or work requiring DA authorization under Sections 9 or 10 of the Rivers and Harbors Act of 1899. Operations and maintenance activities regulated by the Corps are considered during the permit evaluation process.

In a specific watershed, division or district engineers may determine that the cumulative adverse environmental effects of activities authorized by this NWP are more than minimal. Division and district engineers will conduct more detailed assessments for geographic areas that are determined to be potentially subject to more than minimal cumulative adverse environmental effects. Division and district engineers have the authority to require individual permits in watersheds or other geographic areas where the cumulative adverse environmental effects are determined to be more than minimal, or add conditions to the NWP either on a case-by-case or regional basis to require mitigation measures to ensure that the cumulative adverse environmental effects of these activities are no more than minimal. When a division or district engineer determines, using local or regional information, that a watershed or other geographic area is subject to more than minimal cumulative adverse environmental effects due to the use of this NWP, he or she will use the revocation and modification procedure at 33 CFR 330.5. In reaching the final decision, the division or district engineer will compile information on the cumulative adverse effects and supplement this document.

The Corps expects that the convenience and time savings associated with the use of this NWP will encourage applicants to design their projects within the scope of the NWP rather than request individual permits for projects which could result in greater adverse impacts to the aquatic environment. The minimization encouraged by the issuance of this NWP, as well as compensatory mitigation that may be required for specific activities authorized by this NWP, will help reduce cumulative effects to the Nation's wetlands, streams, and other aquatic resources.

Cumulative effects to specific categories of resources (i.e., resources of concern in accordance with CEQ's (1997) guidance) are discussed in more detail below. As discussed above, in addition to activities regulated under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899, there are many categories of activities that contribute to cumulative effects to the human environment. The activities authorized by this NWP during the 5-year period it will be in effect will result in no more than minimal incremental contributions to cumulative effects to these resource categories.

## 4.3.2 Cumulative Effects to Aquatic Ecosystems

The ecological condition of rivers and streams is dependent on the state of their watersheds

NWP005309

(NRC 1992), because they are affected by activities that occur in those watersheds, including agriculture, urban development, deforestation, mining, water removal, flow alteration, and invasive species (Palmer et al. 2010). Land use changes affect rivers and streams through increased sedimentation, larger inputs of nutrients (e.g., nitrogen, phosphorous) and pollutants (e.g., heavy metals, synthetic chemicals, toxic organics), altered stream hydrology, the alteration or removal of riparian vegetation, and the reduction or elimination of inputs of large woody debris (Allan 2004). Agriculture is the primary cause of stream impairment, followed by urbanization (Foley et al. 2005, Paul and Meyer 2001). Agricultural land use adversely affects stream water quality, habitat, and biological communities (Allan 2004). Urbanization causes changes to stream hydrology (e.g., higher flood peaks, lower base flows), sediment supply and transport, water chemistry, and aquatic organisms (Paul and Meyer 2001).  Leopold (1968) found that land use changes affect the hydrology of an area by altering stream flow patterns, total runoff, water quality, and stream structure. Changes in peak flow patterns and runoff affect stream channel stability. Stream water quality is adversely affected by increased inputs of sediments, nutrients, and pollutants, many of which come from non-point sources (Paul and Meyer 2001, Allan and Castillo 2007).

The construction and operation of water-powered mills in the 17th to 19th centuries substantially altered the structure and function of streams in the eastern United States (Walter and Merritts 2008) and those effects have persisted to the present time. In urbanized and agricultural watersheds, the number of small streams has been substantially reduced, in part by activities that occurred between the 19th and mid-20th centuries (Meyer and Wallace 2001). Activities that affect the quantity and quality of small streams include residential, commercial, and industrial development, mining, agricultural activities, forestry activities, and road construction (Meyer and Wallace 2001), even if those activities are located entirely in uplands.

Activities that affect wetland quantity and quality include: land use changes that alter local hydrology (including water withdrawal), clearing and draining wetlands, constructing levees that sever hydrologic connections between rivers and floodplain wetlands, constructing other obstructions to water flow (e.g., dams, locks), constructing water diversions, inputs of nutrients and contaminants, and fire suppression (Brinson and Malvárez 2002). Wetland loss and degradation is caused by hydrologic modifications of watersheds, drainage activities, logging, agricultural runoff, urban development, conversion to agriculture, aquifer depletion, river management, (e.g., channelization, navigation improvements, dams, weirs), oil and gas development activities, levee construction, peat mining, and wetland management activities (Mitsch and Hernandez 2013).  Upland development adversely affects wetlands and reduces wetland functionality because those activities change surface water flows and alter wetland hydrology, contribute stormwater and associated sediments, nutrients, and pollutants, cause increases in invasive plant species abundance, and decrease the diversity of native plants and animals (Wright et al. 2006). Many of the remaining wetlands in the United States are degraded (Zedler and Kercher 2005). Wetland degradation and losses are caused by changes in water movement and volume within a watershed or contributing drainage area, altered sediment transport, drainage, inputs of nutrients from non-point sources, water diversions, fill activities, excavation activities, invasion by non-native species, land subsidence, and

NWP005310

pollutants (Zedler and Kercher 2005). According to Mitsch and Gosselink (2015), categories of activities that alter wetlands include: wetland conversion through drainage, dredging, and filling; hydrologic modifications that change wetland hydrology and hydrodynamics; highway construction and its effects on wetland hydrology; peat mining; waterfowl and wildlife management; agriculture and aquaculture activities; water quality enhancement activities; and flood control and stormwater protection.

There is also little national-level information on the ecological condition of the Nation's wetlands, streams, and other aquatic resources, or the amounts of functions they provide, although reviews have acknowledged that most of these resources are degraded (Zedler and Kercher 2005, Allan 2004) or impaired (U.S. EPA 2015) because of various activities, disturbances, and other stressors. These data deficiencies make it more difficult to characterize the affected environment to assess cumulative effects, and the relative contribution of the activities authorized by this NWP to those cumulative effects.

As discussed in section 3.0 of this document there is a wide variety of causes and sources of impairment of the Nation's rivers, streams, wetlands, lakes, estuarine waters, and marine waters (U.S. EPA 2015), which also contribute to cumulative effects to these aquatic resources. Many of those causes of impairment are point and non-point sources of pollutants that are not regulated under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act of 1899. Two common causes of impairment for rivers and streams, habitat alterations and flow alterations, may be due in part to activities regulated by the Corps under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899. Habitat and flow alterations may also be the caused by activities that do not involve discharges of dredged or fill material or structures or work in navigable waters. For wetlands, impairment due to habitat alterations, flow alterations, and hydrology modifications may also involve activities regulated under section 404, but these causes of impairment may also be due to unregulated activities, such as changes in upland land use that affects the movement of water through a watershed or contributing drainage area or the removal of vegetation.

Many of the activities discussed in this cumulative effects section that affect wetlands, streams, and other aquatic resources are not subject to regulation under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act of 1899.

Estimates of the original acreage of wetlands in the United States vary widely because of the use of different definitions and how those estimates were made (Harris and Gosselink 1990). Dahl (1990) estimates that approximately 53 percent of the wetlands in the conterminous United States were lost in the 200-year period covering the 1780s to 1980s. Much of the wetland loss occurred in the mid-19th century as a result of indirect effects of beaver trapping and the removal of river snags, which substantially reduced the amount of land across the country that was inundated because of beaver dams and river obstructions (Harris and Gosselink 1990). The annual rate of wetland loss has decreased substantially since the 1970s (Dahl 2011), when wetland regulation became more prevalent (Brinson and Malvárez 2002). Between 2004 and 2009, there was no statistically significant difference in wetland acreage in the conterminous United States (Dahl 2011). According to the 2011 wetland

NWP005311

status and trends report, during the period of 2004 to 2009 urban development accounted for 11 percent of wetland losses (61,630 acres), rural development resulted in 12 percent of wetland losses (66,940 acres), silviculture accounted for 56 percent of wetland losses (307,340 acres), and wetland conversion to deepwater habitats caused 21 percent of the loss in wetland area (115,960 acres) (Dahl 2011). Some of the losses occurred to wetlands that are not subject to Clean Water Act jurisdiction and some losses are due to activities not regulated under Section 404 of the Clean Water Act, such as unregulated drainage activities, exempt forestry activities, or water withdrawals. From 2004 to 2009, approximately 100,020 acres of wetlands were gained as a result of wetland restoration and conservation programs on agricultural land (Dahl 2011). Another source of wetland gain is conversion of other uplands to wetlands (389,600 acres during 2004 to 2009) (Dahl 2011). Inventories of wetlands, streams, and other aquatic resources are incomplete, especially at national or regional scales, because the techniques used for those inventories cannot identify all of those resources, especially small wetlands and streams (e.g., Dahl (2011) for wetlands; Meyer and Wallace (2001) for streams).

As discussed in section 3.0, national scale inventories of wetlands, streams, and other types of aquatic resources underestimate the quantity of those resources, and only general information is available on their ability to perform ecological functions and services. Therefore, it is not appropriate to make decisions concerning the significance of cumulative effects by calculating the relative proportion of the aquatic resources baseline impacted by a particular action, or a series of actions subject to a particular federal program. In addition, such an approach does not take into account the many categories of other activities that have direct and indirect effects on aquatic resources that are regulated under other federal, states, or local programs or are not regulated by any entity. Under the Council on Environmental Quality's NEPA definition at 40 CFR 1508.7, a cumulative effects analysis should instead examine the relative contribution that a proposed action will have on cumulative effects to one or more categories of natural resources (i.e., "the incremental impact of the action" and whether that incremental impact is significant or not significant).

For aquatic ecosystems, climate change affects water quality, biogeochemical cycling, and water storage (Julius et al. 2013). Climate change will also affect the abundance and distribution of wetlands across the United States, as well as the functions they provide (Mitsch and Gosselink 2015). Climate change results in increases in stream temperatures, more waterbodies with anoxic conditions, degradation of water quality, and increases in flood and drought frequencies (Julius et al. 2013). The increasing carbon dioxide concentration in the atmosphere also changes the pH of the oceans, resulting in ocean acidification (RS and NAS 2014), which adversely affects corals and some other marine organisms.

Compensatory mitigation required by district engineers for specific activities authorized by this NWP will help reduce the contribution of those activities to the cumulative effects on the Nation's wetlands, streams, and other aquatic resources, by providing ecological functions to partially or fully replace some or all of the aquatic resource functions lost as a result of those activities. Compensatory mitigation requirements for the NWPs are described in general condition 23 and compensatory mitigation projects must also comply with the

NWP005312

applicable provisions of 33 CFR part 332. District engineers will establish compensatory mitigation requirements on a case-by-case basis, after evaluating pre-construction notifications. Compensatory mitigation requirements for individual NWP activities will be specified through permit conditions added to NWP authorizations. When compensatory mitigation is required, the permittee is required to submit a mitigation plan prepared in accordance with the requirements of 33 CFR 332.4(c). Credits from approved mitigation banks or in-lieu fee programs may also be used to satisfy compensatory mitigation requirements for NWP authorizations. Monitoring is required to demonstrate whether the permittee-responsible mitigation project, mitigation bank, or in-lieu fee project is meeting its objectives and providing the intended aquatic resource structure and functions. If the compensatory mitigation project is not meeting its objectives, adaptive management will be required. Adaptive management may involve taking actions, such as site modifications, remediation, or design changes, to ensure the compensatory mitigation project meets its objectives (see 33 CFR 332.7(c)).

The estimated contribution of activities authorized by this NWP to the cumulative effects to wetlands, streams, and other aquatic resources in the United States during the five year period that the NWP would be in effect, in terms of the estimated number of time this NWP would be used until it expires and the projected impacts and compensatory mitigation, is provided in section 7.2.2. It is not practical or feasible to provide quantitative data on the multitude of other contributors to cumulative effects to these resources, including the federal, non-federal, and private activities that are not regulated by the Corps that will also occur during the five year period this NWP is in effect.  National-level data on these many categories of activities that are not regulated by the Corps but contribute to cumulative effects are either not collected for the nation or they are not accessible. The activities authorized by this NWP will result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources in the United States because, as discussed in this section, they are one category of many categories of activities that affect those aquatic resources. The causes of cumulative effects discussed in this section include past, present, and reasonably foreseeable future federal, non-federal, and private activities. For the national-scale cumulative effects analysis presented in this section, it is not possible to quantify the relative contributions of all of the various activities that affect the quantity of wetlands, streams, and other aquatic resources and the functions and services they provide, because such data are not available at the national scale.

As discussed above, there are many categories of activities not regulated by the Corps under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899 that contribute to cumulative effects to wetland, streams, and other aquatic resources. During the 5-year period this NWP is in effect, the activities it authorizes will result in only a no more than minimal incremental contribution to cumulative effects to wetlands, streams, and other aquatic ecosystems.

### 4.3.3 Cumulative Effects to Coastal Areas

In the United States, approximately 39 percent of its population lives in counties that are next to coastal waters, the territorial seas, or the Great Lakes (NOAA 2013).  Those counties

NWP005313

comprise less than 10 percent of the land area of the United States (NOAA 2013).  Coastal waters are also affected by a wide variety of activities. The major drivers of changes to coastal areas are: development activities that alter coastal forests, wetlands, and coral reef habitats for aquaculture and the construction of urban areas, industrial facilities, and resort and port developments (MEA 2005d). Dredging, reclamation, shore protection and other structures (e.g., causeways and bridges), and some types of fishing activities also cause substantial changes to coastal areas (MEA 2005d).  Nitrogen pollution to coastal zones change coral reef communities (MEA 2005d). Adverse effects to coastal waters are caused by habitat modifications, point source pollution, non-point source pollution, changes to hydrology and hydrodynamics, exploitation of coastal resources, introduction of non-native species, global climate change, shoreline erosion, and pathogens and toxins (NRC 1994).

Substantial alterations of coastal hydrology and hydrodynamics are caused by land use changes in watersheds draining to coastal waters, the channelization or damming of streams and rivers, water consumption, and water diversions (NRC 1994). Approximately 52 percent of the population of the United States lives in coastal watersheds (NOAA 2013). Eutrophication of coastal waters is caused by nutrients contributed by waste treatment systems, non-point sources, and the atmosphere, and may cause hypoxia or anoxia in coastal waters (NRC 1994).  Changes in water movement through watersheds may also alter sediment delivery to coastal areas, which affects the sustainability of wetlands and intertidal habitats and the functions they provide (NRC 1994). Most inland waters in the United States drain to coastal areas, and therefore activities that occur in inland watersheds affect coastal waters (NRC 1994).  Inland land uses, such as agriculture, urban development, and forestry, adversely affect coastal waters by diverting fresh water from estuaries and by acting as sources of nutrients and pollutants to coastal waters (MEA 2005d).

Coastal wetlands have been substantially altered by urban development and changes to the watersheds that drain to those wetlands (Mitsch and Hernandez 2013).  Coastal habitat modifications are the result of dredging or filling coastal waters, inputs of sediment via non-point sources, changes in water quality, or alteration of coastal hydrodynamics (NRC 1994). Coastal development activities, including those that occur in uplands, affect marine and estuarine habitats (MEA 2005b). The introduction of non-native species may change the functions and structure of coastal wetlands and other habitats (MEA 2005b). Fishing activities may also modify coastal habitats by changing habitat structure and the biological communities that inhabit those areas (NRC 1994).

As discussed above, there are many categories of activities not regulated by the Corps under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899 that contribute to cumulative effects to coastal areas.  During the 5-year period this NWP is in effect, the activities it authorizes will result in only a no more than minimal incremental contribution to cumulative effects to coastal areas.

### 4.3.4 Cumulative Effects to Endangered and Threatened Species

The status of species as threatened or endangered is also due to cumulative effects (NRC 1986, Odum 1982), and activities authorized by Department of the Army permits are a

NWP005314

minor contributor to the cumulative effects to endangered and threatened species.  Land use and land cover changes are the main cause of the loss of biodiversity (Vitousek et al. 1997). The decline of a species that leads to its status as endangered or threatened is usually caused by multiple factors rather than a single factor (Wilcove et al. 1998, Venter et al. 2006, Czech and Krausman 1997, Richter et al. 1997). It is difficult to determine the relative contribution of each cause of species decline or endangerment (Czech and Krausman 1997). For example, for fish species, the number of factors affecting their status ranged from 1 to 15, with an average of 4.5 threats.  Over 40 percent of fish species were endangered or threatened as a result of 5 or more factors, and less than 7 percent of fish species were identified as imperiled because of a single factor.  During the past few hundred years, human activities have increased species extinction rates by around 1,000 times the Earth's background extinction rates (MEA 2005c).

The main causes of the decline of species to endangered or threatened status are habitat loss and degradation, introduction of species, overexploitation, disease, and climate change (MEA 2005d). Habitat degradation also includes changes in habitat quality caused by habitat fragmentation and pollution. Habitat fragmentation can occur in rivers, and is characterized by disruption of a river's natural flow regime by dams, inter-basin water transfers, or water withdrawals and affects 90 percent of the world's river water volume (MEA 2005d). Invasive alien species are a major cause of species endangerment in freshwater habitats (MEA 2005d).  Losses of biological diversity are directly caused by habitat modifications, including land use changes, alteration of river and stream flows, water withdrawals from rivers, losses of coral reefs, and alteration of the sea bed caused by trawling (MEA 2005c). Other direct causes of losses of biodiversity include pollution, invasive species, species overexploitation, climate change, and disease (MEA 2005c).  There are often multiple factors interacting with each other to reduce biodiversity, instead of single factors working alone (MEA 2005c).

Wilcove et al. (1998) evaluated five categories of threats to species in the United States, and conducted further analyses on the types of habitat destruction that caused species to be listed as endangered or threatened under the Endangered Species Act. The five categories of threats were habitat destruction, alien species, overharvest, pollution, and disease. Wilcove et al. (1998) focused on species under the jurisdiction of the U.S. Fish and Wildlife Service. More than half of the endangered and threatened species under the jurisdiction of the NMFS were listed after this study was published. Wilcove et al. (1998) found information on the threats to 1,880 species, out of a total of 2,490 species that were categorized as imperiled at that time. Habitat destruction and degradation was the most comment threat, a factor for 85 percent of the imperiled species analyzed. The second most common threat was competition with non-native species, or predation by those species. For aquatic animal species, pollution was the second most common cause of endangerment, after habitat loss (Wilcove et al. 1998).

To more closely examine the causes of habitat loss, Wilcove et al. (1998) analyzed U.S. Fish and Wildlife endangered species listing documents and identified 14 categories of habitat loss or degradation: agriculture; livestock grazing; mining and oil and gas extraction; logging; infrastructure development; road construction and maintenance; military activities;

NWP005315

outdoor recreation; use of off-road vehicles; water development projects (e.g., water diversions, flood control facilities; drainage projects; aquaculture; navigation); dams, impoundments, and other water barriers; pollutants (e.g., sediment and mining pollutants); residential and commercial developments; and disruption of fire ecology. Many species were subject to more than one cause of endangerment (Wilcove et al. 1998). Agriculture was the leading cause of habitat destruction, affecting 38 percent of endangered species, followed by residential and commercial development (35 percent), water development (30 percent), and infrastructure development (17 percent). Habitat destruction caused by water development affected 91 percent of listed fish species and 99 percent of listed mussel species.

Richter et al. (1997) studied the factors that endanger freshwater animals. The most significant threats to those species are habitat destruction, habitat fragmentation, pollution, and exotic species. Richter et al. (1997) also looked at the stressors that are impeding the recovery of aquatic species at risk of extinction and found that changes in stream bed substrate composition (e.g., siltation), hydrologic alteration, interactions with other species, nutrient inputs, and habitat destruction were the most common factors. The major sources of stressors to aquatic species are agricultural land use, urban land use, energy generation industries (especially hydroelectric power), and exotic species (Richter et al. 1997). Agricultural activity was identified as having significant adverse effects on aquatic species through non-point source pollution (sediment and nutrients), interactions with exotic species, and water impoundments (Richter et al. 1997). Water impoundments cause changes in hydrology, as well as habitat destruction and fragmentation. Urban land use resulted in much less non-point source pollution than agricultural activities (Richter et al. 1997).

Note that in these studies on species threats and endangerment, the categories of human activities are discussed in general terms, and may include activities in uplands as well as activities in jurisdictional and non-jurisdictional waters and wetlands. Climate change will also alter species distributions, and extinction may occur for those species that cannot adjust to the changes in climate (Starzmoski 2013).

As discussed above, there are many categories of activities not regulated by the Corps under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899 that contribute to cumulative effects to endangered and threatened species and their designated critical habitats.  During the 5-year period this NWP is in effect, the activities it authorizes will result in only a no more than minimal incremental contribution to cumulative effects to endangered and threatened species and their habitats.

### 4.4 Climate Change

Climate change represents one of the greatest challenges our country faces with profound and wide-ranging implications for the health and welfare of Americans, economic growth, the environment, and international security.  Evidence of the warming of climate system is unequivocal and the emission of greenhouse gases from human activities is the primary driver of these changes (IPCC 2014). Already, the United States is experiencing the impacts

NWP005316

of climate change and these impacts will continue to intensify as warming intensifies.  It will have far-reaching impacts on natural ecosystems and human communities. These effects include sea level rise, ocean warming, increases in precipitation in some areas and decreases in precipitation in other areas, decreases in sea ice, more extreme weather and climate events including more floods and droughts, increasing land surface temperatures, increasing ocean temperatures, and changes in plant and animal communities (IPCC 2014).  Climate change also affects human health in some geographic area by increasing exposure to ground-level ozone and/or particulate matter air pollution (Luber et al. 2014).  Climate change also increases the frequency of extreme heat events that threaten public health and increases risk of exposure to vector-borne diseases (Luber et al. 2014).  Climate impacts affect the health, economic well-being, and welfare of Americans across the country, and especially children, the elderly, and others who are particularly vulnerable to specific impacts. Climate change can affect ecosystems and species through a number of mechanisms, such as direct effects on species, populations, and ecosystems; compounding the effects of other stressors; and the direct and indirect effects of climate change mitigation or adaptation actions (Staudt et al. 2013). Other stressors include land use and land cover changes, natural resource extraction (including water withdrawals), pollution, species introductions, and removals of species (Staudt et al. 2013, Bodkin 2012, MEA 2005d) and changes in nutrient cycling (Julius et al. 2013).

## 5.0 Public Interest Review

### 5.1 Public Interest Review Factors (33 CFR 320.4(a)(1))

For each of the 20 public interest review factors, the extent of the Corps consideration of expected impacts resulting from the use of this NWP is discussed, as well as the reasonably foreseeable cumulative adverse effects that are expected to occur.  The Corps decision-making process involves consideration of the benefits and detriments that may result from the activities authorized by this NWP.

(a) Conservation: The activities authorized by this NWP may modify the natural resource characteristics of the project area.  Compensatory mitigation, if required for activities authorized by this NWP, will result in the restoration, enhancement, establishment, or preservation of aquatic habitats that will offset losses to conservation values.  The adverse effects of activities authorized by this NWP on conservation will be minor.

(b) Economics: Utility line activities will have positive impacts on the local economy. During construction, these activities will generate jobs and revenue for local contractors as well as revenue to building supply companies that sell construction materials.  Utility lines provide energy, potable water, telecommunications, and other services to residences and schools, as well as factories, offices, stores, and other places of business, to allow those facilities to operate.

Exhibit 1

NWP005317

(c) Aesthetics: Utility line activities will alter the visual character of some waters of the United States.  The extent and perception of these changes will vary, depending on the size and configuration of the activity, the nature of the surrounding area, and the public uses of the area.  Utility line activities authorized by this NWP can also modify other aesthetic characteristics, such as air quality and the amount of noise.  The increased human use of the project area and surrounding land will also alter local aesthetic values.

(d) General environmental concerns: Activities authorized by this NWP will affect general environmental concerns, such as water, air, noise, and land pollution.  The authorized activities will also affect the physical, chemical, and biological characteristics of the environment.  The adverse effects of the activities authorized by this NWP on general environmental concerns will be minor.  Adverse effects to the chemical composition of the aquatic environment will be controlled by general condition 6, which states that the material used for construction must be free from toxic pollutants in toxic amounts.  General condition 23 requires mitigation to minimize adverse effects to the aquatic environment through avoidance and minimization at the project site.  Compensatory mitigation may be required by district engineers to ensure that the net adverse environmental effects are no more than minimal.  Specific environmental concerns are addressed in other sections of this document.

(e) Wetlands:  The construction, maintenance, repair, or removal of utility lines and associated facilities may result in the loss or alteration of wetlands.  For the construction or maintenance of utility lines impacts to wetlands will be temporary, unless the site contains forested wetlands.  The construction of utility line rights-of-way through forested wetlands will often result in the conversion of forested wetlands to scrub-shrub or emergent wetlands.  Those conversions are usually permanent to maintain the utility line in good, operational order.  The conversion of wetlands to other types of wetlands may result in the loss of certain wetland functions, or the reduction in the level of wetland functions being performed by the converted wetland.  District engineers have the authority to require mitigation to offset losses of wetland functions caused by regulated activities (see paragraph (i) of general condition 23, mitigation).  The construction of utility line substations will result in the permanent loss of wetlands.  Wetlands may also be converted to other uses and habitat types.  Forested wetlands will not be allowed to grow back in the utility line right-of-way so that the utility line will not be damaged and can be easily maintained.  Only shrubs and herbaceous plants will be allowed to grow in the right-of-way.  Some wetlands may be temporarily impacted by the activity when used as temporary staging areas.  These wetlands will be restored, unless the district engineer authorizes another use for the area, but the plant community may be different, especially if the site was originally forested.

Wetlands provide habitat, including foraging, nesting, spawning, rearing, and resting sites for aquatic and terrestrial species.  The loss or alteration of wetlands may alter natural drainage patterns.  Wetlands reduce erosion by stabilizing the substrate.  Wetlands also act as storage areas for stormwater and flood waters.  Wetlands may act as groundwater discharge or recharge areas.  The loss of wetland vegetation will adversely affect water quality because these plants trap sediments, pollutants, and nutrients and transform chemical compounds.  Wetland vegetation also provides habitat for microorganisms that remove nutrients and pollutants from water.  Wetlands, through the accumulation of organic matter,

Exhibit 1

NWP005318

act as sinks for some nutrients and other chemical compounds, reducing the amounts of these substances in the water.

General condition 23 requires avoidance and minimization of impacts to waters of the United States, including wetlands, at the project site. Compensatory mitigation may be required to offset losses of waters of the United States so that the net adverse environmental effects are no more than minimal. General condition 22 prohibits the use of this NWP to discharge dredged or fill material in designated critical resource waters and adjacent wetlands, which may include high value wetlands. Division engineers can regionally condition this NWP to restrict or prohibit its use in high value wetlands. District engineers will also exercise discretionary authority to require an individual permit if high value wetlands will be affected by the activity and the activity will result in more than minimal adverse environmental effects. District engineers may also add case-specific special conditions to the NWP authorization to reduce impacts to wetlands or require compensatory mitigation to offset losses of wetlands.

(f) Historic properties: General condition 20 states that in cases where the district engineer determines that the activity may affect properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized, until the requirements of Section 106 of the National Historic Preservation Act have been satisfied.

(g) Fish and wildlife values: This NWP authorizes certain utility line activities in all waters of the United States. Discharges of dredged or fill material into waters of the United States for the construction of utility line substations is limited to non-tidal waters, excluding non-tidal waters adjacent to tidal waters. Waters of the United States provide habitat to many species of fish and wildlife. Activities authorized by this NWP may alter the habitat characteristics of streams, wetlands, and other waters of the United States, decreasing the quantity and quality of fish and wildlife habitat. The construction of utility line right-of-ways may fragment existing habitat and increase the amount of edge habitat in the area, causing changes in local species composition. Wetland, riparian, and estuarine vegetation provides food and habitat for many species, including foraging areas, resting areas, corridors for wildlife movement, and nesting and breeding grounds. Open waters provide habitat for fish and other aquatic organisms. Fish and other motile animals will avoid the project site during construction and maintenance. Woody riparian vegetation shades streams, which reduces water temperature fluctuations and provides habitat for fish and other aquatic animals. Riparian and estuarine vegetation provides organic matter that is consumed by fish and aquatic invertebrates. Woody riparian vegetation creates habitat diversity in streams when trees and large shrubs fall into the channel, forming snags that provide habitat and shade for fish. The morphology of a stream channel may be altered by activities authorized by this NWP, which can affect fish populations. However, pre-construction notification is required for certain activities authorized by this NWP, which provides district engineers with opportunities to review those activities, assess potential impacts on fish and wildlife values, and ensure that the authorized activity results in no more than minimal adverse environmental effects. Compensatory mitigation may be required by district engineers to restore, enhance, establish, and/or preserve wetlands to offset losses of waters of the United States. Stream rehabilitation, enhancement, and preservation activities may be required as

Exhibit 1

NWP005319

compensatory mitigation for impacts to streams. The establishment and maintenance of riparian areas next to open and flowing waters may also be required as compensatory mitigation.  These methods of compensatory mitigation will provide fish and wildlife habitat values.

General condition 2 will reduce adverse effects to fish and other aquatic species by prohibiting activities that substantially disrupt the necessary life cycle movements of indigenous aquatic species, unless the primary purpose of the activity is to impound water. Compliance with general conditions 3 and 5 will ensure that the authorized activity has only minimal adverse effects on spawning areas and shellfish beds, respectively.  The authorized activity cannot have more than minimal adverse effects on breeding areas for migratory birds, due to the requirements of general condition 4.

For an NWP activity, compliance with the Bald and Golden Eagle Protection Act (16 U.S.C. 668(a)-(d)), the Migratory Bird Treaty Act (16 U.S.C. 703; 16 U.S.C. 712), and the Marine Mammal Protection Act (16 U.S.C. 1361 et seq.) is the responsibility of the project proponent. General condition 19 states that the permittee is responsible for contacting appropriate local office of the U.S. Fish and Wildlife Service to determine applicable measures to reduce impacts to migratory birds or eagles, including whether "incidental take" permits are necessary and available under the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act for a particular activity.

Consultation pursuant to the essential fish habitat provisions of the Magnuson-Stevens Fishery Conservation and Management Act will occur as necessary for proposed NWP activities that may adversely affect essential fish habitat. Consultation may occur on a case-by-case or programmatic basis. Division and district engineers can impose regional and special conditions to ensure that activities authorized by this NWP will result in only minimal adverse effects on essential fish habitat.

(h) Flood hazards:  The activities authorized by this NWP may affect the flood-holding capacity of the 100-year floodplain, including surface water flow velocities.  Changes in the flood-holding capacity of the 100-year floodplain may impact human health, safety, and welfare.  Compliance with general condition 9 will reduce flood hazards.  This general condition requires the permittee to maintain, to the maximum extent practicable, the pre-construction course, condition, capacity, and location of open waters, except under certain circumstances. General condition 10 requires the activity to comply with applicable FEMA-approved state or local floodplain management requirements. Much of the land area within 100-year floodplains is upland, and outside of the Corps scope of review.

(i) Floodplain values: Activities authorized by this NWP may adversely affect the flood-holding capacity of the floodplain, as well as other floodplain values.  The fish and wildlife habitat values of floodplains will be adversely affected by activities authorized by this NWP, by modifying or eliminating areas used for nesting, foraging, resting, and reproduction.  The water quality functions of floodplains may also be adversely affected by these activities. Modification of the floodplain may also adversely affect other hydrological processes, such as groundwater recharge.

Exhibit 1

NWP005320

Compensatory mitigation may be required for activities authorized by this NWP, which will offset losses of waters of the United States and provide water quality functions and wildlife habitat.  General condition 23 requires avoidance and minimization of impacts to waters of the United States to the maximum extent practicable at the project site, which will reduce losses of floodplain values.  The requirements of general condition 23 will minimize adverse effects to floodplain values, such as flood storage capacity, wildlife habitat, fish spawning areas, and nutrient cycling for aquatic ecosystems.  Compliance with general condition 10 will ensure that authorized activities in 100-year floodplains will not cause more than no more than minimal adverse effects on flood storage and conveyance.

(j) Land use: Activities authorized by this NWP will often change the land use from natural to developed.  The installation of utility lines may induce more development in the vicinity of the project.  Since the primary responsibility for land use decisions is held by state, local, and Tribal governments, the Corps scope of review is limited to significant issues of overriding national importance, such as navigation and water quality (see 33 CFR 320.4(j)(2)).

(k) Navigation:  Activities authorized by this NWP must comply with general condition 1, which states that no activity may cause more than minimal adverse effects on navigation. This NWP requires pre-construction notification for all activities in section 10 waters, which will allow the district engineer to review the pre-construction notification and determine if the proposed activity will adversely affect navigation.

(l) Shore erosion and accretion: The activities authorized by this NWP will have minor direct effects on shore erosion and accretion processes, since the NWP does not authorize the construction of utility line substations in tidal waters.  The construction of utility lines and foundations for overhead utility line towers, poles, and anchors, will have only minimal adverse effects on shore erosion and accretion.   However, NWP 13, regional general permits, or individual permits may be used to authorize bank stabilization projects associated with utility line activities, which may affect shore erosion and accretion.

(m) Recreation:  Activities authorized by this NWP may change the recreational uses of the area.  Certain recreational activities, such as bird watching, hunting, and fishing may no longer be available in the area.  Some utility line activities may eliminate certain recreational uses of the area.

(n) Water supply and conservation: Activities authorized by this NWP may adversely affect both surface water and groundwater supplies.  Activities authorized by this NWP can also affect the quality of water supplies by adding pollutants to surface waters and groundwater, but many causes of water pollution, such as discharges regulated under Section 402 of the Clean Water Act, are outside the Corps scope of review.  Some water pollution concerns can be addressed through the water quality management measures that may be required for activities authorized by this NWP.  The quantity and quality of local water supplies may be enhanced through the construction of water treatment facilities.  Division and district engineers can prohibit the use of this NWP in watersheds for public water supplies, if it is in

Exhibit 1

NWP005321

the public interest to do so.  General condition 7 prohibits discharges in the vicinity of public water supply intakes.  Compensatory mitigation may be required for activities authorized by this NWP, which may help improve the quality of surface waters.

(o) Water quality:  Utility line activities in wetlands and open waters may have adverse effects on water quality.  These activities can result in increases in sediments and pollutants in the water.  The loss of wetland and riparian vegetation will adversely affect water quality because these plants trap sediments, pollutants, and nutrients and transform chemical compounds.  Wetland and riparian vegetation also provides habitat for microorganisms that remove nutrients and pollutants from water.  Wetlands, through the accumulation of organic matter, act as sinks for some nutrients and other chemical compounds, reducing the amounts of these substances in the water column.  Wetlands and riparian areas also decrease the velocity of flood waters, removing suspended sediments from the water column and reducing turbidity.  Riparian vegetation also serves an important role in the water quality of streams by shading the water from the intense heat of the sun.  Compensatory mitigation may be required for activities authorized by this NWP, to ensure that the activity does not have more than minimal adverse environmental effects, including water quality.  Wetlands and riparian areas restored, established, enhanced, or preserved as compensatory mitigation may provide local water quality benefits.

During the construction, maintenance, and repair of utility lines and related activities, small amounts of oil and grease from construction equipment may be discharged into the waterway.  Because most of the construction will occur during a relatively short period of time, the frequency and concentration of these discharges are not expected to have more than minimal adverse effects on overall water quality.

This NWP may require Section 401 water quality certification, since it authorizes discharges of dredged or fill material into waters of the United States.  Most water quality concerns are addressed by the State or Tribal Section 401 agency.  In accordance with general condition 23, the permittee may be required to implement water quality management measures to minimize the degradation of water quality.  Water quality management measures may involve the installation of stormwater management facilities to trap pollutants and the establishment and maintenance of riparian areas next to waters of the United States.  Riparian areas help protect downstream water quality and enhance aquatic habitat.

(p) Energy needs: The utility line activities authorized by this NWP may induce higher rates of energy consumption in the area by making electricity, natural gas, and petroleum products more readily available to consumers.  Additional power plants or oil refineries may be needed to meet increases in energy demand, but these issues are beyond the Corps scope of review.  This NWP may be used to authorize the expansion of existing infrastructure to provide energy to new developments.

(q) Safety: The utility line activities authorized by this NWP will be subject to Federal, state, and local safety laws and regulations.  Therefore, this NWP will not adversely affect the safety of the project area. Operators of oil pipelines are required to comply with the Pipeline and Hazardous Materials Safety Administration's safety requirements, and have plans for

Exhibit 1

NWP005322

addressing the risk of oil spills. Pipelines carrying other types of substances must comply with other applicable federal and state laws and regulations during their operations. For example, the Federal Energy Regulatory Commission regulates the interstate transmission of electricity, natural gas, and oil, and issues licenses for interstate natural gas pipelines.

(r) <u>Food and fiber production</u>: Activities authorized by this NWP may adversely affect food and fiber production, especially when utility line activities are constructed on agricultural land.  Utility line activities usually require easements, which may take some agricultural land out of production.  These activities may reduce the amount of available farmland in the nation, unless that land is replaced by converting other land, such as forest, to agricultural land.  The loss of farmland is more appropriately addressed through the land use planning and zoning authority held by state and local governments.  Food production may be increased by activities authorized by this NWP.  For example, this NWP can authorize the construction or expansion of utility lines that provide energy, water, and other services to commercial food production facilities, such as bakeries, canneries, and meat processing plants.

(s) <u>Mineral needs</u>: Activities authorized by this NWP may increase demand for aggregates and stone, which may be used to construct utility lines, substations, and foundations for overhead utility line towers.  Utility lines authorized by this NWP may increase the demand for other building materials, such as steel, aluminum, and copper, which are made from mineral ores.

(t) <u>Considerations of property ownership</u>: The NWP complies with 33 CFR 320.4(g), which states that an inherent aspect of property ownership is a right to reasonable private use.  The NWP provides expedited DA authorization for utility line activities, provided those activities comply with the terms and conditions of the NWP and result in no more than minimal adverse environmental effects.

### *5.2 Additional Public Interest Review Factors (33 CFR 320.4(a)(2))*

#### 5.2.1 Relative extent of the public and private need for the proposed structure or work

This NWP authorizes the construction, maintenance, repair, and removal of utility lines and associated facilities, provided those activities have no more than minimal individual and cumulative adverse environmental effects.  These activities satisfy public and private needs for the conveyance of a variety of substances, as well as communications and information transfer.  The need for this NWP is based upon the number of these activities that occur annually with only minimal individual and cumulative environmental adverse effects.

#### 5.2.2  Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work

Most situations in which there are unresolved conflicts concerning resource use arise when

NWP005323

environmentally sensitive areas are involved (e.g., special aquatic sites, including wetlands) or where there are competing uses of a resource. The nature and scope of the activity, when planned and constructed in accordance with the terms and conditions of this NWP, reduce the likelihood of such conflict. In the event that there is a conflict, the NWP contains provisions that are capable of resolving the matter (see section 1.2 of this document).

General condition 23 requires permittees to avoid and minimize adverse effects to waters of the United States to the maximum extent practicable on the project site. Consideration of off-site alternative locations is not required for activities that are authorized by general permits. General permits authorize activities that have only minimal individual and cumulative adverse effects on the environment and the overall public interest. The district engineer will exercise discretionary authority and require an individual permit if the proposed activity will result in more than minimal adverse environmental effects on the project site. The consideration of off-site alternatives can be required during the individual permit process.

### 5.2.3 The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited

The nature and scope of the activities authorized by the NWP will most likely restrict the extent of the beneficial and detrimental effects to the area immediately surrounding the utility line activity. Activities authorized by this NWP will result in no more than minimal individual and cumulative adverse environmental effects.

The terms, conditions, and provisions of the NWP were developed to ensure that individual and cumulative adverse environmental effects are no more than minimal. Specifically, NWPs do not obviate the need for the permittee to obtain other Federal, state, or local authorizations required by law. The NWPs do not grant any property rights or exclusive privileges (see 33 CFR 330.4(b) for further information). Additional conditions, limitations, restrictions, and provisions for discretionary authority, as well as the ability to add activity-specific or regional conditions to this NWP, will provide further safeguards to the aquatic environment and the overall public interest. There are also provisions to allow suspension, modification, or revocation of the NWP.

## 6.0 Endangered Species Act

The Corps' current regulations and procedures for the NWPs result in compliance with Section 7 of the Endangered Species Act (ESA) and ensure that activities authorized by this NWP will not jeopardize the continued existence or any listed threatened and endangered species or result in the destruction or adverse modification of critical habitat. Current local procedures in Corps districts are effective in ensuring compliance with ESA. Those local procedures include regional programmatic consultations and the development of Standard Local Operating Procedures for Endangered Species (SLOPES). The issuance or reissuance of an NWP, as governed by NWP general condition 18 (which applies to every NWP and

which relates to endangered and threatened species and critical habitat) and 33 CFR 330.4(f), results in "no effect" to listed species or critical habitat, because no activity that "may affect" listed species or critical habitat is authorized by NWP unless ESA Section 7 consultation with the U.S. Fish and Wildlife Service (USFWS) and/or National Marine Fisheries Service (NMFS) has been completed.  Activities that do not comply with general condition 18 or other applicable general or regional conditions are not authorized by any NWP, and thus fall outside of the NWP Program. Unauthorized activities are subject to the prohibitions of Section 9 of the ESA.

Each activity authorized by an NWP is subject to general condition 18, which states that "[n]o activity is authorized under any NWP which is likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation, as identified under the Federal Endangered Species Act (ESA), or which will directly or indirectly destroy or adversely modify the critical habitat of such species."  In addition, general condition 18 explicitly states that the NWP does not authorize "take" of threatened or endangered species, which will ensure that permittees do not mistake the NWP authorization as a Federal authorization to take threatened or endangered species.  General condition 18 also requires a non-federal permittee to submit a pre-construction notification to the district engineer if any listed species or designated critical habitat might be affected or is in the vicinity of the project, or if the project is located in designated critical habitat. This general condition also states that, in such cases, non-federal permittees shall not begin work on the activity until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized.

Under the current Corps regulations (33 CFR 325.2(b)(5)), the district engineer must review all permit applications for potential impacts on threatened and endangered species or critical habitat.  For the NWP program, this review occurs when the district engineer evaluates the pre-construction notification or request for verification.  Nationwide permit general condition 18 requires a non-federal applicant to submit a pre-construction notification to the Corps if any listed species or designated critical habitat might be affected or is in the vicinity of the project, or if the project is located in designated critical habitat.  Based on the evaluation of all available information, the district engineer will initiate consultation with the USFWS or NMFS, as appropriate, if he or she determines that the proposed activity may affect any threatened and endangered species or critical habitat.  Consultation may occur during the NWP authorization process or the district engineer may exercise discretionary authority to require an individual permit for the proposed activity and initiate section 7 consultation during the individual permit process.  If ESA Section 7 consultation is conducted during the NWP authorization process without the district engineer exercising discretionary authority, then the applicant will be notified that he or she cannot proceed with the proposed NWP activity until section 7 consultation is completed.

If the district engineer determines that the proposed NWP activity will have no effect on any threatened or endangered species or critical habitat, then the district engineer will notify the applicant that he or she may proceed under the NWP authorization as long as the activity complies with all other applicable terms and conditions of the NWP, including applicable regional conditions. When the Corps makes a "no effect" determination, that determination

Exhibit 1

NWP005325

is documented in the record for the NWP verification.

In cases where the Corps makes a "may affect" determination, formal or informal Section 7 consultation is conducted before the activity is authorized by NWP.  A non-federal permit applicant cannot begin work until notified by the Corps that the proposed NWP activity will have "no effect" on listed species or critical habitat, or until ESA Section 7 consultation has been completed (see also 33 CFR 330.4(f)). Federal permittees are responsible for complying with ESA section 7(a)(2) and should follow their own procedures for complying with those requirements (see 33 CFR 330.4(f)(1)). Therefore, permittees cannot rely on complying with the terms of an NWP without considering ESA-listed species and critical habitat, and they must comply with the NWP conditions to ensure that they do not violate the ESA.  General condition 18 also states that district engineers may add activity-specific conditions to the NWPs to address ESA issues as a result of formal or informal consultation with the USFWS or NMFS.

Each year, the Corps conducts thousands of ESA section 7 consultations with the FWS and NMFS for activities authorized by NWPs. These section 7 consultations are tracked in ORM2.  During the period of March 19, 2012, to September 30, 2016, Corps districts conducted 1,402 formal consultations and 9,302 informal consultations for NWP activities under ESA section 7. During that time period, the Corps also used regional programmatic consultations for 9,829 NWP verifications to comply with ESA section 7. Therefore, each year NWP activities are covered by an average of more than 4,500 formal, informal, and programmatic ESA section 7 consultations with the FWS and/or NMFS. In a study on ESA section 7 consultations tracked by the USFWS, Malcom and Li (2015) found that during the period of 2008 to 2015, the Corps conducted the most formal and informal section 7 consultations, far exceeding the numbers of section 7 consultations conducted by other federal agencies.

Section 7 consultations are often conducted on a case-by-case basis for activities proposed to be authorized by NWP that may affect listed species or critical habitat, in accordance with the USFWS's and NMFS's interagency regulations at 50 CFR part 402. Instead of activity-specific section 7 consultations, compliance with ESA may also be achieved through formal or informal regional programmatic consultations. Compliance with ESA Section 7 may also be facilitated through the adoption of NWP regional conditions. In some Corps districts SLOPES have been developed through consultation with the appropriate regional offices of the USFWS and NMFS to make the process of complying with section 7 more efficient.

Corps districts have, in most cases, established informal or formal procedures with local offices of the USFWS and NMFS, through which the agencies share information regarding threatened and endangered species and their critical habitat.  This information helps district engineers determine if a proposed NWP activity may affect listed species or their critical habitat and, when a "may effect" determination is made, initiate ESA section 7 consultation. Corps districts may utilize maps or databases that identify locations of populations of threatened and endangered species and their critical habitat.  Where necessary, regional conditions are added to one or more NWPs to require pre-construction notification for NWP activities that occur in known locations of threatened and endangered species or critical

Exhibit 1                                                    NWP005326

habitat.  For activities that require agency coordination during the pre-construction notification process, the USFWS and NMFS will review the proposed activities for potential impacts to threatened and endangered species and their critical habitat.  Any information provided by local maps and databases and any comments received during the pre-construction notification review process will be used by the district engineer to make a "no effect" or "may affect" determination for the pre-construction notification.

Based on the safeguards discussed in this section, especially general condition 18 and the NWP regulations at 33 CFR 330.4(f), the Corps has determined that the activities authorized by this NWP will not jeopardize the continued existence of any listed threatened or endangered species or result in the destruction or adverse modification of designated critical habitat.  Although the Corps continues to believe that these procedures ensure compliance with the ESA, the Corps has taken some steps to provide further assurance.  Corps district offices meet with local representatives of the USFWS and NMFS to establish or modify existing procedures such as regional conditions, where necessary, to ensure that the Corps has the latest information regarding the existence and location of any threatened or endangered species or their critical habitat.  Corps districts can also establish, through local procedures or other means, additional safeguards that ensure compliance with the ESA.  Through ESA Section 7 formal or informal consultations, or through other coordination with the USFWS and NMFS, the Corps establishes procedures to ensure that the NWP is not likely to jeopardize any threatened and endangered species or result in the destruction or adverse modification of designated critical habitat.  Such procedures may result in the development of regional conditions added to the NWP by the division engineer, or in conditions to be added to a specific NWP authorization by the district engineer.

If informal section 7 consultation is conducted, and the USFWS and/or NMFS issues a written concurrence that the proposed activity may affect, but is not likely to adversely affect, listed species or designated critical habitat, the district engineer will add conditions (e.g., minimization measures) to the NWP authorization that are necessary to avoid the likelihood of adverse effects to listed species or designated critical habitat. If the USFWS and/or NMFS does not issue a written concurrence that the proposed NWP activity "may affect, but is not likely to adversely affect" listed species or critical habitat, the Corps will initiate formal section 7 consultation if it changes its determination to "may affect, likely to adversely affect."

If formal section 7 consultation is conducted and a biological opinion is issued, the district engineer will add a condition to the NWP authorization to incorporate the appropriate elements of the incidental take statement of the biological opinion into the NWP authorization, if the biological opinion concludes that the activity is not likely to jeopardize the continued existence of listed species or adversely modify or destroy critical habitat.  If the biological opinion concludes that the proposed activity is likely to jeopardize the continued existence of listed species or adversely modify or destroy critical habitat, the proposed activity cannot be authorized by NWP and the district engineer will instruct the applicant to apply for an individual permit.  The incidental take statement includes reasonable and prudent measures such as mitigation, monitoring, and reporting requirements that minimize incidental take.  The appropriate elements of the incidental take statement are

NWP005327

dependent on those activities in the biological opinion over which the Corps has control and responsibility (i.e., the discharges of dredged or fill material into waters of the United States and/or structures or work in navigable waters and their direct and indirect effects on listed species or critical habitat). The appropriate elements of the incidental take statement are those reasonable and prudent measures that the Corps has the authority to enforce under its permitting authorities. Incorporation of the appropriate elements of the incidental take statement into the NWP authorization by a binding, enforceable permit condition provides an exemption from the take prohibitions in ESA Section 9 (see Section 7(o)(2) of the ESA).

The Corps can modify this NWP at any time that it is deemed necessary to protect listed species or their critical habitat, either through: 1) national general conditions or national-level modifications, suspensions, or revocations of the NWPs; 2) regional conditions or regional modifications, suspensions, or revocations of NWPs; or 3) activity-specific permit conditions (modifications) or activity-specific suspensions or revocations of NWP authorizations.  Therefore, although the Corps has issued the NWPs, the Corps can address any ESA issue, if one should arise.  The NWP regulations also allow the Corps to suspend the use of some or all of the NWPs immediately, if necessary, while considering the need for permit conditions, modifications, or revocations.  These procedures are provided at 33 CFR 330.5.

## 7.0 Clean Water Act Section 404(b)(1) Guidelines Analysis

The 404(b)(1) Guidelines compliance criteria for general permits are provided at 40 CFR 230.7.  This 404(b)(1) Guidelines compliance analysis includes analyses of the direct, secondary, and cumulative effects on the aquatic environment caused by discharges of dredged or fill material authorized by this NWP.

### *7.1 Evaluation Process (40 CFR 230.7(b))*

7.1.1    Alternatives (40 CFR 230.10(a))

General condition 23 requires permittees to avoid and minimize discharges of dredged or fill material into waters of the United States to the maximum extent practicable on the project site.  The consideration of off-site alternatives is not directly applicable to general permits (see 40 CFR 230.7(b)(1)).

7.1.2    Prohibitions (40 CFR 230.10(b))

This NWP authorizes discharges of dredged or fill material into waters of the United States, which require water quality certification.  Water quality certification requirements will be met in accordance with the procedures at 33 CFR 330.4(c).

No toxic discharges will be authorized by this NWP.  General condition 6 states that the material must be free from toxic pollutants in toxic amounts.

NWP005328

This NWP does not authorize activities that jeopardize the continued existence of any listed threatened or endangered species or result in the destruction or adverse modification of critical habitat. Reviews of pre-construction notifications, regional conditions, and local operating procedures for endangered species will ensure compliance with the Endangered Species Act. Refer to general condition 18 and to 33 CFR 330.4(f) for information and procedures.

This NWP will not authorize the violation of any requirement to protect any marine sanctuary. Refer to section 7.2.3(j)(1) of this document for further information.

### 7.1.3   Findings of Significant Degradation (40 CFR 230.10(c))

Potential impact analysis (Subparts C through F): The potential impact analysis specified in Subparts C through F is discussed in section 7.2.3 of this document. Mitigation required by the district engineer will ensure that the adverse effects on the aquatic environment are no more than minimal.

Evaluation and testing (Subpart G): Because the terms and conditions of the NWP specify the types of discharges that are authorized, as well as those that are prohibited, individual evaluation and testing for the presence of contaminants will normally not be required. If a situation warrants, provisions of the NWP allow division or district engineers to further specify authorized or prohibited discharges and/or require testing. General condition 6 requires that materials used for construction be free from toxic pollutants in toxic amounts.

Based upon Subparts B and G, after consideration of Subparts C through F, the discharges authorized by this NWP will not cause or contribute to significant degradation of waters of the United States.

### 7.1.4   Factual determinations (40 CFR 230.11)

The factual determinations required in 40 CFR 230.11 are discussed in section 7.2.3 of this document.

### 7.1.5   Appropriate and practicable steps to minimize potential adverse impacts (40 CFR 230.10(d))

As demonstrated by the information in this document, as well as the terms, conditions, and provisions of this NWP, actions to minimize adverse effects (Subpart H) have been thoroughly considered and incorporated into the NWP. General condition 23 requires permittees to avoid and minimize discharges of dredged or fill material into waters of the United States to the maximum extent practicable on the project site. Compensatory mitigation may be required by the district engineer to ensure that the net adverse effects on the aquatic environment are no more than minimal.

NWP005329

### *7.2 Evaluation Process (40 CFR 230.7(b))*

#### 7.2.1 Description of permitted activities (40 CFR 230.7(b)(2))

As indicated by the text of this NWP in section 1.0 of this document, and the discussion of potential impacts in section 4.0, the activities authorized by this NWP are sufficiently similar in nature and environmental impact to warrant authorization under a single general permit.  Specifically, the purpose of the NWP is to authorize discharges of dredged or fill material into waters of the United States for the construction, maintenance, repair, or removal of utility lines and associated facilities. The nature and scope of the impacts are controlled by the terms and conditions of the NWP.

The activities authorized by this NWP are sufficiently similar in nature and environmental impact to warrant authorization by a general permit. The terms of the NWP authorize a specific category of activity (i.e., discharges of dredged or fill material for the construction, maintenance, repair, or removal of utility lines and associated facilities) in a specific category of waters (i.e., waters of the United States). The terms of the NWP do not authorize the construction of utility line substations in tidal waters or in non-tidal wetlands adjacent to tidal waters. The restrictions imposed by the terms and conditions of this NWP will result in the authorization of activities that have similar impacts on the aquatic environment, namely the replacement of aquatic habitats, such as certain categories of non-tidal wetlands, with utility line facilities. Most of the impacts relating to the construction, maintenance, repair, or removal of utility lines will be temporary.

If a situation arises in which the activity requires further review, or is more appropriately reviewed under the individual permit process, provisions of the NWPs allow division and/or district engineers to take such action.

#### 7.2.2 Cumulative effects (40 CFR 230.7(b)(3))

The 404(b)(1) Guidelines at 40 CFR 230.11(a) define cumulative effects as "…the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." For the issuance of general permits, such as this NWP, the 404(b)(1) Guidelines require the permitting authority to "set forth in writing an evaluation of the potential individual and cumulative impacts of the categories of activities to be regulated under the general permit." [40 CFR 230.7(b)] More specifically, the 404(b)(1) Guidelines cumulative effects assessment for the issuance or reissuance of a general permit is to include an evaluation of "the number of individual discharge activities likely to be regulated under a general permit until its expiration, including repetitions of individual discharge activities at a single location." [40 CFR 230.7(b)(3)]  If a situation arises in which cumulative effects are likely to be more than minimal and the proposed activity requires further review, or is more appropriately reviewed under the individual permit process, provisions of the NWPs allow division and/or district engineers to take such action.

Based on reported use of this NWP during the period of March 19, 2012, to March 12, 2015,

NWP005330

the Corps estimates that this NWP will be used approximately 11,500 times per year on a national basis, resulting in impacts to approximately 1,700 acres of waters of the United States, including jurisdictional wetlands.  The reported use includes pre-construction notifications submitted to Corps districts, as required by the terms and conditions of the NWP as well as regional conditions imposed by division engineers. The reported use also includes voluntary notifications to submitted to Corps districts where the applicants request written verification in cases when pre-construction notification is not required. The reported use does not include activities that do not require pre-construction notification and were not voluntarily reported to Corps districts. The Corps estimates that 2,500 NWP 12 activities will occur each year that do not require pre-construction notification, and that these activities will impact 50 acres of jurisdictional waters each year.

Based on reported use of this NWP during that time period, the Corps estimates that 9 percent of the NWP 12 verifications will require compensatory mitigation to offset the authorized impacts to waters of the United States and ensure that the authorized activities result in only minimal adverse effects on the aquatic environment. The verified activities that do not require compensatory mitigation will have been determined by Corps district engineers to result in no more than minimal individual and cumulative adverse effects on the aquatic environment without compensatory mitigation.  During 2017-2022, the Corps expects little change to the percentage of NWP 12 verifications requiring compensatory mitigation, because there have been no substantial changes in the mitigation general condition or the NWP regulations for determining when compensatory mitigation is to be required for NWP activities. The Corps estimates that approximately 300 acres of compensatory mitigation will be required each year to offset authorized impacts.  The demand for these types of activities could increase or decrease over the five-year duration of this NWP.

Based on these annual estimates, the Corps estimates that approximately 69,700 activities could be authorized over a five-year period until this NWP expires, resulting in impacts to approximately 8,900 acres of waters of the United States, including jurisdictional wetlands. Approximately 1,500 acres of compensatory mitigation would be required to offset those impacts. Compensatory mitigation is the restoration (re-establishment or rehabilitation), establishment, enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. [33 CFR 332.2]

Wetland restoration, enhancement, and establishment projects can provide wetland functions, as long as the wetland compensatory mitigation project is placed in an appropriate landscape position, has appropriate hydrology for the desired wetland type, and the watershed condition will support the desired wetland type (NRC 2001). Site selection is critical to find a site with appropriate hydrologic conditions and soils to support a replacement wetland that will provide the desired wetland functions and services (Mitsch and Gosselink 2015). The ecological performance of wetland restoration, enhancement, and establishment is dependent on practitioner's understanding of wetland functions, allowing sufficient time for wetland functions to develop, and allowing natural processes of ecosystem development (self-design or self-organization) to take place, instead of over-

designing and over-engineering the replacement wetland (Mitsch and Gosselink (2015). Most studies of the ecological performance of compensatory mitigation projects have focused solely on the ecological attributes of the compensatory mitigation projects, and few studies have also evaluated the aquatic resources impacted by permitted activities (Kettlewell et al. 2008), so it is difficult to assess whether compensatory mitigation has fully or partially offset the lost functions provided by the aquatic resources that are impacted by permitted activities.  In its review, the NRC (2001) concluded that some wetland types can be restored or established (e.g., non-tidal emergent wetlands, some forested and scrub-shrub wetlands, sea grasses, and coastal marshes), while other wetland types (e.g., vernal pools, bogs, and fens) are difficult to restore and should be avoided where possible. Restored riverine and tidal wetlands achieved wetland structure and function more rapidly than depressional wetlands (Moreno-Mateos et al. 2012).  Because of its greater potential to provide wetland functions, restoration is the preferred compensatory mitigation mechanism (33 CFR 332.3(a)(2)). Bogs, fens, and springs are considered to be difficult-to-replace resources and compensatory mitigation should be provided through in-kind rehabilitation, enhancement, or preservation of these wetlands types (33 CFR 332.3(e)(3)).

In its review of outcomes of wetland compensatory mitigation activities, the NRC (2001) stated that wetland functions can be replaced by wetland restoration and establishment activities. They discussed five categories of wetland functions: hydrology, water quality, maintenance of plant communities, maintenance of animal communities, and soil functions. Wetland functions develop at different rates in wetland restoration and establishment projects (NRC 2001). It is difficult to restore or establish natural wetland hydrology, and water quality functions are likely to be different than the functions provided at wetland impact sites (NRC 2001). Reestablishing or establishing the desired plant community may be difficult because of invasive species colonizing the mitigation project site (NRC 2001). The committee also found that establishing and maintaining animal communities depends on the surrounding landscape. Soil functions can take a substantial amount of time to develop, because they are dependent on soil organic matter and other soil properties (NRC 2001). The NRC (2001) concluded that the ecological performance in replacing wetland functions depends on the particular function of interest, the restoration or establishment techniques used, and the extent of degradation of the compensatory mitigation project site and its watershed.

The ecological performance of wetland restoration and enhancement activities is affected by the amount of changes to hydrology and inputs of pollutants, nutrients, and sediments within the watershed or contributing drainage area (Wright et al. 2006). Wetland restoration is becoming more effective at replacing or improving wetland functions, especially in cases where monitoring and adaptive management are used to correct deficiencies in these efforts (Zedler and Kercher 2005). Wetland functions take time to develop after the restoration or enhancement activity takes place (Mitsch and Gosselink 2015, Gebo and Brooks 2012), and different functions develop at different rates (Moreno-Mateos 2012).  Irreversible changes to landscapes, especially those that affect hydrology within contributing drainage areas or watersheds, cause wetland degradation and impede the ecological performance of wetland restoration efforts (Zedler and Kercher 2005). Gebo and Brooks (2012) evaluated wetland compensatory mitigation projects in Pennsylvania and compared them to reference standards

NWP005332

(i.e., the highest functioning wetlands in the study area) and natural reference wetlands that showed the range of variation due to human disturbances. They concluded that most of the wetland mitigation sites were functioning at levels within with the range of functionality of the reference wetlands in the region, and therefore were functioning at levels similar to some naturally occurring wetlands. The ecological performance of mitigation wetlands is affected by on the landscape context (e.g., urbanization) of the replacement wetland and varies with wetland type (e.g., riverine or depressional) (Gebo and Brooks 2012). Moreno-Mateos and others (2012) conducted a meta-analysis of wetland restoration studies and concluded that while wetland structure and function can be restored to a large degree, the ecological performance of wetland restoration projects is dependent on wetland size and local environmental setting. They found that wetland restoration projects that are larger in size and in less disturbed landscape settings achieve structure and function more quickly.

Streams are difficult-to-replace resources and compensatory mitigation should be provided through stream rehabilitation, enhancement, and preservation since those techniques are most likely to be ecologically successful (see 33 CFR 332.3(e)(3)). Stream rehabilitation is usually the most effective compensatory mitigation mechanism since restoring a stream to a historic state is not possible because of changes in land use and other activities in a watershed (Roni et al. 2008). Stream rehabilitation and enhancement projects, including the restoration and preservation of riparian areas, provide riverine functions (e.g., Allan and Castillo (2007) for rivers and streams, NRC (2002) for riparian areas). Improvements in ecological performance of stream restoration projects is dependent on the restoration method and how outcomes are assessed (Palmer et al. 2014). Non-structural and structural techniques can be used to rehabilitate and enhance streams, and restore riparian areas (NRC 1992). Non-structural practices include removing disturbances to allow recovery of stream and riparian area structure and function, reducing or eliminating activities that have altered stream flows to restore natural flows, preserving or restoring floodplains, and restoring and protecting riparian areas, including fencing those areas to exclude livestock and people (NRC 1992). Structural rehabilitation and enhancement techniques include dam removal, as well as channel, bank, and/or riparian area modifications to improve river and stream habitat (NRC 1992).

The restoration and enhancement of river and stream functions and services can be improved through a variety of techniques and in many cases combinations of these techniques are used (Roni et al. 2013). Examples of stream restoration and enhancement techniques include: dam removal and modification, culvert replacement or modification, fish passage structures when connectivity cannot be restored or improved by dam removal or culvert replacement, levee removal or setbacks, reconnecting floodplains and other riparian habitats, road removal, road modifications, reducing sediment and pollution inputs to streams, replacing impervious surfaces with pervious surfaces, restoring adequate in-stream or base flows, restoring riparian areas, fencing streams and their riparian areas to exclude livestock, improving in-stream habitat, recreating meanders, and replacing hard bank stabilization structures with bioengineering bank stabilization measures (Roni et al. 2013). Road improvements, riparian rehabilitation, reconnecting floodplains to their rivers, and installing in-stream habitat structures have had varying degrees of ecological performance in stream rehabilitation activities (Roni et al. 2008). The ecological performance of these stream

Exhibit 1

NWP005333

rehabilitation activities is strongly dependent on addressing impaired water quality and insufficient water quantity, since those factors usually limit the biological response to stream rehabilitation efforts (Roni et al. 2008). Ecologically successful stream rehabilitation and enhancement activities depend on addressing the factors that most strongly affect stream functions, especially water quality, water flow, and riparian quality, and not focusing solely on rehabilitating or enhancing the physical habitat of streams (Palmer et al. 2010). The ability to restore the ecological functions of streams is dependent on the condition of the watershed draining to the stream being restored because human land uses and other activities in the watershed affect how that stream functions (Palmer et al. 2014). Stream restoration projects should focus on restoring ecological processes, through activities such as dam removal, watershed best management practices, improving the riparian zone, and reforestation, instead of focusing on the manipulation the structure of the stream channel (Palmer et al. 2014).

For compensatory mitigation projects, restoration is the preferred mechanism (see 33 CFR 332.3(a)(2). In an analysis of 89 ecosystem restoration projects, Rey Banayas et al. (2009) concluded that restoration activities can increase biodiversity and the level of ecosystem services provided. However, such increases do not approach the amounts of biodiversity and ecosystem services performed by undisturbed reference sites. The ability to restore ecosystems to provide levels of functions and services similar to historic conditions or reference standard conditions is influenced by human impacts to watersheds and other types of landscapes (e.g., urbanization, agriculture) and to the processes that sustain those ecosystems (Zedler et al. 2012, Hobbs et al. 2014). Those changes need to be taken into account when establishing goals and objectives for restoration projects (Zedler et al. 2012), including compensatory mitigation projects. The ability to reverse ecosystem degradation to restore ecological functions and services is dependent on the degree of degradation of that ecosystem and the surrounding landscape, and whether that degradation is reversible (Hobbs et al. 2014).

As discussed in section 3.0, the status of waters and wetlands in the United States as reported under the provisions of Sections 303(d) and 305(b) of the Clean Water Act exhibits considerable variation, ranging from good to threatened to impaired. One of the criteria that district engineers consider when they evaluate proposed NWP activities is the "degree or magnitude to which the aquatic resources perform these functions" (see paragraph 1 of Section D, "District Engineer's Decision." The quality of the affected waters is considered by district engineers when making decisions on whether to require compensatory mitigation for proposed NWP activities to ensure no more than minimal adverse environmental effects (see 33 CFR 330.1(e)(3)), and amount of compensatory mitigation required (see 33 CFR 332.3(f)). The quality of the affected waters also factors into the determination of whether the required compensatory mitigation offsets the losses of aquatic functions caused by the NWP activity.

The compensatory mitigation required by district engineers in accordance with general condition 23 and activity-specific conditions will provide aquatic resource functions and services to offset some or all of the losses of aquatic resource functions caused by the activities authorized by this NWP, and reduce the contribution of those activities to the

73

Exhibit 1

NWP005334

cumulative effects on the Nation's wetlands, streams, and other aquatic resources. The required compensatory mitigation must be conducted in accordance with the applicable provisions of 33 CFR part 332, which requires development and implementation of approved mitigation plans, as well as monitoring to assess ecological success in accordance with ecological performance standards established for the compensatory mitigation project. The district engineer will evaluate monitoring reports to determine if the compensatory mitigation project has fulfilled its objectives and is ecological successful. [33 CFR 332.6] If the monitoring efforts indicate that the compensatory mitigation project is failing to meet its objectives, the district engineer may require additional measures, such as adaptive management or alternative compensatory mitigation, to address the compensatory mitigation project's deficiencies. [33 CFR 332.7(c)]

According to Dahl (2011), during the period of 2004 to 2009 approximately 489,620 acres of former upland were converted to wetlands as a result of wetland reestablishment and establishment activities. Efforts to reestablish or establish wetlands have increased wetland acreage in the United States.

The individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP will be no more than minimal. The Corps expects that the convenience and time savings associated with the use of this NWP will encourage applicants to design their projects within the scope of the NWP, including its limits, rather than request individual permits for projects that could result in greater adverse impacts to the aquatic environment. Division and district engineers will restrict or prohibit this NWP on a regional or case-specific basis if they determine that these activities will result in more than minimal individual and cumulative adverse effects on the aquatic environment.

### 7.2.3 Section 404(b)(1) Guidelines Impact Analysis, Subparts C through F

(a) Substrate: Discharges of dredged or fill material into waters of the United States will alter the substrate of those waters, usually replacing the aquatic area with dry land, and changing the physical, chemical, and biological characteristics of the substrate. The original substrate will be removed or covered by other material, such as concrete, asphalt, soil, gravel, etc. Temporary fills may be placed upon the substrate, but must be removed upon completion of the activity (see general condition 13). Higher rates of erosion may result during construction, but general condition 12 requires the use of appropriate measures to control soil erosion and sediment.

(b) Suspended particulates/turbidity: Depending on the method of construction, soil erosion and sediment control measures, equipment, composition of the bottom substrate, and wind and current conditions during construction, fill material placed in open waters will temporarily increase water turbidity. Pre-construction notification is required for certain activities authorized by this NWP, which allows the district engineer to review those activities and ensure that the individual and cumulative adverse effects on the aquatic environment are no more than minimal. Particulates will be resuspended in the water column during removal of temporary fills. The turbidity plume will normally be limited to the immediate vicinity of the disturbance and should dissipate shortly after each phase of the

NWP005335

construction activity.  General condition 12 requires the permittee to stabilize exposed soils and other fills, which will reduce turbidity.  In many localities, sediment and erosion control plans are required to minimize the entry of soil into the aquatic environment.  NWP activities cannot create turbidity plumes that smother important spawning areas downstream (see general condition 3).

(c) Water:  Utility line activities can affect some characteristics of water, such as water clarity, chemical content, dissolved gas concentrations, pH, and temperature.  The construction of utility lines, and utility line substations can change the chemical and physical characteristics of the waterbody by introducing suspended or dissolved chemical compounds or sediments into the water.  Changes in water quality can affect the species and quantities of organisms inhabiting the aquatic area.  Water quality certification is required for most activities authorized by this NWP, which will ensure that the activity does not violate applicable water quality standards.  Permittees may be required to implement water quality management measures to ensure that the authorized activity does not result in more than minimal degradation of water quality.  Stormwater management facilities may be required to prevent or reduce the input of harmful chemical compounds into the waterbody.  The district engineer may require the establishment and maintenance of riparian areas next to open waters, such as streams.  Riparian areas help improve or maintain water quality, by removing nutrients, moderating water temperature changes, and trapping sediments.

(d) Current patterns and water circulation: Activities authorized by this NWP may adversely affect the movement of water in the aquatic environment.  Certain utility line activities authorized by this NWP require pre-construction notification to the district engineer, to ensure that adverse effects to current patterns and water circulation are no more than minimal.  General condition 9 requires the authorized activity to be designed to withstand expected high flows and to maintain the course, condition, capacity, and location of open waters to the maximum extent practicable.  General condition 10 requires activities to comply with applicable FEMA-approved state or local floodplain management requirements, which will reduce adverse effects to surface water flows.

(e) Normal water level fluctuations: The activities authorized by this NWP will have negligible adverse effects on normal patterns of water level fluctuations due to tides and flooding.  Most utility lines will have little effect on normal water level fluctuations because they occupy a small proportion of the land surface or are installed under the surface of the substrate.  General condition 9 requires the permittee to maintain the pre-construction course, condition, capacity, and location of open waters, to the maximum extent practicable.  To ensure that the NWP does not authorize activities that adversely affect normal flooding patterns, general condition 10 requires NWP activities to comply with applicable FEMA-approved state or local floodplain management requirements.

(f) Salinity gradients: The activities authorized by this NWP are unlikely to adversely affect salinity gradients, unless the utility line activity is associated with an outfall structure that will release freshwater into marine or estuarine waters, thereby reducing the salinity of those waters in the vicinity of the outfall structure.  These adverse effects will be minimal.

Exhibit 1

NWP005336

(g) Threatened and endangered species: T The NWPs do not authorize activities that will jeopardize the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended. In addition, the NWPs do not authorize activities that will destroy or adversely modify critical habitat of those species. See 33 CFR 330.4(f) and paragraph (a) of general condition 18.  For NWP activities, compliance with the Endangered Species Act is discussed in more detail in section 6.0 of this document.

(h) Fish, crustaceans, molluscs, and other aquatic organisms in the food web. Certain activities authorized by this NWP require pre-construction notification to the district engineer, which will allow review of those projects to ensure that adverse effects to fish and other aquatic organisms in the food web are no more than minimal.  Fish and other motile animals will avoid the project site during construction.  Sessile or slow-moving animals in the path of discharges, equipment, and building materials will be destroyed.  Some aquatic animals may be smothered by the placement of fill material.  Motile animals will return to those areas that are temporarily impacted by the activity and restored or allowed to revert back to preconstruction conditions.  Aquatic animals will not return to sites of permanent fills.  Benthic and sessile animals are expected to recolonize sites temporarily impacted by the activity, after those areas are restored.  Activities that alter the riparian zone, especially floodplains, may adversely affect populations of fish and other aquatic animals, by altering stream flow, flooding patterns, and surface and groundwater hydrology.

Division and district engineers can place conditions on this NWP to prohibit discharges during important stages of the life cycles of certain aquatic organisms.  Such time of year restrictions can prevent adverse effects to these aquatic organisms during reproduction and development periods.  General conditions 3 and 5 address protection of spawning areas and shellfish beds, respectively.  General condition 3 states that activities in spawning areas during spawning seasons must be avoided to the maximum extent practicable.  In addition, general condition 3 also prohibits activities that result in the physical destruction of important spawning areas.  General condition 5 prohibits activities in areas of concentrated shellfish populations.  General condition 9 requires the maintenance of pre-construction course, condition, capacity, and location of open waters to the maximum extent practicable, which will help minimize adverse impacts to fish, shellfish, and other aquatic organisms in the food web.

(i) Other wildlife: Activities authorized by this NWP will result in adverse effects to other wildlife associated with aquatic ecosystems, such as resident and transient mammals, birds, reptiles, and amphibians, through the destruction of aquatic habitat, including breeding and nesting areas, escape cover, travel corridors, and preferred food sources. This NWP does not authorize activities that jeopardize the continued existence of Federally-listed endangered and threatened species or result in the destruction or adverse modification of critical habitat. Compensatory mitigation, including the establishment and maintenance of riparian areas next to open waters, may be required for activities authorized by this NWP, which will help offset losses of aquatic habitat for wildlife.  General condition 4 states that activities in breeding areas for migratory birds must be avoided to the maximum extent practicable.

(j) Special aquatic sites: The potential impacts to specific special aquatic sites are discussed

NWP005337

below:

(1) <u>Sanctuaries and refuges</u>: The activities authorized by this NWP will have no more than minimal adverse effects on waters of the United States within sanctuaries or refuges designated by Federal or state laws or local ordinances.  General condition 22 prohibits the use of this NWP to discharge dredged or fill material in NOAA-managed marine sanctuaries and marine monuments and National Estuarine Research Reserves. District engineers will exercise discretionary authority and require individual permits for specific projects in waters of the United States in sanctuaries and refuges if those activities will result in more than minimal adverse effects on the aquatic environment.

(2) <u>Wetlands</u>: The activities authorized by this NWP will have only minimal adverse effects on wetlands.  District engineers will review pre-construction notifications for certain activities authorized by this NWP to ensure that the adverse effects on the aquatic environment are no more than minimal.  For some NWP 12 activities, there will be losses of wetlands in cases where the authorized activity involves permanent fills in jurisdictional wetlands to convert those areas to dry land.  There may also be permanent conversions of wetlands from forested to scrub-shrub or emergent wetlands in the utility line right-of-way. Division engineers can regionally condition this NWP to restrict or prohibit its use in certain high value wetlands.  See paragraph (e) of section 5.1 for a more detailed discussion of impacts to wetlands.

(3) <u>Mud flats</u>: The activities authorized by this NWP will have minor adverse effects on mud flats.  Small portions of mud flats may be destroyed by the installation of utility lines, but these adverse effects will be no more than minimal.  Pre-construction notification is required for certain activities authorized by this NWP and the pre-construction notification must include a delineation of special aquatic sites, including mud flats.

(4) <u>Vegetated shallows</u>: The activities authorized by this NWP will have only minimal adverse effects on vegetated shallows in tidal waters, since only utility lines and foundations for overhead utility line towers, poles, and anchors can be constructed in tidal waters that may be inhabited by submerged aquatic vegetation.  District engineers will receive pre-construction notifications for all utility line activities in section 10 waters to determine if those activities will result in only minimal adverse effects on the aquatic environment.  Division engineers can regionally condition this NWP to restrict or prohibit its use in non-tidal vegetated shallows.  For those NWP activities that require pre-construction notification, the district engineer will review the proposed activity and may exercise discretionary authority to require the project proponent to obtain an individual permit if the activity will result in more than minimal adverse effects on the aquatic environment.

(5) <u>Coral reefs</u>: The activities authorized by this NWP may affect coral reefs.  The activities authorized by this NWP will have no more than minimal adverse effects on coral reefs. Pre-construction notification is required for all section 10 activities authorized by this NWP, so that the district engineer can review each proposed activity and ensure that it results in minimal adverse environmental effects.  If the proposed activity will result in more

77

Exhibit 1

NWP005338

than minimal adverse effects on the aquatic environment, the district engineer will exercise discretionary authority to require the project proponent to obtain an individual permit.

(6) Riffle and pool complexes: The activities authorized by this NWP will have no more than minimal adverse effects on riffle and pool complexes.  Division engineers can regionally condition this NWP to restrict or prohibit its use in riffle and pool complexes.  Pre-construction notification is required for certain utility line activities authorized by this NWP, which will allow district engineers to review those proposed activities, and if he or she determines the adverse environmental effects are more than minimal, exercise discretionary authority to require the project proponent to obtain an individual permit.

(k) Municipal and private water supplies: See paragraph (n) of section 5.1 for a discussion of potential impacts to water supplies.

(l)  Recreational and commercial fisheries, including essential fish habitat:  The activities authorized by this NWP may adversely affect waters of the United States that act as habitat for populations of economically important fish and shellfish species.  Division and district engineers can condition this NWP to prohibit discharges during important life cycle stages, such as spawning or development periods, of economically valuable fish and shellfish.  All utility lines requiring section 10 authorization require submission of pre-construction notifications to the district engineer, which will allow review of each activity in navigable waters to ensure that adverse effects to economically important fish and shellfish are no more than minimal.  Compliance with general conditions 3 and 5 will ensure that the authorized activity does not adversely affect important spawning areas or concentrated shellfish populations. As discussed in paragraph (g) of section 5.1, there are procedures to help ensure that individual and cumulative impacts to essential fish habitat are no more than minimal.  For example, division and district engineers can impose regional and special conditions to ensure that activities authorized by this NWP will result in only minimal adverse effects on essential fish habitat.

(m) Water-related recreation: See paragraph (m) of section 5.1 above.

(n) Aesthetics: See paragraph (c) of section 5.1 above.

(o) Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar areas:  General condition 22 prohibits the use of this NWP to authorize discharges of dredged or fill material in designated critical resource waters and adjacent wetlands, which may be located in parks, national and historical monuments, national seashores, wilderness areas, and research sites.  This NWP can be used to authorize activities in parks, national and historical monuments, national seashores, wilderness areas, and research sites if the manager or caretaker wants to conduct activities in waters of the United States and those activities result in no more than minimal adverse effects on the aquatic environment.  Division engineers can regionally condition the NWP to prohibit its use in designated areas, such as national wildlife refuges or wilderness areas.

Exhibit 1

**8.0 Determinations**

*8.1 Finding of No Significant Impact*

Based on the information in this document, the Corps has determined that the issuance of this NWP will not have a significant impact on the quality of the human environment. Therefore, the preparation of an Environmental Impact Statement is not required.

*8.2 Public Interest Determination*

In accordance with the requirements of 33 CFR 320.4, the Corps has determined, based on the information in this document, that the issuance of this NWP is not contrary to the public interest.

*8.3 Section 404(b)(1) Guidelines Compliance*

This NWP has been evaluated for compliance with the 404(b)(1) Guidelines, including Subparts C through G.  Based on the information in this document, the Corps has determined that the discharges authorized by this NWP comply with the 404(b)(1) Guidelines, with the inclusion of appropriate and practicable conditions, including mitigation, necessary to minimize adverse effects on affected aquatic ecosystems.  The activities authorized by this NWP will result in no more than minimal individual and cumulative adverse effects on the aquatic environment.

*8.4 Section 176(c) of the Clean Air Act General Conformity Rule Review*

This NWP has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act.  It has been determined that the activities authorized by this permit will not exceed *de minimis* levels of direct emissions of a criteria pollutant or its precursors and are exempted by 40 CFR 93.153.  Any later indirect emissions are generally not within the Corps continuing program responsibility and generally cannot

Exhibit 1

NWP005340

be practicably controlled by the Corps.  For these reasons, a conformity determination is not required for this NWP.

FOR THE COMMANDER

Dated: 21 Dec 2016

Donald E. Jackson
Major General, U.S. Army
Deputy Commanding General
 for Civil and Emergency Operations

## 9.0 Literature Cited

Allan, J.D. 2004. Landscapes and Riverscapes: The Influence of Land Use on Stream Ecosystems. Annual Review of Ecology, Evolution, and Systematics. 35:257–284.

Allan, J.D. and M.M. Castillo. 2007. Stream Ecology: Structure and Function of Running Waters, 2nd edition. Springer (The Netherlands). 436 pp.

Beechie, T. J.S. Richardson, A.M. Gurnell, and J. Negishi. 2013. Watershed processes, human impacts, and process-based restoration. In, Stream and Watershed Restoration: A Guide to Restoring Riverine Processes and Habitats. Edited by P. Roni and T. Beechie. Wiley and Sons, Inc. (West Sussex, UK), pp. 11-49.

Benstead, J.P. and D.S. Leigh. 2012. An expanded role for river networks. Nature Geoscience 5:678-679.

Bodkin, D.B. 2012. The Moon in the Nautilus Shell: Discordant Harmonies Reconsidered from Climate Change to Species Extinction, How Life Persists in an Ever-Changing World. Oxford University Press (New York, New York). 424 pp.

Booth, D.B., J.R. Karr, S. Schauman, C.P. Konrad, S.A. Morley, M.G. Larson, and S.J. Burges. 2004. Reviving urban streams: Land use, hydrology, biology, and human behavior. Journal of the American Water Resources Association. 40:1351-1364.

Brinson, M.M. and A.I. Malvárez. 2002. Temperate freshwater wetlands: type, status and threats. Environmental Conservation 29:115-133.

Brooks, R.T. and E.A. Colburn. 2011. Extent and channel morphology of unmapped headwater stream segments of the Quabbin watershed, Massachusetts. Journal of the American Water Resources Association 47:158-168.

Brown, T.C. and P. Froemke. 2012. Nationwide assessment of non-point source threats to water quality. Bioscience 62:136-146.

Butman, D. and P.A. Raymond. 2011. Significant efflux of carbon dioxide from streams and rivers in the United States. Nature Geoscience 4:839–842.

Carpenter, S.R., E.H. Stanley, and J.M. Vander Zanden. 2011. State of the world's freshwater ecosystems: Physical, chemical, and biological changes. Annu. Rev. Environ. Resources. 36:75-99.

Council on Environmental Quality (CEQ). 1997. Considering cumulative effects under the National Environmental Policy Act.

Cowardin, L.M., V. Carter, F.C. Golet, and E.T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. U.S. Department of the Interior, Fish and

Exhibit 1

NWP005342

Wildlife Service.  FWS/OBS-79-31.  131 pp.

Czech, B. and P.R. Krausman. 1997. Distribution and causation of species endangerment in the United States. Science 277:1116-1117.

Dahl, T.E. 2011. Status and trends of wetlands in the conterminous United States 2004 to 2009. U.S. Department of the Interior, Fish and Wildlife Service, Washington, DC. 108 pp.

Dahl, T.E. 1990. Wetlands losses in the United States 1780s to 1980s. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. 21 pp.

Dahl, T.E. and C.E. Johnson. 1991. Status and Trends of Wetlands in the Conterminous United States, Mid-1970s to Mid-1980s. U.S. Department of the Interior, Fish and Wildlife Service, Washington, DC. 28 pp.

Dale, V.H., S. Brown, R.A. Haeuber, N.T. Hobbs, N. Huntly, R.J. Naiman, W.E. Riebsame, M.G. Turner, and T.J. Valone. 2000. Ecological principles and guidelines for managing the use of land. Ecological Applications 10:639-670.

Deegan, L.A., D.S. Johnson, R.S. Warren, B.J. Peterson, J.W. Fleeger, S. Fagherazzi, and W.M. Wollheim. 2012. Coastal eutrophication as a driver of salt marsh loss. Nature 490:388-392.

Dudgeon, D. A.H. Arthington, M.O. Gessner, Z.-I. Kawabata, D.J. Knowler, C. Lévêque, R.J. Naiman, A.-H. Prieur-Richard, D. Soto, M.L.J. Stiassny, and C.A. Sullivan. 2005. Freshwater biodiversity: importance, threats, status and conservation challenges. Biological Reviews 81:163-182.

Ellis, E.C., K.K. Goldewijk, S. Siebert, D. Lightman, and N. Ramankutty.  2010. Anthropogenic transformation of the biomes, 1700 to 2000. Global Ecology and Biogeography 19:589-606.

Ellis, E.C. and N. Ramankutty.  2008.  Putting people in the map: Anthropogenic biomes of the world. Frontiers in Ecology and the Environment 6:439-447.

Elmore, A.J., J.P. Julian, S.M. Guinn, and M.C. Fitzpatrick. 2013. Potential stream density in mid-Atlantic watersheds. PLOS ONE 8:e74819

Federal Geographic Data Committee. 2013. Classification of wetlands and deepwater habitats of the United States. FGDC-STD-004-2013. Second Edition. Wetlands Subcommittee, Federal Geographic Data Committee and U.S. Fish and Wildlife Service, Washington, DC.

Fennessy, M.S., A.D. Jacobs, and M.E. Kentula. 2007. An evaluation of rapid methods for assessing the ecological condition of wetlands. Wetlands 27:543-560.

Exhibit 1

NWP005343

Fischenich, J.C. 2006. Functional objectives for stream restoration. EMRRP Technical Notes Collection (ERDC TN-EMRRP-SR-52). Vicksburg, MS: U.S. Army Engineer Research and Development Center. 18 pp.

Foley, J.A., R. DeFries, G.P. Asner, C. Barford, G. Bonan, S.R. Carpenter, F.S. Chapin, M.T. Coe, G.C. Daily, H.K. Gibbs, J.H. Helkowski, T. Holloway, E.A. Howard, C.J. Kucharik, C. Monfreda, J.A. Patz, I.C. Prentice, N. Ramankutty, and P.K. Snyder. 2005. Global consequences of land use. Science 309:570-574.

Frayer, W.E., T.J. Monahan, D.C. Bowden, F.A. Graybill. 1983. Status and Trends of Wetlands and Deepwater Habitats in the Conterminous United States: 1950s to 1970s. Department of the Interior, U.S. Fish and Wildlife Service. Washington, DC. 32 pp.

Gebo, N.A. and R.P. Brooks. 2012. Hydrogeomorphic (HGM) assessments of mitigation sites compared to natural reference wetlands in Pennsylvania. Wetlands 32:321-331.

Gergel, S.E., M.G. Turner, J.R. Miller, J.M. Melack, and E.H. Stanley. 2002. Landscape indicators of human impacts to riverine systems. Aquatic Sciences 64:118-128.

Gittman, R.K, F.J. Fodrie, A.M. Popowich, D.A. Keller, J.F. Bruno, C.A. Currin, C.H. Peterson, and M.F. Piehler. 2015. Engineering away our natural defenses: an analysis of shoreline hardening in the United States. Frontiers in Ecology and the Environment 13:301-307.

Gosselink, J.G. and L.C. Lee. 1989. Cumulative impact assessment in bottomland hardwood forests. Wetlands 9:83-174.

Hall, J.V., W.E. Frayer, and B.O. Wilen. 1994. Status of Alaska Wetlands. U.S. Department of the Interior, Fish and Wildlife Service, Washington, DC.  33 pp.

Halpern, B.S., S. Walbridge, K.A. Selkoe, C.V. Kappel, F. Micheli, C. D'Agrosa, J.F. Bruno, K.S. Casey, C. Ebert, H.E. Fox, R. Fujita, D. Heinemann, H.S. Lenihan, E.M. P. Madin, M.T. Perry, E.R. Selig, M. Spalding, R. Steneck, and R. Watson. 2008. A global map of human impact on marine ecosystems.  Science 319:948-952.

Hansen, W.F. 2001. Identifying stream types and management implications. Forest Ecology and Management 143:39-46.

Harris,  L.D. and J.G. Gosselink. 1990. Cumulative impacts of bottomland hardwood forest conversion on hydrology, water quality, and terrestrial wildlife. In: Ecological Processes and Cumulative Impacts: Illustrated by Bottomland Hardwood Wetland Ecosystems. Ed. by J.G. Gosselink, L.C. Lee, and T.A. Muir. Lewis Publishers, Inc. (Chelsea, MI). pp. 260-322.

Hobbs, R.J., E. Higgs, C.M. Hall, P. Bridgewater, F.S. Chapin III, E.C. Ellis, J.J. Ewel, L.M. Hallett, J. Harris, K.B. Hulvey, S.T. Jackson, P.L. Kennedy, C. Kueffer, L. Lach, T.C. Lantz, A.E. Lugo, J. Mascaro, S.D. Murphy, C.R. Nelson, M.P. Perring, D.M. Richardson,

Exhibit 1                                                    NWP005344

T.R. Seastedt, R.J. Standish, B.M. Starzomski, K.N. Suding, P.M. Tognetti, L. Yakob, and L. Yung. 2014. Managing the whole landscape: historical, hybrid, and novel ecosystems. Frontiers in Ecology and the Environment 12:557-564.

Intergovernmental Panel on Climate Change (IPCC). 2014. Climate change 2014: synthesis report. Contributions of Working Groups I, II, and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPPC, Geneva, Switzerland, 151 pp.

Julius, S.H., J.M. West, D. Nover, R. Hauser, D.S. Schimel, A.C. Janetos, M.K. Walsh, and P. Backlund. 2013. Climate change and U.S. natural resources: Advancing the nation's capacity to adapt. Ecological Society of America. Issues in Ecology, Report Number 18. 17 pp.

Kettlewell, C.I., V. Bouchard, D. Porej, M. Micacchion, J.J. Mack, D. White, and L. Fay. 2008. An assessment of wetland impacts and compensatory mitigation in the Cuyahoga River watershed, Ohio, USA. Wetlands 28:57-67.

King, D.M., Wainger, L.A., C.C. Bartoldus, and J.S. Wakeley. 2000. Expanding wetland assessment procedures: Linking indices of wetland function with services and values. ERDC/EL TR-00-17, U.S. Army Engineer Research and Development Center, Vicksburg, MS.

Leopold, L.B., M.G. Wolman, and J.P. Miller. 1964. Fluvial Processes in Geomorphology. Dover Publications, Inc. (New York). 522 pp.

Leopold, L.B. 1994. A View of the River. Harvard University Press (Cambridge). 298 pp.

Leopold. L.B. 1968. Hydrology for urban land planning – A guidebook on the hydrologic effects of urban land use. Department of the Interior. U.S. Geological Survey. Geological Survey Circular 554. 18 pp.

Luber, G., K. Knowlton, J. Balbus, H. Frumkin, M. Hayden, J. Hess, M. McGeehin, N. Sheats, L. Backer, C. B. Beard, K. L. Ebi, E. Maibach, R. S. Ostfeld, C. Wiedinmyer, E. Zielinski-Gutiérrez, and L. Ziska. 2014. Chapter 9: Human Health. Climate Change Impacts in the United States: The Third National Climate Assessment, J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, Eds., U.S. Global Change Research Program, 220-256. doi:10.7930/J0PN93H5.

Malcom, J.W. and Y.-W. Li. 2015. Data contradict common perceptions about a controversial provision of the U.S. Endangered Species Act. Proceedings of the National Academy of Sciences (early edition). www.pnas.org/cg/doi/10.1073/pnas.1516938112

Malmqvist, B. and S. Rundle. 2002. Threats to running water ecosystems of the world. Environmental Conservation 29:134-153.

Exhibit 1

NWP005345

Meyer, J.L. and J.B. Wallace. 2001.  Lost linkages and lotic ecology: rediscovering small streams. In Ecology: Achievement and Challenge. Ed. by M.C. Press, N.J. Huntly, and S. Levin.  Blackwell Science (Cornwall, Great Britain).  pp. 295-317.

Millar, C.I. and L.B. Brubaker. 2006. Climate change and paleoecology: New contexts for restoration ecology. In: Foundations of Restoration Ecology, edited by D.A. Falk, M.A. Palmer, and J.B. Zedler. Island Press (Washington, DC). Chapter 15, pages 315-340.

Millennium Ecosystem Assessment (MEA). 2005b. Ecosystems and Human Well-Being: Wetlands and Water Synthesis.  World Resources Institute, Washington, DC. 68 pp.

Millennium Ecosystem Assessment (MEA). 2005c. Ecosystems and human well-being: Biodiversity synthesis.  World Resources Institute, Washington, DC.  86 pp.

Millennium Ecosystem Assessment (MEA). 2005d. Ecosystems and Human Well-Being: Synthesis. Island Press, Washington, DC. 137 pp.

Mitsch, W.J. and J.G. Gosselink. 2015. Wetlands. 5th edition. John Wiley and Sons, Inc. (Hoboken, New Jersey)  736 pp.

Mitsch, W.J. and M.E. Hernandez. 2013. Landscape and climate change threats to wetlands of North and Central America. Aquatic Sciences 75:133-149.

Moreno-Mateos, D., M.E. Power, F.A. Comìn, R. Yockteng. 2012. Structural and functional loss in restored wetland ecosystems.  PLoS Biol 10(1): e1001247. doi:10.1371/journal.pbio.1001247

National Oceanic and Atmospheric Administration (NOAA). 2013. National Coastal Population Report: Population Trends from 1970 to 2020. NOAA State of the Coast Report Series. 22 pp.

National Oceanic and Atmospheric Administration (NOAA). 1975. The Coastline of the United States. http://shoreline.noaa.gov/_pdf/Coastline_of_the_US_1975.pdf (accessed October 23, 2014).

National Research Council (NRC). 1986. Ecological Knowledge and Environmental Problem-Solving: Concepts and Case-Studies. National Academy Press (Washington, DC). 388 pp.

National Research Council (NRC).  1992.  Restoration of Aquatic Ecosystems.  National Academy Press (Washington, DC).  552 pp.

National Research Council (NRC). 1994. Priorities for Coastal Ecosystem Science. National Academy Press (Washington, DC). 118 pp.

National Research Council (NRC). 1995. Wetlands: Characteristics and Boundaries.

Exhibit 1

NWP005346

National Academy Press (Washington, DC). 306 pp.

National Research Council (NRC).  2001.  Compensating for Wetland Losses Under the Clean Water Act. National Academy Press (Washington, DC). 322 pp.

National Research Council (NRC).  2002.  Riparian Areas: Functions and Strategies for Management National Academy Press (Washington, DC). 444  pp.

Nickerson, C., R. Ebel, A. Borchers, and F. Carriazo. 2011. Major Uses of Land in the United States, 2007, EIB-89, U.S. Department of Agriculture, Economic Research Service, December 2011.

Odum, W.E. 1982. Environmental degradation and the tyranny of small decisions. Bioscience. 32:728-729.

Palmer, M.A., K.L. Hondula, and B.J. Koch. 2014. Ecological restoration of streams and rivers: Shifting strategies and shifting goals. Annual Review of Ecology, Evolution, and Systematics. 45:247-269.

Palmer, M.A., H.L. Menninger, and E. Bernhardt. 2010. River restoration, habitat heterogeneity, and biodiversity: a failure of theory or practice? Freshwater Biology 55:205-222.

Paul, M.J. and J.L. Meyer. 2001. Streams in the urban landscape. Annual Review of Ecology and Systematics. 32:333-365.

Peterson, C.H. and J. Lubchenco. 1997. Marine ecosystem services, in Nature's Services: Societal Dependence on Natural Ecosystems. Edited by G.C. Daily. Island Press (Washington, DC). pp. 177-194.

Postel, S. and S. Carpenter. 1997. Freshwater ecosystem services, in Nature's Services: Societal Dependence on Natural Ecosystems. Edited by G.C. Daily. Island Press (Washington, DC). pp. 195-214.

Reid, L.M. 1993. Research and cumulative watershed effects. U.S. Department of Agriculture, U.S. Forest Service General Technical Report PSW-GTR-141. 118 pp.

Rey Benayas, J.M., A.C. Newton, A. Diaz, and J.M. Bullock. 2009. Enhancement of biodiversity and ecosystems by ecological restoration: a meta-analysis. Science 325:1121-1124.

Richter, B.D., D.P. Braun, M.A. Mendelson, and L.L. Master. 1997. Threats to imperiled freshwater fauna. Conservation Biology 11:1081-1093.

Roni, P., K. Hanson, and T. Beechie. 2008. Global review of the physical and biological effectiveness of stream habitat rehabilitation techniques. North American Journal of

Exhibit 1

NWP005347

Fisheries Management 28:856-890.

Roni, P., G. Pess, K. Hanson, and M. Pearsons. 2013.  Selecting appropriate stream and watershed restoration techniques.  In,  Stream and Watershed Restoration: A Guide to Restoring Riverine Processes and Habitats. Edited by P. Roni and T. Beechie. Wiley and Sons, Inc. (West Sussex, UK), pp. 144-188.

Royal Society (RS) and the National Academy of Sciences (NAS). 2014. Climate change evidence and causes: An overview from the Royal Society and the U.S. National Academy of Sciences. 34 pp.

Smith, R.D., Ammann, A., Bartoldus, C., and Brinson, M.M. 1995. An approach for assessing wetland functions using hydrogeomorphic classification, reference wetlands, and functional indices. Technical Report WRP-DE-9, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

Starzomski, B.M. 2013. Novel ecosystems and climate change. In: Novel Ecosystems: Intervening in the New Ecological World Order, First Edition. Edited by R.J. Hobbs, E.S. Higgs, and C.M. Hall. John Wiley and Sons, Ltd. (West Sussex, UK). pp. 88-101.

Staudt, A. A.K. Leidner, J. Howard, K.A. Brauman, J.S. Dukes, L.J. Hansen, C. Paukert, J. Sabo, and L.A. Solórzano. 2013. The added complications of climate change: understanding biodiversity and ecosystems. Frontiers in Ecology and Environment 11:494-501.

Steffen, W., P.J. Crutzen, and J.R. McNeill. 2007. The Anthropocene: Are humans overwhelming the forces of nature?  Ambio 36:614-621

Tiner, R. 1997a. NWI maps: Basic information on the Nation's wetlands. Bioscience 47:269.

Tiner, R. 1997b. NWI maps: What they tell us. National Wetlands Newsletter. 19:7-12.

Tiner, R.W. 1999. Wetland Indicators: A Guide to Wetland Identification, Delineation, Classification, and Mapping. Lewis Publishers (Boca Raton, FL) 392 pp.

U.S. Department of Agriculture. 2015. Summary Report: 2012 National Resources Inventory, Natural Resources Conservation Service, Washington, DC, and Center for Survey Statistics and Methodology, Iowa State University, Ames, Iowa. http://www.nrcs.usda.gov/technical/nri/12summary (accessed January 21, 2016)

U.S. Environmental Protection Agency (U.S. EPA). 2015. National Summary of State Information. http://ofmpub.epa.gov/waters10/attains_index.control (accessed May 27, 2015).

U.S. Environmental Protection Agency (U.S. EPA). 2016. National Wetland Condition Assessment 2011: A Collaborative Survey of the Nation's Wetlands. EPA-843-R-15-005.

Exhibit 1

NWP005348

Office of Wetlands, Oceans, and Watersheds, Office of Research and Development (Washington, DC). 105 pp.

Venter, O., N.N. Brodeur, L. Nemiroff, B. Belland, I.J. Dolinsek, and J.W.A. Grant. 2006. Threats to endangered species in Canada. Bioscience. 56:903-910.

Vitousek, P.M., H.A. Mooney, J. Lubchenco, and J.M. Melillo. 1997. Human domination of the Earth's ecosystems. Science 277:494-499.

Walter, R.C. and D.J. Merritts. 2008. Natural streams and the legacy of water-powered mills. Science 319:299-304.

Wilcove, D.S., D. Rothstein, J. Dubow, A. Philips, and E. Losos. 1998. Quantifying threats to imperiled species in the United States. Bioscience. 48:607-615.

Wright, T., J. Tomlinson, T. Schueler, K. Cappiella, A. Kitchell, and D. Hirschman. 2006. Direct and indirect impacts of urbanization on wetland quality. Wetlands and Watersheds Article #1. Center for Watershed Protection (Ellicott City, Maryland). 81 pp.

Zedler, J.B., J.M. Doherty, and N.A. Miller. 2012. Shifting restoration policy to address landscape change, novel ecosystems, and monitoring.  Ecology and Society 17:36.

Zedler, J.B. and S. Kercher. 2005. Wetland resources: Status, trends, ecosystem services, and restorability. Annual Review Environmental Resources. 30:39-74.

Exhibit 1

NWP005349