## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

| | |
|---|---|
| SIERRA CLUB, | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § |
| U.S. ARMY CORPS OF ENGINEERS, ET AL., | § |
| *Defendants*, | §    Case No. 1:20-cv-00460-RP |
| *and* | § |
| | § |
| KINDER MORGAN TEXAS PIPELINE LLC, | § |
| AND PERMIAN HIGHWAY PIPELINE, LLC, | § |
| *Intervenor-Defendants.* | § |

## INTERVENOR-DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

W. Stephen Benesh
Texas State Bar No. 02132050
BRACEWELL LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701-4061
Telephone: (512) 494-3680
Facsimile: (800) 404-3970
Email: steve.benesh@bracewell.com

and

Ann D. Navaro (*admitted pro hac vice*)
Brittany Pemberton (*admitted pro hac vice*)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 828-5811
Facsimile: (800) 404-3970
Email: ann.navaro@bracewell.com
Email: brittany.pemberton@bracewell.com

Date: July 10, 2020

***COUNSEL FOR INTERVENOR DEFENDANTS KINDER MORGAN TEXAS PIPELINE LLC AND PERMIAN HIGHWAY PIPELINE, LLC***

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND .....................................................................................................3

        A.      The Permian Highway Pipeline ...................................................................3

        B.      The Federal Regulatory Process ..................................................................5

        C.      Status of construction of the Permian Highway Pipeline.............................9

III.    ARGUMENT ...........................................................................................................9

        A.      Plaintiff is unlikely to succeed on the merits of its claims because it lacks
                standing. ....................................................................................................10

        B.      If the Court must reach the analysis of preliminary injunction factors,
                Plaintiff has not shown a substantial threat of immediate irreparable injury.............12

                1.      Plaintiff's delay alone refutes any suggestion of imminence and
                        justifies denying its motion. ............................................................13

                2.      Plaintiff's alleged procedural injuries do not alone constitute
                        irreparable harm justifying the issuance of a preliminary injunction. ..............15

                3.      Plaintiff's declarants allege harms related to events that have already
                        occurred and that therefore cannot be prevented by the injunction
                        Plaintiff seeks. ...............................................................................15

                4.      Plaintiff's concerns that construction activities and the use of
                        horizontal drilling may lead to water contamination are speculative,
                        based on a mischaracterization of the facts, and untethered to the
                        relief it seeks. ................................................................................20

                        a.      The use of horizontal directional drilling in areas of the
                                Trinity and Edwards Aquifers is not within the Corps'
                                jurisdiction. ........................................................................21

                        b.      Plaintiff's assertion that PHP discharged 36,000 gallons of
                                "toxic" drilling fluid "into the Blanco River" is wrong and the
                                risk of a future incident is speculative. ...................................22

                        c.      Plaintiff's allegations that the Pipeline represents a significant
                                risk of harm to the aquifer are speculative given the
                                numerous protective measures PHP has employed. ............................25

                5.      Plaintiff's remaining allegations are either pure speculation,
                        temporary in nature, or do not withstand scrutiny. ...........................26

                        a.      Plaintiff's numerous other allegations that are groundless or
                                duplicative do not provide a basis for the relief they seek. ................27

                        b.      Plaintiff alleges temporary harms that are not "irreparable." ............28

                        c.      Plaintiff's allegations of harm caused by the Biological
                                Opinion and Biological Assessment do not withstand
                                scrutiny. ...........................................................................29

C.     PHP will suffer significant harm if the injunction issues.................................................30

D.     The public interest supports denying injunctive relief. ....................................31

E.     If an injunction issues, Plaintiff should be required to post a bond of at least $7 million .................................................................................................................33

IV.    CONCLUSION ..............................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*,
    92 F. Supp. 3d 314 (E.D. Pa. 2015) ................................................................................ 34

*Amoco Prod. Co. v. Gambell*,
    480 U.S. 531 (1987) ........................................................................................................... 30

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*,
    779 F. Supp. 2d 542 (W.D. Tex. 2011) ........................................................................ 26

*Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*,
    217 F.3d 393 (5th Cir. 2000) ................................................................................ 13, 16, 20

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng's*,
    297 F.R.D. 633 (N.D. Ala. 2014) .................................................................................. 34

*Bluefield Water Ass'n v. City of Starkville, Miss.*,
    577 F.3d 250 (5th Cir. 2009) ............................................................................................. 9

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) .................................................................................. 9, 10, 26

*Ctr. for Biological Diversity v. EPA*,
    937 F.3d 533 (5th Cir. 2019) ....................................................................................... 10, 11

*City of Austin v. Kinder Morgan Texas Pipeline LLC*,
    No. 20-cv-00138-RP (W.D. Tex. 2020) ..................................................................... 14

*City of Hearne v. Johnson*,
    929 F.3d 298 (5th Cir. 2019) ......................................................................................... 10

*Comm. of 100 on Fed. City v. Foxx*,
    87 F. Supp. 3d 191 (D.D.C. 2015) ............................................................................... 12

*Continuum Co., Inc. v. Incepts, Inc.*,
    873 F.2d 801 (5th Cir. 1989) ......................................................................................... 34

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) .................................................................. 12, 17, 19, 28

*Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*,
    364 F.3d 269 (5th Cir. 2004) ......................................................................................... 11

*Dine Citizens Against Ruining Our Env't v. Jewell,*
  No. CIV 15-0209, 2015 WL 4997207 (D.N.M. Aug. 14, 2015), *aff'd*, 839 F.3d
  1276 (10th Cir. 2016) ........................................................................................................... 30

*Fath v. Texas Dep't of Transp.,*
  670 F. App'x 294 (5th Cir. 2016) .......................................................................................... 9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ...................................................................................................... 10, 11

*Fund For Animals v. Babbitt,*
  2 F. Supp. 2d 562, 566 (D. Vt. 1996) .................................................................................. 19

*Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop., Inc.,*
  No. 4:15-cv-0821-O, 2015 WL 13469994 (N.D. Tex. Nov. 10, 2015) ................................ 13

*Greater Yellowstone Coal. v. Flowers,*
  321 F.3d 1250 (10th Cir. 2003) ........................................................................................... 18

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
  49 F.3d 1551 (Fed. Cir. 1995) ............................................................................................. 14

*Holland Am. Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) ......................................................................................... 24, 27

*Idaho Rivers United v. U.S. Army Corps of Eng'rs,*
  156 F. Supp. 3d 1252 (W.D. Wash. 2015) ........................................................................... 18

*Lichterman v. Pickwick Pines Marina Inc.,*
  308 F. App'x 828 (5th Cir. 2009) ........................................................................................ 12

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................................. 15

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
  760 F.2d 618 (5th Cir. 1985) ................................................................................................. 9

*Native Ecosystems Council v. Krueger,*
  40 F. Supp. 3d 1344 (D. Mont. 2014) .................................................................................. 18

*NO Gas Pipeline v. FERC,*
  756 F.3d 764 (D.C. Cir. 2014) ............................................................................................. 11

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng's,*
  817 F. Supp. 2d 1290 (D. Or. 2011) .................................................................................... 15

*Pence v. Permian Highway Pipeline, LLC,*
  No. 20-cv-00088 (W.D. Tex. 2020) ..................................................................................... 14

*Permian Highway Pipeline, LLC v. City of Kyle,*
  No. 19-cv-00734 (W.D. Tex. 2019) ...................................................................14

*Permian Highway Pipeline, LLC v. Henry J. Limited P'ship,*
  No. 15945 (216th Jud. Dist. Ct. Gillespie Cty. Tex.) ......................................16

*Ridgely v. Fed. Emergency Mgmt. Agency,*
  512 F.3d 727 (5th Cir. 2008)..............................................................................9

*Schrier v. Univ. of Colo.,*
  427 F.3d 1253 (10th Cir. 2005) ..................................................................13, 16

*Sierra Club, Inc. v. Bostick,*
  539 F. App'x 885 (10th Cir. 2013) ....................................................................30

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  803 F.3d 31 (D.D.C. 2015) ................................................................................11

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  990 F. Supp. 2d 9 (D.D.C. 2013) ...................................... 12, 13, 20, 25, 27, 28, 33

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)...........................................................................................10

*W. Ala. Quality of Life Coal. v. Fed. Highway Admin.,*
  302 F. Supp. 2d 672 (S.D. Tex. 2004) ..............................................................29

*Wilderness Workshop v. U.S. Bureau of Land Mgmt.,*
  531 F.3d 1220 (10th Cir. 2008) .........................................................................30

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................ 10, 12, 18, 30, 31

*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.,*
  No. 3:05-cv-94-D, 2006 WL 1540587 (N.D. Tex. June 6, 2006).....................14

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ...................................................... 12, 20, 22, 26

**Statutes**

16 U.S.C. § 1532(19)..................................................................................................6

16 U.S.C § 1536..........................................................................................................6

16 U.S.C. § 1536(a) ....................................................................................................6

16 U.S.C. § 1536(b) .............................................................................................7, 29

16 U.S.C § 1538..........................................................................................................6

16 U.S.C. § 1538(a) ............................................................................................................. 6

33 U.S.C. § 403 ............................................................................................... 5, 6, 8, 21

33 U.S.C. § 1311(a) ......................................................................................... 5, 21, 22

33 U.S.C. § 1344(a) ................................................................................................ 5, 21

33 U.S.C. § 1344(e) ............................................................................................................. 5

33 U.S.C. § 1362(7) ............................................................................................................. 5

TEX. UTIL. CODE ANN. § 121.051(a) ............................................................................... 32

**Regulations**

33 C.F.R. pt. 323 ............................................................................................................. 15

33 C.F.R. pt. 325 ............................................................................................................. 15

33 C.F.R. § 320.2(b) ............................................................................................................. 5

33 C.F.R. § 325.3 ............................................................................................................. 15

33 C.F.R. § 328.3(a) ............................................................................................................. 5

33 C.F.R. § 330.1(b) ............................................................................................................. 6

33 C.F.R. § 330.1(g) ............................................................................................................. 5

33 C.F.R. § 330.5 ............................................................................................................. 15

50 C.F.R. § 17.3 ............................................................................................................. 6

50 C.F.R. § 402.02 ......................................................................................................... 6, 7

50 C.F.R. § 402.14 ............................................................................................................. 7

82 Fed. Reg. 1,860 (Jan. 6, 2017) ....................................................... 5, 6, 8, 21, 22, 28

84 Fed. Reg. 15,491 (Apr. 15, 2019) ........................................................................... 33

84 Fed. Reg. 44,976 (Aug. 27, 2019) ............................................................................ 6

85 Fed. Reg. 22,250 (Apr. 21, 2020) ............................................................................ 8

30 TEX. ADMIN. CODE Ch. 213 ..................................................................................... 4

**Rules**

Federal Rule of Civil Procedure 65(c)..........................................................................................33

## I.     INTRODUCTION

Intervenor-Defendants Kinder Morgan Texas Pipeline LLC and Permian Highway Pipeline, LLC (collectively, "PHP") file this response in opposition to the Plaintiff Sierra Club's Motion for a Preliminary Injunction.

Seven weeks after filing its Complaint and some four months after the issuance of the federal agency decision being challenged, the Sierra Club has belatedly decided to try to stop construction of the Permian Highway Pipeline project (the "Pipeline")—construction that is now more than 72 percent complete. Sierra Club's motion is premised on a false set of facts concerning both the status of construction and the environmental impacts of the pipeline; and it is fatally weakened by Sierra Club's failure to establish specific harm to its members that could be remedied by this Court even if the alleged harm rose to the level warranting extraordinary relief, which it does not. The only Sierra Club member who claims property directly impacted by the Pipeline within the jurisdiction of the U.S. Army Corps of Engineers ("Corps"), Heath Frantzen, failed to acknowledge in his declaration that: (1) his property had already been cleared and construction was substantially complete on the date he signed his declaration; and (2) that he has claimed, in other legal proceedings, to have platted his property to sell it for subdivision development—directly contradicting his alleged concerns about the potential impacts constructing the Pipeline will have on his land and on him. Now, work on Mr. Frantzen's property is complete. Similarly, the harms alleged by the Sierra Club's other member-declarants to their specific interests are based on construction that has been completed or nearly completed, the specific activity they seek to enjoin would not remedy the harms they claim, and their speculative and generalized concerns are not sufficient to support judicial intervention.

Sierra Club seeks an order that would have the effect, at the current stage of construction, of halting the project. Sierra Club disclaims this intent by tailoring its request to activities subject to Corps jurisdiction in specific areas of construction, areas that are both under the jurisdiction of the Corps

and subject to consultation with the U.S. Fish and Wildlife Service ("Service") under the Endangered Species Act—so called "Corps Action Areas." Sierra Club bases its motion on its challenge to a discrete action of the Corps under the National Environmental Policy Act, 42 U.S.C. §§ 4321 ("NEPA")—the decision to incorporate the terms and conditions of a Service-issued biological opinion and incidental take statement into the nationwide permit verifications the Corps issued to PHP relevant to the Pipeline.

Injunctive relief is an extraordinary remedy. Sierra Club must establish a substantial likelihood of prevailing on the merits, that there is a substantial threat of irreparable injury that justifies extraordinary relief, that the threatened injury outweighs the harm that an injunction would cause defendants, and that the injunction will not disserve the public interest. Regarding Sierra Club's inability to succeed on the merits of this claim, PHP generally joins the Federal Defendants' arguments. In addition, Sierra Club is unlikely to succeed on the merits of its claim because it has failed to demonstrate standing.

The Court should also deny Sierra Club's motion because it has not shown a substantial threat of immediate, irreparable injury. First, Sierra Club's own delay in seeking injunctive relief justifies denying it the relief it seeks. Second, Sierra Club's alleged harms cannot be addressed because the construction activities that might have any specific effect on Sierra Club's member-declarants have already been completed or nearly completed. In particular, Sierra Club has not established that any remaining construction in "Corps Action Areas" will have any impact on Plaintiff.

Third, Sierra Club's claims are otherwise too speculative to establish irreparable harm warranting an injunction, have no connection with Corps Action Areas, and are factually unfounded. For example, Sierra Club claims the Pipeline poses a risk to the Edwards and Trinity Aquifers in central Texas because of the use of the horizontal directional drilling ("HDD") construction technique to install segments of the Pipeline under certain rivers. However, an injunction cannot issue on this

basis because this activity does not take place in Corps Action Areas and is not regulated by the Corps. Further, Sierra Club mischaracterizes the facts and overstates the implications of a March 2020 HDD incident, asserting without evidence that PHP discharged 36,000 gallons of "toxic" drilling fluid "into the Blanco River" when the drilling fluid is also used to drill drinking water wells. What is more, the harms Sierra Club alleges in connection with HDD and construction over the karst are too speculative to constitute irreparable injury.

The Court should deny the motion because the relief Sierra Club seeks would cause significant harm to PHP. While Sierra Club claims construction outside Corps Action Areas could continue, as a practical matter, the relief it seeks, if granted today, would likely have the effect of shutting down the project. Further, while PHP could complete much of the remaining construction without the benefit of a Corps permit because it could avoid Corps jurisdiction for all except one water crossing, doing so would cause PHP to incur additional expense and delay. These actual harms greatly outweigh the purely speculative and remote harms alleged by Sierra Club—especially in light of the fact that most of the actions they claim cause harm to individual members have already occurred. Finally, PHP addresses the disservice to the public interest if Sierra Club's relief is granted.

For these reasons, more fully explained below, the Court should deny Sierra Club's motion for injunctive relief. If it does not, the Court should require Sierra Club to post a bond of at least $7 million.

## II.     BACKGROUND

### A.     The Permian Highway Pipeline

The Pipeline is a $2.27 billion, 428-mile, buried 42-inch intrastate dry natural gas pipeline in Texas that has been under construction for the past ten months. *See* Declaration of Sital K. Mody ¶¶ 5, 8 ("Mody Decl.", attached as Exhibit A); *see* U.S. Army Corps of Eng'rs, Biological Assessment for

the Permian Highway Pipeline at 1, Dkt. 10-1 ("Biological Assessment"). When finished in January 2021 it will extend from Reeves County to Colorado County. Biological Op., Dkt. 10-8 at 8.

The Pipeline is a dry natural gas pipeline; it will not transport liquid products. This is because the liquids associated with natural gas extraction are removed before the dry gas is introduced to the Pipeline. Mody Decl, Ex. A, ¶ 23. PHP requires that its customers' gas meet quality specifications that will also ensure that the gas is dry, and the Pipeline is designed with filter separators that will catch any such liquids. *Id.* ¶¶ 24–25. Further, many of the right-of-way agreements, road crossing agreements, as well as the statutory scheme by which property was condemned allow only the transmission of natural gas, and the Pipeline's capacity is fully subscribed exclusively for natural gas for the next ten years. *Id.* ¶ 32. KMTP's other natural gas pipeline in this part of Texas demonstrates that almost no liquids will appear in the line. *Id.* ¶ 25. In the unlikely event that liquids are discovered in the Pipeline, PHP has the ability to interrupt service and shut off the receipt point. *Id.* ¶ 23.

Approximately 23 miles of the Pipeline crosses the Trinity Aquifer recharge zone within the Balcones Fault Zone and approximately 12 miles of the Pipeline crosses the recharge and transition zones of the Edwards Aquifer. Declaration of Dr. Kemble White ¶ 4 ("White Decl.," attached as Exhibit C); Letter from Sital K. Mody, Pres., PHP, to U.S. Army Corps of Eng'rs & U.S. Fish & Wildlife Serv. at 3 (Nov. 25, 2019) ("Mody Letter," Ex. A, Attach. A-2); Biological Op., Dkt. 10-8 at 2. Karst features like, caves, faults, fractures, and sinkholes, allow precipitation and surface water to rapidly recharge the groundwater reservoir. Cambrian Environmental Report at 3 (Nov. 22, 2019) ("Cambrian Report," Ex. C, Attach. C-2). PHP's engineers worked with a team of karst scientists and geoscientists to select a route for the Pipeline that minimized implications for sensitive karst features.[1] Biological Op., Dkt. 10-8 at 3; White Decl., Ex. C, ¶ 4.

---

[1] Gas pipelines are not subject to the Texas Commission on Environmental Quality's ("TCEQ") Edwards Aquifer regulations, *see* 30 TEX. ADMIN. CODE. Ch. 213. Nevertheless, PHP is voluntarily implementing all of the applicable best management practices required in the TCEQ regulations and

B.     **The Federal Regulatory Process**

The Pipeline crosses certain waters subject to the permitting authority of the Corps pursuant to the CWA, and, one water subject to the Corps' permitting authority under Section 10 of the Rivers and Harbors Act ("RHA"). The CWA prohibits the discharge of any "pollutant," including dredged or fill material, into "navigable waters" without a permit. *See* 33 U.S.C. §§ 1311(a), 1344(a). "[N]avigable waters" means "the waters of the United States" ("WOTUS"). *Id.* § 1362(7); 33 C.F.R. § 328.3(a). Section 10 of the RHA, 33 U.S.C. § 403, applies to a narrower category of waters, traditionally navigable waters, and prohibits obstruction, alteration, and construction of any structure over or in, or any other work that could affect the "course, location, condition, or capacity of such waters . . . ." 33 C.F.R. § 320.2(b). The Corps has the authority to allow these activities pursuant to permit and the installation of a utility line under a Section 10 water requires, in most circumstances, a permit. 82 Fed. Reg. 1,860, 1,883 (Jan. 6, 2017).

Under CWA Section 404, the Corps authorizes discharges of dredged or fill material into WOTUS through individual and general permits, including Nationwide Permits ("NWP"). 33 U.S.C. § 1344(a), (e). NWPs are also used to authorize activities under Section 10 of the RHA. 33 C.F.R. § 330.1(g). Relevant here is NWP 12, which covers activities required for the construction of utility lines such as the Pipeline. 82 Fed. Reg. at 1,985. Under some circumstances, the NWP authorizes activities without review or verification by the Corps. In other circumstances, the applicant must submit a "pre-construction notification" ("PCN") to the Corps and await a verification that NWP 12

---

guidelines for construction on the Edwards Aquifer in a state-of-the-art Void Mitigation Plan. Biological Op., Dkt. 10-8, at 3; White Decl., Ex. C, ¶ 5; Cambrian Environmental, Void Response and Mitigation Measures for the Permian Highway Pipeline, Central Texas (Aug. 15, 2019), Dkt. 10-4 ("Void Mitigation Plan"). The Void Mitigation Plan was initially intended for use in the Edwards Aquifer recharge and transition zone; however, PHP has employed the Plan's protective measures in the Trinity Aquifer as well. White Decl., Ex. C, ¶ 5.

applies to the activity at issue. *Id.* at 1,986.[2] As explained below, PHP followed the process as defined by the federal agencies in order to secure appropriate authorizations for work related to the Pipeline.

The Pipeline crosses through three of the Corps' Districts. *See* Biological Assessment at 9, Dkt. 10-1. Work in the Corps' Albuquerque District did not require any PCNs. *Id.* at iii. Of the crossings of federally protected waters in the Galveston and Fort Worth Districts, some crossings triggered General Condition 18 of NWP 12, which requires a PCN when the proposed activity may affect a species listed under the ESA or a species is in the vicinity of a crossing.[3] 82 Fed. Reg. at 1,999. PHP submitted PCNs to the Fort Worth and Galveston Districts in May 2019. U.S. Army Corps of Eng'rs, Fort Worth District NWP 12 Verification, Dkt. 10-9 at 1; Galveston District NWP 12 Verification, Dkt. 10-10 at 1.

Per General Condition 18, PHP and the Corps consulted with the Service under Section 7 of the ESA to assess the potential impacts to listed species.[4] Under Section 7, each federal agency must ensure that its actions are not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species. 16 U.S.C. § 1536(a)(2). If the agency determines that the action is likely to adversely affect a listed species, formal consultation begins and the Service reviews whether the action

---

[2] Consistent with Congress' goal, NWPs "regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b). The Corps re-issues the NWPs every five years, most recently in 2017. 82 Fed. Reg. 1,860 (Jan. 6, 2017).

[3] While the Corps' consultation obligations focus on the extent of its own jurisdiction under the CWA, once those mandatory obligations are triggered, the regulations implementing Section 7 of the ESA require the Service to consider impacts to listed species along the entire length of a project such as the Pipeline. *See* 50 C.F.R. § 402.02; 84 Fed. Reg. 44,976, 44,990 (Aug. 27, 2019).

[4] ESA Section 9 prohibits the "take" of federally-listed endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). There are two ways to gain a "safe harbor" from the take prohibitions in Section 9 when a taking of a protected species is incidental to private or federal action: Section 10 incidental take permitting and Section 7 consultation, which was the approach required here. The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Service's regulations define "harm" to mean an "act which actually kills or injures wildlife." 50 C.F.R. § 17.3.

is likely to cause jeopardy. 50 C.F.R. § 402.14. After consultation, the Service issues a written "biological opinion," detailing its expert scientific judgment regarding the proposed action's effects on listed species. 16 U.S.C. § 1536(b)(3)(A). If the Service determines that the proposed action is not likely to jeopardize the species, but is reasonably certain to result in the incidental "take" of members of the species, the Service provides a written "incidental take statement" with the biological opinion. *Id.* § 1536(b)(4)(i)-(ii). The incidental take statement specifies those reasonable and prudent measures that the Service considers "necessary or appropriate to minimize such impact" and imposes other "terms and conditions." *Id.* at § 1536(b)(4)(ii), (iv).

In this case, the Service issued its Biological Opinion for the project on February 3, 2020 ("BiOp"), concluding the process that began formally with the submission of a Biological Assessment by the Corps to the Service in September 2019.[5] *See* BiOp, Dkt. 10-8 at 5. The BiOp analyzes the Pipeline's potential impacts on threatened and endangered species for the entire action area of the project, defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. However, this case concerns only a subset of these areas: the "Corps Action Areas." Biological Op., Dkt. 10-8 at 7. The Corps Action Areas are those portions of the action area under the Corps regulatory control due to impacts to

---

[5] In its letter transmitting the BiOp and accompanying Incidental Take Statement ("ITS"), the Service concurred with the Corps that the Pipeline may affect, but is not likely to adversely affect, the Barton Springs salamander (*Eurycea sosorum*); determined the Pipeline may affect, but is not likely to adversely affect the Austin blind salamander (*Eurycea waterlooensis*); and concurred that the Pipeline would have no effect on 26 other threatened or endangered species. Biological Op., Dkt. 10-8 at 2, 4. The BiOp and ITS also evaluate the Pipeline with respect to the endangered Houston toad (*Bufo houstonensis*) and golden-cheeked warbler (*Setophaga chrysoparia*). Biological Op., Dkt. 10-8 at 36–39, 41–46. The Service reached a "no-jeopardy" conclusion with regard to the Houston toad and the GCWA even though incidental take may occur. *Id.* at 47; *see also id.* at 51–58 (the ITS). Although no provisions, state or federal, protect the endangered Tobusch fishhook cactus ("TFHC") (*Sclerocactus brevihamatus spp. tobuschii*) on private lands, *id.* at 51, the BiOp also considered impacts on this endemic plant. *Id.* at 39–41, 46. The Service also concluded that the Pipeline would not jeopardize the continued existence of the TFHC. *Id.* at 51.

WOTUS, and are limited to those sections of the project where NWP 12 is required *and* General Condition 18 is triggered. Biological Op., Dkt. 10-8 at 9.

On February 13, 2020, the Corps' Fort Worth and Galveston Districts issued verifications that work subject to their jurisdiction could proceed under NWP 12. *See* Dkt. 10-9, 10-10. Under the CWA, only temporary impacts to WOTUS were authorized by NWP 12—there were no permanent impacts to waters protected under the CWA.[6] *See* General Condition 13, 82 Fed. Reg. at 1,999. Under the RHA, only the HDD crossing under the Navidad River, a Corps Action Area, required authorization under NWP 12. Galveston Verification, Dkt. 10-10, at 11.

To accommodate landowner requests, PHP has proposed to make three micro-adjustments to the Pipeline's route—one in Gillespie County and two just west of the city of Kyle in Hays County. U.S. Army Corps of Eng'rs, Addendum to Biological Op., Dkt. 10-15 at 2 ("BiOp Addendum"). In light of this proposal and to analyze potential construction impacts that were not addressed in the Service's February 3 BiOp, the Service reinitiated consultation with the Corps on February 27, 2020. BiOp Add., Dkt. 10-15 at 1. The Service issued an addendum to the BiOp and ITS on May 4, 2020 that addresses the proposed micro-adjustments and construction impacts.[7]

In accordance with best practices, the terms of NWP 12, and the terms of the BiOp/ITS and the BiOp Addendum, work on the project, including in the Corps Action Areas, is undertaken subject to an array of conditions and measures intended to protect the species and the environment. *See, e.g.,*

---

[6] Since the issuance of the Corps' original verification, the definition of "waters of the United States" under the CWA has changed. 85 Fed. Reg. 22,250 (Apr. 21, 2020). The new definition went into effect on June 22, 2020, in all states except Colorado. *See* U.S. Army Corps of Eng'rs, Latest News, *Navigable Waters Protection Rule becomes effective* (June 22, 2020), https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/ (last visited July 7, 2020). Under the new definition, many of the Pipeline crossings are likely no longer jurisdictional. However, at present, PHP continues to operate under the terms of the original NWP 12 verification.

[7] PHP has also proposed shifting the route to avoid two crossings of the Blanco River. PHP is working with the Corps and the Service to evaluate the route adjustment. Crow Decl., Ex. B, ¶ 10.

Fort Worth Verification, Dkt. 10-9, at 2–3; Galveston District Verification, 10-10, at 2; BiOp, Dkt. 10-8, at 55–56; BiOp Addendum, Dkt. 10-15, at 12–13.

## C.     Status of construction of the Permian Highway Pipeline

The Pipeline is being constructed in five spreads and significant work has been completed on each spread. Overall, more than 72 percent of the pipeline is complete, and PHP has completed more than 302 miles of the project. Mody Decl., Ex. A, ¶ 5. Construction began in September 2019 in Spread 1, and it is complete. *Id.* ¶¶ 5, 6. Spreads 2 and 3 have been combined, and construction in "Spread 23" is 65 percent complete. *Id.* ¶ 7. Construction in Spread 4 is 58 percent complete and construction in Spread 5 is 60 percent complete. *Id.* More specifically, a total of more than 191 miles of the Pipeline have been laid in the trench and backfilled in these spreads 23, 4 and 5. Trenching is 87 percent complete along the length of the Pipeline. Mody Decl., Ex. A, Attach. A-1.

## III.     ARGUMENT

A preliminary injunction is an "extraordinary remedy." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *accord Fath v. Texas Dep't of Transp.*, 670 F. App'x 294, 295 (5th Cir. 2016). For a preliminary injunction to issue, a movant must show "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely*, 512 F.3d at 734. A preliminary injunction should not be granted "unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *Bluefield Water Ass'n v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). Moreover, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). There is no different standard for

seeking an injunction under NEPA. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008); *Canal Auth. of State of Fla.*, 489 F.2d at 577–78.

Here, Plaintiff falls woefully short of meeting its burden, and its Motion must be denied.

**A.     Plaintiff is unlikely to succeed on the merits of its claims because it lacks standing.**

As stated above, PHP joins the Federal Defendants' arguments on the merits of Plaintiff's claims and does not restate those arguments here. Additionally, Plaintiff is unlikely to succeed on the merits of its NEPA claims because it lacks Article III standing. While Plaintiff and its members have alleged procedural injuries under NEPA, it cannot rely on those alone and its member-declarants have not demonstrated that they can make a sufficient showing to establish standing to bring this action.

To establish standing, a plaintiff must demonstrate that: (1) it has suffered a concrete and particularized injury in fact that is actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) it is likely the injury will be redressed by a decision rendered in the plaintiff's favor. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). In environmental cases, "Article III standing requires injury to the [*plaintiff*]. Injury to the environment is insufficient." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019) (emphasis added) (citing *Friends of the Earth, Inc.*, 528 U.S. at 181). In NEPA litigation, the alleged deprivation of a procedural right alone is insufficient to create Article III standing. *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009). An alleged procedural injury must also "impact a[ ] concrete interest" to satisfy the constitutional injury in fact requirement. *See City of Hearne v. Johnson*, 929 F.3d 298, 303 (5th Cir. 2019); *Friends of the Earth*, 528 U.S. at 183.

Of Plaintiff's member-declarants, Mr. Frantzen is the only one who has property or alleges use of property within a Corps Action Area. Mr. Frantzen alleges various harms related to the construction across his Property. *See* Frantzen Decl., Dkt. 10-11, ¶¶ 4–6, 8–11. However, none of these alleged injuries are redressable because construction on his property is complete. *Friends of the*

*Earth*, 528 U.S. at 183. *See* Declaration of Michael S. Crow ¶ 5 ("Crow Decl.," attached as Exhibit B). Mr. Frantzen's other allegations do not remedy this defect. His broader concern that the Pipeline will impact the GCWA and his other concerns related to construction and operation are merely allegations of generalized harm to the environment—as opposed to harms to Mr. Frantzen as a Sierra Club member—and claims of generalized harm do not support standing. *See Ctr. for Biological Diversity*, 937 F.3d at 537.

Similarly, Mr. Frantzen's unsupported allegation that the Pipeline might cause an explosion or leak methane into the river are entirely speculative. Mody Decl., Ex. A, ¶¶ 18–22. Finally, Mr. Frantzen's concern that maintenance of the Pipeline would lead to harassment of GCWA is undermined by the Service's conclusion in the BiOp that maintenance and operation will not result in additional impacts to the GCWA. Biological Op., Dkt. 10-8 at 48. To the extent alleged harms have not already occurred, as in *NO Gas Pipeline v. FERC*, Mr. Frantzen's declaration "express[es] concerns over injuries that have neither occurred nor become imminent;" the increased risks and scenarios complained of may only manifest following a series of theoretical actions by a variety of actors. 756 F.3d 764, 768 (D.C. Cir. 2014). "[T]hese concerns are far too speculative to represent a concrete injury establishing standing." *Id.* (quotation omitted).

None of the other member-declarants have alleged an injury that is "fairly traceable to the challenged conduct of the defendant." *Friends of the Earth*, 528 U.S. at 181. These declarants' lands, or lands they purport to use, are not located in or near Corps Action Areas. Crow Decl., Ex. B, ¶¶ 5–9. As such, these declarants' alleged injuries do not arise from the Corps' decision to incorporate the terms and conditions of the BiOp and ITS into the verifications.[8] Because these member-declarants alleged injuries that are not fairly traceable to the action Plaintiff challenges, these individuals do not

---

[8] In its Complaint, Sierra Club does not allege that NEPA analysis is required for the whole of the Pipeline—an argument rejected in *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 46 (D.D.C. 2015) and that Sierra Club explicitly disclaims in this case. Mot. at 15 n.7.

provide Plaintiff standing. *Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004) ("A plaintiff's failure to establish one of the three elements of Article III standing deprives federal courts of jurisdiction to hear the plaintiff's suit."). Furthermore, as explained below, these declarants allege harms that relate to past construction, that are outside of the Corps Actions Areas, or that are otherwise too generalized or speculative to support Plaintiff's standing.

**B.      If the Court must reach the analysis of preliminary injunction factors, Plaintiff has not shown a substantial threat of immediate irreparable injury.**

Because Plaintiff lacks standing and Federal Defendants have further established that Plaintiff's claims are not likely to succeed, the Court may end its inquiry and deny injunctive relief. *See Lichterman v. Pickwick Pines Marina Inc.*, 308 F. App'x 828, 835 n.5 (5th Cir. 2009). Even if Plaintiff could show a plausible likelihood of success on the merits, Plaintiff still bears the burden of demonstrating that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

This element "no doubt . . . erects a very high bar for a movant." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013). In the context of a claim that a federal agency violated NEPA, irreparable harm may be found only if a procedural harm is combined with other concrete injury. *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 202 (D.D.C. 2015). However, "[a] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22 (quotation omitted); *Sierra Club*, 990 F. Supp. 2d. at 39 ("[I]njunctive relief will not be granted against something merely feared as liable to occur at some indefinite time" and the movant "must show that [t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."). Because a party seeking an injunction must demonstrate an injury that is "both certain and great," some potential environmental harms are "too small to meet an irreparable harm standard. *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 976 (D.C. Cir. 1985).

A party seeking injunctive relief "must show that the alleged harm will directly result from the action which the movant seeks to enjoin," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and a court must deny injunctive relief if it will not actually prevent the harm alleged. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."). Because "the court must decide whether the harm will in fact occur," a plaintiff seeking injunctive relief must "substantiate the claim [of] irreparable injury" and "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Sierra Club*, 990 F. Supp. 2d at 39. The Fifth Circuit has "consistently found that a request for injunctive relief is moot when the event sought to be enjoined has occurred." *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 396 (5th Cir. 2000).

Plaintiff cannot meet this high standard for an array of reasons, each one sufficient to reject Plaintiff's motion. First, the Sierra Club's own delay in seeking an injunction fatally weakens its claims that there is imminent harm requiring extraordinary relief. Second, the procedural harms Plaintiff alleges are alone insufficient to support an injunction. Third, the majority of the harm alleged by Plaintiff is related to construction activities that are already complete. Fourth, Plaintiff's purported concerns about risk to the aquifers are speculative, based on a mischaracterization of the facts, and untethered from the relief it seeks. Finally, Plaintiff's remaining allegations suffer from one or more additional flaws—they are unrelated to any water crossing in a Corps Action Area, they are too speculative to support extraordinary relief, or they are simply temporary in nature.

1. **Plaintiff's delay alone refutes any suggestion of imminence and justifies denying its motion.**

Injunctive relief is not available unless the movant shows that "[t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Sierra Club*, 990 F. Supp. 2d. at 39. Therefore, delay in seeking injunctive relief "is a

consideration when analyzing the threat of imminent and irreparable harm." *See, e.g.*, *Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop., Inc.*, No. 4:15-cv-0821-O, 2015 WL 13469994, at *2 (N.D. Tex. Nov. 10, 2015); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."). "Absent a good explanation, [] a substantial period of delay [] militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-cv-94-D, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) (quoting *High Tech Med. Instrumentation*, 49 F.3d at 1557).

Here, Plaintiff cannot show that there is an urgent need for injunctive relief to prevent imminent irreparable harm. The causes of action in Plaintiff's complaint, while meritless, nonetheless ripened the day the Corps issued its verifications—February 13, 2020. Compl. ¶ 75. More than four months elapsed between that day and the filing of Plaintiff's motion—four eventful months with multiple lawsuits over this same project, some of which includes the active involvement of three of Plaintiff's member-declarants, Ms. Pence, Ms. Blair, and Mr. Frantzen.[9] Plaintiff also has been well-aware of and engaged in advocacy against the Pipeline for some time. *See, e.g.*, Press Release, Sierra Club, Kinder Morgan Spills Into Drinking Water During Construction of Permian Highway Fracked Gas (Apr. 2, 2020).[10] Furthermore, nearly two months elapsed between the filing of the Complaint and the filing of this motion—during which time Plaintiff did not effectively even serve Federal Defendants. In the context of preliminary relief, this is an unacceptable and prejudicial delay for which

---

[9] *See Permian Highway Pipeline, LLC v. City of Kyle*, No. 19-cv-00734 (W.D. Tex. 2019); *Pence v. Permian Highway Pipeline, LLC*, No. 20-cv-00088 (W.D. Tex. 2020) (Ms. Pence is the lead plaintiff); *City of Austin v. Kinder Morgan Texas Pipeline LLC*, No. 20-cv-00138-RP (W.D. Tex. 2020) (Ms. Blair is an expert witness and Mr. Frantzen provided support for declarant).
[10] *Available at* https://www.sierraclub.org/press-releases/2020/04/kinder-morgan-spills-drinking-water-during-construction-permian-highway.

Plaintiff has not—and cannot—offer a reasonable explanation. Plaintiff's delay utterly refutes any suggestion of real imminent harm and its motion should be denied on this basis alone.

**2.      Plaintiff's alleged procedural injuries do not alone constitute irreparable harm justifying the issuance of a preliminary injunction.**

Plaintiff argues that the Corps' alleged NEPA violation and attendant lack of public participation in the Corps' decision to incorporate the BiOp/ITS into the verifications constitutes continuing irreparable harm. Mot. at 16–17. Even if Plaintiff has demonstrated a likelihood of success on the merits of its procedural claims Plaintiff must also show concrete interests that are impaired by any procedural defect with respect to NEPA. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572–73, n.7 (1992); *see also Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng's*, 817 F. Supp. 2d 1290, 1316 (D. Or. 2011)); *RB Jai Alai v. Fla. Dep't of Transp.*, No. 6:13-cv-1167-orl-40GJK, 2014 WL 12617779, at *4, 5 (M.D. Fla. Sept. 30, 2014).[11] They do not.

**3.      Plaintiff's declarants allege harms related to events that have already occurred and that therefore cannot be prevented by the injunction Plaintiff seeks.**

Plaintiff offers the declarations of five members who allege an urgent need for an injunction to prevent supposed imminent harms both to their specific uses of specific places and to prevent alleged imminent harms to the environment generally. However, clearing is nearly complete along nearly the entire Pipeline route and none of Plaintiff's member-declarants are located near the remaining discrete areas associated with proposals to adjust the route. Mody Decl., Ex. A, ¶ 5; Crow. Decl., Ex. B, ¶¶ 5–9. Additionally, construction of the Pipeline itself is substantially complete.

---

[11] Moreover, Plaintiff misunderstands the nature of the Nationwide Permit program, which does not provide the opportunity for public review and comment on verifications that the permit applies to a specific project. Nor would Corps regulations require public comment on any NEPA analysis if Plaintiff were to prevail on the merits. As Plaintiff acknowledges, the Corps prepares a NEPA analysis at a nationwide level for the issuance of the NWP itself—it does not have a regulatory process for doing so at the verification stage. *See* 33 C.F.R. § 330.5. Even if the Corps were to require PHP to seek an individual permit, the Corps does not seek public comment on NEPA analyses. Rather, the Corps issues a Public Notice of a permit application and requests public comment on that information. *Id.* § 325.3; *see generally* 33 C.F.R. pts. 323 and 325 (policies and procedures for permit issuance).

Construction in spread 23 is 65 percent complete, construction in spread 4 is 58 percent complete, and construction in spread 5 is 60 percent complete. *Id.* ¶ 7. No work remains to be done in any Corps Action Areas located near any member-declarants. Because "a request for injunctive relief is moot when the event sought to be enjoined has occurred," the Court cannot grant an injunction on the basis of any of these declarants' alleged harms.[12] *Bayou Liberty Ass'n, Inc.*, 217 F.3d at 396. As explained further below, the vast majority of the harms Plaintiff alleges have already occurred and therefore could not be prevented by the injunction it seeks. *Id.*; *see also Schrier*, 427 F.3d at 1267.

First, the five member-declarants allege an array of harms to their interest in using their property or specific areas they claim are affected by the Pipeline right-of-way. Construction in these areas is either complete, or almost complete; the harms cannot be prevented by an injunction that stops construction in Corps Action Areas. Of the five declarants, only Mr. Frantzen alleges that he owns property crossed by the Pipeline and, as far as PHP can determine, his is the only property that is in or near a Corps Action Area. Crow Decl., Ex. B, ¶ 5. However, his property was already cleared and construction was substantially complete by the date he signed his declaration. *Id.*, *see also* Declaration of John Scott Long ¶ 12 ("Long Decl.," attached as Exhibit D) ("On or about June 20, 2020, the pipeline has been installed, backfilled, and final restoration including the replacement of original contours and seeding is complete on the Frantzen property."). Mr. Frantzen also fails to acknowledge that he has claimed, in other legal proceedings, to have platted his property to sell it for subdivision development[13]—directly contradicting his statement that he has prioritized maintaining

---

[12] Moreover, the injunctive relief Plaintiff seeks may actually cause harm, should it require PHP to leave trenches open (exacerbating the possibility of construction sedimentation and runoff) or prevent restoration of any WOTUS under the terms of NWP 12 where crossings are underway but not complete. *See* Nationwide Permit (12) Utility Line Activities at 6 (Mar. 19, 2017) (requiring "[a]ll temporarily disturbed waters and wetlands must be restored to their pre-construction contours" within 12 months).

[13] *See e.g.*, Mot. for Recon. of Order Limiting Def.'s Withdrawal of Funds from Court Registry at 13, *Permian Highway Pipeline, LLC v. Henry J. Limited P'ship*, No. 15945 (216th Jud. Dist. Ct. Gillespie Cty.

habitat on his land for the GWCA and undermining his alleged concerns "about what impacts the construction of the pipeline will have to [his] land, such as invasive species, impacts to topsoil, clearing of trees, and oak wilt." Frantzen Decl. ¶ 6.[14]

Three of the member-declarants, Ms. Gates, Mr. Watson, Ms. Gallimore, and Ms. Pence allege harms that, similarly, cannot be remedied. Even if those harms were connected to Corps Action Areas—which they are not—the harms are not "imminent" as the activities that they claim affect them are complete or so nearly complete as to be far below the magnitude of injury required to sustain extraordinary relief. *Cuomo*, 772 F.2d at 976 (irreparable harm must be both "certain and great"). More specifically, the clearing and relevant water crossings are complete near Ms. Gallimore, Ms. Gates, and Ms. Pence. The Pipeline does not cross Ms. Gallimore's property, but the crossing of Lone Man Creek, which plays a central role in her declaration, was completed without incident on June 26, 2020 and within a single day.[15] Crow Decl., Ex. B, ¶ 8; Attachment B-4.

The Pipeline route also does not cross Ms. Gates' land in Driftwood, Hays County, which lies within a subdivision that is across a road from the Pipeline route. Crow Decl., Ex. B, ¶ 6. In the area outside Ms. Gates' subdivision, the Pipeline route has been cleared and graded. *Id.* Similarly, the Pipeline route does not cross Ms. Pence's property in Fredericksburg, Gillespie County, nor does Ms. Pence claim an interest in any Corps Action Area where work is not complete. The property near Ms. Pence over which she expresses concern has been cleared and graded, and pipe was strung in late

_____

Tex.) (filed May 21, 2020), attached as Exhibit F (describing a Deed executed by Frantzen to obtain a line of credit to cover subdivision-development costs).

[14] Contrary to Mr. Frantzen's assertions, Frantzen Decl., Dkt. 10-11, ¶ 6, the spread of oak wilt is unlikely in light of the expanded oak wilt protocol that PHP has followed in all areas with potential GCWA habitat since March 2020. Long Decl., Ex. D, ¶ 4; BiOp Add., Dkt. 10-15 at 2.

[15] Ms. Gallimore's concerns that the Pipeline crossing could divert water from the creek on her property are unfounded. Gallimore Decl., Dkt. 10-16, ¶ 4. The water crossing was completed using the dry-cut method and no underground drilling (e.g., HDD) was performed. This method temporarily diverts water and maintains its flow around a trench while workers install the Pipeline. In this case, this ephemeral creek did not even contain standing or flowing water at the time of work. Crow Decl., Ex. B, ¶ 8.

June. Crow Decl., Ex. B, ¶ 9. Finally, the Pipeline route does not cross the property of the fifth and final member-declarant, John Watson, in Johnson City, Blanco County. In fact, Mr. Watson lives over 35 miles from the location where PHP is crossing underneath the Pedernales River using HDD. Crow Decl., Ex. B, ¶ 7. The HDD effort underneath the Pedernales River began on Friday, June 26. Declaration of Derek Brammer ¶ 30 ("Brammer Decl.," attached as Exhibit E).

Second, Plaintiff's allegations regarding harms to threatened and endangered species and other wildlife are based on activities that have already occurred.[16] Plaintiff asserts only the barest allegations of harm regarding the Houston toad and the Tobusch fishhook cactus ("TFHC"). Mot. at 25–27. These allegations do not support an injunction because any impacts on these species or their habitat resulting from clearing occurred in the past. As clearing is complete along the Pipeline in the area of the toad, any areas with potential Houston toad habitat have already been cleared. Mody Decl., Ex. A, Attach. A-1; Crow Decl., Ex. B, ¶ 15. Additionally, trenching is 74 percent complete in areas that may contain Houston toad habitat. Mody Decl., Ex. A, Attach. A-1; Crow Decl., Ex. B, ¶ 15.[17] All 42 of the individual cacti that might have been impacted by the Pipeline have been relocated and there is no potential for remaining construction to impact this species. Crow. Decl., Ex. B ¶ 16.[18]

---

[16] Plaintiff argues that, in the context of NEPA litigation, harm to the species as a whole is not required for an injunction. Mot. at 26 n.14 (citing *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). This appears to be a question of first impression in the Fifth Circuit, but at least one court has concluded the opposite. *See Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1263–64 (W.D. Wash. 2015). In any event, the harms Plaintiff alleges regarding threatened or endangered species do not support an injunction.

[17] Only one of Plaintiff's member-declarants, John Watson, expresses any interest in the Houston toad or the project's impacts on it. Watson Decl. ¶ 7. However, he lives several counties away from areas designated critical habitat or even areas where Houston toads have been sighted, and he makes no claims that he visits Houston toad habitat for the purpose of observing them. Similarly, no member-declarants asserts any interest in the TFHC. The TFHC individuals have been salvaged in partnership with San Angelo State and the right of way cleared in in Kimble County. Crow Decl., Ex. B, ¶ 16. Such "generalized allegations of abstract environmental injur[ies]" are therefore insufficient to constitute irreparable harm. *See Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014).

[18] Quoting the BiOp, Plaintiff speculates that the remaining cacti identified in advance of clearing and construction "may experience reduced reproductive potential and gene flow." Mot. at 27 (quoting

Plaintiff also alleges that the Pipeline is causing irreparable harm to the warbler. Mot. at 3–4, 26; Blair Decl., Dkt. 22 ¶ 5. However, all potential areas of GCWA habitat have been cleared except for areas associated with three micro adjustments to the Pipeline's route and areas associated with a potential route change to avoid two crossings of the Blanco River. Crow Decl., Ex. B, ¶ 10; BiOp Add., Dkt. 10-15 at 4. These areas will be cleared after the GCWAs have left the area pursuant to the terms of the BiOp and ITS.[19] *Id.* Additionally, the Service concluded that any impacts due to habitat removal are also temporary as habitat removal would affect GCWAs in adjacent habitat for one breeding season which ends in 21 days—on July 31 of this year. Biological Op., Dkt. 10-8 at 38. Even if Plaintiff could demonstrate harm from this small remaining amount of clearing after the GCWAs have left the area, harm sufficient to support an injunction must be both "both certain and great;" some potential environmental harms are "too small to meet an irreparable harm standard." *Cuomo*, 772 F.2d at 976.

Two of Plaintiff's other member-declarants also allege that their ability to view or enjoy wildlife, including the GCWA, is being injured by clearing or construction of the Pipeline and Declarant Jennifer Blair, offered as an expert by Plaintiff, alleges that vegetation clearing will cause irreparable harm to wildlife and habitat.[20] *See* Gates Decl., Dkt. 10-12, ¶ 6; Watson Decl., Dkt. 10-14,

Biological Op., Dkt. 10-8 at 41). However, this cannot be grounds for an injunction as Plaintiff has provided no evidence that such possible effects are certain to occur (and indeed, Plaintiff acknowledges that the expert opinion of the Service is that such harm is not certain). *See Winter*, 555 U.S. at 22. Plaintiff also ignores the possibility that the cactus may recolonize parts of the maintained right-of-way. Biological Op., Dkt. 10-8 at 41.

[19] Moreover, Plaintiff acknowledges that PHP has gone to great lengths to observe significant conservation measures to mitigate potential impacts to the GCWA population. Mot. at 9. As required by the BiOp, PHP has purchased 1,363 acres for mitigation habitat for the GCWA and transferred it to the Service to be protected in perpetuity as part of the Balcones Wildlife Refuge. Biological Op., Dkt., 10-8 at 11–12. This total represents sufficient conservation credits to offset any habitat destruction and degradation from the original Pipeline route and the three micro-adjustments, and it includes 67 additional GCWA conservation credits intended to offset any potential impacts that may arise in the future from the project due to oak wilt. BiOp Add., Dkt. 10-15 at 10.

[20] Mr. Frantzen professes concern that both "the construction *and operation*" of the Pipeline "will keep the golden-cheeked warbler from returning to my land." Frantzen Decl., Dkt. 10-11, at ¶¶ 5, 6

¶ 6; Blair Decl., Dkt. 22 at ¶ 4. Again, as clearing is complete along the Pipeline route (with the exception of pending route adjustments), including in the areas closest to Plaintiff's members, these allegations do not justify an injunction. *Bayou Liberty Ass'n, Inc.*, 217 F.3d at 396.

Plaintiff relies on both Ms. Blair and Dr. Hayes for a variety of allegations of harm to wildlife species and the environment. However, both make only generic claims. *See* Blair Decl. ¶ 6; Hayes Decl., Dkt. 10-7, ¶ 18, ¶ 23. Neither Ms. Blair nor Dr. Hayes identifies these species, let alone provides evidence that they might be injured, killed, or otherwise irreparably affected by remaining clearing and construction activities. Plaintiff bears the burden of establishing irreparable harm and such generalized statements are insufficient. *Wis. Gas Co.*, 758 F.2d at 674 (Because "the court must decide whether the harm will in fact occur," a party seeking injunctive relief must "substantiate the claim [of] irreparable injury . . . .").

In light of the status of clearing and construction and the total lack of evidence that the alleged harm to wildlife, species, and habitat Plaintiff complains of "[is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," *Sierra Club*, 990 F. Supp. 2d. at 39, the Court must deny the injunction. Plaintiff's request for relief is essentially moot. *Bayou Liberty Ass'n, Inc.*, 217 F.3d at 396.

**4.     Plaintiff's concerns that construction activities and the use of horizontal drilling may lead to water contamination are speculative, based on a mischaracterization of the facts, and untethered to the relief it seeks.**

Plaintiff repeatedly asserts that various Pipeline construction activities, the use of HDD as a construction technique, and accidental spills from the Pipeline after it is in operation are significant

---

(emphasis added). These allegations are speculative, at best, as well as moot and undermined by his development plans. *See Fund for Animals v. Babbitt*, 2 F. Supp. 2d 562, 566–67 (D. Vt. 1996) (noting that "[t]he plaintiffs have presented virtually no concrete evidence to support their contention that their ability to view or photograph moose will be impaired" as a result of the proposed action and concluding that it is therefore "questionable as to whether any of the named plaintiffs will suffer any injury").

risks of irreparable harm to the Edwards and Trinity Aquifers and to the Pedernales River. *See, e.g.,* Mot. at 19, 22, 24. These unfounded fears cannot justify an injunction for several reasons. The Corps simply does not have jurisdiction over any use of HDD in the areas of concern to the Plaintiff, the Edwards and Trinity aquifer region, because this construction activity does not involve the dredging or filling of waters of the United States and is not occurring under a water subject to Section 10 of the RHA in these areas. Additionally, Plaintiff overstates the potential harms to the Pedernales River based on its mischaracterization of a one-time inadvertent loss of drilling fluid during an HDD exercise under the Blanco River in March 2020. Finally, the harms Sierra Club alleges in connection with HDD and construction over the karst are too speculative to constitute irreparable injury.

      a.      **The use of horizontal directional drilling in areas of the Trinity and Edwards Aquifers is not within the Corps' jurisdiction.**

Throughout its pleadings, Plaintiff insists that the Pipeline is a danger to the Edwards and Trinity Aquifers. Mot. at 19, 22, 24. However, any potential risks related to the use of HDD do not support injunctive relief because the Corps does not have jurisdiction over this activity as it relates to the Trinity and Edwards Aquifers, the areas of concern to Plaintiff.[21] As relevant to Section 404 and the Corps, the CWA prohibits the "discharge" of "dredged or fill material" into WOTUS without a permit. 33 U.S.C. §§ 1311(a), 1344(a). In no event does the Corps have authority under the CWA to regulate work that does not actually result in activity that impacts a jurisdictional water through the "discharge of dredged or fill material." In issuing the current NWP 12 in 2017, and in response to a suggestion that the Corps clarify that a regulated crossing of a WOTUS does not refer to HDD, the Corps stated that "the term 'crossing' refers to regulated activities." 82 Fed. Reg. at 1,883. As a result,

---

[21] The pipeline will be installed via HDD under the Navidad River pursuant to RHA Section 10 and NWP 12. However, the Navidad River is in the Corps' Galveston District and is not in the region of the Trinity and Edwards Aquifers. Plaintiff makes no allegations of specific harms related to construction activity in the Galveston District. However, the relief they seek would apparently have the effect of stopping construction under the Navidad River because it is occurring subject to Corps jurisdiction in a Corps Action Area.

actions taken to avoid CWA-regulated impacts to waters are lawful and, in fact, are encouraged by the Corps. The Corps explained: "Horizontal directional drilling for utility line installation and replacement is an important technique for avoiding and minimizing adverse effects to jurisdictional waters and wetlands during the construction of utility lines." *Id.* at 1,887. Thus, unless the HDD activity involves activities within the Corps jurisdiction under Section 404 (for example, if the entry or exit points would impact a jurisdictional water), the activity is not subject to Corps jurisdiction. Nor are inadvertent returns (a loss of drilling fluid to the surface) subject to Corps jurisdiction. Even if the HDD fluids are released directly into a WOTUS, the Corps does not consider the fluid to be "fill material" within the meaning of the CWA. *Id.* at 1,886.

For an injunction to issue, Plaintiff "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. PHP's use of HDD fails this test because it is not authorized by the Corps verifications Plaintiff seeks to stay and in the areas of concern to Plaintiff—the Trinity and Edwards Aquifers and Pedernales River; HDD in these areas are not regulated by the Corps.

b.   **Plaintiff's assertion that PHP discharged 36,000 gallons of "toxic" drilling fluid "into the Blanco River" is wrong and the risk of a future incident is speculative.**

Plaintiff substantially overstates the risk from a potential drilling fluid loss by grossly mischaracterizing the facts surrounding a single incident during the use of HDD at the Blanco River HDD. This incident occurred on March 28, when PHP's contractors attempted to route the Pipeline underneath the Blanco River using HDD. Brammer Decl., Ex. E, ¶ 7. The drilling contractor lost drilling fluid when they encountered an unknown and unidentified void feature. *Id.* ¶ 17. When the loss of circulation was discovered, PHP ceased drilling the pilot borehole immediately but discovered only on March 30 via social media that certain landowners in the area were reporting that their wells had been affected. *Id.* ¶ 12. PHP reached out to those landowners and continues to work with landowners and state and local authorities to remedy these impacts. *Id.* ¶¶ 14–15. After further

-22-

evaluation of the loss of drilling fluids and the existence of a subsurface void feature, PHP decided against another HDD attempt. PHP properly plugged and abandoned the pilot hole. *Id.* ¶ 13.

Plaintiff claims that "the toxic and chemical-laden sediment resulting from that spill are likely [to] persist for months, if not years, and threaten to permanently degrade water quality in the Edwards aquifer . . . ." Mot. at 22 (citing Hayes Decl., Dkt. 10-7, ¶¶ 27, 36, 41; Blair Decl., Dkt. 22 ¶ 7). Plaintiff's misstatements warrant correction.[22]

First, Plaintiff's description of the drilling fluid as "toxic" is simply wrong. The drilling fluid lost in the HDD incident was composed of a mixture of 95 percent City of Blanco potable water and 5 percent AMC Gel. AMC Gel is composed almost entirely of bentonite (approximately 94 percent) which is a naturally occurring clay material, silica which is the primary component of sand (approximately 5 percent), and less than 0.5 percent each of acrylamide homopolymer and sodium carbonate. Bentonite clay contains phyllosilicates, or sheet-like silica-based minerals. The safety data sheet ("SDS") for AMC Gel warns against the unprotected inhalation of the dry product, which may cause cancer only through "prolonged or repeated exposure." Brammer Decl., Attach. E-1 at 2. These kinds of health impacts are most likely to be observed in occupational health contexts—for example, miners and construction workers who are exposed to dust and silica over decades may develop health problems. White Decl., Ex. C, ¶ 17.[23] Second, Plaintiff asserts that this discharge reached the Blanco River, Mot. at 28, but fails to cite any reliable authority. Plaintiff purportedly relies on the declaration

___

[22] PHP responds to Plaintiff's speculative assertions that this incident—and others like it—could harm two endangered species of aquatic salamanders in Part III.B.4.

[23] In fact, the use of bentonite clay in drilling water wells, White Decl., Ex. C, ¶ 18, and for plugging and abandoning drinking and oil and gas wells to prevent the well from becoming a conduit for contamination from the surface into the aquifer further belies Plaintiff's allegations of toxicity. *See* Tim Brown, Tex. Ass'n of Cties., *What are Orphaned Wells and Where Can We Find Them*, https://www.county.org/County-Magazine/Sept-Oct-2018/What-are-Orphaned-Wells-and-Where-Can-We-Find-The (Oct. 2018).

of Dr. Hayes to support its assertion, *see* Mot. at 28–29, but Dr. Hayes explains he understands that the loss was to the Trinity Aquifer, not the Blanco River. Hayes Decl., Dkt. 10-7, ¶ 34.

Third, Dr. Hayes's assertion that the drilling fluid loss has caused "irreparable and chronic" negative impacts to underground water resources, Hayes Decl. ¶ 35, is unfounded.[24] Naturally occurring bentonite clay does not pose a danger to the Trinity Aquifer. Given that the bentonite clay was only a small portion of the drilling fluid mixture, the amount of bentonite clay received by the aquifer was particularly insignificant. *Id.* The volume of sediment added to the aquifer due to the spill would not be appreciably greater than the amount added during a rainstorm, and sampling indicates that sediments have effectively dissipated by now. *See* Brammer Decl., Attach. E-2 at 2.[25]

Finally, based on these misinformed views, Plaintiff argues that using HDD under the Pedernales River could contaminate that river or the aquifers and member-declarants' water supplies. *See e.g.,* Mot. at 24; Watson Decl., Dkt. 10-14, ¶ 5.[26] For the reasons just provided, if such a loss of drilling fluid were to occur, it would not pose the serious risks Plaintiff allege. Moreover, a loss of drilling fluid during the Pedernales HDD is implausible. Based on the geotechnical data PHP has gathered regarding the Pedernales, HDD will remain in the soil and clay above the bedrock. Brammer Decl., Ex. E, ¶ 30.

---

[24] Further, PHP responded to address landowner concerns with respect to the two wells known to have been temporarily impacted by the spill and recently tested 17 additional wells in the vicinity.

[25] Nonetheless, as part of its response to this incident, PHP has agreed to fund a dye-trace study that would be performed by the Blanco-Pedernales Groundwater Conservation District. The dye trace study will map underground water conduits in the area and provide useful information to conservation districts and local governments. White Decl., Ex. C, ¶ 21.

[26] Plaintiff also argues that similar activity could cause harm to the Blanco River. Mot. at 19 ("In addition, the project would use horizontal directional drilling in ten areas, including the crossing of seven major Texas rivers, including two crossings of the pristine Blanco River in the "interconnected contributing recharge zones of the Trinity and Edwards Aquifers."). However, PHP is not using HDD under the Blanco River. Brammer Decl., Ex. E, ¶ 12; Crow Decl., Ex. B, ¶ 10.

As "there must be more than an unfounded fear on the part of the applicant," this single incident does not support an injunction of future activity. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

      **c.**    **Plaintiff's allegations that the Pipeline represents a significant risk of harm to the aquifer are speculative given the numerous protective measures PHP has employed.**

Plaintiff alleges that the activities authorized under NWP 12 "create a significant risk of harm to the aquifer" in light of the "unique geological karst features in west and central Texas . . . ." Mot. at 3. However, an injunction is not warranted because Plaintiff has entirely failed to explain why the extraordinary measures in PHP's Void Mitigation Plan are insufficient to minimize these potential impacts. *Sierra Club*, 990 F. Supp. 2d at 39.

Plaintiff's allegations of harm to the aquifer are belied by a number of protective measures PHP has taken with regard to the karst—the efficacy of which Plaintiff has not rebutted. With the expertise of karst geoscientists, PHP designed and planned the Pipeline's route to avoid karst features identified in an extensive survey, BiOp., Dkt. 10-8 at 2–3, and is voluntarily employing construction best management practices based on TCEQ's Aquifer Protection Program regulations. White Decl., Ex. C, ¶¶ 4–5; *see also* Mody Letter, Ex. A, Attach. A-2, at 4–5; Cambrian Report, Ex. C, Attach. C-2, at 7–8. PHP has also prohibited numerous other sources of potential contamination in the karst protection zones, like storage tanks and vehicle refuelling. White Decl., Ex. C, ¶ 13; Biological Op., Dkt. 10-8 at 10–12; Cambrian Report, Ex. C, Attach. C-2, at 8.

PHP is not using HDD in any waters located in the Edwards Aquifer recharge zone out of an abundance of caution for the hydrology of that area. Void Mitigation Plan 7.0, Dkt. 10-4; Biological Op., Dkt. 10-8 at 3–4. During construction, PHP follows a highly protective Void Mitigation Plan, which the Service anticipated would avoid or minimize potential water quality degradation as a result of contaminants and sediments. BiOp., Dkt. 10-8 at 3. Under the Void Mitigation Plan, PHP and

Cambrian conduct trench inspections on a continual basis to identify potential voids, and they stop work when one is discovered to determine whether mitigation measures are required. Void Mitigation Plan, Dkt. 10-4 at 2.0, 3.0, 5.0; BiOp., Dkt. 10-8 at 3. Consistent with the Service's expectations, PHP has implemented the Void Mitigation Plan and multiple personnel are examining the right-of-way for the possible presence of void features. Long Decl., Ex. D, ¶¶ 7–8.[27]

This court has previously denied an injunction in a case raising analogous concerns because the project (1) was not likely to adversely affect the species at issue; (2) adhered to TCEQ's aquifer regulations; and (3) instituted other procedures to prevent irreparable injury to the karst, including temporarily halting construction when a karst feature was identified. *See Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 573–75 (W.D. Tex. 2011). Plaintiff has not shown that the Court should rule any differently in this case. Moreover, Plaintiff's speculative concerns are unconnected to work in Corps Action Areas, meaning that Plaintiff's requested injunction would not prevent them from occurring. *Wis. Gas Co.*, 758 F.2d at 674.

### 5.      Plaintiff's remaining allegations are either pure speculation, temporary in nature, or do not withstand scrutiny.

Plaintiff's remaining arguments do not demonstrate a substantial threat of imminent irreparable harm because they are purely speculative or allege harms that are temporary or non-existent. They do not carry Plaintiff's burden of persuasion that an injunction is necessary. *Canal Auth. of State of Fla.*, 489 F.2d at 573.

---

[27] Plaintiff's declarant Dr. Hayes appears to be unaware of these protective measures. Hayes Decl., Dkt. 10-7, ¶ 16. He alleges that PHP construction and operation could lead to karst contamination, *see, e.g.*, *id.* ¶ 31; however, Dr. Hayes lacks the qualifications to make such statements as he has not been educated or trained as geoscientist. White Decl., Ex. C, ¶ 11. Additionally, Dr. Hayes's concern that pipelines should not be built in karst areas because trenching activities potentially create new pathways for contaminants to enter aquifers would apparently apply to any pipeline or other utility line, including water pipelines, that needs to be trenched. White Decl., Ex. C, ¶ 11. Hayes also raises the possibility of a liquids spill from the Pipeline. Hayes Decl., Dkt. 10-7, ¶¶ 40–42. For the numerous reasons explained above and in the attached declaration by Sital K. Mody, this is highly speculative. Mody Decl., Ex. A, ¶¶ 22–25.

a.   **Plaintiff's numerous other allegations that are groundless or duplicative do not provide a basis for the relief they seek.**

Plaintiff also alleges a number of other supposed risks and injuries that do not support an injunction because they are either groundless or duplicative. Plaintiff's claims that the Pipeline could explode, Mot. at 23–24 (citing Frantzen Decl., Dkt. 10-11, ¶ 9) or leak methane and harm water quality, Mot. at 24; Frantzen Decl., Dkt. 10-11, ¶ 9, are groundless and speculative. Given the Pipeline's state-of-the-art design and PHP's track record with Gulf Coast Express, the Hill Country Lateral, among others, it is extremely unlikely that a pipeline explosion would occur. Mody Decl., Ex. A ¶¶ 18–22. Furthermore, predicting a specific location of an explosion is even more speculative. As "there must be more than an unfounded fear on the part of the applicant," these do not support an injunction. *See Holland Am. Ins. Co.*, 777 F.2d at 997.

Plaintiff alleges that members' businesses or property values may be impacted by the project, Mot. at 24 (citing Frantzen Decl., Dkt. 10-11, ¶ 9); Pence Decl., Dkt. 10-17, ¶ 7; Gates Decl., Dkt. 10-12, ¶ 8, but again provides nothing to show that these claims are not "something merely feared as liable to occur at some indefinite time." *Sierra Club*, 990 F. Supp. 2d. at 39. Additionally, because these speculative harms are economic and they are *per se* not "irreparable." *Id.*[28]

Plaintiff also alleges that harm is occurring to the endangered Austin blind and Barton Springs salamanders. Mot. at 18; Hayes Decl., Dkt. 10-7, ¶¶ 35, 40. However, Plaintiff has provided no evidence that either salamander species is present in any potential habitat near the Pipeline (much less that they are being harmed). In fact, the Pipeline's route is over five miles away from observed locations of the Barton Springs salamander and 18.4 miles away from observed locations of the Austin blind salamander and the BiOp concurs that these are unlikely to be adversely affected by the Pipeline. Biological Op., Dkt. 10-8 at 2–3. Plaintiff fails to show that these species are near the Pipeline, and

---

[28] Furthermore, there is nothing currently preventing Mr. Frantzen from opening and operating his hunting ranch.

coupled with the improbability of contamination reaching the aquifer, *see* Part III.B.4 above, Plaintiff's claim of harm here are "something merely feared as liable to occur at some indefinite time" that do not justify an injunction. *Sierra Club*, 990 F. Supp. 2d. at 39.

Finally, Plaintiff expends enormous effort detailing generalized impacts of the Pipeline as a whole it believes constitute irreparable harm. Mot. 18–23. PHP has already addressed the vast majority of these alleged harms as they relate to Plaintiff's member-declarants' interests. Others not already addressed, including building permanent ancillary facilities and maintaining the permanent 50-foot easement along the length of the Pipeline, are "too small to meet an irreparable harm standard." *Cuomo*, 772 F.2d at 976.

### b.   Plaintiff alleges temporary harms that are not "irreparable."

Additionally, a number of Plaintiff's alleged harms are temporary. Specifically, Plaintiff alleges one consequence of the project is "sustained extreme noise of the pipeline construction from blasting, engines and excavating." Mot. at 21. Trenching is 87 percent complete along the Pipeline, Mody Decl., Ex. A, Attach. A-1, so any concerns about blasting are generally in the past; and in any event, construction noise will—inherently—abate once construction is complete. Likewise, Plaintiff's fears about the impacts of the work in the water crossings—e.g., riparian productivity, water quality, erosion and sedimentation, and boating or swimming hazards—are also temporary. NWP 12 requires that soil erosion and sediment controls be used, that fill material be removed from crossings, that stream banks be restored. 82 Fed. Reg. at 1,999. Plaintiff relies in part on Jennifer Blair for these statements. Ms. Blair is a wildlife biologist, not a karst geoscientist, water quality specialist, or construction engineer. Therefore, she is unqualified to offer an opinion regarding the sufficiency of PHP's erosion and sedimentation controls or the impacts of the Pipeline on water quality. Blair Decl., Dkt. 22 ¶¶ 7, 9. Additionally, the photographs included in her declaration depict normal construction. Long Decl., Ex. D, ¶ 5.

Because the very nature of temporary harms is that they are not "irreparable," these alleged concerns do not justify injunctive relief. *W. Ala. Quality of Life Coal. v. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (finding no irreparable harm because, "while there may be temporary effects of the construction project . . . , the project has a life expectancy of 33 months, which is not permanent or of long duration").

> c.    **Plaintiff's allegations of harm caused by the Biological Opinion and Biological Assessment do not withstand scrutiny.**

Moreover, Plaintiff claims that the "conservation measures" in the Biological Assessment and the terms and conditions of the BiOp cause harm. Mot. at 20–23. But, closer inspection reveals these arguments do not withstand scrutiny. Instead of citing measures in those documents that require, among other things, habitat protection, seasonal clearing to avoid killing or wounding GCWAs, oak wilt prevention, and karst protection, *see* Biological Assessment, Dkt. 10-1 at 6–10, BiOp., Dkt. 10-8 at 10–15, 54–58, Plaintiffs cites analysis of the effects of the Pipeline or else cherrypicks purported "harms" that such measures *actually address*. Biological Assessment, Dkt. 10-1 at 14, 55; BiOp, Dkt. 10-8 at 3, 10.[29] This is contrary to the "incorporation" language in the verifications, which explains that the verifications do not authorize take and require compliance with the "mandatory terms and conditions" of the BiOp "to implement the reasonable and prudent measures that are associated with incidental take . . . ." Fort Worth District NWP 12 verification, Dkt. 10-9 at 2; Galveston District NWP 12 Verification, Dkt. 10-10 at 2 (same); *see also* 16 U.S.C. § 1536(b)(4)(ii), (iv) (incidental take statements must (among other things) "set[ ] forth the terms and conditions . . . that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified").

As these arguments do not actually allege harm upon closer inspection, they do not provide a basis for an injunction.

---

[29] The "additional construction measures designed to reduce impacts to engendered [*sic*] species" Plaintiff raises on pages 22–23 of the Motion are addressed through this brief.

**C.      PHP will suffer significant harm if the injunction issues.**

The Court should deny Plaintiff's motion because the relief that the Sierra Club seeks—an injunction that stays the Corps' NWP 12 verifications—would, as a practical matter, shut down construction and cause PHP to incur significant additional costs. These actual harms greatly outweigh the purely speculative and remote harms alleged by Plaintiff, especially in light of the status of construction and the minimal to non-existent remaining impact on the Plaintiff's member-declarants. In considering whether to issue a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). Courts should not "address[] these considerations in only a cursory fashion." *Id.* at 26. There is no presumption in favor of alleged environmental injuries over economic injuries. *See, e.g., Amoco Prod. Co.*, 480 U.S. at 542; *see also Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1231 (10th Cir. 2008); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 895–96 (10th Cir. 2013).[30]

In contrast to Plaintiff's remaining speculative and remote harms, a preliminary injunction against the Pipeline would, despite Plaintiff's protestations to the contrary, cause immediate harm to PHP. If the Court were to grant the relief Plaintiff seeks it would prevent critical construction activities within one Corps Action Area relating to the installation of the Pipeline under the Navidad River via HDD. Mody Decl., Ex. A, ¶ 35. This is the only HDD crossing for the entire project within a Corps Action Area, and the Pipeline cannot be completed and placed into service until PHP completes the Navidad River crossing. *Id.* Stopping construction of the project at this critical location would result in approximately $5 million in damages from increased construction costs to discontinue the HDD,

---

[30] *See also Dine Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209, 2015 WL 4997207, at *50 (D.N.M. Aug. 14, 2015), *aff'd*, 839 F.3d 1276 (10th Cir. 2016) (denying an injunction because "not only do the Operators interests'—lost profits—outweigh the Plaintiffs, the public's-lost jobs, both directly working for the petroleum industry and peripherally supporting it-do as well. The Plaintiffs have failed to establish that [either the] environment, or the public that enjoys it, would be any worse off.").

secure the site, and complete the HDD at a later date. *Id.* A lengthy injunction that prevents PHP from completing the Navidad River HDD would risk the $1.98 billion PHP has invested to date of the project's $2.27 billion budget. *Id.*

Except for the Navidad River crossing, PHP can complete construction of the project at this stage outside Corps jurisdiction by boring under waters subject to CWA jurisdiction. However, doing so will cause PHP to incur delay and expense to change its construction plans in order to complete the project without the need for authorization under the CWA. *Id.* ¶ 34. This would result in needless financial harm to PHP. PHP anticipates that the increased cost of using different construction methods relative to the previously budgeted costs for conventional crossing methods would be approximately $2 million. *Id.* ¶ 34. Additionally, halting construction would lead to lost revenues on the order of $32.8 million per month (approximately $1.08 million per day), and/or expose PHP to liability based on existing commercial and delivery contracts. *Id.* ¶ 35.

## D.    The public interest supports denying injunctive relief.

Courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction" as the factor deserves "serious consideration." *Winter*, 555 U.S. at 24, 27 (internal citations and quotations omitted). Plaintiff claims it seeks a limited remedy that would allow pipeline construction to continue, but the remedy it seeks would either shut down construction, depending on the stage of construction when an order issues, or require PHP to change its construction plan to complete the project. Mody Decl., Ex. A, ¶¶ 34–35. Preventing completion of the project would have public consequences on Texas residents, counties, the state, the environment, and the public's interest in the fair and efficient administration of laws governing our nation's energy infrastructure.

The Pipeline supports roughly 2,500 local construction jobs and 18 full-time, ongoing positions following construction, and will continue to accelerate the development and job creation

from oil and gas production throughout Texas. Mody Decl., Ex. A, ¶ 36. When complete, the new facilities constructed as part of the Pipeline will generate approximately $42 million of increased annual revenue to applicable state and local taxing bodies. *Id.* The oil and gas production facilitated by the Pipeline will raise that number to almost $1 billion in annual revenue. *Id.* ¶ 38. These revenues will contribute to Texas' Permanent School Fund and the Permanent University Fund, which fund primary, secondary, and higher public education. An unwarranted delay in pipeline construction would delay the creation of these jobs and revenues. *Id.* ¶ 37. Additionally, the Pipeline reduces the amount of natural gas produced in the Permian Basin that is flared and wasted on a daily basis because of insufficient pipeline capacity in the region. Mody Decl., Ex. A, ¶ 13; Press Release, Rystad Energy, *Permian Gas Flaring Reaches Yet Another High* (Apr. 6, 2020)[31]

Finally, a preliminary injunction would harm the public at large, which, through legislation and agency rulemaking, at both the federal and state levels, has created a framework for the responsible, fair, and economic development of the nation's energy infrastructure. Texas recognizes the significance of gas utility infrastructure within the state and has declared that gas utilities are "affected with a public interest." TEX. UTIL. CODE ANN. § 121.051(a). Congress enacted the CWA and tasked the Corps to oversee an efficient permitting system that achieves the Act's goals. Congress also enacted and amended the ESA to protect vulnerable wildlife but also allow for responsible infrastructure development. The Corps has promulgated nationwide permits to achieve these goals and has worked with the Service to evaluate and approve the aspects of the construction of PHP within its jurisdiction. Applicants, such as PHP, invest substantial sums in reliance on the efficacy of that regulatory framework. In a similar case, the U.S. District Court for the District of Columbia observed that issuance of an injunction like the one at issue here would be damaging to federal agencies' interests in

---

[31] *Available at* https://www.rystadenergy.com/newsevents/news/press-releases/a-downturn-silver-lining-permian-gas-flaring-has-decreased-and-is-expected-to-fall-further-in-2020/.

the "development of stable North American energy sources" and the efficient use of limited agency resources. *Sierra Club*, 990 F. Supp. 2d at 42.[32]

PHP has pursued these federal and state authorizations and approvals diligently and responsibly. At every turn, PHP engaged with the agencies to assist them as they fulfil their regulatory obligations. *See* Biological Assessment, Dkt. 10-1 at 10–17; Mody Letter, Ex. A, Attach A-2 at 7. PHP followed the process as defined by the federal agencies and secured appropriate authorizations for work related to the Pipeline. Indeed, PHP has taken major and voluntary steps that go beyond what is expected to understand and account for environmental conditions in the Pipeline's path. *See e.g.* Cambrian Report, Ex. C, Attach. C-1; *see also Sierra Club*, 990 F. Supp. 2d at 42 (describing pipeline developer's commitment of resources to environmental compliance). An unwarranted delay would only frustrate this regime for lawful energy infrastructure development at the expense of taxpayers, landowners, and the public.

**E.     If an injunction issues, Plaintiff should be required to post a bond of at least $7 million**

Plaintiff has failed to show that the extraordinary remedy of injunction is appropriate in this case. However, if this Court nonetheless finds that an injunction should issue, Federal Rule of Civil Procedure 65(c) makes a bond a necessary condition to that injunction. Although Plaintiff claims it should not be subject to this requirement, Mot. at 35 n. 15, the Rule explicitly exempts only the "United States, its officers, and its agencies" from this "requirement." Fed. R. Civ. P. 65(c). And, although courts have found in limited situations that a public-interest plaintiff's advocacy might justify a nominal bond, *see e.g.*, *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, 92 F. Supp. 3d 314, 331 (E.D.

---

[32] Elected officials from both political parties have expressed the importance to the public of establishing new and reliable energy infrastructure. *See* President Barack Obama, Remarks by the President on Energy (Mar. 22, 2012 6:16 PM MDT), available at https://obamawhitehouse.archives.gov/the-press-office/2012/03/22/remarks-president-energy; Exec. Order. No. 13,867, Issuance of Permits With Respect to Facilities and Land Transportation Crossings at the International Boundaries of the United States, 84 Fed. Reg. 15,491 (Apr. 15, 2019).

Pa. 2015), courts nevertheless impose bonds in similar situations. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng's*, 297 F.R.D. 633, 635–36jan (N.D. Ala. 2014) (rejecting environmental group plaintiff's request for waiver of $300,000 bond). If the Court issues a preliminary injunction, it should order Plaintiff to post a bond of at least $7 million, which is the amount of increased construction costs PHP will incur if the project is delayed. Requiring Plaintiff to post a bond will provide some assurance that it may collect damages "in the event that it was wrongfully enjoined." *Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).

## IV.   CONCLUSION

FOR THESE REASONS, Intervenor-Defendants Kinder Morgan Texas Pipeline LLC and Permian Highway Pipeline, LLC request that the Court deny Plaintiff's Motion for Preliminary Injunction, and grant Defendants and Intervenor-Defendants such other relief to which they are entitled.

Dated July 10, 2020

Respectfully submitted ,

BRACEWELL LLP

*/s/ W. Stephen Benesh*
W. Stephen Benesh
Texas State Bar No. 02132050
111 Congress Avenue, Suite 2300
Austin, Texas 78701-4061
Telephone: (512) 494-3680
Facsimile: (800) 404-3970
Email: steve.benesh@bracewell.com

and

Ann D. Navaro (*admitted pro hac vice*)
Brittany Pemberton (*admitted pro hac vice*)
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 828-5811
Facsimile: (800) 404-3970
Email: ann.navaro@bracewell.com
Email: brittany.pemberton@bracewell.com

*COUNSEL FOR INTERVENOR DEFENDANTS*
*KINDER MORGAN TEXAS PIPELINE LLC AND*
*PERMIAN HIGHWAY PIPELINE, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 10, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ W. Stephen Benesh*