IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-460-RP |
| | § | |
| UNITED STATES ARMY CORPS OF | § | |
| ENGINEERS, et al., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KINDER MORGAN TEXAS PIPELINE | § | |
| LLC and PERMIAN HIGHWAY PIPELINE, | § | |
| LLC, | § | |
| | § | |
| Intervenor-Defendants. | § | |

## **ORDER**

Before this Court is Plaintiff Sierra Club's Motion for Preliminary Injunction. (Dkt. 10).

Defendants United States Army Corps of Engineers (the "Corps") and several officials[1] at the Corps

(together, the "Federal Defendants") filed a response in opposition. (Dkt. 29). Intervenor-

Defendants Kinder Morgan Texas Pipeline LLC and Permian Highway Pipeline LLC (together,

"Kinder Morgan") filed a separate response in opposition. (Dkt. 30). Sierra Club filed a reply. (Dkt.

33). The Court held a preliminary injunction hearing on July 31, 2020. (Dkt. 39).

---

[1] Lieutenant General Todd T. Semonite, in his official capacity as Commanding General and Chief of
Engineers of the U.S. Army Corps of Engineers; Colonel Kenneth N. Reed, in his official capacity as District
Commander of the U.S. Army Corps of Engineers Fort Worth District; Colonel Timothy R. Vail, in his
official capacity as District Commander of the U.S. Army Corps of Engineers Galveston District; Brandon
W. Mobley; in his official capacity as Chief, Regulatory Division, U.S. Army Corps of Engineers; and Kristi
McMillan, in her official capacity as Leader, Central Evaluation Unit, U.S. Army Corps of Engineers.

Also before this Court is Sierra Club's opposed motion for leave to file two supplemental declarations, filed after the hearing on the motion preliminary injunction. (Dkt. 40). Kinder Morgan filed a response, (Dkt. 41), and Sierra Club filed a reply, (Dkt. 43). After reviewing the briefing, the record, and the relevant law, the Court will grant Sierra Club's motion for leave to file supplemental declarations.

Having considered the parties' briefing—including the briefing in support of and in response to Sierra Club's motion for leave to file supplemental declarations—the arguments presented at the hearing, the record, and the relevant law, the Court will deny Sierra Club's motion for preliminary injunction.

# I. BACKGROUND

## A. Lawsuit About the Permian Highway Pipeline

This case concerns the construction of the Permian Highway Pipeline (the "Pipeline"), a 429-mile long natural gas pipeline that will run from Reeves County, Texas to Colorado County, Texas. (Compl., Dkt. 1, at 1–2). Sierra Club and its members seek to halt work on the Pipeline at 129 water crossings. (Mot. Prelim. Injunc., Dkt. 10, at 1, 43). Sierra Club alleges the Corps authorized the Pipeline to be constructed at those water crossings in violation of the National Environmental Policy Act ("NEPA"). (*Id.*).

Sierra Club filed its lawsuit on April 30, 2020. (Dkt. 1). In its complaint, Sierra Club brings three claims: (1) the Corps has not complied with the vacatur of Nationwide Permit 12 ("NWP 12") and Kinder Morgan therefore continues its work on the Pipeline without a valid permit; (2) the Corps violated NEPA by failing to perform a NEPA analysis when its Fort Worth District issued a verification for a portion of the Pipeline that incorporated the terms and conditions of the Biological Opinion and Incidental Take Statement from the U.S. Fish and Wildlife Service (the "Service"); and,

similarly, (3) the Corps violated NEPA by failing to perform a NEPA analysis when its Galveston District issued a verification for a portion of the Pipeline that incorporated the terms and conditions of the Biological Opinion and Incidental Take Statement from the Service. (*Id.* at 23–25). Sierra Club filed its motion for preliminary injunction on June 10, 2020, requesting the Court enjoin the Corps' verifications pursuant to Sierra Club's second and third claims. (Mot. Prelim. Injunc., Dkt. 10, at 1). Sierra Club does not raise its first claim regarding the vacatur of the NWP 12 in the context of its motion for preliminary injunction.[2] (*Id.* at 8, n.1).

This case involves an interplay between several regulatory schemes, which the Court will discuss below, before turning to the regulatory steps undertaken by the Federal Defendants and Kinder Morgan.

## B. Controlling Regulatory Schemes

### 1. Clean Water Act

---

[2] On April 15, 2020, the United States District Court for Montana vacated NWP 12, finding the Corps failed to consult with the U.S. Fish and Wildlife Service under Endangered Species Act ("ESA") Section 7 prior to issuing NWP 12. (*Id.*). The District of Montana held that "[s]ubstantial evidence exists that the Corps' reissuance of NWP 12 [in 2017] 'may affect' listed species and critical habitat. This substantial evidence requires the Corps to initiate consultation under ESA Section 7(a)(2) to ensure that the discharge activities authorized under NWP 12 comply with the ESA." *N. Plains Res. Council v. U.S. Army Corps of Engineers*, No. CV-19-44-GF-BMM, 2020 WL 1875455, at *7 (D. Mont. Apr. 15, 2020), *amended*, No. CV 19-44-GF-BMM, 2020 WL 3638125 (D. Mont. May 11, 2020). The District of Montana then narrowed the remedy of its original order: rather than vacating NWP 12 in all respects, the court limited its vacatur to new pipeline projects. "To vacate NWP 12 only as it relates to new oil and gas pipeline construction will prohibit the Corps from relying on NWP 12 for those projects that likely pose the greatest threat to listed species. The Corps may not approve the discharge of dredged or fill material under NWP 12 for projects constructing new oil and gas pipelines. NWP 12 will remain in place during remand insofar as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP 12 projects." *N. Plains Res. Council v. U.S. Army Corps of Engineers*, No. CV 19-44-GF-BMM, 2020 WL 3638125, at *7 (D. Mont. May 11, 2020). After that decision had been appealed to the Ninth Circuit, the Supreme Court considered an application for a stay pending appeal. On July 6, 2020, in a one-paragraph order, Justice Kagan ruled that the stay was granted in part and denied in part. *Army Corps of Engineers v. N. Plains Res. Council*, No. 19A1053, 2020 WL 3637662, at *1 (U.S. July 6, 2020). "The district court's May 11, 2020 order granting partial vacatur and an injunction is stayed, except as it applies to the Keystone XL pipeline, pending disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this stay shall terminate automatically. In the event the petition for a writ of certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court." *Id.*

When a proposed project involves the waters of the United States, applicants must comply with the Clean Water Act. 33 U.S.C. § 1344. Under Section 404 of the Clean Water Act, the Corps authorizes such projects through individual and general permits, including nationwide permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e). When the Corps issues or reissues a nationwide permit to authorize activities under Section 404 of the Clean Water Act, "it conducts national-scale cumulative impact assessment in accordance with the National Environmental Policy Act (NEPA) definition of 'cumulative impact.'" Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860, 1861 (Jan. 6, 2017). The Corps satisfies its NEPA obligation when it "finalizes the environmental assessment in its national decision document for the issuance or reissuance of an NWP." *Id.*

Under its general permitting authority, the Corps issued NWP 12, which allows for utility line construction in waters of the United States "provided the activity does not result in the loss of greater than 1/2 acre of [U.S. waters] for each single and complete project." (Compl., Dkt. 1, at 10) (citing 82 Fed. Reg. at 1,985). Some NWPs, like the one at issue in this case, require project proponents "to notify Corps district engineers of their proposed activities prior to conducting regulated activities, so that the district engineers can make case-specific determinations of NWP eligibility." 82 Fed. Reg. at 1,861. This Preconstruction Notification ("PCN") provides the district engineer with the opportunity to review a proposed activity to ensure that it qualifies for NWP authorization. *Id.* When a Corps district receives a PCN, the district engineer reviews it and determines "whether the proposed activity will result in no more than minimal individual and cumulative adverse environmental effects." *Id.*

2. Endangered Species Act

The core protection under the Endangered Species Act ("ESA") is Section 9. ESA § 9; 16 U.S.C. § 1538(a). Section 9 makes it illegal to "take" any member of an endangered species. *Id.* The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" means "an act which actually kills or injures wildlife," including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

However, the incidental taking of an endangered species is permitted under two exceptions embodied in Section 7 and Section 10 of the ESA, codified at 16 U.S.C. § 1536 and 16 U.S.C. § 1539, respectively. Under the Section 10 exception, private parties may apply for an incidental take permit after navigating a comparatively rigorous and time-consuming procedure. 16 U.S.C. § 1539. By contrast, the Section 7 exception provides a procedure through which federal agencies and certain "applicants" may obtain determinations in the form of incidental take statements through a consultation process between the federal action agency and the Service.

Under Section 7, a federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (citing 16 U.S.C. § 1536(a)(2)). Here, the relevant federal action agency is the Corps. Any activity authorized under a Clean Water Act NWP that may affect a listed species may not proceed "unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." 82 Fed. Reg. at 1,999. If the Corps determines that a proposed action may affect listed species or

5

critical habitat, it must initiate the formal consultation process with the appropriate wildlife agency—in this case, the Service. 50 C.F.R. § 402.14(a).

Formal consultation is a mandatory process for proposed projects that may adversely affect listed species or critical habitat. *See id.* The process is initiated in writing by the relevant federal agency (here, the Corps) and concludes with the issuance of a biological opinion by the Service. 16 U.S.C. § 1536(b)(3)(A). The biological opinion includes "[a] detailed discussion of the environmental baseline of the listed species and critical habitat; a detailed discussion of the effects of the action on listed species or critical habitat" and concludes with the Service's opinion as to whether the proposed action is likely "to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" as required under Section 7(a)(2). 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14(g)(4), (h). If the Service concludes that jeopardy or adverse modification is likely, "then any take resulting from the proposed action is subject to section 9 liability (unless that take is authorized by other provisions of the [ESA])." *Ctr. for Biological Diversity*, 698 F.3d at 1107.

In cases where the Service concludes that the project will *not* result in jeopardy or adverse modification, but also concludes that the proposed action is likely to result in the "incidental take" of an endangered species, the Service will provide an incidental take statement along with its biological opinion. *Id.* (citing 50 C.F.R. § 402.14(i)). The incidental take statement "[s]pecifies the impact, i.e., the amount or extent, of such incidental take on the species" and "those reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact." 50 C.F.R. § 402.14(i). Any taking of an endangered species in compliance with the terms and conditions of the incidental take statement is not a prohibited taking under the ESA and no other authorization or permit is required. 16 U.S.C. § 1536(h) and (o)(1); 50 C.F.R. § 402.14(i)(5). The Corps and the applicant must comply with the incidental take statement in its entirety if they wish to be insulated

from take liability under Section 9 of the ESA for takes incidental to the project. *See id.*; *Fath v. Texas Dep't of Transportation*, No. 1:16-CV-234-LY, 2016 WL 7442868, at *6 (W.D. Tex. Sept. 6, 2016).

## C. Kinder Morgan's Permitting Process for the Pipeline

Kinder Morgan opted to proceed under NWP 12 to construct the Pipeline at water crossings. For 330 of 449 water crossings along the route of the Pipeline, Kinder Morgan was able to proceed without notifying the Corps because those crossings did not trigger any of NWP 12's general conditions. (Mot. Prelim. Injunc., Dkt. 30, at 13) (citing 33 C.F.R. §§ 330.1(e)(1), 330.6(a)). The other 129 water crossings potentially jeopardized a listed species under the ESA, triggering NWP 12's General Condition 18[3] that prohibits any construction activity until the Corps issues a verification ensuring that the project complies with the ESA. 82 Fed. Reg. at 1999–2000.

For those 129 water crossings that might jeopardize an endangered species, Kinder Morgan submitted PCNs to the Corps. (*See* Corps Fort Worth District Verification, Dkt. 10-9, at 1; Corps Galveston District Verification, Dkt. 10-10, at 1). In response, the Corps notified the Service that Kinder Morgan would be seeking authorization of certain impacts to waters of the United States under NWP 12. (Biological Op., Dkt. 10-8, at 6). Pursuant to this process, the Corps provided the Service with a biological assessment for the Pipeline project that evaluated whether its authorization of the Pipeline might jeopardize the continued existence of those endangered species. (Biological Assessment, Dkt. 10-1). Because the Biological Assessment concluded that the Pipeline may adversely affect protected species, (*id.* at 7), the Corps initiated the formal consultation process with the Service, as required under Section 7, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). (Fed. Defs. Resp., Dkt. 29, at 18–19). The Service then conducted an analysis to determine whether the Pipeline was "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat." 16 U.S.C. § 1536(a)(2).

---

[3] NWP 12 is subject to 32 general conditions. 82 Fed. Reg. 1862, 1998–2005.

On February 3, 2020, the Service issued its Biological Opinion. *See*

16 U.S.C. § 1536(b)(3)(A). The Biological Opinion assessed the Pipeline's affect on five species: the

golden-cheeked warbler, Houston toad, Tobusch fishhook cactus, Austin blind salamander, and

Barton Springs salamander. (Biological Op., Dkt. 10-8, at 1). The Service determined that the action

area for the Pipeline "encompass[ed] the entirety of the project within the Corps' Fort Worth and

Galveston districts regulatory boundaries, and includes Project Workspaces, and the areas where

native impacts to listed species and their . . . habitat may occur." (*Id.* at 9–10) (hereinafter, "Action

Areas"). The Service also concluded that the Pipeline "may affect, and is likely to adversely affect

golden-cheeked warbler, Houston toad, and Tobusch fishhook cactus; and may affect, and is not

likely to adversely affect Austin blind salamander and Barton Springs salamander." (*Id.* at 1). There

are 64 Action Areas in the Fort Worth District and 30 in the Galveston District. (Biological

Assessment, Dkt. 10-1, at 90–94; Project Analysis Area Maps, Dkt. 10-2, 10-3, 10-4, at 1–22). The

Action Areas include the crossing and dredge and fill of the 129 water crossings in dispute in this

case: 86 waters in the Fort Worth District and 43 in the Galveston District. (Biological Assessment,

Dkt. 10-1, at 7).

As part of its Biological Opinion, the Service issued an incidental take statement outlining

"non-discretionary" reasonable and prudent measures "necessary and appropriate to minimize

incidental take of the golden-cheeked warbler and Houston toad." (Biological Op., Dkt. 10-8, at 54–

55); *see also* 50 C.F.R. § 402.14(i). Specifically, to be exempt from take liability under Section 9 of the

ESA, the Corps and Kinder Morgan "must comply" with several terms and conditions. (*Id.* at 55); *see*

*also* 50 C.F.R. § 402.14(i)(5) ("Any taking . . . which is in compliance with the terms and conditions

of [the incidental take statement] is not a prohibited taking under the [ESA].").  Failure to comply

with these terms and conditions "will result in loss of Section 9 take coverage for activities occurring

outside the Corps' jurisdiction, if not remedied within a reasonable period of time to the satisfaction

of the Service." (Biological Op., Dkt. 12-1, at 56; *id.* at 52 ("[T]he Applicant has a continuing duty to comply with the [terms and conditions of the incidental take statement], in order for the exemption in section 7(o)(2) to apply.")). The Service's Biological Opinion and Incidental Take Statement did not become effective unless and until the Corps issued all required Clean Water Act authorizations for the project. (Biological Op., Dkt. 10-8, at 52).

On February 13, 2020, the Corps' Fort Worth and Galveston Districts issued verification letters authorizing Kinder Morgan's proposed pipeline project. (Verifications, Dkt. 10-9; 10-10). The verification letters stated that the Corps had "determined the discharge of dredged or fill materials into waters of the United States associated with [the pipeline project] is authorized by Nationwide Permit 12 for Utility Line Activities," but conditioned this authorization upon compliance with the mandatory terms and conditions stated within the Biological Opinion and Incidental Take Statement. (Verifications, Dkt. 10-9, at 2; 10-10, at 2). The Corps "incorporated" the terms and conditions of the Biological Opinion into its verification letters and stated that "[f]ailure to comply with the terms and conditions [in the Biological Opinion] would constitute non-compliance with [the Corps] permit" and "invalidate[] the incidental take authorization." (*Id.*). Any take of listed species absent a valid permit "would constitute an unauthorized take" under Section 9 of the ESA. (*Id.*).

It is undisputed that the Corps adopted and incorporated the terms and conditions of the Biological Opinion and Incidental Take Statement into its Clean Water Act NWP 12 verifications for the Pipeline, added special conditions, and did not conduct a NEPA analysis. (*See generally* Fed. Defs. Resp., Dkt. 29, at 15–23) (arguing that the Corps was not required to conduct a NEPA analysis).

After the verifications were issued, Kinder Morgan proposed to make three "micro-adjustments" to the Pipeline's route—one in Gillespie County and two near Kyle, Texas.

(Addendum, Dkt. 10-15, at 2). In response, the Service reinitiated consultation with the Corps on February 27, 2020. (*Id.*). On May 4, 2020, the Service issued an Addendum to the Biological Opinion with additional terms and conditions. (Addendum, Dkt. 10-15).

### D. Kinder Morgan's Construction Activity

With the Corps' authorization in hand, Kinder Morgan began building the Pipeline in September 2019, and the Pipeline was seventy-two percent complete as of July 2020. (Kinder Morgan Resp., Dkt. 30, at 17). Kinder Morgan divided the Pipeline into five spreads: spread 1 is complete; spreads 2 and 3 were combined and are 65 percent complete; spread 4 is 58 percent complete; and spread 5 is 60 percent complete. (*Id.*). Trenching is 87 percent complete along the length of the Pipeline. (*Id.*). Kinder Morgan was slated to start work again in golden-cheeked warbler habitat at the beginning of August 2020. (*See* Hr'g. Transcript, Dkt. 42, at 11, 12) (Sierra Club counsel stating: "I'd also point out that one of the key issues in our view today in the imminent harms at issue is, starting as early as tomorrow, Permian Highway can go back into endangered-species habitat just a couple of miles upstream, or towards town, the town of Kyle, from Sierra Club's members' property and start permanently destroying endangered warbler habitat.").

### II. DISCUSSION

### A. Sierra Club's Standing

Kinder Morgan argues that Sierra Club lacks standing to bring this case.[4] According to Kinder Morgan, only one Sierra Club member, Heath Frantzen ("Frantzen"), has property or alleges use of property within an Action Area. (Kinder Morgan Resp., Dkt. 30, at 18). Kinder Morgan dismisses Frantzen's alleged harms to his property by arguing that none is redressable since construction on his property is complete. (*Id.* at 18–19). Kinder Morgan attacks Frantzen's other allegations as "generalized harm to the environment" and speculative. (*Id.* at 19). Kinder Morgan

---

[4] The Federal Defendants do not challenge Sierra Club's standing.

challenges the declarations from other Sierra Club members as alleging injuries that are not fairly traceable because their properties are not in or near the Action Areas. (*Id.*).

Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561(1992) (plaintiff bears the burden of establishing Article III standing). An association has standing to bring suit on behalf of its members when: (1) one or more of the organization's members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members.[5] *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). For a Sierra Club member to establish Article III standing, she must demonstrate: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action, and (3) redressable by a favorable outcome. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). If a plaintiff fails to establish all three of these elements, she lacks standing to sue in federal court.

Sierra Club has submitted declarations from five members who "own property, operate businesses, obtain drinking and agricultural water, recreate, fish, hunt, observe wildlife, or use and enjoy waters and lands that have been or will be directly impacted by the construction and operation" of the Pipeline. (Reply, Dkt. 33, at 6; Frantzen Decl., Dkt. 10-11; Gates Decl., Dkt. 10-12; Watson Decl., Dkt. 10-14; Gallimore Decl., Dkt. 10-16; Pence Decl., Dkt. 10-17). There is no dispute that Sierra Club member Frantzen lives along the Pipeline route and the Pipeline cuts

---

[5] Kinder Morgan challenges only whether one of Sierra Club's members would otherwise have standing to sue in their own right; Kinder Morgan does not claim that Sierra Club is not seeking to protect interests germane to its purpose or that Sierra Club's claim and requested relief requires the participation of individual members. (*See* Kinder Morgan Resp., Dkt. 30, at 10–12).

through his 260 acres. (Frantzen Decl., Dkt. 10-11, at 2). Frantzen uses his land to, among other activities, run a hunting ranch, observe wildlife, fish, recreate, and source water, and he has concrete plans to continue those activities. (*Id.* at 2–4). These facts are sufficient to show an actual or imminent injury in fact as part of the standing analysis.[6] *See Hollingsworth v. Vilsack*, 366 F. Supp. 3d 766, 774–75 (W.D. La. 2018) ("[C]ourts have held that plaintiffs who participate in outdoor activities such as hunting may have standing to assert NEPA claims.") (citing *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 59, 66 (D.C. Cir. 2016) (finding Sierra Club member who fished, boated, and seasonally duck hunted had standing to sue the Federal Energy Regulatory Commission under NEPA); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 983, 988 (8th Cir. 2011) (finding hunting club that engaged in activities such as duck, deer, and turkey hunting had standing to sue the U.S. Army Corps of Engineers under NEPA).

Sierra Club also has established that its members' injuries are fairly traceable to the Corps' challenged action and redressable by a favorable outcome. *See Paxton*, 943 F.3d at 1002. Kinder Morgan argues that Frantzen's injuries are not redressable because construction on his property is complete. (Kinder Morgan Resp., Dkt. 30, at 18–19). But Frantzen voices other concerns such as contamination and migration of pollution into groundwater he relies on, (Decl., Dkt. 10-11, at 3–4), and Belinda Kay Pence worries that clearing, construction, and operation of the Pipeline will diminish her use and enjoyment of her home and time spent outdoors because of pollution, possible leaks, destruction of habitat, and the permanent maintenance of the Pipeline easement, (Decl., Dkt. 10-17, at 2–3). Sierra Club members' concerns show that their injuries are fairly traceable to the Pipeline. *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, No. CV H-11-3063, 2012 WL 13040281, at *10 (S.D. Tex. Aug. 22, 2012) (finding standing based on two Sierra Club members who enjoyed

---

[6] Sierra Club also submitted an expert declaration from a biogeochemist who identified imminent and reasonably certain risks to the interests of Sierra Club members stemming from the Pipeline. (Blair Decl., Dkt. 10-13; Reply, Dkt. 33, 6–7).

the outdoors near a dam that was the subject of the suit and feared flooding of that area). Finally, as Sierra Club argues, if this Court enjoins the verifications until the Corps conducts a NEPA analysis, then there is a reasonable possibility those harms could be redressed or mitigated. (*See* Reply, Dkt. 33, at 7). Accordingly, the Court finds that Sierra Club has standing to sue on behalf of its members.

## B. Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) (in deciding whether to grant injunctive relief in a NEPA case, "a court must determine that an injunction should issue under the traditional four-factor test . . . ."). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## C. Preliminary Injunction Analysis

In applying this framework, the Court reaches only the issue of whether Sierra Club has met its burden of showing irreparable harm. Sierra Club contends that they have adequately established irreparable harm by demonstrating (1) the Corps' NEPA violation and lack of public participation in its process; (2) irreparable harm to the environment in constructing the Pipeline and maintaining the right-of-way; (3) additional, permanent impacts to the environment that have not been subject to NEPA review; (4) irreparable harm to Sierra Club members' property, business, recreational,

aesthetic, and environmental interests; and (5) the impacts on endangered species and their habitat. (Mot. Prelim. Injunc., Dkt. 10, at 22–35).

In response, the Federal Defendants argue that (1) Sierra Club waited too long to file their preliminary injunction; (2) a procedural violation of NEPA is not sufficient to establish irreparable injury; and (3) the other alleged harms to Sierra Club members are not sufficient to support an injunction. (Fed. Defs. Resp., Dkt. 29, at 33–42). Kinder Morgan challenges Sierra Club's attempt to show irreparable harm by arguing that (1) the alleged procedural injuries do not alone constitute irreparable harm; (2) Sierra Club members allege harms related to events that have already occurred; (3) Sierra Club's alleged harms pertaining to water contamination are speculative; and (4) Sierra Club's other allegations of harm are speculative, temporary, and do not withstand scrutiny. (Kinder Morgan Resp., Dkt. 30, at 20–37).

The Court first dispenses with the Federal Defendants and Kinder Morgan's argument that Sierra Club's delay in filing its motion for preliminary injunction weighs against a finding of irreparable harm. (Fed. Defs. Resp., Dkt. 29, at 33–35; Kinder Morgan Resp., Dkt. 30, at 21-23). Sierra Club filed its case on April 30, 2020, (Compl., Dkt. 1), and filed its Motion for Preliminary Injunction about seven weeks later on June 19, 2020, (Mot. Prelim. Injunc., Dkt. 10), which was approximately four months after the Corps issued its verifications. While it is true that a delay may undermine a party's argument that, absent an injunction, irreparable harm will result, courts in the Fifth Circuit have accepted delays of several months and more. *See, e.g.*, *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698–99 (N.D. Tex. 2015) (finding that an eight-month delay did not impact irreparable harm when the plaintiff was investigating the claims in good faith). Moreover, Sierra Club presents several arguments about how their delay did not prejudice the Federal Defendants and how their delay was justified, including that Sierra Club needed time to try to collect

14

information from the government[7] and to evaluate their claims after the Corps issued its

verifications in February 2020, all while managing the disruptions caused by the COVID-19

pandemic.[8] (Reply, Dkt. 33, at 20–22; Hr'g. Transcript, Dkt. 42, at 22–23). The Court finds that

Sierra Club proceeded diligently and rejects the Federal Defendants and Kinder Morgan's argument

that Sierra Club's delay negates its fear of irreparable harm.

Moving to the substance of Sierra Club's showing of irreparable harm, the Court examines

whether the Corps' alleged NEPA violation constitutes continuing irreparable harm. Sierra Club

impliedly concedes that a procedural violation of NEPA, by itself, is not sufficient to establish

irreparable injury but argues that "the procedural injuries from the Corps' violations of the law

coupled with the particularized, permanent harms to Sierra Club members' use and enjoyment of

their own property and the lands and waters in the vicinity of the pipeline *are* sufficient to establish

irreparable harm." (Reply, Dkt. 33, at 15) (citing *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d

669 (5th Cir. 1992); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998)). The Court

therefore assumes a NEPA procedural injury without deciding whether such an injury, standing

alone, could constitute irreparable harm, and turns to the additional harms claimed by Sierra Club on

behalf of its members to determine if those are reasonably certain to occur imminently.

According to Sierra Club, its members have property, business, recreational, aesthetic, and

environmental interests that are irreparably harmed and will be irreparably harmed by the Corps'

implementation of the Biological Opinion and Incidental Take Statement's terms and conditions.

(Mot. Prelim. Injunc., Dkt. 10, at 30). Sierra Club relies on the allegations of five Sierra Club

---

[7] Sierra Club contends the government still has not complied with or responded to its requests for
information. (Hr'g. Transcript, Dkt. 42, at 23).

[8] For example, Sierra Club explains that it requested information from the government in January 2020 and
then agreed to extend the government's response deadline when the government reached out in March 2020
to explain that "[g]iven the Covid-19 crisis, our office is teleworking, but experiencing technical difficulties
connecting with our own resources and with the public." (Email from the Corps to Sierra Club, Dkt. 33-4).

members,[9] especially Heath Frantzen, who provided declarations regarding their concerns about the Pipeline. (*Id.* at 30–32). Frantzen lives in Fredericksburg, Texas, where he has lived his entire life on 260 acres of land owned by his family for three generations. (Frantzen Decl., Dkt. 10-11, at 1– 2). He operates a "trophy deer hunting ranch," and people visit his property to observe wildlife, fish and recreate on the Pedernales River, and "experience the unique beauty that is the Hill Country." (*Id.*). Frantzen was not able to open his land for hunting this year because of the Pipeline, and he is concerned about the impact of clearing and construction activities to (1) endangered species on his property like the golden-cheeked warbler,[10] (2) his topsoil and trees, and (3) his well water supply and the water quality of the Pedernales River. (*Id.* at 3–4). Frantzen worries that an accident or leak could happen like the "drilling accident in Blanco County that ruptured the karst and impacted wells there." (*Id.* at 4). The other Sierra Club members live near the Pipeline or its route and express similar concerns about the Pipeline's effect on their livelihoods, the wildlife and trees, their recreational activities, and their water supplies, as well as its potential effect on real estate values. (Gates Decl., Dkt. 10-12; Watson Decl., Dkt. 10-14; Gallimore Decl., Dkt. 10-16; Pence Decl., Dkt. 10-17).

Sierra Club fails to meet its burden to show irreparable harm based on its members' alleged harms. To begin, Sierra Club's members allege harms that already have occurred and cannot form the basis of injunctive relief. As described by Michael Crow, Vice President at SWCA Environmental Consultants, Inc., who prepared the PCNs and the draft Biological Assessment for the Pipeline: "[p]otential warbler habitat that existed in the right-of-way on Mr. Frantzen's property has been cleared and the water crossing subject to Corps jurisdiction has been completed. The

---

[9] Heath Frantzen, (Decl., Dkt. 10-11), Susan Gates, (Decl., Dkt. 10-12), John Watson, (Decl., Dkt. 10-14), Lynn Gallimore, (Decl., Dkt. 10-16), and Belinda Kay Pence, (Decl., Dkt. 10-17).
[10] Frantzen states that his property is a designated golden-cheeked warbler habitat and that he and his visitors regularly look for the species. (Frantzen Decl., Dkt. 10-11, at 3).

Pipeline has been installed, the trench backfilled, and the surface reseeded." (Crow Decl., Dkt. 30-2, at 3). At the Court's hearing on its Motion for Preliminary Injunction, Sierra Club acknowledged that clearing and construction on Frantzen's property is complete. (Hr'g. Transcript, Dkt. 42, at 14). In fact, clearing is 98 percent complete along the entire Pipeline route, and none of Sierra Club's members lives near the "remaining discrete areas associated with proposals to adjust the route" where there may be additional clearing and trenching activity. (Kinder Morgan Resp., Dkt. 30, at 23) (citing Mody Decl.,[11] Dkt. 30-1, at 2; Crow Decl., Dkt. 30-2, at 3–4). Injunctions are forward-looking remedies that may issue "only if *future* injury is 'certainly impending.'" *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014) (emphasis added). The Court cannot remedy any harm that resulted from Kinder Morgan's past clearing and construction activities by enjoining Kinder Morgan's future clearing and construction activities.

The Federal Defendants and Kinder Morgan attack the remaining alleged harms to Sierra Club members as speculative: possibilities that may occur, but Sierra Club has not shown they are likely to occur or that they would be irreparable. (Fed. Defs. Resp., Dkt. 29, at 39; Kinder Morgan Resp., Dkt. 30, at 28–29). In their briefing and at the preliminary injunction hearing, Sierra Club and Kinder Morgan extensively discussed Kinder Morgan's attempt to cross underneath the Blanco River in March 2020 using horizontal directional drilling. (*See, e.g.*, Mot. Prelim. Injunc., Dkt. 10, at 35–36; Kinder Morgan Resp., Dkt. 30, at 30–33; Hr'g. Transcript, Dkt. 42, at 37–38). Kinder Morgan admits that there was an "incident" when Kinder Morgan used horizontal directional drilling at the Blanco River water crossing and "lost drilling fluid when they encountered an unknown and unidentified void feature."[12] (Kinder Morgan Resp., Dkt. 30, at 30). Kinder Morgan

---

[11] Sital Mody is the president of the Midstream Group of Kinder Morgan and president of Permian Highway Pipeline, LLC. (Mody Decl., Dkt. 30-1, at 1).

[12] According to Kinder Morgan, the drilling fluid is composed of water, bentonite, a "naturally occurring clay material," silica, and very small amounts of acrylamide homopolymer and sodium carbonate, (*id.* at 31), and will not cause irreparable harm to water resources, (*id.* at 32).

concedes that drilling fluid impacted the wells of nearby residents and that it "has worked with residents who've had impacted wells in order to address their concerns and provide water." (Hr'g. Transcript, Dkt. 42, at 37). Kinder Morgan is now pursuing a different route for that Blanco River water crossing. (*Id.* at 37–38).

At the hearing, Sierra Club alleged that Kinder Morgan is attempting to cross the Pedernales River using horizontal directional drilling, "which is directly upstream from two of the Sierra Club's members' property." (Hr'g. Transcript, Dkt. 42, at 11). Sierra Club argued: "[I]n light of [Kinder Morgan]'s acknowledged spill of drilling fluid in another river crossing along the project, there is indeed a reasonable fear, a reasonable concern that such a spill across the Pedernales [River] would likewise impact downstream property interests and drinking water resources [of] Sierra Club's members." (*Id.*). Kinder Morgan responded that the Pedernales River crossing was not relevant to the case because that crossing is outside the Corps' jurisdiction, (*id.* at 18), and the work there is mostly complete with no drilling fluid loss, (*id.*, at 38–39).

Following the hearing, Sierra Club filed an opposed motion for leave to file supplemental declarations, urging the Court to consider two supplemental declarations as evidence to refute Kinder Morgan's assertion at the hearing, as portrayed by Sierra Club, that there have been no drilling incidents at the Pedernales River water crossing. (Dkt. 40, at 2). The first declaration is from Owen Parker ("Parker") who lives in Fredericksburg, Texas next to the Pedernales River and who listened to the Court's preliminary injunction hearing on July 31, 2020. (Parker Decl., Dkt. 40-1, at 1–2). Parker states that Kinder Morgan, in direct contradiction to its claims at the hearing, has spilled drilling fluid during its construction activities at the Pedernales River crossing, including on July 25 when Kinder Morgan "was attempting to drill a tunnel under the Pedernales River [and] a significant amount—approximately 90 gallons—of drilling fluid and possibly ground water was forced to the surface of our property and spewed out of the ground." (*Id.* at 2). He continues that

within five minutes "a separate flow of this fluid sprang up." (*Id.*). Mr. Parker attaches photos to his declaration showing murky water in glass jars and pooled on the ground and a work crew attempting to clean up the leak on his property. (*Id.* at 2, 4–7). Based on this event and the drilling fluid leak at the Blanco River, he believes "there is an imminent risk of additional leaks, drilling fluid spills on my property, and impacts to ground water if [Kinder Morgan] is allowed to continue [its work]." (*Id.* at 3).

The second declaration is another declaration from John Watson ("Watson"). (Dkt. 40-2). Watson lives in Johnson County, Texas along the Pedernales River and downstream from the Pedernales River water crossing. (Watson Suppl. Decl., Dkt. 40-2, at 1). Watson also listened to the July 31, 2020 hearing. (*Id.* at 1–2). He states that it is his understanding based on personal observations and news stories that there was a drilling fluid leak at the Pedernales River water crossing. (*Id.* at 2). He claims that Kinder Morgan "admitted that 'ponding or drilling fluids' occurred in the area." (*Id.*). He expresses his concern about additional leaks and the harms those leaks would cause to his "enjoyment of the river, habitat, and species" in and around the Pedernales River. (*Id.* at 3).

Kinder Morgan filed a response in opposition, (Dkt. 41), arguing that (1) its representations at the hearing were accurate; (2) the "three small inadvertent returns that occurred on July 25 at the Pedernales [horizontal directional drilling] site . . . are not like the Blanco River [horizontal directional drilling] incident;" (3) the returns are a "fairly normal occurrence;" (4) Kinder Morgan's drilling contractor "acted quickly to pause the operation [and] immediately contain and recover all 90 gallons of drilling fluid;" (5) Sierra Club's motion is untimely; and (6) the Pedernales River water crossing allegations are not relevant because the Corps does not have jurisdiction over the use of horizontal directional drilling to cross under the Pedernales River. (*Id.* at 2–5). To support its factual claims, Kinder Morgan submits another declaration from Derek Brammer, (Dkt. 41-1), a senior

project manager for Kinder Morgan, and a letter (and its attachments) from David Lamb, (Dkt. 41-2), who is employed by Permian Highway Pipeline, to Brandon Mobley at the Corps regarding the "inadvertent return" on July 25, 2020. Sierra Club filed a reply in support of its motion on August 6, 2020. (Dkt. 43).

The Court will grant Sierra Club's motion for leave to supplement its motion for preliminary injunction. While Sierra Club arguably could have possessed this information and submitted it before the hearing, Sierra Club explains that it submitted it specifically to refute Kinder Morgan's claims during the hearing about the work being done at the Pedernales water crossing. Moreover, there is little or no prejudicial impact to Kinder Morgan because Kinder Morgan filed an opposition and, along with its opposition, filed its own supplementary declaration and a letter with attachments. Coupled with the fact that Sierra Club filed the supplement soon after the hearing and that it pertains to ongoing work being done at a Pipeline water crossing, the Court, in its discretion, will consider the parties' additional filings—(Sierra Club Mot. Leave, Dkt. 40; Kinder Morgan Resp., Dkt. 41; Sierra Club Reply, Dkt. 43)—in making its determination.

Even with the additional evidence of the incident at the Pedernales River water crossing, the Court finds that Sierra Club fails to meet its irreparable harm burden. Sierra Club relies on the Blanco River and Pedernales River incidents to shore up their allegations of imminent irreparable harm. For example, Parker states he is "especially concerned that another spill, similar to the one Kinder Morgan caused on the Blanco River, would occur on or near our property and contaminate our drinking water." (Parker Decl., Dkt. 40-1, at 1–2). Kinder Morgan admits that drilling fluids were released when it attempted to drill at the Blanco River and that those fluids impacted nearby wells. (Parker Decl., Dkt. 40-1, at 1–3). Kinder Morgan also admits that drilling fluids were released at the Pedernales River crossing, although it argues that the fluid leak there was minor, is a somewhat common occurrence, and did not compare to the Blanco River incident. (Resp. Mot.

Supp., Dkt. 41, at 3–4). Regardless, Sierra Club makes a series of assumptions from there: that a similar drilling accident is likely to happen again at a water crossing, that drilling fluid will be released, that drilling fluid will cause harm, and that the harm will be irreparable.

Sierra Club's position tends towards speculation that cannot form the basis of a showing of irreparable harm. "[S]peculation built upon further speculation does not amount to a 'reasonably certain threat of imminent harm'" and does not warrant injunctive relief. *Friends of Lydia Ann Channel v. United States Army Corps of Engineers*, 701 F. App'x 352, 357 (5th Cir. 2017) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "[B]ecause 'the court must decide whether the harm will *in fact* occur,' a party seeking injunctive relief must 'substantiate the claim of irreparable injury' and 'must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Sierra Club misses the mark on showing a threat of imminent harm because, even if continued horizontal directional drilling is certain, (Hr'g. Transcript, Dkt. 42, at 38–39) (Kinder Morgan's counsel noting that horizontal directional drilling continues), and even though Kinder Morgan admitted that "even the most thorough review couldn't identify every single possible void," (*id.*), Sierra Club has not shown that any harm resulting from future horizontal directional drilling is likely. Sierra Club's members focus mostly on the threat they perceive to water at or near Pipeline water crossings from horizontal directional drilling. Although Sierra Club's concerns are genuine and the Court finds they are credible, the Court finds that the degree of speculation combined with the ambiguity of Sierra Club's alleged harm approaches a showing of irreparable harm but falls just shy of it. Furthermore, the Biological Assessment sets out horizontal directional drilling mitigation measures, (Void Response and Mitigation Measures, Dkt. 10-4, at 24–30), that were incorporated

into the Biological Opinion, (Biological Op., Dkt. 10-8, at 11), that address what Kinder Morgan

should do if a drilling fluid leak occurs, (Void Response and Mitigation Measures, Dkt. 10-4, at 29).

Kinder Morgan claims it followed its "elaborate plans in place" after the Blanco River drilling

accident to address "that situation," and Sierra Club has not argued otherwise. (Hr'g. Transcript,

Dkt. 42, at 37).

Almost all of Sierra Club's other allegations of harm from the construction and operation of

the Pipeline and from the implementation of the Incidental Take Statement's terms and conditions

to animals, trees, vegetation, and soil also already have occurred. (*See* Reply, Dkt. 33, at 14, 16–19).

Sierra Club focuses on the alleged irreparable harm to endangered species and contends that in the

context of NEPA litigation a showing of harm to a species as a whole is not required for an

injunction. (Mot. Prelim. Injunc., Dkt. 10, at 33 n.14). In a footnote in its brief, Kinder Morgan

identifies the issue as a question of first impression in the Fifth Circuit. (Kinder Morgan Resp., Dkt.

30, at 26 n.16). Since the parties did not fully brief which standard applies, the Court declines to

decide which standard is appropriate.

Nonetheless, even under the less stringent standard, Sierra Club has not shown irreparable

harm to the Houston toad, Tobusch fishhook cactus, Barton Springs salamander, Austin blind

salamander, or golden-cheeked warbler. The clearing activities are complete in the habitats of the

Houston toad, Tobusch fishhook cactus, and golden-cheeked warbler, except for the three micro-

adjustments and "areas associated with a potential route change to avoid two crossings of the Blanco

River" that could impact golden-cheeked warbler habitat. (Kinder Morgan Resp., Dkt. 30, at 26–27).

Per the Biological Opinion and Incidental Take Statement, those remaining areas will be cleared

after the golden-cheeked warblers have left their breeding grounds. (Biological Op., Dkt. 10-8, at 12,

37, 55). The impact on golden-cheeked warbler habitat is mostly temporary[13]—Kinder Morgan will complete clearing activities before the next golden-cheeked warbler breeding season—and any permanent harm to their habitat is offset by Kinder Morgan's mitigation activities, including Kinder Morgan's purchase of 1,363 acres of habitat for golden-cheeked warblers, land that was transferred to the Service to be protected in perpetuity as part of the Balcones Wildlife Refuge, (Kinder Morgan Resp., Dkt. 30, at 27, n.19; Biological Op., Dkt. 10-8, at 11–12), and Kinder Morgan's work to prevent oak wilt which can destroy golden-cheeked warbler habitat, (*id.* at 12). *But see City of Austin v. Kinder Morgan Texas Pipeline, LLC*, No. 1:20-CV-138-RP, 2020 WL 1324071, at *6 (W.D. Tex. Mar. 19, 2020) (cataloging Kinder Morgan's admitted failures to prevent oak wilt along the same Pipeline). Therefore, to the extent that clearing and trenching activities continue—and under the assumption that Kinder Morgan complies with the mandatory terms and conditions of the Biological Opinion and Incidental Take Statement—the impact on endangered species is likely temporary and not irreparable. *Sierra Club*, 990 F. Supp. 2d at 39 ("Plaintiffs' sound and fury regarding the land that must be cleared and the wetlands that may be altered does not signify that any of these environmental effects will be permanent or irreversible, as the preliminary injunction standard requires.").

Perhaps foremost among Sierra Club's alleged harms are the permanent fixtures of the Pipeline: dredge and fill in the water, (Reply, Dkt. 33, at 17), the maintenance of the "50-ft permanent easement" for the Pipeline, (Mot. Prelim. Injunc., Dkt. 10-8, at 25), the "permanent disturbance" of approximately 2,600 acres for the right-of-way, (*id.*), and the permanent disturbance of approximately 175 acres caused by ancillary facilities, (*id.*). Unlike Sierra Club's other alleged harms, the easement and permanent disturbances are ongoing allegations of harm that do not suffer

---

[13] The Service concluded that "initial impacts due to habitat removal and construction are expected to last less than a year and will affect [golden-cheeked warblers] in adjacent habitat for one breeding season." (Biological Op., Dkt. 10-8, at 37).

from the same temporal trap of being either in the past (not redressable by injunctive relief) or in the future (too speculative) as its other allegations of harm. Kinder Morgan responds that the permanent impacts are too small to justify an injunction. (Kinder Morgan Resp., Dkt. 30, at 19, 29). The Court agrees but only to the extent those alleged harms are considered in conjunction with the mitigation requirements set out in the Biological Opinion.

Sierra Club has not shown that the impact of the permanent fixtures is more than minimal or that those alleged harms are not offset by the conservation measures undertaken by Kinder Morgan at the direction of the Corps. The Court already outlined the portions of the mitigation plan that reduce the impact to golden-cheeked warblers and their habitat. The Biological Opinion also notes that Kinder Morgan's "void mitigation and water quality measures avoid and minimize potential for contaminants and sediments to enter and degrade water quality." (Biological Op., Dkt. 10-8, at 3). In light of these mitigation measures, the Biological Opinion concluded that "[p]otential harm to salamanders at locations geographically removed from the proposed project due to degradation of habitat in the form of reduced water quality resulting from operation and maintenance activities is expected to be discountable (i.e. extremely unlikely to occur)." (*Id.* at 4). Harm that is "extremely unlikely to occur" is not a "definitive threat of future harm" warranting a preliminary injunction. (*Id.*); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018).

While Sierra Club has not shown irreparable harm at this juncture, the Court acknowledges that Sierra Club's allegations come close and that Sierra Club has marshaled a great deal of evidence that demonstrates harm to the environment. The Court makes its determination pursuant to a legal framework that discounts much of Sierra Club's harm allegations to the point that it becomes an almost insurmountable hurdle to obtain injunctive relief, even when Kinder Morgan has admittedly drilled into a void in the karst, leaked drilling fluid and impacted the drinking water wells of nearby

residents, and intends to continue to use horizontal directional drilling at water crossings. Unfortunately, granting an injunction at this stage of the Pipeline's completion would not "unring the bell," *Leatt Corp. v. Innovative Safety Tech.*, LLC, No. 09-CV-1301-IEG(POR), 2010 WL 1526382, at *10 (S.D. Cal. Apr. 15, 2010), and Sierra Club has failed to establish a definitive threat of future harm.

### III. CONCLUSION

For these reasons, **IT IS ORDERED** that Sierra Club's Motion for Preliminary Injunction, (Dkt. 10), is **DENIED**.

**IT IS FURTHER ORDERED** that Sierra Club's Motion for Leave to File Supplemental Declarations, (Dkt. 40), is **GRANTED**.

**SIGNED** on August 28, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE