**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **SIERRA CLUB,**<br><br>        **Plaintiff,**<br><br>        v.<br><br>**UNITED STATES ARMY CORPS OF ENGINEERS; Lieutenant General Todd T. Semonite (in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers); Colonel Kenneth N. Reed (in his official capacity as District Commander of the U.S. Army Corps of Engineers Fort Worth District); Colonel Timothy R. Vail(in his official capacity as District Commander of the U.S. Army Corps of Engineers Galveston District); Brandon W. Mobley (in his official capacity as Chief, Regulatory Division, U.S. Army Corps of Engineers); and Kristi McMillan (in her official capacity as Leader, Central Evaluation Unit, U.S. Army Corps of Engineers).**<br><br>        **Defendants.** | **CIVIL ACTION NO. 1:20-CV-460** |

**AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Sierra Club submits this Amended Complaint under Federal Rule of Civil Procedure 15(a)(1)(B). For the convenience of the court and the parties Sierra Club states that this is substantially the same as the original complaint except for updating and amending the introductory and background allegations (specifically, paragraphs 2-6, 33, 40-43, and 75), the First Claim for relief (specifically, paragraphs 79-83), and Prayer for Relief concerning Nationwide Permit 12 and its

application to the Permian Highway Pipeline; correcting the paragraph numbering and minor typographical errors; and responding to Defendants' affirmative defenses.

## NATURE OF THE CASE

1.      This is an action for declaratory and injunctive relief challenging the U.S. Army Corps of Engineers' (the "Corps" or "USACE") permitting the discharge of dredge and fill material into waters of the United States ("WOTUS") in the construction of the Permian Highway Pipeline (hereafter "the pipeline" or "PHP"), a proposed natural gas pipeline approximately 428.54 miles long from the Waha Interconnect in Reeves County, Texas, to the delivery point in Colorado County, Texas. Because the pipeline will cross a number of jurisdictional waters of the United States, and discharge dredge and fill material into them, it is proceeding pursuant to "verifications" the Corps issued under Nationwide Permit 12 ("NWP 12").

2.      On April 15, 2020, however, the United States District Court for Montana concluded that the Corps' failure to consult with the U.S. Fish and Wildlife Service (the "Service" or "FWS") under Endangered Species Act ("ESA") section 7 prior to issuing NWP 12 was arbitrary, capricious, and unlawful. *Northern Plains Resource Council et. al. v. U.S. Army Corps of Engineers*, No. 19-44-GF-BMM, 2020 WL 1875455 (D. Mont. April 15, 2020) ("*Northern Plains*"). Because the Keystone XL pipeline had relied on NWP 12 for authorization to conduct dredge and fill activities in waters of the United States, the District of Montana enjoined any further dredge and fill activity on that pipeline pending completion of the Section 7 consultation process.

3.      This Court should likewise enjoin the Corps' authorization of any dredge or fill activity in connection with the Permian Highway Pipeline under NWP 12 pending completion of the consultation process for NWP 12 and the Corps' compliance with all environmental statutes and regulations.

4.      The Corps' issuance of the NWP 12 verifications for the PHP also violated the

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and applicable regulations.

Specifically, the Corps failed to prepare an environmental impact statement or environmental

assessment for its adoption and incorporation of the Terms and Conditions of the Service's

February 3, 2020 biological opinion and incidental take statement into the verifications, which

constitutes a "major federal action" that requires NEPA analysis. *Sierra Club v. U.S. Army Corps of

Engineers*, 803 F.3d 31, 45-47 (D.C. Cir. 2015); 40 C.F.R. § 1508.18. The Corps' violation of NEPA

means it failed to take the required "hard look" at the environmental impacts of its implementation

of the terms and conditions through the verifications and did not consider their direct, indirect and

cumulative impacts on the jurisdictional waters or the Corps Action Areas.

5.      Additionally, under the Service's regulations, "reinitiation of consultation is required

and shall be requested by the Federal agency or by the Service," where "new information reveals

effects of the action that may affect listed species . . . in a manner or to an extent not previously

considered." 50 C.F.R. § 402.16. The Corps has not, however, reinitiated consultation on the

verifications in light of the District of Montana's holding that the Corps' issuance of NWP 12 was

arbitrary, capricious, and unlawful.

6.      The Corps' actions as set forth herein, including but not limited to the agency's

finding that the issuance of NWP 12 would have "no effect" on endangered species and its failure to

engage in Section 7 consultation for the NWP program, and its resulting approval and verification of

the Permian Highway's water crossings under NWP 12, were arbitrary and capricious, an abuse of

discretion or not in accordance with law contrary to the Administrative Procedure Act ("APA"), 5

U.S.C. §706(2)(A). The Corps' actions also constitute agency action unlawfully withheld or

unreasonably delayed contrary to the APA, 5 U.S.C. §706(1). Plaintiffs request that the Corps

verifications be vacated, and the court issue an injunction halting the PHP's dredge and fill of WOTUS, unless and until the Corps issues a valid permit for this activity.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1331 (questions of federal law); 28 U.S.C. § 1346 (United States as a defendant); and the APA, 5 U.S.C. §§ 701-06. The relief requested is authorized under 28 U.S.C. §§ 2201 (declaratory judgment), 2202, and 1361 (action to compel an officer of the United States); and 5 U.S.C. §§ 704–06.

8.      Venue is proper in this judicial district and in this Court under 28 U.S.C. § 1391(e)(1)(A) and (B). Defendants are a federal agency and officers who reside in this judicial district; a substantial part of the events or omissions giving rise to the claims occurred here; and a portion of the PHP and the Corps' jurisdictional waters and Corps' Action Areas at issue are in this district.

9.      This case is related to *City of Austin, et. al. v. Kinder Morgan Texas Pipeline,* LLC, W.D. Tex. no. 1:20-cv-138-RP pending before this court, which involves claims concerning Nationwide Permit 12, the Service's biological opinion and NEPA.

## PARTIES

### PLAINTIFF:

10.      Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grassroots environmental organization. Sierra Club is incorporated in California, and has its headquarters in Oakland, California. It has more than 784,000 members nationwide, including more than 27,000 members in Texas in its Lone Star Chapter. Sierra Club is dedicated to the protection and preservation of the natural and human environment, including but not limited to wetlands, rivers, streams, forests and wildlife, including threatened and endangered species and their habitats. Sierra Club's mission is to explore, enjoy and protect the wild places of the earth; to practice and promote

4

the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

11.     Sierra Club has members in Texas whose real property, recreational, aesthetic, business, and/or environmental interests have been, are being, and will be adversely affected by the Defendants' actions as set forth herein. Sierra Club brings this action on behalf of itself and its members.

12.     Sierra Club and its members monitor the use of waters of the United States and compliance with the law respecting these water bodies, educate their members and the public concerning the management of these water bodies, and advocate policies and practices that protect the natural value of these water bodies.

13.     Sierra Club members will suffer concrete injury from the construction and operation of the PHP and its impacts on the Corps' jurisdictional waters and the USACE Action Areas without adequate environmental review or adequate opportunities for public notice and comment. Members of the Sierra Club use and enjoyment of jurisdictional waters and the USACE Action Areas described in the Corps' verification and the Service's biological opinion would be diminished by the PHP. Sierra Club members own property that will be crossed by the pipeline and will be subjected to the noise, air pollution, sediment runoff, clearing of vegetation and aesthetic damage attendant to the construction and heavy machinery. Sierra Club members also use the waterways and surrounding areas that stand to be filled and deforested by the construction and operation of the PHP for recreation and business purposes such as wildlife and bird viewing, fishing, hiking, and camping.

14.     The acts and omissions alleged here further harm Sierra Club's members' environmental, aesthetic, and welfare interest in using and enjoying the natural environment in areas adversely affected by the construction of the PHP. The construction of the PHP is causing harm to

lands, plant life, aquatic life, and natural ecosystems that Sierra Club members use and enjoy, thus harming their recreational and aesthetic interests.

15. Sierra Club and its members are and will be injured as a result of the Defendants' authorization of the Project without the preparation of the appropriate environmental analyses required by NEPA, thereby depriving Sierra Club and its members of procedural rights and protections to which they would otherwise be entitled. Sierra Club and its members regularly comment on NEPA documents and rely on information and data contained in these documents to plan their activities, to prepare and inform their participation concerning agency actions, and to disseminate the information to their members/citizens and the general public for their information and use. These activities are impaired when, as in this case, the Corps fails to prepare NEPA documents and give public notice and opportunity for participation as required.

16. Sierra Club members would attend public hearings, offer comments, and otherwise remain actively involved in any public review process for the PHP should Defendants offer one. The procedural and informational interests and organizational purposes of Sierra Club and its members are and will be directly injured by the Defendants' failure to comply with the statutes and regulations cited in this Complaint.

17. The Corps' failures also hamper Sierra Club's ability to perform certain programmatic functions essential to its mission, such as ensuring that federal agencies properly consider public health and environmental protections in issuing any final agency action, and educating the public about those impacts.

18. Sierra Club members use, enjoy, or depend on the water bodies affected by the Corps' NWP 12, as well as its verifications of the PHP, and rely on these for clean water, healthy forests and wetland ecosystems, presence of wildlife, and outdoor recreation and business activities

of various kinds, including nature study, photography, commercial guiding, bird-watching, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities.

19.     Sierra Club's and its members' protectable health, recreational, aesthetic, procedural, informational, and organizational interests have been and continue to be harmed by the Corps' failure to halt discharge of dredge and fill materials by the PHP; and its failure to fulfill its legal obligation to fully consider the environmental and public health impacts of PHP construction and dredge and fill activities in jurisdictional waters in the Corps' Action Area, as required by NEPA.

20.     If the Corps complied with the vacatur of NWP 12 and with NEPA, as the law requires, it would redress Sierra Club's members' injuries. The Corps would not be permitting the unlawful discharge of dredge and fill material into the jurisdictional waters. And Sierra Club members would be able to participate in any NEPA process. The agency would be required to consider and respond to Sierra Club's members' environmental, public health, and aesthetic concerns, including additional public health and environmental conditions on further construction or denying or rescinding the verifications.

21.     The Defendants' actions at issue in this case pose an imminent risk of harm and cause harm to Plaintiff's interests. Plaintiff has exhausted their administrative remedies or has no administrative remedies for the actions alleged. The actions challenged in this complaint are either final actions or actions unlawfully held subject to judicial review under the APA. An actual, justiciable controversy exists between Plaintiff and Defendants. Plaintiff has standing for the claims made herein; and Plaintiff has no adequate remedy at law.

**DEFENDANTS:**

22.     Defendant United States Army Corps of Engineers is the federal agency charged with administering permits under section 404 of the Clean Water Act for discharge of dredged or fill

material into the waters of the United States. The Corps is headquartered in Washington, D.C. The Corps has district offices throughout the country, including the Fort Worth and Galveston districts.

23.     Defendant Todd T. Semonite is Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers in Washington, D.C. and is designated to act for the Secretary of the Army. Plaintiff brings this action against him in his official capacity only. He is the federal officer personally responsible for compliance with any injunction related to the Corps that this Court issues.

24.     Defendant Kenneth N. Reed is the District Commander of the U.S. Army Corps of Engineers, Fort Worth District. Plaintiff brings this action against him in his official capacity only.

25.     Defendant Col. Timothy R. Vail is the District Commander of the U.S. Army Corps of Engineers, Galveston District. Plaintiff brings this action against him in his official capacity only.

26.     Defendant Brandon W. Mobley is the Chief, Regulatory Division for the Corps who signed the Fort Worth District NWP 12 verification for PHP at issue in this lawsuit. Plaintiff brings this action against him in his official capacity only.

27.     Defendant Kristi McMillan is the Leader, Central Evaluation Unit for the Corps who signed the Galveston District NWP 12 verification for PHP at issue in this lawsuit. Plaintiff brings this action against her in her official capacity only.

## STATUTORY AND REGULATORY FRAMEWORK

### The Clean Water Act and Nationwide Permit 12

28.     The Clean Water Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, section 404 of the Clean Water Act prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit. *Id.* § 1344.

29.     Section 404 of the Clean Water Act gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. 33 U.S.C. § 1344. The

Corps oversees the section 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency ("EPA"), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The underlying intent behind the guidelines, known as the 404(b)(1) guidelines and set forth at 40 C.F.R. Part 230 subparts B through J, is that dredged or fill material should not be discharged if it will result in an unacceptable impact on the aquatic ecosystem. 40 C.F.R. § 230.1(c).

30.    The guidelines provide that no discharge of dredged or fill material shall be permitted for an individual project: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge will cause or contribute to significant degradation of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10. The Corps' regulations also require that destruction of wetlands is to be avoided to the extent practicable. 33 C.F.R. § 320.4(r).

31.    When issuing an individual section 404 permit for a specific project, the Corps must comply with the requirements of NEPA, which are set forth below.

32.    An alternative to the individual 404 permit process is the nationwide permit program. Section 404(e) allows the Corps to, "issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

33.    One such nationwide permit is NWP 12, which authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities [including natural gas pipelines] in waters of the United States, provided the activity does not result in the loss

of greater than 1/2-acre of waters of the United States for each single and complete project." 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017). NWP 12 also authorizes discharges into waters of the United States for the construction of related substation facilities, access roads, and overhead utility lines, "provided the [related] activity, in combination with all other activities included in one single and complete project, does not result in the loss of greater than 1/2-acre of waters of the United States." *Id.* The Corps issued NWP 12 for the first time in 1977 and it has been reissued every five years since then, most recently in 2017. *Id.* at 1860, 1985-86.

34.     Permittees may proceed with activities authorized by NWP 12 without notifying the Corps. See 33 C.F.R. § 330.1(e)(1). However, under certain "general conditions," permittees must notify the Corps' district engineers of their project through submission of a preconstruction notification and await verification before the project may proceed under the NWP. *Id.* §§ 330.1(e)(1), 330.6(a).

35.     Under General Condition 18(c) to the Corp's nationwide permits, non-federal permittees or applicants must submit a preconstruction notification to the Corps district engineer if the activity "might affect" any listed species or designated critical habitat, and "shall not begin work" on the activity until notified by the district engineer that the requirements of the ESA have been satisfied. 82 Fed. Reg. at 1999-2000. The preconstruction notification "must include the name(s) of the endangered or threatened species that might be affected by the proposed activity or that utilize the designated critical habitat that might be affected," and the district engineer will then "determine whether the proposed activity 'may affect' or will have 'no effect' [on] listed species and designated critical habitat." 82 Fed. Reg. at 1999. If a "may effect" determination is made, the Corps will undertake Section 7 consultation with the FWS or National Marine Fisheries Service or both as appropriate.

### The Endangered Species Act and the Section 7 Consultation Process for NWP 12

36.     The Endangered Species Act requires federal agencies, through consultation with the Service, to "insure that any action authorized, funded, or carried out by the agency . . . is not likely to jeopardize the continued existence of" any listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). "Action" is defined to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02. An agency must initiate consultation with the Service whenever it takes an action that may affect a listed species, subject to limited exceptions. 50 C.F.R. § 402.14(a).

37.     The result of the interagency consultation process is a biological opinion that evaluates impacts to listed species to determine if the action is likely to jeopardize the species' existence or adversely modify critical habitat. If the conclusion of the opinion results in a determination of jeopardy or adverse modification, then the opinion identifies changes to the action to avoid these effects. 16 U.S.C. § 1536(b).

38.     If the Service concludes that an action is not likely to jeopardize listed species, the Service provides the action agency with a written statement, commonly known as an "incidental take statement" ("ITS"). *See* 16 U.S.C. § 1536 (b)(4)(i); 50 C.F.R. § 402.14(i). The ITS must specify "the impact of such incidental taking"; specify the "reasonable and prudent measures" that are "necessary or appropriate to minimize such impact"; and "terms and conditions" that the action agency must comply with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(i),(ii),(iv); 50 C.F.R. § 402.14(i)(1)(i),(ii),(iv).

39.     To comply with the ESA for NWP 12-authorized activities, the Corps applies NWP General Condition 18(a), which states that "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of

11

the proposed activity has been completed." 82 Fed. Reg. at 1999. Similarly, General Condition 32 provides that "the permittee cannot begin the activity until receiving written notification from the Corps that there is 'no effect' on listed species." *Id.* at 2003 (emphasis added).

40.     On July 1, 2019, several public-interest organizations, including Plaintiff, served notice of their intent to sue the Corps for violations of the ESA, 16 U.S.C. §§ 1531-44, in connection with the reissuance of NWP 12. The organizations subsequently filed suit in the District of Montana, alleging that the Corps' determination that the issuance of the NWP would have "no effect" on endangered species was arbitrary and capricious, and that the Corps unlawfully failed to initiate formal programmatic consultation regarding the effects of NWP 12 on terrestrial and aquatic species, in direct violation of the requirements of Section 7 of the ESA.

41.     In an April 15, 2020 decision, the U.S. District Court for Montana agreed with the public interest organizations, holding that the Corps had arbitrarily and unlawfully failed to consult with the U.S. Fish and Wildlife Service on the nationwide permit as required under ESA section 7 before issuing NWP 12. *See Northern Plains,* 2020 WL 1875455 at *7-8 (D. Mont. April 15, 2020). Accordingly, the district court enjoined any further dredge and fill activity necessary for the construction of the Keystone XL pipeline, which relied on NWP 12 to authorize the construction of the pipeline. *Id.*, *amended by,* 2020 WL 3638125 (May 11, 2020) (vacating NWP 12 for failure to comply with the ESA and remanding to the Corps for compliance).[1]

42.     Every Corps' decision reissuing NWP 12 (or a subsequent permit) without engaging in a programmatic consultation under Section 7 of the ESA has now been held invalid. *See Nat'l Wildlife Fed'n v. Brownlee*, 402 F.Supp.2d 1 (D.D.C. 2005) (invalidating the 2002 NWP 12 for failure to

_____

[1] The district court also vacated NWP 12 and issued a nationwide injunction on the Corps' use of NWP 12 pending the Corps' nationwide Section 7 consultation and reissuance of the NWP. The Ninth Circuit denied the Corps' motion for stay pending appeal and found the Corps had no likelihood of success on the merits and did not show irreparable harm. The U.S. Supreme Court subsequently limited the vacatur and injunction to the Keystone XL pipeline. The Corps' appeal to the Ninth Circuit of the Montana district court order is pending.

undertake a programmatic Section 7 consultation); *Northern Plains*, 2020 WL 1875455. Other courts

have struck down similar programmatic agency actions taken without first engaging in a

programmatic Section 7 consultation. *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th

Cir. 2011) (vacating BLM amendments to national grazing regulations for failure to engage in a

programmatic consultation).

43.     Here, the Service's biological opinion and accompanying incidental take statement

are not effective unless and until the Corps issues all required Clean Water Act authorizations for the

project. Biological Opinion at 52. The Corps' verifications and the associated biological opinion and

incidental take statement for the PHP are explicitly conditioned on compliance with the terms and

conditions of NWP 12. SWF-2018-00227 at 1-2 (Fort Worth District verification) and SWG-2018-

00737 at 1-2 (Galveston District verification); *see also* NWP 12 Final Decision Document at 65-66

(requiring compliance with NWP conditions and "the safeguards" discussed in the NWP "to ensure

that [any action] do[es] not violate the ESA").

44.     Because NWP 12 was arbitrary and capricious and issued in violation of the ESA, as

set forth in *Northern Plains*, the Corps' allowance of the Permian Highway's water crossings and its

verifications pursuant to NWP 12 are arbitrary and capricious and contrary to the ESA.

45.     Because the terms and conditions of the agency action now differ from the

assumptions underlying the biological opinion, the Corps must reinitiate consultation to ensure they

do not violate the ESA. *See* 50 C.F.R. § 402.16 ("reinitiation of consultation is required and shall be

requested by the Federal agency or by the Service," where "new information reveals effects of the

action that may affect listed species . . . in a manner or to an extent not previously considered.").

## The National Environmental Policy Act

46.     NEPA is our "basic national charter" for environmental protection. 40 C.F.R. §

1500.1. Among the statute's goals are to "insure that environmental information is available to

public officials and citizens before decisions are made and actions are taken"; and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* §§ 1500.1(b)-(c).

47.     To achieve these objectives, NEPA requires all agencies of the federal government to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). According to regulations promulgated by the Council on Environmental Quality, an agency created by Congress to implement NEPA, the term "major Federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Major federal actions include "actions approved by permit or other regulatory decision." 40 C.F.R. § 1508.18(b)(4). "Major reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18.

48.     The environmental impact statement must describe, among other things: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposal be implemented; and (3) alternatives to the proposed action. *Id.* § 4332(2)(C)(i)-(iii). The alternatives analysis is the heart of any environmental impacts statement and must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, including a no action alternative, and include appropriate mitigation measures to provide informed public participation and agency decision-making. 40 C.F.R. § 1502.14.

49.     To determine whether a proposed action significantly affects the environment, and whether an environmental impact statement is required, the federal agency may first prepare an environmental assessment. 40 C.F.R. § 1508.9 (2010). An environmental assessment must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* The agency must take a "hard look" at the relevant environmental concerns and alternatives to the proposed action.

50.     If the agency concludes in an environmental assessment that a project may have significant impacts on the environment, then an environmental impact statement must be prepared. 40 C.F.R. § 1501.4. To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species. 40 C.F.R. §§ 1508.27 (a), (b).

51.     If an environmental assessment concludes that there are no potentially significant impacts to the environment, the federal agency is not required to prepare an environmental impact statement but it must provide a detailed statement of reasons why the project's impacts are insignificant and issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.13. If the agency issues an environmental assessment and FONSI, it must make a convincing case for a finding of no significant impact on the environment.

52.     The Council on Environmental Quality regulations require a give and take between an agency and members of the public in the NEPA process. *See* 40 C.F.R. §§ 1500.1(b) (2010) ("public scrutiny [is] essential"), 1500.2(d) (2010) (the agency must "[e]ncourage and facilitate public involvement"), 1506.6 (2010) (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "solicit appropriate information from the public."). The regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to comment on, and address, the factors that the agency must consider in preparing an environmental assessment. *Id.* § 1501.4 (2010). When preparing an environmental impact statement, the agency must provide the public and affected persons or organizations with an opportunity to comment, and must assess, consider, and respond to those comments. 40 C.F.R §§ 1503.1, 1503.4 (2010).

15

53.     When the Corps incorporates the "terms and conditions" of a biological opinion and incidental take statement issued by the Service under ESA section 7 into its NWP 12 "verification" or "permit,", this constitutes a "major federal action" on which NEPA analysis (an EIS or EA) is required. *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d at 45-47; 40 C.F.R. § 1508.18.

54.     Although the Corps prepared a "Decision Document" as part of the nationwide permit process that purports to be a NEPA analysis for its nationwide permits, including NWP 12, it did not perform any NEPA analysis for the incorporation of terms and conditions of the PHP biological opinion and incidental take statement into its verification(s) for the PHP. As a result, it has not performed a NEPA analysis of the direct, indirect, and cumulative impacts associated with its implementation of the terms and conditions of the PHP biological opinion and incidental take statement, or taken the "hard look" at these impacts, which NEPA requires. *See* 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1508.7, 1508.25(c).

55.     In the Montana district court opinion vacating NWP 12, the court held it would be necessary for the Corps to supplement its Decision Document for NWP 12 after the new ESA section 7 consultation was completed, to take into account the new information that would come from such a consultation. *Northern Plains,* 2020 WL 1875455; and *see* 40 C.F.R. § 1502.9(b)(ii) (requiring supplemental environmental impact statements for "significant new circumstances or information"); *see also* 50 C.F.R. § 402.16 ("Reinitiation of consultation is required and shall be requested" where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered").

### The Administrative Procedure Act

56.     The Administrative Procedure Act, 5 U.S.C. §§ 701-06, provides for judicial review of agency actions such as those at issue here. A reviewing court shall hold unlawful and set aside any

agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

57.     The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "[A]gency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## STATEMENT OF FACTS

58.     The proposed Permian Highway Pipeline natural gas pipeline [the "pipeline," "project" or "PHP"] would be approximately 428.54 miles long and extend from the Waha Interconnect in Reeves County, Texas, to the delivery point in Colorado County, Texas. The pipeline consists of a 42-inch outer diameter natural gas pipeline to be constructed primarily by conventional trenching methods. Horizontal directional drilling or horizontal bore construction methods will be used under certain river crossings. The project will also require the construction and operation of a variety of ancillary facilities and sites associated with the pipeline. Bulldozers, track hoes, and conventional bore and directional drilling/boring equipment will be used. Construction began on the project in February or March, 2020 and is expected to take approximately one year to complete.

59.     The PHP will cross and involve the dredge and fill of numerous permanent and intermittent WOTUS. This includes causing the discharge of dredged or fill material into approximately 449 waters along the pipeline route. Hundreds of these can proceed under NWP 12 without notification to the Corps [hereinafter referred to as the "self-certification process"].

60.     Approximately eighty-six (86) of the proposed WOTUS crossings within the Fort Worth District and forty-three (43) of the proposed WOTUS crossings within the Galveston District require pre-construction notification and review under NWP 12 and General Condition 18 related to endangered species. The Corps proposed "verifications" of the pipeline pursuant to NWP 12 and General Condition 18 to authorize discharges of dredge or fill material into these WOTUS.

61.     Specifically the Corps proposed Project Numbers SWF-2018-00227 (Fort Worth District verification) and SWG-2018-00737 (Galveston District verification), for the PHP within the Corps Fort Worth and Galveston districts respectively. The Corps' Fort Worth and Galveston districts' requested formal ESA section 7 consultation with the Service on September 18, 2019, and September 24, 2019, respectively.

62.     On February 3, 2020 the Service issued a biological opinion for its review of the Corps' verifications for dredge and fill by the PHP, in accordance with section 7 of the ESA. This review was for effects on the federally endangered golden-cheeked warbler *(Setophaga [Dendroica] chrysoparia),* Houston toad *(Bufo houstonensis),* and the federally threatened Tobusch fishhook cactus *(Sclerocactus brevihamatus* ssp. *tobuschii).* The Service also provided its concurrence with the Corps' determination that the proposed action may affect, but is not likely to adversely affect, the Austin blind salamander *(Eurycea waterlooensis)* and Barton Springs salamander *(Eurycea sosorum).*

63.     The "Action Area" covered by the Service's biological opinion was defined as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. This included Project Workspaces, Analysis Area, USACE Action Area, and the Applicant Action Area.

64.     The Service defined the "USACE Action Area" as follows:

The USACE Action Area consists of those portions of the action area under the Corps regulatory control due to impacts to WOTUS, and are limited to those sections of the project where NWP 12 is required and NWP General Condition 18, Endangered Species, is triggered. Condition 18 is triggered in the USACE Action

Area where pipeline activities requiring Corps permitting may affect federally listed species. Therefore, the USACE Action Area is limited to those particular portions of the project where both NWP 12 authorization is required and Condition 18 is triggered as a result. In those locations defined as USACE Action Areas, the Corps' regulatory boundary distance is based either on the extent of the likely species effects in the Corps' Ft. Worth District and inflection distance in the Corps' Galveston District. Total acreage of USACE Action Area per Corps districts are: Fort Worth (1,204.3 acres), and Galveston (923.7 acres).

65.     After reviewing the status of the golden-cheeked warbler, Houston toad, and the

Tobusch fishhook cactus, the environmental baseline within the Action Area, the effects of the

proposed action, and cumulative effects, the Service's biological opinion was that the action, as

proposed, is not likely to jeopardize the continued existence of these species; and that no designated

critical habitat is located within the Action Area; therefore, none will be affected.

66.     Based on its "no-jeopardy" determination, and to comply with ESA Section 7(b)(4),

16 U.S.C. § 1536(b)(4)(i), the Service issued an "incidental take statement" to the Corps. This

incidental take statement is included in the same document as the February 3, 2020 biological

opinion. Included in the incidental take provisions for the "take" of the listed species, "reasonable

and prudent measures" that are "necessary or appropriate to minimize" the impact on the species;

and "terms and conditions" that the action agency must comply with to implement the reasonable

and prudent measures. 16 U.S.C. § 1536(b)(4)(i)(ii),(iv); 50 C.F.R. § 402.14(i)(1)(i)(ii), (iv).

67.     To obtain protection against any unlawful "taking" under Section 9 of the ESA, 16

U.S.C. § 1538, the Service required the Corps to incorporate the "terms and conditions" of the

incidental take statement into its verifications:

> The measures described below are nondiscretionary and must be implemented by the U.S. Army Corps of Engineers (Corps) and/or the Applicant (Permian Highway Pipeline, LLC.), as applicable. With respect to the USACE Action Area, the Corps must make the measures described below that are applicable to the USACE Action Area binding conditions of any authorization issued by the Corps to implement the project covered by this biological opinion.

68.     On February 13, 2020 the Corps issued its final verifications for Project Numbers SWF-2018-00227 (Fort Worth District verification) and SWG-2018-00737 (Galveston District verification). These constitute final agency actions under the APA 5 U.S.C. § 704.

69.     The Corps complied with the biological opinion and incorporated the terms and conditions into its final verifications.

70.     From the Corps' Fort Worth verification at page 2:

The terms and conditions of the [biological opinion] that are applicable to USACE Action Area(s) in the Fort Worth District are incorporated by reference in this permit. Failure to comply with the terms and conditions that are applicable to the USACE action area within the Fort Worth District would constitute non-compliance with your USACE permit.

71.     From the Corps' Galveston verification at page 2:

Your authorization under this Corps permit is conditional upon your implementing and abiding by all project elements identified in the enclosed FWS [biological opinion] that are subject to the USACE Action Area(s) and your compliance with all of the mandatory terms and conditions associated with incidental take of the attached FWS [biological opinion] pertaining to the USACE Action Area(s), which terms and conditions are incorporated by reference in this permit. Failure to comply with the terms and conditions that are applicable to the USACE action area within the Galveston District would constitute non-compliance with your USACE permit.

72.     The Service's "terms and conditions" referred to in the verifications include numerous measures that will have environmental impacts, to Corps jurisdictional waters and to the USACE Action Area, in addition to their effects on the endangered species. The terms and conditions include incorporation of "all" conservation measures described within the PHP's biological assessment dated August, 2019 and the biological opinion. The "conservation measures" in the biological opinion incorporated into the terms and conditions include herbicide and pesticide application measures, oil spill prevention and response measures, an inadvertent return mitigation plan for horizontal directional drilling, and environmental awareness training. In addition, the biological opinion's conservation measures include extensive "void mitigation" measures to protect against impacts to the Edwards aquifer (and the two species of endangered salamanders), and

provides that construction vehicles may cross waters, provides for bypass pumping and culverts and other measures applicable to water crossings. These measures are all incorporated into the Corps verifications.

73.     Additionally, the "conservation measures" in the August, 2019 biological assessment submitted by the Corps to the Service, include for the golden warbler: the applicant purchasing 1,363 acres for the warbler and transferring this to the Service; avoiding construction activities in the warbler habitat 3/1-7/31 but allowing construction activities adjacent to it; and Oak wilt prevention measures such as not cutting oak trees from February-June. It also involves fencing and monitoring for the Houston toad and collection and translocation of the Tobusch fishhook cactus before construction. These measures are all incorporated into the Corps verifications.

74.     The Corps did not prepare any NEPA analysis, whether an environmental impact statement or environmental assessment, for its implementation of the terms and conditions through their incorporation into the verifications.

75.     The permittee Permian Highway Pipeline LLC has begun construction of the PHP and dredge and fill under NWP's self-certification process or the Corps' issued verifications or both. Its actions are having or will have an adverse environmental impact on the jurisdictional waters and the USACE Action Area; and these actions constitute a commitment of resources that may limit the Corps' choice of reasonable alternatives. *See* 40 C.F.R. § 1506.1.

76.     The Corps' action or failure to act is permitting environmental impacts on jurisdictional waters and USACE Action Areas. These impacts include but are not limited to trench cut crossings, installing a 42-inch diameter pipeline below the ground, with attendant clearing of trees and vegetation, removing topsoil, filling wetlands, clearing and maintaining the right-of-way, diverting waters, dumping trench materials into them, and horizontal directional drilling activities and discharges. These activities impact soils and sediments, surface water and groundwater,

wetlands, vegetation, wildlife, fisheries, land use, recreation, visual areas, air quality and noise, and risks from spills from equipment and cumulative impacts.

## CLAIMS FOR RELIEF

### CLAIM I

**Because the Corps' Reissuance of NWP 12 Violated the Endangered Species Act and Applicable Regulations, and was arbitrary and capricious contrary to the Administrative Procedure Act,  the Corps' use of NWP 12 for the PHP is Arbitrary, Capricious, and Unlawful.**

77.     Plaintiffs allege each and every allegation contained in the preceding paragraphs.

78.     The PHP's discharge of dredge and fill materials into WOTUS are proceeding under NWP 12.

79.     The Corps has an ongoing duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

80.     The Corps' 2019 reissuance of NWP 12 was an agency action that "may affect" listed species, and therefore the Corps was required to undertake programmatic ESA section 7 consultation to ensure that activities authorized and undertaken pursuant to NWP 12 will not result in cumulative adverse impacts that would jeopardize the continued existence of listed species or result in adverse modification of designated critical habitat. *Id.*

81.     The Corps' finding that NWP 12 will have "no effect" on endangered and threatened species, and its subsequent failure to consult with the FWS and NMFS on NWP 12, were contrary to Section 7 of the ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations; and were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2).

22

82.     Because they were issued in reliance on the Corps' NWP 12, which unlawfully failed to evaluate the nationwide impacts on endangered species, the Corps' actual or tacit approval of the PHP's crossings of jurisdictional waters and its February 13, 2020 verifications issued to Permian Highway Pipeline LLC for the dredge and fill activities are arbitrary, capricious, and unlawful.

83.     In sum, the Corps' approval of NWP 12 and its application to the PHP are arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or limitations, or short of statutory right, without observance of procedure required by law, or otherwise not in accordance with law contrary to the APA, 5 U.S.C. § 706(2)(A), (C), (D), and constitute agency action unlawfully withheld or unreasonably delayed contrary to the APA, 5 U.S.C. §706(1).

## CLAIM II

**The Corps violated NEPA, Applicable Regulations, and the APA by Failing to Perform a NEPA Analysis for its Incorporation of the Service's Terms and Conditions into the Fort Worth Verification**

84.     Plaintiffs allege each and every allegation contained in the preceding paragraphs.

85.     When the Corps incorporates the terms and conditions of a biological opinion and incidental take statement into its NWP 12 verification or permit, as it did here, this constitutes a "major federal action" on which NEPA analysis is required. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18; *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d at 45-47. This NEPA analysis must be performed for the limited Corps' action verifying or permitting the water crossings and impacts on the jurisdictional waters as opposed to the entire pipeline, *id.*, accordingly Plaintiff seeks only that limited analysis in this claim.

86.     The Corps did not perform a NEPA analysis for the incorporation of terms and conditions of the PHP biological opinion and incidental take statement into the Fort Worth District's February 13, 2020 NWP 12 verification.

87.     The Corps' Fort Worth verification and its failure to perform the required NEPA analysis violate NEPA and the NEPA regulations and are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The Corps failure to perform the required NEPA analysis also constitutes agency action unlawfully withheld or unreasonably delayed contrary to the APA, 5 U.S.C. § 706(1).

## CLAIM III

### The Corps violated NEPA, Applicable Regulations, and the APA by Failing to Perform a NEPA Analysis for its Incorporation of the Service's Terms and Conditions into the Galveston Verification

88.     Plaintiffs allege each and every allegation contained in the preceding paragraphs.

89.     When the Corps incorporates the terms and conditions of a biological opinion and incidental take statement into its NWP 12 verification or permit, as it did here, this constitutes a "major federal action" on which NEPA analysis is required. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18; *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d at 45-47. This NEPA analysis must be performed for the limited Corps' action verifying or permitting the water crossings and impacts on the jurisdictional waters as opposed to the entire pipeline, *id.*, accordingly Plaintiff seeks only that limited analysis in this claim.

90.     The Corps did not perform a NEPA analysis for the incorporation of terms and conditions of the PHP biological opinion and incidental take statement into the Galveston District's February 13, 2020 NWP 12 verification.

91.     The Corps' Galveston verification and its failure to perform the required NEPA analysis violate NEPA and the NEPA regulations and are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The Corps failure to perform the required NEPA analysis also constitutes agency action unlawfully withheld or unreasonably delayed contrary to the APA, 5 U.S.C. § 706(1).

24

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this Court to find for Plaintiff and to enter a judgment:

a) Declaring, as set forth in the court's decision in *Northern Plains Resource Council v. U.S. Army Corps of Engineers*, 2020 WL 3638125 (D. Mont. May 11, 2020), that the Corps issued NWP 12 in violation of the Administrative Procedure Act, the Endangered Species Act, and applicable regulations;

b) Declaring the Corps' February 13, 2020 Fort Worth District Verification and Galveston District Verification pursuant to NWP 12, and its allowing PHP to use NWP 12 for PHP's other water crossings, were in violation of the Administrative Procedure Act, the Endangered Species Act, and NWP 12 and its terms and conditions and are invalid;

c) Declaring the Corps' February 13, 2020 Fort Worth District Verification and Galveston District Verification were issued in violation of NEPA, the NEPA regulations, and the APA; and setting aside or vacating the verifications pursuant to the APA, 5 U.S.C. § 706(2)(A);

d) Vacate all Corps verifications or other approvals of PHP under NWP 12;

e) Enjoining any PHP activities in jurisdictional waters or in the Corps' Action Areas;

f) Enjoining any PHP activities in reliance on NWP 12, the Corps' verifications, or the Services' incidental take statement, including any dredging, filling or other alterations of waters of the United States, unless and until Defendants fully comply with the CWA, NEPA, ESA, and the APA;

g) Awarding Plaintiff its attorneys' fees, expenses and costs; and

h) Providing for such other relief as the Court deems just and appropriate.

## RESPONSE TO ALLEGED AFIRMATIVE DEFENSES

Plaintiff denies the Corps' allegation that the Complaint fails to state a claim on which relief can be granted.

Plaintiff's claims are not moot because the Court may still order some degree of effectual relief.

Plaintiff's claims are not barred by laches.

Plaintiff has standing.

**DATED: September 18, 2020**     Respectfully submitted,

/s/ *Joshua D. Smith*
**MARY WHITTLE**
Texas Bar No. 24033336
**MARK GUERRERO**
Texas State Bar No. 24032377
**GUERRERO & WHITTLE, PLLC**
2630 Exposition Blvd., Ste. 102
Austin, Texas 78703
Telephone: (512) 605-2300
Fax: (512) 222-5280
mary@gwjustice.com
mark@gwjustice.com

**JOSHUA D. SMITH**
Ore. Bar No. 071757 (*pro hac vice*)
**SIERRA CLUB**
2101 Webster Street, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
Fax: (510) 208-3140
joshua.smith@sierraclub.org

**REBECCA L. MCCREARY**
Colo. Bar No. 54097 (*pro hac vice*)
**SIERRA CLUB**
1650 38th Street, Suite 102W
Boulder, Colorado 80301

Telephone: (303) 449-5595
Fax: (303) 449-6520
rebecca.mccreary@sierraclub.org

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 18th day of September, 2020, a true and correct copy of the foregoing document was filed and served using the electronic case filing system (ECF) pursuant to the electronic filing requirements of the United States District Court for the Western District of Texas.

_/s/ Joshua D. Smith_       
Joshua D. Smith